**APPEAL NUMBER: 2022-1822**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**LESLIE BOYER,**

     **Plaintiff-Appellant,**

**v.**

**UNITED STATES,**

     **Defendant-Appellee.**

**ON APPEAL FROM THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**
**BRIEF FOR PLAINTIFF-APPELLANT**

**Jon C. Goldfarb**
**L. William Smith**
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
The Kress Building
301 North 19th Street
Birmingham, Alabama 35203
(205) 314-0500
**Attorneys for Plaintiff-Appellant**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1822

**Short Case Caption** Boyer v. United States

**Filing Party/Entity** Leslie Boyer

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/06/2022

Signature: /s/ Jon C. Goldfarb

Name: Jon C. Goldfarb

FORM 9. Certificate of Interest

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Leslie Boyer, Plaintiff-Appellant | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| Christina M. Malmat | Wiggins Childs Pantazis Fisher & Goldfarb | |
| Lieselotte Carmen-Burks | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………...……………vii

STATEMENT OF RELATED CASES…………………………………….x

STATEMENT REGARDING ORAL ARGUMENT…………………….….xi

STATEMENT OF JURISDICTION…………………………………….....xii

STATEMENT OF THE ISSUES…………………………………………..1

STATEMENT OF THE CASE…………………………………………….2

   A. Summary of Proceedings…………………………………………...2

   B. Statement of Facts…………………………………………………..6

SUMMARY OF ARGUMENT…………………………………………...13

ARGUMENT……………………………………………………………...16

   I.     The Equal Pay Act Prescribes a Form of Strict Liability……………16

   II.    The Court Erred in Finding That Reliance on Prior Pay Alone Could Carry the Agency's Burden of Establishing an Affirmative Defense to EPA Liability……………………………………………………..17

   III.   The Court Erred in Focusing on Inapplicable Statutes and in Finding Non-Existent Conflicts Between Those Provisions and the Equal Pay Act……………………………………………………….…..22

       a.  The Applicable Statute Under Which Plaintiff Was Appointed Does Not Authorize the Use of Prior Pay in Setting Salary……..23

       b.  The Inapplicable Statutes Cited by the Trial Court Also Do Not Require Reliance on Prior Pay Alone in Setting Salary…………24

       c.  The Implementing Regulation for 5 U.S.C. § 5333 Allows Consideration of "Other Relevant Factors" Which May Include Pay Equity………………………………………………………..27

d.   The VA Handbook Directs Pay-Setting Authorities to Consider the Pay Rates of Current Personnel, Showing That the Agency Has the Ability to Comply with the EPA…………………………………30

e.   The Court Erred in Finding That the Agency May Rely on the VA Handbook as an "Other Factor Other than Sex," as the Agency Did Not Follow the Handbook Procedures…………………………...34

IV.   The Court Erred in Relying on a Purported "Admission" by Plaintiff to Relieve the Agency of Its Burden of Proving an Affirmative Defense…………………………………………………………35

V.   The Court Erred in Granting Defendant's Motion for Summary Judgment………………………………………………………39

VI.   The Court Erred in Denying Plaintiff's Motion for Summary Judgment………………………………………………………43

CONCLUSION AND RELIEF SOUGHT…………………………………..52

# TABLE OF AUTHORITIES

*Aldrich v. Randolph Cent. Sch. Dist.*,
963 F.2d 520, 525 (2d Cir. 1992)………………………………………..20

*Cf. Castro v. Sec'y of Homeland Sec.*,
472 F.3d 1334, 1337 (11th Cir. 2006)………………………………...27

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10, 18 (1993)………………………………………………..27

*Conyers v. MSPB*,
388 F.3d 1380, 1382 (Fed. Cir. 2004)………………………………...27

*Cooke v. United States*,
85 Fed. Cl. 325, 342 (2008)…………………………………………..18

*Cooper v. Meridian Yachts, Ltd.*,
575 F.3d 1151, 1178 (11th Cir. 2009)…………………………....…36

*Corning Glass Works v. Brennan*,
417 U.S. 188, 195, 196, 205, 208 (1974)………………………16-19, 37, 44

*Drum v. Leeson Elec. Corp.*,
565 F.3d 1071, 1073 (8th Cir. 2009)…………………………………..48

*EEOC v. J.C. Penney Co., Inc.*,
843 F.2d 249, 253 (6th Cir. 1988)……………………………………..20

*EEOC v. Md. Ins. Admin.*,
879 F.3d 114, 121 (4th Cir.2018)……………………………………..44

*Glenn v. Gen. Motors Corp.*,
841 F.2d 1567, 1570-71 (11th Cir. 1988)………………………………20-21

*Gordon v. United States*,
903 F.3d 1248, 1254 (Fed. Cir. 2018)……………………………18, 35-36

*Hill v. Federal Trade Comm'n*,
124 F.2d 104, 106 (5th Cir. 1941)…………………………………….36

*Irby v. Bittick*,
    44 F.3d 949, 954-55 (11th Cir. 1995)…………………………………2, 22, 39

*Kansas v. Garcia*,
    140 S. Ct. 791, 806 (2020)…………………………………………………26

*Ledbetter v. Goodyear Tire & Rubber Co.*,
    550 U.S. 618, 640 (2007)……………………………………………19, 37

*Mickelson v. N.Y. Life Ins. Co.*,
    460 F.3d 1304, 1312 (10th Cir. 2006)…………………………………….38, 44

*Miranda v. B & B Cash Grocery Store, Inc.*,
    975 F.2d 1518, 1533 (11th Cir. 1992)…………………………………….18, 37

*Mitchell v. Jefferson County Bd. of Educ.*,
    936 F.2d 539 (11th Cir.1991)……………………………………………18

*Moorehead v. United States*,
    88 Fed. Cl. 614, 619 (2009)……………………………………………..44

*Riser v. QEP Energy*,
    776 F.3d 1191, 1198-99 (10th Cir. 2015)……………………..…20, 22

*Rizo v. Yovino*,
    950 F.3d 1217, 1219, 1222-24, 1227-29 (9th Cir. 2020)……....19, 22, 24, 44

*Stanziale v. Jargowsky*,
    200 F.3d 101, 107-08 (3d Cir. 2000)………………………………….44

*Turnes v. Amsouth Bank, N.A.*,
    36 F.3d 1057, 1061 (11th Cir. 1994)…………………………………….44

*Yant v. United States*,
    588 F.3d 1369, 1372 (Fed. Cir. 2009)………………………16, 18, 35-37, 51

## STATUTES & OTHER:

5 C.F.R § 531.212(b)…………………………………………………………..28-31

5 U.S.C. § 5333……………………………………………………………..5, 23-30

29 U.S.C. § 206(d)(1)………………………………………….13, 16,-19, 20, 37

38 U.S.C. § 7401………………………………………………………...25, 31

38 U.S.C. § 7401(3)…………………………………………...5, 13, 23, 29-30

38 U.S.C §7408……………………………………………………23-25, 30

Equal Pay Act……………………………………...1-5, 13-14, 16-27, 30, 32-38, 44

Title VII…………………………………………………………..19-20

Tucker Act……………………………………………………………….2

# STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, Counsel for Plaintiff-Appellant is unaware of any related matters currently pending before it.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant believes that oral argument will be necessary for full consideration of the parties' arguments on appeal.

## **STATEMENT OF JURSDICTION**

This Court has jurisdiction pursuant to 28 U.S.C § 1295(3), as Plaintiff appeals from a final order granting summary judgment in the Court of Federal Claims.

# STATEMENT OF THE ISSUES

As the trial court acknowledged, this case turns on a question of law: once a plaintiff has established a prima facie case under the Equal Pay Act, is an agency's reliance on prior salary alone sufficient to carry its burden of establishing as an affirmative defense that the pay differential between the plaintiff and her comparator is justified by an "other factor other than sex," where the relevant statutory and regulatory scheme does not require the Agency to rely on prior salary alone?

# STATEMENT OF THE CASE

## A. Summary of Proceedings.

In this case, originally filed in the Northern District of Alabama, Plaintiff Leslie Boyer brings a single claim for pay discrimination in violation of the Equal Pay Act. (Appx37). Prior to transfer, the government filed a motion for summary judgment in the Northern District of Alabama. (Appx38). In support of its motion, the government attached the Record of Investigation from the agency EEO proceedings. (Appx38). Plaintiff responded and filed a summary judgment motion of her own. (Appx39).

After considering the entire record, including most of the materials relied on by the parties in the Court of Federal Claims, the court in the Northern District of Alabama granted summary judgment to Plaintiff. (Appx45). Citing *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995), the Court found that "the record establishes that prior salary alone was the reason for Boyer and [her comparator's] salaries and 'such a justification cannot solely carry the affirmative defense.'" (Appx54).

Following the grant of summary judgment to Plaintiff, the government moved to dismiss the case, this time arguing that the Northern District of Alabama lacked subject-matter jurisdiction under the Tucker Act. (Appx40). In response, Plaintiff conceded lack of jurisdiction and moved for transfer to the Court of Federal Claims. (Appx40-41). In its answer in the Court of Federal Claims, the government conceded

that Plaintiff had established a prima facie case of discrimination: "As an initial matter, in our answer, we agreed that Ms. Boyer established a prima facie case under the Equal Pay Act (EPA), 29 U.S.C. §§ 201, 203(e)(2)." (Appx406).

The parties engaged in written discovery in the Court of Federal Claims and, relying on the witness depositions and documents contained in the federal Record of Investigation, again filed cross-motions for summary judgment. (Appx42).

In evaluating the parties' cross motions, the trial court correctly recognized that Plaintiff had established a prima facie case under the Equal Pay Act: "The government, in cross-moving for summary judgment, concedes Plaintiff has established a prima facie case under the EPA…" (Appx1). The trial court disagreed, however, with the conclusions of the Northern District of Alabama trial court (which found "no evidence" that other factors "were even considered", *see* Appx55-56) and denied summary judgment to Plaintiff on the grounds that "a reasonable factfinder could conclude that other factors were considered and incorporated into the pay differential." (Appx26). Conversely, in considering the government's motion for summary judgment, the trial court correctly found that "a reasonable factfinder viewing the facts in the light most favorable to Plaintiff could conclude that existing or prior pay *alone* explains the salary differential." (Appx27).

Proceeding to evaluate the government's claimed affirmative defense, the trial court recognized a Circuit split on the question of whether a pay disparity may be

justified by reference to prior salary alone: "To summarize, the circuits are split between prior salary alone being an acceptable factor other than sex (Fourth and Seventh), prior salary being an acceptable factor when combined with other factors (Eighth, Tenth, and Eleventh), and prior salary never being an acceptable factor to consider (Ninth)." (Appx21). The trial court further correctly recognized that "the Federal Circuit has not yet clearly spoken on the issue." (Appx20).

In granting the government's motion for summary judgment, the trial court reasoned that "Plaintiff has only alleged such rates were determined based on existing or prior pay alone" and that "in the context of setting federal employee pay, this method qualifies as a factor other than sex under the EPA." (Appx27). The trial court reasoned that "[t]aken together or separately, the federal statutory and regulatory scheme and Plaintiff's admission regarding her prior salary demonstrate why, in this case, existing or prior pay alone qualifies as an affirmative defense under the EPA." (Appx28).

As to the alleged "admission" regarding Plaintiff's prior salary, the trial court reasoned as follows:

> the undisputed facts of this case demonstrate why Plaintiff's prior salary was set at the level it was: Plaintiff explained that her North Alabama Regional Hospital employment "had a lower salary . . . because there were a lot of benefits and perks that no one else offers in Pharmacy." For example, Plaintiff "could get off work any time [she] wanted to," "accrued like three days of comp time every month," and "was able to spend – do things with [her] family a lot easier than [she could] at and [sic] other job."

4

(Appx34-35) (cites omitted). The court reasoned that this testimony constitutes "an admission by Plaintiff that her prior salary was lower because of 'benefits and perks,' not gender discrimination." (Appx35).

As to the "federal statutory and regulatory scheme," the trial court reasoned that although Plaintiff and her comparator were both hired pursuant to 38 U.S.C. § 7401(3), a different statute, 5 U.S.C. § 5333, was "nonetheless relevant to the application of the EPA in this case" because in the trial court's view, it constitutes "conclusive evidence that, at least for federal employees, Congress considers existing or prior pay alone to be a factor other than sex." (Appx2, Appx33). The trial court believed that "one would have to find that the EPA and the language regarding existing pay in § 5333 are in conflict with one another to hold that the EPA prohibits the use of existing pay alone in determining GS employee wages." (Appx29). The trial court reasoned that "the VA Handbook, consistent with both § 5333 and the OPM regulation, expressly permits the use of a 'candidate's existing pay or recent salary history, competing job offer(s), higher or unique qualifications, or special needs of VA' in setting initial pay rates" and that "the disjunctive 'or' in the VA Handbook specifically permits use of existing pay or recent salary history alone without consideration of other factors in determining a VA employee's pay rate." (Appx33). Pursuant to this reasoning, the trail court granted summary judgment for the government, concluding that "Congress granted agencies the authority to depart

upwardly from the minimum rate of pay for new federal employees hired under title 5, including some VA employees, and certain other VA employees under title 38 based on existing or prior pay alone." (Appx36).

## B. <u>Statement of Facts.</u>

Plaintiff received her Doctorate in Pharmacy in 1999 from Auburn University. (Appx122). Plaintiff has continuously worked as a pharmacist since 1999, and as a pharmacy manager from 2007 until the date of her hire at GS-12 Step 7 in July 2015. (*Id.*). She worked as a staff pharmacist at Payless Pharmacy from 1999-2000, Rite-Aid Pharmacy from 2000-2002, Huntsville Hospital from 2002-2005, and Walgreens Pharmacy from 2005-2007. (*Id.*) In 2007, Plaintiff accepted a position as a pharmacy manager at Kroger Pharmacy. (*Id.*). In 2011, Plaintiff accepted a job at the North Alabama Regional Hospital while continuing to work at Kroger as needed. (*Id.*)

Plaintiff's comparator received his Doctorate in Pharmacy in 2006, seven years after Plaintiff. (Appx191). The comparator worked as a pharmacy manager at Rite-Aid from 2006-2012, Kroger from 2012-2015, and Central North Alabama Health Services from 2015 until the date of his hire in January 2016. (*Id.*).

The pay of VA pharmacists is set by the "VISN 7 Pharmacy Professional Standards Board" ("the Board") for the VA Southeast Network, which "acts on behalf of the Undersecretary for Health for VISN 7 matters that require actions by a

Professional Standards Board for Pharmacists." (Appx366). The responsibilities of the Board include "determining eligibility for employment and grade qualifications for GS-14 level positions or lower grades where a local Board cannot be convened." (*Id.*).

The VA's hiring practices are governed by VA Handbook 5005, Appendix G15, Licensed Pharmacist Qualification Standard, entered into the record at page 211 of the Investigative Report for this case. (Appx368). The requirements for GS-12 are set forth on page 213 of the Investigative Report. (Appx370). There is no dispute that Plaintiff and her comparator both meet the requirements for the GS-12 clinical pharmacist position.

Monica Sfakianos, Associate Chief of Pharmacy Operations for the VA, was the selecting official in this case. (Appx255, 258). Sfakianos reviewed the rates of pay for Plaintiff and her comparator, L.C., at hire. (Appx258). Sfakianos also "prepared the recommendation memo" to the Pharmacy Professional Standards Board for each candidate. (*Id.*).

The Board that approved Plaintiff's salary consisted of Kendra Brookshire, Lisa Ambrose, and Jeneseter Crocton, (Appx81-82, Defendant's Discovery Responses, Resp. to Rog. 1.). The same Board members also approved L.C.'s salary, except that Albert M. McGuffey sat in place of Crocton. (Appx82-83, Defendant's Discovery Responses, Resp. to Rog. 2). William F. Harper, the Acting Medical

Center Director, was the approving authority when Plaintiff's salary was set, and Thomas C. Smith, the Medical Center Director, was the approving authority when L.C.'s salary was set. (Appx81-84).

Sfakianos, who made the pay recommendation for Plaintiff to the Board and provided the information to justify that recommendation, testified, "Each Pharmacist there was boarded based on their current salary. We requested that they submit current pay stubs so that we could match. Otherwise, they would have been brought in much lower steps. And the salary is the easiest way to justify. So we did have pay stubs for each of those employees. We looked – or I looked at the current pay scale at that time versus that person's current salary and most closely matched that salary as I could on the step level from one to ten." (Appx258-259).

Sfakianos submitted the following memo to the Board recommending that Plaintiff be hired at GS-12, Step 7:

> 1. The following candidate, Leslie Boyer, has been selected as a Clinical Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center. She has met all the requirements to be considered for initial appointment. I recommend her initial appointment as a GS-12, Step 7, which is above the minimum rate of grade (GS-12, Step 1). This board action is recommended for initial appointment and applies to the Licensed Pharmacist Qualifications Standards in accordance with the provisions of VA Handbook 5005/55, Part II, Appendix G15.
>
> 2. BVAMC will benefit greatly from the addition of Dr. Boyer to our staff. She brings a wealth of experience through her fifteen years of pharmacy practice. She has extensive experience with direct patient care in both retail and institutional settings. She also has advanced clinical skills with medication monitoring and making medication recommendations based on

clinical efficacy while maintain an annual budget. She most recently has worked directly as a lead pharmacist in a mental health institution. This will be of great benefit in dealing with this growing population of our veterans. She also has experience with and coordinated Joint Commission surveys within pharmacy services.

3. The recommendation of a GS-12, Step 7 is requested to secure highly qualified candidate. GS-12, step 7 is recommended to remain competitive and meet current documented salary. In addition, candidate received a very positive reference from former employers. The enclosed board action is submitted for review and recommendation.

[ . . .]

(Appx129).

Sfakianos submitted a similar memo to the Board recommending that L.C. be hired at GS-12, Step 10:

1. The fallowing candidate, [L.C.], has been selected as a Clinical Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center. He has met all the requirements to be considered for Initial appointment. I recommend his initial appointment as a GS-12, Step 10, which is above the minimum rate of grade (GS-12, Step 1). This board action is recommended for initial appointment and applies to the Licensed Pharmacist Qualifications Standards in accordance with the provisions of VA Handbook 5005/55, Part II, Appendix G15.

2. BVAMC will benefit greatly from the addition of Dr. [L.C.] to our staff. He brings a wealth of experience with many years of pharmacy practice. He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration.

3. The recommendation of a GS-12, Step 10 is requested to secure highly qualified candidate. GS-12, step 10 is recommended to remain competitive and more closely meet current documented salary. In addition, candidate received a very positive reference from former employers. The enclosed board action is submitted for review and recommendation. […]

(Appx193).

Sfakianos testified, "...I boarded everybody exactly the same without regards to anything special other than their current pay stubs." (Appx260). (emphasis added).

Kendra Brookshire, who was the Chair of the three-member Boards that recommended L.C. be hired at Step 10 and Plaintiff at Step 7, testified, "So we look at their education, training, and qualifying experience and kind of go that route. But at the end of the day pay stubs can basically trump what would be determined by the qualifying experience." (Appx279) (emphasis added). Brookshire continued, "...it could be that you know they're presented with you know this could be your salary, and they're like oh I can't come for that. You know, and then you know they may be asked to provide pay stubs. But at any rate, if their pay stubs would justify a higher salary then really that experience – relevant experience kind of just goes by the wayside." (Appx281) (emphasis added).

Lisa Ambrose, who also served as a member of both Boards, testified, "I do know that we've had Pharmacists with the same exact credentials if you just looked at their education and experience. But then if you look at their pay stubs of where they're coming from it can make a huge difference. It can make the difference between a step three and a step ten just based on what they're currently being paid. That's the biggest factor that we always took into consideration. We don't want to shortchange people who are coming and taking pay cuts to come here." (Appx271).

The Board, retaining two of the three members (Brookshire and Ambrose) in common for each decision, accepted Sfakianos's recommendations to hire Plaintiff at Step 7 and L.C. at Step 10. (Appx126-129; Appx193; Appx390-392).

The memo attached to the Board Approval for Plaintiff to be hired at GS-12 Step 7 copies much of its language from Sfakianos's memo (Appx129) recommending that Plaintiff be hired at Step 7, stating, "Dr. Boyer brings over fifteen years of pharmacy practice. She has extensive experience with direct patient care in both retail and institutional settings. She also has advanced clinical skills with medication monitoring and making medication recommendations based on clinical efficacy while maintain [sic] an annual budget. She has extensive experience with pharmaceutical needs of mental health patients which will be a benefit in dealing with this growing population of our veterans. She also has experience with and coordinated Joint Commission surveys within pharmacy services. Due to Dr. Boyer's pharmaceutical skills, education and current salary, the board recommends a GS-12 Step 7 to secure this highly qualified candidate." (Appx128).

The memo attached to the Board Approval for L.C. to be hired at GS-12 Step 10 also copies much of its language from Sfakianos's recommendation (Appx193) that L.C. be hired at that step, stating as follows:

> 1. BVAMC will benefit greatly from the addition of Dr. [L.C.] to our staff. He brings a wealth of experience with many years of pharmacy practice. He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and

pharmacy administration. Dr. [L.C.]'s experience will be valuable in treating veterans in the Huntsville CBOC as a new expanded clinic where a hybrid model will be utilized between dispensing functions and direct patient care.

2. The recommendation of a GS-12, Step 10 is requested to remain competitive and more closely meet current documented salary of this highly qualified candidate. In addition, candidate received a very positive reference from former employers. The enclosed board action is submitted for approval and recommendation. […]

3. Securing Dr. [L.C.] will benefit BVAMC in that adequate staffing is needed to be to open the dispensing pharmacy at the Huntsville clinic.

(Appx392).

The pay recommendations of Sfakianos and the Board were accepted by the approving authority, and the starting salary for L.C. at Step 10 was $124,980, while Plaintiff's starting salary at Step 7 was $115,364, resulting in a pay disparity that continues to this day. (Appx365).

## SUMMARY OF ARGUMENT.

This Court should join the majority of Circuits and hold that reliance on prior salary <u>alone</u> is insufficient to establish an affirmative defense under 29 U.S.C. § 206(d)(1). The Court should further find that there is no inherent conflict between the Equal Pay Act's prohibition on relying solely on a male comparator's prior salary to justify a pay disparity and the federal government's statutory and regulatory scheme for setting pay for new hires. 38 U.S.C § 7401(3), the statute under which Plaintiff was hired, does not authorize reliance on prior pay. To the contrary, the VA Handbook section applying 38 U.S.C § 7401(3) recognizes that the Agency "should consider such things as the number of on-duty personnel in the category under consideration and their pay rates" along with "possible employee … relations problems which may result … and alternatives to using this authority" to avoid creating pay inequities. (Appx79). The Agency thus is required to exercise discretion in considering prior pay in setting pay for new hires; such discretion includes considering whether such use would give rise to a violation of the Equal Pay Act.

In this case, unlike other Equal Pay Act cases in the Federal Circuit, Plaintiff was relieved of the burden of showing that the pay differential between her and her comparator was "historically or presently based on sex." This is because the Agency admitted Plaintiff established a prima facie case. The question, therefore, is whether Defendant can meet its burden of establishing, as an affirmative defense, that it relied

on any <u>job-related</u> "other factor other than sex" in paying Plaintiff's comparator a higher starting salary than it paid Plaintiff. Monica Sfakianos, who wrote the memos on which the Board relied in setting the salaries of Plaintiff and her comparator, testified unequivocally, "…I boarded everybody exactly the same without regards to anything special other than their current pay stubs." Consistent with Ms. Sfakianos's testimony, the Agency failed to produce any evidence that it relied on any factor other than prior salary alone in its decision to pay Plaintiff's comparator more.

Because the Agency failed to consider "such things as the number of on-duty personnel in the category under consideration and their pay rates…" and the "possible employee … relations problems" from creating a pay disparity cognizable under the EPA prior to exercising its pay-setting authority, the trial court erred in finding that the Agency's purported reliance on the VA Handbook establishes an affirmative defense under the EPA. In fact, the Agency did not follow its own Handbook's guidance. The court further erred in failing to recognize that the Handbook requires that prior to using existing pay, the Agency must consider how to avoid creating pay disparities that would violate the EPA, further showing that there is no inherent conflict between the federal employee pay-setting statutes, the VA Handbook, and the EPA. In accordance with these arguments, this Court should reverse the trial court's order granting summary judgment to the Agency and enter judgment for Plaintiff. Alternatively, to the extent that the Court believes there are

material issues as to whether the Agency relied on any factor other than prior pay in the decision to pay Plaintiff's comparator a higher salary, the Court should remand the case for trial.

## ARGUMENT

### I.     The Equal Pay Act Prescribes a Form of Strict Liability.

The Equal Pay Act states,

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such  payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . .

29 U.S.C. § 206(d)(1). "The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve." *Yant v. United States*, 588 F.3d 1369, 1372 (Fed. Cir. 2009) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 208 (1974)). To establish a prima facie case of wage discrimination under the Equal Pay Act, plaintiffs "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id.* (quoting 29 U.S.C. § 206(d)(1); *Corning Glass*, 417 U.S. at 195). "Once plaintiffs have carried their burden, 'the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions.' Specifically, the employer can avoid liability by proving that payment to employees of the opposite

sex 'is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Id.* (quoting 29 U.S.C. § 206(d)(1); *Corning Glass*, 417 U.S. at 196).

## II.    The Court Erred in Finding That Reliance on Prior Pay Alone Could Carry the Agency's Burden of Establishing an Affirmative Defense to EPA Liability.

The majority of Circuits have concluded that reliance on prior pay alone is insufficient to carry an employer's burden of showing that an "other factor other than sex" justifies an otherwise cognizable pay disparity between similarly situated male and female employees. Nevertheless, the trial court reasoned that "[t]aken together or separately, the federal statutory and regulatory scheme […] demonstrate why, in this case, existing or prior pay alone qualifies as an affirmative defense under the EPA." (Appx28). In finding that the Agency could carry its affirmative defense solely by reference to Plaintiff's comparator's higher prior pay, the district court erred. The court should have followed the majority of Circuits that have held that reliance on a comparator's prior pay alone is insufficient to carry a Defendant's burden of establishing the affirmative defense to liability under the EPA.

The Agency judicially admitted that Plaintiff has established a prima facie case under the EPA: "As an initial matter, in our answer, we agreed that Ms. Boyer established a prima facie case under the Equal Pay Act (EPA)." (Appx406). This not

only means that the Agency conceded that Plaintiff and her comparator perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Yant*, 588 F.3d at 1372 (Fed. Cir. 2009); *Corning Glass Works*, 417 U.S. at 195, 208; 29 U.S.C. § 206(d)(1). In this Circuit, Defendant's concession that Plaintiff has established a prima facie case also means that Plaintiff is relieved of any burden she might otherwise have had of proving that "the pay differential between the similarly situated employees is 'historically or presently based on sex.'" *See* Appx2 fn 2; *Gordon v. United States*, 903 F.3d 1248, 1254 (Fed. Cir. 2018) (quoting *Yant v. United States*, 588 F.3d 1369, 1372 (Fed. Cir. 2009)), vacated following joint stipulation of voluntary dismissal, 754 F. App'x 1007 (Fed. Cir. 2019)).

Because "[t]he Equal Pay Act prescribes a form of strict liability," once the Plaintiff has established a prima facie case, as Ms. Boyer has done here, "the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (citing *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539 (11th Cir.1991)) (emphasis added).

The burden on an employer to establish an affirmative defense is "a heavy one." *Cooke v. United States*, 85 Fed. Cl. 325, 342 (2008) (cites omitted). The

employer "must prove that the gender-neutral factor it identified is actually the factor causing the wage differential in question." *Id.* (cites omitted). In other words, to counter a prima facie case, an employer must prove "not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Rizo v. Yovino*, 950 F.3d 1217, 1222 (9th Cir. 2020) (cites omitted).

The question of whether an employer may point to "market forces" as an "other factor other than sex" under 29 U.S.C. § 206(d)(1) has been at issue since the earliest days of the Equal Pay Act. In *Corning Glass v. Brennan*, a 1974 case before the U.S. Supreme Court, the employer attempted to justify a wage differential by claiming that it paid women less than men because women were willing to work for less. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 205 (1974). The Supreme Court in *Corning Glass* cautioned against relying on prior salary to justify pay differentials in the context of the Equal Pay Act, and in the years since, most federal courts that consider this issue have likewise closely scrutinized such reliance. *Id.*

In *Rizo v. Yovino*, the most recent Circuit Court decision to analyze the question of whether prior salary can justify a wage differential under the EPA, the Ninth Circuit, sitting *en banc*, focused closely on the statutory text. 950 F.3d at 1219. The Ninth Circuit began its analysis by observing that "[u]nlike Title VII, the EPA does not require proof of discriminatory intent." *Id.* at 1223 (*quoting Ledbetter v.*

*Goodyear Tire & Rubber Co.*,, 550 U.S. 618,640 (2007) for the proposition that "the EPA and Title VII are not the same," in part because "the EPA does not require . . . proof of intentional discrimination"). The Ninth Circuit observed that once a prima facie case of liability is established, the employer may put forth one or more of the four enumerated statutory defenses codified at 29 U.S.C. § 206(d)(1), including "(iv) a differential based on any other factor other than sex." *Id.* at 1222 (quoting 29 U.S.C. § 206(d)). Rejecting the employer's argument "that the fourth exception allows any factor that is not sex itself to serve as an affirmative defense," the Ninth Circuit joined the Second, Fourth, Sixth, Eighth, Tenth, and Eleventh Circuits in holding that "the scope of the fourth exception is limited." *Id.* at 1123-24; citing *Riser v. QEP Energy*, 776 F.3d 1191, 1198 (10th Cir. 2015); *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 525 (2d Cir. 1992) (requiring that reason be "business-related"); *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1570-71 (11th Cir. 1988); *EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir. 1988) ("[T]he 'factor other than sex' defense does not include literally *any* other factor . . ."). Based on the principle of *ejusdem generis*, the Ninth Circuit reasoned that "[b]ecause the three enumerated exceptions are all job-related, and the elements of the 'equal work' principle are job-related, Congress' use of the phrase 'any *other* factor other than sex' (emphasis added) signals that the fourth exception is also limited to job-related factors." *Id.* at 1124. The *en banc* court observed that this result was in line with the

"significant majority of the circuit courts" which "agree that the scope of the EPA's fourth exception is not unlimited," and that the majority of courts to consider the question have agreed that "the text of the Act and canons of construction, and the EPA's history and clear purpose, all point to the conclusion that the fourth exception is limited to job-related factors only." *Id* at 1227. The Ninth Circuit ultimately concluded that "[b]ecause prior pay may carry with it the effects of sex-based pay discrimination … the wage associated with an employee's prior job does not qualify as a factor other than sex that can defeat a prima facie EPA claim." *Id.* at 1229.

The court further observed that "the EPA does not prevent employers from considering prior pay for other purposes. For example, it is not unusual for employers and prospective employees to discuss prior pay in the course of negotiating job offers, and the EPA does not prohibit this practice." *Id*. at 1231. The court further emphasized "the difference between considering prior pay when setting a salary—which the EPA does not address, much less prohibit—and relying on prior pay to defend an EPA violation." *Id.*

This civil action was originally filed in the Eleventh Circuit, one of the jurisdictions that has consistently rejected "market force" justifications for gender wage differentials, while allowing consideration of prior salary in some circumstances under the "other factor other than sex" defense. *See generally Glenn v. General Motors Corp.*, 841 F.2d 1567, 1570-71 (11th Cir. 1988) (rejecting

affirmative defense that company hired women at lower salaries, and maintained those salaries through transfers, because women would accept less). In *Irby v. Bittick*, the Eleventh Circuit discussed the prohibition on relying solely on prior salary to establish an affirmative defense to EPA liability and concluded that "[w]hile an employer may not overcome the burden of proof on the affirmative defense of relying on 'any other factor other than sex' by resting on prior pay alone, as the district court correctly found, there is no prohibition on utilizing prior pay as part of a mixed motive, such as prior pay and more experience." 44 F.3d 949, 955 (11th Cir. 1995). Like the Eleventh Circuit, the Tenth Circuit has charted a middle road in holding that the EPA "precludes an employer from relying solely upon a prior salary to justify pay disparity." *Riser*, 776 F.3d at 1199 (10th Cir. 2015).

The Court need not follow *Rizo* and hold that prior salary may not be a component of the affirmative defense. Rather, this Court could adopt the more moderate reasoning of the Tenth and Eleventh Circuits and hold that reliance on prior pay <u>alone</u> is insufficient to carry a defendant's burden of establishing the affirmative defense. The reasoning of the Tenth and Eleventh Circuits mandates reversal in this matter even if the Court disagrees with the ultimate holding of *Rizo*.

**III.** **The Court Erred in Focusing on Inapplicable Statutes and in Finding Non-Existent Conflicts Between Those Provisions and the Equal Pay Act.**

In concluding that "the federal statutory and regulatory scheme …
demonstrate[s] why, in this case, existing or prior pay alone qualifies as an
affirmative defense under the EPA," the district court erred because it focused its
analysis on 5 U.S.C § 5333, despite acknowledging that Plaintiff and her comparator
were hired pursuant to a different statute, 38 U.S.C § 7401(3). Contrary to the trial
court's reasoning, the court would not "have to find that the EPA and the language
regarding existing pay in sec 5333 are in conflict with one another…" if it had
concluded that a defendant may not justify a pay disparity otherwise cognizable
under the EPA solely by reference to the comparator's prior pay. This is because, as
the court recognized, § 5333 "does not directly apply to the appointment of VA
pharmacists." (Appx33).

### a. __The Applicable Statute Under Which Plaintiff Was Appointed Does Not Authorize the Use of Prior Pay in Setting Salary.__

38 U.S.C § 7401(3), the statute under which Plaintiff was appointed, states:
"There may be appointed by the Secretary such personnel as the Secretary may find
necessary for the health care of veterans … as follows … (3) … pharmacists…"

38 U.S.C § 7401(3) does not affirmatively authorize the consideration of prior
pay in setting the initial pay rate of employees such as pharmacists. The district court
therefore erred in basing its reasoning on the alleged conflict between the EPA and
§5 U.S.C. § 5333 / 38 U.S.C § 7408. Instead, the district court should have focused
on 38 U.S.C § 7401(3). As discussed below, the district court also erred in finding

an inherent conflict between the two statutes it did consider and the EPA's prohibition on establishing an affirmative defense to a pay disparity by reference to prior pay alone.

### b. <u>The Inapplicable Statutes Cited by the Trial Court Also Do Not Require Reliance on Prior Pay Alone in Setting Salary.</u>

To the extent 5 U.S.C § 5333 and similar statutes are relevant, the trial court erred in finding that a conflict would be inherent between these statutes and the EPA. Rather, as is often the case with overlapping regulatory schemes, the Agency, acting pursuant to a permissive statute, has the flexibility to constrain the scope of its decision by reference to a restrictive statute legislating in an overlapping area. The Agency is not prohibited from "considering prior pay when setting a salary—which the EPA does not address, much less prohibit." *Rizo*, 950 F.3d at 1231. Finding that the Agency violated the EPA in this instance therefore would not "read … off the books" an existing regulatory scheme, as the trial court erroneously believed. Rather, the Agency would remain free to consider all the factors set forth in the statutes and regulations, including considering prior pay, while also ensuring that its pay setting decisions do not give rise to pay disparities between similarly situated male and female employees that are differentiated solely by the male comparator's higher prior salary.

Neither 5 U.S.C § 5333 nor 38 U.S.C § 7408 <u>requires</u> an Agency to set the salary of a new hire at a level that would create a pay disparity between similarly

situated male and female employees that would be justifiable solely by reference to the male comparator's prior pay. Agencies are not <u>required</u> to pay a male candidate more than a similarly situated female employee simply because the male candidate has a higher prior salary. Accordingly, there is no inherent conflict between these statutes and the EPA's prohibition of relying on prior pay alone to justify an otherwise cognizable pay disparity.

5 U.S.C. § 5333 states:

> New appointments shall be made at the minimum rate of the appropriate grade. However, under regulations prescribed by the Office of Personnel Management which provide for such considerations as the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government for his services, the head of an agency may appoint, with the approval of the Office in each specific case, an individual to a position at such a rate above the minimum rate of the appropriate grade as the Office may authorize for this purpose. The approval of the Office in each specific case is not required with respect to an appointment made by the Librarian of Congress.

5 U.S.C. § 5333.

38 U.S.C § 7408 applies to "additional employees, other than those provided in section 7306 and paragraphs (1) and (3) of Section 7401 of this title" (an exception that includes the statute under which Plaintiff was appointed). 38 U.S.C § 7408 states that "[t]he Secretary, after considering an individual's existing pay, higher or unique qualifications, or the special needs of the Department, may appoint the individual to a position in the Administration providing direct patient-care services or services

incident to direct patient-services at a rate of pay above the minimum rate of the appropriate grade."

Although each statute references "existing pay" as a permissible consideration, neither goes so far as to require appointing officials to make salary determinations based on prior pay alone. Neither statute therefore requires the agency to create a pay disparity that would be cognizable under the EPA. Because it remains possible for an Agency to exercise its pay setting authority pursuant to these statutes without creating pay disparities between similarly situated male and female employees differentiated solely by the male comparator's higher prior salary, there is no conflict that would require narrowly construing the EPA. *See, e.g., Kansas v. Garcia*, 140 S. Ct. 791, 806 (2020) (reasoning "[w]e likewise see no ground for holding that the Kansas statutes at issue conflict with federal law. It is certainly possible to comply with both IRCA and the Kansas statutes…").

In addition, neither of the inapplicable statutes examined by the trial court contains a "notwithstanding" clause or other similar language expressing an intent by Congress to hold the federal government to a different standard than private employers in the majority of the country. Congress's decision that no such clause was needed likely reflects congressional understanding that it is possible for an agency to rely on all the factors set forth in § 5333 and the regulations while simultaneously avoiding the creation of pay disparities justifiable solely by reference

to prior pay. *Cf. Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1337 (11th Cir. 2006) (finding that where ATSA included a "notwithstanding any provision of law" clause "the language of the ATSA exempts TSA from compliance with the Rehabilitation Act in establishing employment standards for security screeners"); *Conyers v. MSPB*, 388 F.3d 1380, 1382 (Fed. Cir. 2004) ("[t]he language 'notwithstanding any other provision of law' signals that this … provision is to override more general conflicting statutory provisions to the extent that they would apply to screeners"); *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section.") With no such clear expression by Congress of an intent to exempt federal government employees from the EPA's protections, this Court should hold that the federal government may not carry its burden of establishing an affirmative defense based solely on prior pay.

### c. <u>The Implementing Regulation for 5 U.S.C. §5333 Allows Consideration of "Other Relevant Factors" Which May Include Pay Equity.</u>

The implementing regulation for 5 U.S.C. § 5333, the inapplicable statute examined by the trial court, similarly does not require an agency to set the salary of a new hire at a level that would create a pay disparity between similarly situated male and female employees justifiable solely by reference to prior pay.

The implementing regulation for § 5333, codified at 5 C.F.R § 531.212, states in pertinent part:

> An agency may set the payable rate of basic pay of a newly appointed employee above the minimum rate of the grade under this section if the candidate meets one of the following criteria:
>
> (1) The candidate has superior qualifications. An agency may determine that a candidate has superior qualifications based on the level, type, or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors that support a superior qualifications determination. The candidate's skills, competencies, experience, education, and/or accomplishments must be relevant to the requirements of the position to be filled. These qualities must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality compared to other candidates; or
>
> (2) The candidate fills a special agency need. An agency may determine that a candidate fills a special agency need if the type, level, or quality of skills and competencies or other qualities and experiences possessed by the candidate are relevant to the requirements of the position and are essential to accomplishing an important agency mission, goal, or program activity. A candidate also may meet the special needs criteria by meeting agency workforce needs, as documented in the agency's strategic human capital plan.

5 C.F.R. § 531.212(b).

If the above criteria are satisfied, the regulation further provides as follows:

> An agency may consider one or more of the following factors, as applicable in the case at hand, to determine the step at which to set an employee's payable rate of basic pay using the superior qualifications and special needs pay-setting authority:
>
> (1) The level, type, or quality of the candidate's skills or competencies;

(2) The candidate's existing salary, recent salary history, or salary documented in a competing job offer (taking into account the location where the salary was or would be earned and comparing the salary to payable rates of basic pay in the same location);

(3) Significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled;

(4) Existing labor market conditions and employment trends, including the availability and quality of candidates for the same or similar positions;

(5) The success of recent efforts to recruit candidates for the same or similar positions;

(6) Recent turnover in the same or similar positions;

(7) The importance/criticality of the position to be filled and the effect on the agency if it is not filled or if there is a delay in filling it;

(8) The desirability of the geographic location, duties, and/or work environment associated with the position;

(9) Agency workforce needs, as documented in the agency's strategic human capital plan; or

(10) Other relevant factors.

5 C.F.R. § 531.212(c).

Again, as the statutory text makes clear, neither 5 U.S.C. § 5333 nor 38 U.S.C § 7401(3) requires reliance on prior pay alone. Agencies, rather, are permitted to rely on prior pay so long as the agency first determines that a candidate has "superior qualifications" which must be "significantly higher than that needed to be minimally required for the position" and/or "of a more specialized quality compared to other

candidates." 5 C.F.R. § 531.212(b). Once an agency makes such a finding, however, this still does not mean that the agency is required to rely on prior pay alone. Rather, "[a]n agency may consider one or more" of § 531.212(c)'s list of enumerated factors, "as applicable in the case at hand, to determine the step at which to set an employee's payable rate of basic pay." *Id.* Included at the end of the list is the catch-all factor of "[o]ther relevant factors"; the inclusion of the catch-all makes clear that an agency seeking to rely on a candidate's prior pay may consider the pay and qualifications of similarly situated employees. The Agency thus remains free to consider the pay of currently on-duty personnel as a relevant "other … factor" in setting the pay of new hires to ensure that no pay disparity that would be cognizable under the EPA is created by paying a male new hire more than a similarly situated female employee. Finding that the Agency violated the EPA in this instance therefore would not "read … off the books" this existing regulatory scheme, as the trial court believed. Rather, agencies would remain free to rely on all the factors set forth in § 5333 and its implementing regulations while avoiding creating pay disparities between similarly situated male and female employees justifiable solely by reference to prior pay.

### d. **The VA Handbook Directs Pay-Setting Authorities to Consider the Pay Rates of Current Personnel, Showing That the Agency Has the Ability to Comply with the EPA.**

As the court acknowledged, Plaintiff was appointed not under 5 U.S.C. § 5333 or 38 U.S.C § 7408 but rather under 38 U.S.C §7401(3). Contrary to the trial court's

reasoning, the VA Handbook section for this statute makes clear that the existing statutory and regulatory scheme is sufficiently flexible to accommodate pay equity.

Analyzing 5 C.F.R. § 531.212(b), the court reasoned that regulatory language requiring that the agency find that a candidate's qualities be "of a more specialized quality compared to other candidates" does not mean that the Agency should consider the qualifications and salaries of current employees when setting the pay levels of new hires: "Plaintiff's interpretation would presumably require the VA— and all federal agencies, for that matter—to compare a *candidate's* qualifications with effectively *all other current* employees doing the same or similar work… In short, Plaintiff's interpretation is not a fair reading of the regulation." (Appx33).

In so reasoning, the court overlooked that the VA Handbook instructs approving officials to do just that, showing that Plaintiff's reading is more than "fair." In fact, it is the Agency's own interpretation of the statute. The Handbook contains a separate section for appointments under 38 U.S.C § 7401, the statute under which Plaintiff was appointed. (Appx76-79). This section states that "[a]uthorized officials may, after considering an individual's existing pay, higher or unique qualifications, or special needs of VA, appoint [employees in hybrid occupations listed under 38 U.S.C. § 7401(3)] and VHA GS patient-care personnel at rates of pay above the minimum rate of the [highest applicable rate range for the] appropriate grade." (Appx77). The Handbook further provides "[p]ay

31

determinations under this paragraph may be made after considering a candidate's existing pay, recent salary history or competing job offer, higher or unique qualifications or special needs of VA." (Appx78). The Handbook cautions, "[b]efore using this pay setting authority, approving officials should <u>consider such things as the number of on-duty personnel in the category under consideration and their pay rates</u>, the number of vacancies and the availability of well-qualified candidates; <u>possible employee and/or community relations problems</u> which may result from using this authority and alternatives to using this authority to include the use of recruitment incentives, a more comprehensive recruitment effort, job redesign, internal training, use of part-time employees, etc." (Appx79) (emphasis added).

Implicit in this last directive is the premise that managers, in setting the pay of new hires, should consider whether such decisions may give rise to pay inequities with current employees. As the Handbook acknowledges, such inequities may lead to "possible employee and/or community relations problems." It stands to reason that if an Agency can consider whether appointment of a new employee at a rate above the minimum rate for the pay grade might create "possible employee and/or community relations problems," the Agency is also capable of determining whether such an appointment might create a pay disparity cognizable under the EPA. The trial court therefore erred in reasoning that "Plaintiff's interpretation is not a fair reading of the regulation" because it would allegedly "engender[] … illogical

results" by requiring the VA "to compare a candidate's qualifications with effectively all other current employees doing the same or similar work." (Appx32-33). In fact, the Agency's own handbook already directs the Agency to consider the equity of a new hire's proposed salary in comparison with the pay rates of current employees. (Appx79). Under the existing statutory and regulatory framework, the VA therefore has sufficient flexibility to comply with the EPA's prohibition on paying male employees more than similarly situated female employees solely because the male has a higher current or prior salary.

Again, nothing in the VA Handbook requires the Agency to rely on prior pay alone. Rather, the Handbook cautions decisionmakers against using such authority without first considering the pay of existing employees along with alternatives to using its special pay setting authority. In including such provisions, the Handbook shows that contrary to the trial court's reasoning, there is no inherent conflict between prohibiting an Agency from justifying a pay disparity through reliance on prior salary alone, while also, in contexts where no pay disparity is created between similarly situated male and female employees, allowing reliance on prior pay. This language in the Handbook further shows that approving officials are aware of the need to examine the pay rates of on-duty personnel when setting pay for new hires. The Agency's established practice thus includes considerations relevant to pay

equity which, if followed, would enable the Agency to avoid creating pay disparities justifiable only by reference to the male comparator's higher prior salary.

     **e.** **The Court Erred in Finding That the Agency May Rely on the VA Handbook as an "Other Factor Other than Sex," as the Agency Did Not Follow the Handbook Procedures.**

As argued in the preceding section, the Agency's Handbook requires the Agency to consider factors relevant to pay equity. Crucially, in this case, there is no evidence the Agency did so. Rather, despite purporting to rely on the Handbook in appointing Plaintiff's comparator at a higher salary, the Agency failed to observe the Handbook's instruction that "approving officials should consider such things as the number of on-duty personnel in the category under consideration and their pay rates…" The Agency also failed to consider the "possible employee and/or community relations problems" that would arise from creating a pay disparity between Plaintiff and her comparator justifiable solely by reference to the comparator's prior salary. If the Agency had followed its own procedures, it would have been required to consider the pay rates of on-duty personnel such as Plaintiff and also to consider "alternatives to using this authority" to avoid creating "possible employee and/or community relations problems" that would result from a pay disparity justifiable only by reference to the male comparator's prior salary. The Handbook thus would have required the Agency to consider factors other than prior salary alone, and the Agency would not have violated the EPA's rule against

justifying a pay disparity solely by reference to a comparator's prior salary. Because the Agency failed to follow its Handbook in exercising its pay setting authority, the trial court erred in finding that the Agency's reliance on the Handbook qualifies as an "other factor other than sex" that excuses it from liability under the EPA. The trial court further erred in failing to recognize that the Agency's own Handbook requires the Agency to consider how to avoid creating pay disparities, further showing there is no inherent conflict between the relevant statutes, the Handbook, and the EPA.

**IV.** **The Court Erred in Relying on a Purported "Admission" by Plaintiff to Relieve the Agency of Its Burden of Proving an Affirmative Defense.**

In this case, unlike other EPA cases in the Federal Circuit, Plaintiff was relieved of any burden she might otherwise have had of showing that the pay differential between her and her comparator was "historically or presently based on sex." *Gordon v. United States*, 903 F.3d 1248, 1254 (Fed. Cir. 2018) (quoting *Yant v. United States*, 588 F.3d 1369, 1372 (Fed. Cir. 2009)), vacated following joint stipulation of voluntary dismissal, 754 F. App'x 1007 (Fed. Cir. 2019)). This is because the Agency conceded Plaintiff had established a prima facie case under the EPA. As the Agency wrote in opposing summary judgment, "[a]s an initial matter, in our answer, we agreed that Ms. Boyer established a prima facie case under the Equal Pay Act (EPA)…" (Appx406) (citing "Answer ¶¶ 14-17, ECF No. 32…").

"[A] party is bound by the admissions in his pleadings," and the Agency's judicial admission that Plaintiff established a prima facie case under Federal Circuit law places the factual and legal issues implicated by the admission "not only beyond the need of evidence to prove [the issues] but beyond the power of evidence to controvert" them. *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1178 (11th Cir. 2009) (*quoting Hill v. Federal Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941). Because it is at the prima facie stage at which the Federal Circuit has required plaintiffs to make a showing of discriminatory intent (as the trial court acknowledged in footnote two, citing *Gordon* and *Yant*), conceding the prima facie meant that Agency had relieved Plaintiff of any burden she otherwise would have had to show intentional discrimination. Nevertheless, despite the Agency's judicial admissions, the Court erroneously reasoned that "the undisputed fact the Court has before it on this point is an admission by Plaintiff that her prior salary was lower because of 'benefits and perks,' not gender discrimination…" (Appx35).

Because the Agency admitted that Plaintiff established a prima facie case, the trial court's analysis should have begun and ended with the second stage of the EPA's burden-shifting analysis. At that stage, "the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent

on the part of the defendant." *Miranda v. B & B Cash Grocery Store, Inc*., 975 F.2d 1518, 1533 (11th Cir. 1992). Accordingly, the Court should have placed the burden of proof to establish an "other factor other than sex" defense entirely on the Agency: "Once plaintiffs have carried their burden [to establish a prima facie case], 'the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions.'" *Yant*, 588 F.3d at 1372 (Fed. Cir. 2009) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 208 (1974)). The trial court, focusing on what it incorrectly labeled an "undisputed admission" by Plaintiff, which in the court's view explained "why her prior salary was lower than would be typical for a pharmacist of her experience," erroneously relieved the Agency of this burden and instead placed the burden on Plaintiff to show intentional sex discrimination by her former employer. This is inconsistent with the Supreme Court's dictate that that "the EPA does not require … proof of intentional discrimination," *Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 640 (2007)*, and also with the EPA's narrow focus on current wage disparities at the defendant's establishment. 29 U.S.C. § 206(d)(1). Given the Agency's judicial admissions, the burden of proof should have remained with the Agency, and the trial court should have found that the Agency failed to establish that it relied on anything other than the comparator's higher prior salary alone in deciding to pay him more

than Plaintiff. The court should also have found that reliance on prior salary alone is not an affirmative defense to EPA liability.

The trial court further erred in allowing the Agency to obtain summary judgment based on facts that were undisputedly not included in the Agency's decision-making process. As stated above, the court reasoned that "the undisputed fact the Court has before it on this point is an admission by Plaintiff that her prior salary was lower because of 'benefits and perks,' not gender discrimination…" (Appx34-35). However, this fact comes not from the record of materials the Agency considered, but from Plaintiff's deposition testimony in these proceedings. There is no evidence any decisionmaker had knowledge of the reasons Plaintiff's prior salary may have been lower than it might have been at a different job, or that such considerations were part of the Agency's decision. Rather, the undisputed evidence shows that the Agency considered only the raw numbers in order to "closely meet current documented salary." (Appx128; Appx193). As reasoned by the Tenth Circuit, the employer must show not merely that its claimed reasons for paying the male comparator more "could explain the wage disparity, but that the proffered reasons do in fact explain the wage disparity." *Mickelson*, 460 F.3d 1312. In allowing the Agency to obtain summary judgment based on Plaintiff's alleged "admission" regarding facts that were not part of the Agency's decision-making process, the district court allowed the Agency to bypass this burden of proof. Here,

38

Defendant has submitted no evidence that it decided to pay Plaintiff less because of her prior job's "benefits and perks." Rather, the district court erroneously seized on this language from Plaintiff's deposition taken after she initiated her EEO complaint.

The district court's analysis further overlooked that the factors identified in Plaintiff's alleged "admission" – that her prior job allowed her to "do things with [her] family…" – are fully consistent with factors that historically have driven and perpetuated the gender pay gap. The court's reasoning serves to emphasize why it is important that employers not be permitted to rely solely on a male employee's higher prior salary to justify paying him more than a similarly situated female coworker: "if prior salary alone were a justification, the exception would swallow up the rule and inequality in pay among genders would be perpetuated." *Irby*, 830 F. Supp. at 636. That is what will happen here if the district court's reasoning stands.

## V.     The Court Erred in Granting Defendant's Motion for Summary Judgment.

As the trial court correctly recognized, "a reasonable factfinder viewing the facts in the light most favorable to Plaintiff could conclude that existing or prior pay *alone* explains the salary differential." (Appx27). Because reliance on prior pay alone is insufficient to carry a Defendant's burden of establishing an affirmative defense, the court erred in granting summary judgment for Defendant, and this Court should reverse that order and vacate the judgment.

Monica Sfakianos, Associate Chief of Pharmacy Operations for the VA, was the "recommending official" who set the rates of pay for Plaintiff and Mr. L.C.. (Appx 255, 258). Ms. Sfakianos "prepared the recommendation memo." (Appx258). Sfakianos testified, "Each Pharmacist there was boarded based on their current salary. We requested that they submit current pay stubs so that we could match. Otherwise, they would have been brought in much lower steps. And the salary is the easiest way to justify. So we did have pay stubs for each of those employees. We looked – or I looked at the current pay scale at that time versus that person's current salary and most closely matched that salary as I could on the step level from one to ten." (Appx258-259). Sfakianos testified, "...I boarded everybody exactly the same without regards to anything special other than their current pay stubs." (Appx260). (emphasis added).

Contrary to the district court's reasoning, a reasonable factfinder further could determine that the VA did not view L.C. as having more relevant experience than Plaintiff. Sfakianos's recommendation to hire Plaintiff states, "BVAMC will benefit greatly from the addition of Dr. Boyer to our staff. She brings a wealth of experience through her fifteen years of pharmacy practice. She has extensive experience with direct patient care in both retail and institutional settings." (Appx129). Sfakianos's recommendation then proceeds with a catalog of Plaintiff's relevant experience: "She also has advanced clinical skills with medication monitoring and making

40

medication recommendations based on clinical efficacy while maintain [sic] an annual budget. She most recently has worked directly as a lead pharmacist in a mental health institution. This will be of great benefit in dealing with this growing population of our veterans. She also has experience with and coordinated Joint Commission Surveys within pharmacy services." (Appx129).

The corresponding listing of experience for L.C., by contrast, merely states, "BVAMC will benefit greatly from the addition of Dr. L.C. to our staff. He brings a wealth of experience with many years of pharmacy practice. He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration," without identifying any ways in which his experience exceeded Plaintiff's. (Appx193). Based on the contents of Sfakianos's recommendation letters, a reasonable factfinder could find that the VA considered Plaintiff to have been the more experienced hire; yet Sfakianos recommended that L.C. be hired at Step 10 and Plaintiff at Step 7. The recommendation memo that Sfakianos prepared for L.C. concludes, "The recommendation of a GS-12, Step 10 is requested to secure highly qualified candidate. GS-12, step 10 is recommended to remain competitive and more closely meet current documented salary." (Appx193) (emphasis added). As she freely admitted in her deposition, this determination was based on prior salary alone. Sfakianos testified, "...I boarded everybody exactly the same without regards to

anything special other than their current pay stubs." (Appx260). (emphasis added).

The Board and the approving authority then rubber-stamped this recommendation, as shown by the fact that the memo attached to the Pharmacy Professional Standards Board Approval for Plaintiff to be hired at GS-12 Step 7 copies much of its language from Sfakianos's memo (Appx129) recommending that Plaintiff be hired at Step 7.

Similar to the language from Sfakainos's memo, the Board's recommendation states, "Dr. Boyer brings over fifteen years of pharmacy practice. She has extensive experience with direct patient care in both retail and institutional settings. She also has advanced clinical skills with medication monitoring and making medication recommendations based on clinical efficacy while maintain [sic] an annual budget. She has extensive experience with pharmaceutical needs of mental health patients which will be a benefit in dealing with this growing population of our veterans. She also has experience with and coordinated Joint Commission surveys within pharmacy services. Due to Dr. Boyer's pharmaceutical skills, education and current salary, the board recommends a GS-12 Step 7 to secure this highly qualified candidate." (Appx128). Based on the above, a reasonable factfinder could reject any argument that Defendant based the decision to pay L.C. more on "prior pay and more experience." Both the documentary and the testimonial evidence make clear that the applicants' current pay stubs were the only factor that differentiated Plaintiff and L.C., as Sfakianos testified that with the exception of the current pay stubs, she

"boarded everybody exactly the same." (Appx260). Based on this evidence, the court correctly determined that "a reasonable factfinder viewing the facts in the light most favorable to Plaintiff could conclude that existing or prior pay *alone* explains the salary differential." (Appx27). Accordingly, this Court should reverse the trial court's order granting summary judgment. In addition, judgment as a matter of law should further be entered for the Plaintiff, as set forth below.

## VI. The Court Erred in Denying Plaintiff's Motion for Summary Judgment.

In denying summary judgment to the plaintiff, the trial court incorrectly reasoned "a reasonable factfinder could conclude that other factors were considered and incorporated into the pay differential." (Appx26). However, based on the testimony and documentary evidence discussed above, no reasonable factfinder could conclude that the Agency relied on anything other than L.C.'s prior pay in setting his initial pay rate higher than Plaintiff's. As the Northern District of Alabama court correctly found when reviewing substantially the same record, "there is no evidence in the record that these relative comparisons were even considered in making the decisions at issue. While there is general testimony about the process, the only testimony regarding the decisionmakers' motivations was Sfakianos who testified she used prior pay alone." (Appx55-56). Accordingly, the trial court erred in denying Plaintiff's motion for summary judgment.

To counter a prima facie case, an employer must prove "not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Rizo v. Yovino*, 950 F.3d 1217, 1222 (9th Cir. 2020) (quoting *EEOC v. Md. Ins. Admin.,* 879 F.3d 114, 121 (4th Cir.2018) (emphasis in original) (citing *Stanziale v. Jargowsky,* 200 F.3d 101, 107-08 (3d Cir. 2000))); *see also Mickelson v. N.Y. Life Ins. Co*., 460 F.3d 1304, 1312 (10th Cir. 2006). "[A]n employer may not satisfy its burden of production by offering a justification which the employer either did not know or did not consider at the time the decision was made." *Turnes v. Amsouth Bank, N.A.,*
36 F.3d 1057, 1061 (11th Cir. 1994). The burden of proving an affirmative defense under the EPA is on the Defendant, not the Plaintiff. *See Corning Glass Works*, 417 U.S. at 208; *Moorehead*, 88 Fed. Cl. at 619 ("Because these are affirmative defenses, the defendant bears the burden of proof.") The Court erred by failing to recognize that the Agency produced no evidence that it in fact relied on any factor other than the comparator's higher prior salary to differentiate Plaintiff's pay from her comparator's.

First, it is undisputed that Monica Sfakianos, Associate Chief of Pharmacy Operations for the VA, was the "recommending official" who recommended the pay rates for Plaintiff and Mr. L.C.. (Appx255, 258). Ms. Sfakianos "prepared the recommendation memo." (Appx258). She testified, "[e]ach Pharmacist there was

boarded based on their current salary. We requested that they submit current pay

stubs so that we could match. Otherwise, they would have been brought in much

lower steps. And the salary is the easiest way to justify. So we did have pay stubs

for each of those employees. We looked – or I looked at the current pay scale at that

time versus that person's current salary and most closely matched that salary as I

could on the step level from one to ten." (Appx258, 259). Sfakianos testified, "...I

underline: boarded everybody exactly the same without regards to anything special other than

their current pay stubs." (Appx260). (emphasis added).

Sfakianos submitted the following memo to the Pharmacy Professional

Standards Board, recommending that Plaintiff be hired at GS-12, Step 7:

> 1. The following candidate, Leslie Boyer, has been selected as a Clinical
> Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center.
> She has met all the requirements to be considered for initial appointment. I
> recommend her initial appointment as a GS-12, Step 7, which is above the
> minimum rate of grade (GS-12, Step 1). This board action is recommended
> for initial appointment and applies to the Licensed Pharmacist Qualifications
> Standards in accordance with the provisions of VA Handbook 5005/55, Part
> II, Appendix G15.

> 2. BVAMC will benefit greatly from the addition of Dr. Boyer to our staff.
> She brings a wealth of experience through her fifteen years of pharmacy
> practice. She has extensive experience with direct patient care in both retail
> and institutional settings. She also has advanced clinical skills with
> medication monitoring and making medication recommendations based on
> clinical efficacy while maintain an annual budget. She most recently has
> worked directly as a lead pharmacist in a mental health institution. This will
> be of great benefit in dealing with this growing population of our veterans.
> She also has experience with and coordinated Joint Commission surveys
> within pharmacy services.

3. The recommendation of a GS-12, Step 7 is requested to secure highly qualified candidate. GS-12, step 7 is recommended to remain competitive and meet current documented salary. In addition, candidate received a very positive reference from former employers. The enclosed board action is submitted for review and recommendation.

[ . . .]

(Appx129).

Sfakianos submitted a similar memo to the Pharmacy Professional Standards Board, recommending that L.C. be hired at GS-12, Step 10:

1. The fallowing candidate, [L.C.], has been selected as a Clinical Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center. He has met all the requirements to be considered for Initial appointment. I recommend his initial appointment as a GS-12, Step 10, which is above the minimum rate of grade (GS-12, Step 1). This board action is recommended for initial appointment and applies to the Licensed Pharmacist Qualifications Standards in accordance with the provisions of VA Handbook 5005/55, Part II, Appendix G15.

2. BVAMC will benefit greatly from the addition of Dr. [L.C.] to our staff. He brings a wealth of experience with many years of pharmacy practice. He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration.

3. The recommendation of a GS-12, Step 10 is requested to secure highly qualified candidate. GS-12, step 10 is recommended to remain competitive and more closely meet current documented salary. In addition, candidate received a very positive reference from former employers. The enclosed board action is submitted for review and recommendation. […]

(Appx193). The nearly identical language of these memos shows that Plaintiff and

L.C. were equivalent in terms of experience and skills, with both memos referencing

each candidate's "wealth of experience", "years of pharmacy practice," "extensive

experience with direct patient care," and "Joint Commission Surveys" and "very positive reference from former employers." The minor differences are matters of syntax rather than substance: "medication monitoring and making medication recommendations based on clinical efficacy while maintain an annual budget" and "worked directly as a lead pharmacist in a mental health institution" for Plaintiff vs. "medication management, patient counseling, formulary management" for L.C. With equivalent terms knocked out, all that remains are the conclusions: "The recommendation of a GS-12, Step 10 is requested to secure highly qualified candidate. GS-12, step 10 is recommended to remain competitive and more closely meet current documented salary." (Appx193) (emphasis added).

Faced with such evidence, the district court erroneously reasoned as follows:

> Even if the Court were to adopt Plaintiff's conclusions from Sfakianos' testimony, which was taken three-and-a-half years after Plaintiff's boarding, that is not the end of the matter— especially when one views the rest of the record in the light most favorable to the government as the non-moving party. For example, just prior to Plaintiff's official hiring, Sfakianos informed Plaintiff that "[t]hey do not base [salary] on years of experience. It is more based on education, residency, published articles, BCPS, etc... but they do consider salary matching." Appx 71 (emphasis added). This communication alone, sent by email during the boarding process, suggests a multi-layered salary justification. Moreover, the Board's recommendation cites Plaintiff's "pharmaceutical skills, education and current salary" in justifying the step on the salary scale she was given. Appx 69 (emphasis added). Is a reasonable factfinder to ignore this more contemporaneous evidence?

(Appx25). There are several problems with this reasoning. First, Skafianos's testimony was taken under oath; her email to Plaintiff was not, nor was the cited

email provided to the Board that rubber-stamped Skafianos's recommendation. Second, as to the Board's recommendation, the proper question before the Court was not the laundry list of factors Skafianos listed in her recommendations for Plaintiff and her comparator, as most of those factors were identical for both Plaintiff and her comparator. Rather, the question was what factor <u>differentiated</u> Plaintiff from her comparator and thus accounts for the pay disparity between them. As reasoned by the Eighth Circuit, "[j]ustifying [the comparator's] salary does not justify [the plaintiff's] salary. It is the differential that must be explained." *Drum*, 565 F.3d at 1073. Tellingly, Skafianos's recommendation and the Board's recommendation contain nearly identical language for both candidates. The factors that apply equally to each candidate cannot explain the differential between their salaries. The only factor that differentiates the two candidates was the need listed for each of them to "more closely meet current documented salary," as the comparator's current salary was higher than Plaintiff's. Based on Skafianos's sworn testimony and the identical boilerplate language contained in the documentation for Plaintiff and her comparator, differing in substance only with respect to prior salary, no reasonable factfinder could conclude that any factor other than each candidate's prior salary was the cause of the pay disparity. The Court erred in concluding to the contrary.

The Court further reasoned that a reasonable factfinder could conclude that Skafianos was not the decisionmaker. (Appx25-26). However, in so reasoning, the

Court overlooked evidence establishing that the Pharmacy Board also relied on prior salary alone. Kendra Brookshire, who was the Chair of the three-member Pharmacy Professional Standards Boards that recommended L.C. be hired at Step 10 and Plaintiff at Step 7, testified, "So we look at their education, training, and qualifying experience and kind of go that route. But at the end of the day pay stubs <u>can basically trump</u> what would be determined by the qualifying experience." (Appx279) (emphasis added). Brookshire continued, "...it could be that you know they're presented with you know this could be your salary, and they're like oh I can't come for that. You know, and then you know they may be asked to provide pay stubs. But at any rate, if their pay stubs would justify a higher salary then really that experience – <u>relevant experience kind of just goes by the wayside</u>." (Appx281) (emphasis added). Similarly, Lisa Ambrose, who also was on both Boards, testified, "I do know that we've had Pharmacists with the same exact credentials if you just looked at their education and experience. But then if you look at their pay stubs of where they're coming from it can make a huge difference. It can make the difference between a step three and a step ten just based on what they're currently being paid. That's the biggest factor that we always took into consideration. We don't want to shortchange people who are coming and taking pay cuts to come here." (Appx271). These admissions undercut the trial court's reasoning.

The trial court's reasoning also overlooked clear evidence that the Pharmacy Standards Board merely rubber stamped Sfakianos's recommendation. The Board, retaining two of the three members (Brookshire and Ambrose) in common for each decision, accepted Sfakianos's recommendations to hire Plaintiff at Step 7 and L.C. at Step 10. (Appx126-129; Appx193; Appx390-392). The memo attached to the Board Approval for Plaintiff to be hired at GS-12 Step 7 copies much of its language from Sfakianos's memo (Appx129):

> Dr. Boyer brings over fifteen years of pharmacy practice. She has extensive experience with direct patient care in both retail and institutional settings. She also has advanced clinical skills with medication monitoring and making medication recommendations based on clinical efficacy while maintain [sic] an annual budget. She has extensive experience with pharmaceutical needs of mental health patients which will be a benefit in dealing with this growing population of our veterans. She also has experience with and coordinated Joint Commission surveys within pharmacy services. Due to Dr. Boyer's pharmaceutical skills, education and current salary, the board recommends a GS-12 Step 7 to secure this highly qualified candidate.

(Appx128).

The memo attached to the Board Approval for L.C. to be hired at GS-12 Step 10 also copies much of its language from Sfakianos's recommendation memo for L.C. (Appx193):

> 1. BVAMC will benefit greatly from the addition of Dr. [L.C.] to our staff. He brings a wealth of experience with many years of pharmacy practice. He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration. Dr. [L.C.]'s experience will be valuable in treating veterans in the Huntsville CBOC as a new expanded clinic where a hybrid model will be utilized between dispensing functions and direct patient care.

2. The recommendation of a GS-12, Step 10 is requested to remain competitive and more closely meet current documented salary of this highly qualified candidate. In addition, candidate received a very positive reference from former employers. The enclosed board action is submitted for approval and recommendation. […]

3. Securing Dr. [L.C.] will benefit BVAMC in that adequate staffing is needed to be to open the dispensing pharmacy at the Huntsville clinic.

(Appx391).

As to the Board memo's reference to the "new expanded clinic where a hybrid model will be utilized between dispensing functions and direct patient care," this refers not to L.C.'s qualifications, but rather to his future duties in a workplace that he shared with Plaintiff. However, the government has conceded in its answer that Plaintiff and L.C. performed "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Yant*, 588 F.3d at 1372. Because the government conceded in its answer that Plaintiff and L.C. had "equal work" and that their jobs required "equal skill, effort, and responsibility," L.C.'s future duties cannot serve as an "other factor" to justify the pay differential.

Given this evidence, no reasonable factfinder could conclude that the Board's decision was made independently from Sfakianos's recommendation; rather, the Board rubber-stamped Sfakianos's recommendation. Similarly, no reasonable juror could conclude that anything other than prior salary explains the differential between

the two recommended starting salaries, as the other factors listed for each candidate are identical in most instances and in others differ only as to syntax, and the candidates' future duties are irrelevant to the pay differential as the government has conceded Plaintiff established a prima facie case. Sfakianos's admission that "I boarded everybody exactly the same without regards to anything special other than their current pay stubs" is reinforced by the Board members' own admissions that "if their pay stubs would justify a higher salary then really that experience – relevant experience kind of just goes by the wayside" and that even for "Pharmacists with the same exact credentials" "what they're currently being paid" is "the biggest factor that we always took into consideration.." (Appx271; Appx281).

Because the government bears the burden of establishing its affirmative defense, the burden of proof was on the Agency to counter this evidence. The trial court erred in finding that the government could meet its "heavy" burden given the admissions and documentary evidence discussed above and the government's failure to produce evidence establishing (as opposed to raising a theoretical possibility) that it relied on some factor other than prior salary. Accordingly, the order granting summary judgment should be overturned and judgment entered for the plaintiff.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

Based on the above arguments, authorities, and evidence, the lower court's order should be reversed. This Court should find that as a matter of law, an Agency

may not carry its burden of establishing an affirmative defense through reliance on prior salary alone, and that in this case, the Agency has failed to produce evidence that it relied on any factor other than M.C.'s higher prior salary in differentiating him from Plaintiff in the decision to pay him more than it paid her. Accordingly, judgment should be entered for the plaintiff. In the alternative, to the extent Plaintiff is not entitled to summary judgment, this matter should be remanded for trial.

Respectfully Submitted,

/s/ *L. William Smith*
Jon C. Goldfarb
L. William Smith
Counsel for Plaintiff-Appellant

**OF COUNSEL:**
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
The Kress Building
301 North 19th Street
Birmingham, Alabama 35203
(205) 314-0500 (telephone)
(205) 254-1500 (facsimile)
jcg@wigginschilds.com
wsmith@wigginschilds.com

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2022-1822

**Short Case Caption:**  Boyer v. United States

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes  12,941  words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 09/23/2022

Signature:  /s/ L. William Smith

Name:  L. William Smith

# ADDENDUM

# In the United States Court of Federal Claims

No. 20-438 C
Filed Under Seal: March 25, 2022
Reissued: April 20, 2022[*]

```
* * * * * * * * * * * * * * * * * * * *
                                       *
LESLIE BOYER,                          *
                                       *
              Plaintiff,               *
                                       *
       v.                              *
                                       *
THE UNITED STATES,                     *
                                       *
              Defendant.               *
                                       *
   * * * * * * * * * * * * * * * * * * *
```

*Jon C. Goldfarb*, Wiggins Childs Pantazis Fisher & Goldfarb, LLC, of Birmingham, AL, for Plaintiff.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for Defendant.

## OPINION AND ORDER

**SOMERS**, Judge.

This case is brought by Plaintiff Leslie Boyer, a female clinical pharmacist at the Veterans Affairs Medical Center of Birmingham, Alabama ("BVAMC"), who alleges gender discrimination in violation of the Equal Pay Act ("EPA"). Plaintiff's claim arises out of her discovery, three years after her hiring, that a male coworker in the same position ("Male Comparator"), who Plaintiff alleges has less experience than her, was hired after her with a higher starting pay rate. The justification for the pay differential forms the crux of this dispute.

Plaintiff, in moving for summary judgment, asserts that BVAMC willfully violated the EPA by relying on prior salary alone in determining pay rates. The government, in cross-moving for summary judgment, concedes Plaintiff has established a prima facie case under the EPA; however, it asserts as an affirmative defense the use of a "factor other than sex" in determining

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. No redactions were proposed; and the Court made minor typographical and stylistic corrections.

Plaintiff's and Male Comparator's pay rates, citing the statutory and regulatory authorities that govern federal pay determinations.[1]  For the reasons that follow, the Court denies Plaintiff's motion for summary judgment and grants the government's cross-motion.

## BACKGROUND AND PROCEDURAL HISTORY

As is evident from the briefs in this case, what constitutes the factual record in this case appears to be uncontested.[2]  The parties, however, put genuine issues of material fact in dispute by the markedly different conclusions they draw from the evidence in the record.  An overview of the relevant hiring process, Plaintiff's and Male Comparator's appointments, and the proceedings to date is necessary to understand Plaintiff's claim.

## A.  Hiring Process at BVAMC

Generally, new hires (or "appointments") in the federal government are made at the minimum rate of pay (or "step") for the appropriate grade of the individual under the General Schedule ("GS") system.  *See* 5 U.S.C. § 5333.  In order to depart from the minimum step, an agency must justify the step increase it intends to offer the individual.  *Id*.  In pertinent part, 5 U.S.C. § 5333 provides that, pursuant to regulations, federal agencies may appoint an individual above the minimum step "for such considerations as the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government for his services . . . ."  *Id*.

Although Plaintiff and Male Comparator, as pharmacists, were hired pursuant to 38 U.S.C. § 7401(3) (and not title 5), 5 U.S.C. § 5333 (as is explained in more depth *infra*) is nonetheless relevant to the application of the EPA in this case.  Some, but not all Department of Veterans' Affairs ("VA" or "Department") employees, are hired pursuant to title 5 and, therefore, are directly covered by § 5333.  Moreover, the Veterans Health Administration ("VHA")—a component of the Department—uses specific policies and procedures to make a new appointment and to justify a departure from the minimum step of a grade that track nearly verbatim § 5333's grounds.  VA Handbook 5007/51, Part II, Chapter 3 provides that "[a]uthorized individuals may, after considering an individual's existing pay, higher or unique

---

[1] The Court assumes the government conceded that Plaintiff established a prima facie case because this litigation was originally filed in a district court, which, in addition to lacking jurisdiction over the case, was not bound by Federal Circuit precedent that requires an EPA plaintiff to "establish that the pay differential between the similarly situated employees is 'historically or presently based on sex.'" *Gordon v. United States*, 903 F.3d 1248, 1254 (Fed. Cir. 2018) (quoting *Yant v. United States*, 588 F.3d 1369, 1372 (Fed. Cir. 2009)), *vacated following joint stipulation of voluntary dismissal*, 754 F. App'x 1007 (Fed. Cir. 2019).

[2] To date, the parties have not objected to, or contested the admissibility of, any materials presented in the record or attached in support of their briefs.  Rather, the parties simply draw two different conclusions from the same set of facts presented to the Court.

**Appx2**

qualifications, or special needs of VA, appoint [certain employees] . . . at rates of pay above the minimum rate of the [highest applicable rate range for the] appropriate grade." *See* ECF No. 43 at 4 ("Gov.'s Mot. Summ. J.") (citing ECF No. 44 at 18 ("Appx")).[3] To do so, the VA considers the following "Criteria for Pay Determinations":

> The following factors must be documented and forwarded to the authorizing official for consideration when requesting appointment of an individual at a rate above the minimum rate of the grade:

> a. Recommended grade, step and salary rate;

> b. Reason for requesting an appointment above the minimum rate of the grade. This may include information on the candidate's existing pay or recent salary history, competing job offer(s), higher or unique qualifications, or special needs of VA . . . .

Appx 19. Thereafter, "the selecting official is required to 'forward the recommendation for appointment above the minimum rate of the grade to the appropriate professional or similar standards board.'" Gov.'s Mot. Summ. J. at 5 (quoting Appx 20). "The board will consider this information when making a formal recommendation regarding the candidate's qualifications, and recommended grade and step upon appointment." Appx 20. Such board recommendations "may serve as the justification to support an appointment above the minimum rate of the grade." *Id.* Furthermore, "[a] brief narrative . . . should be included which provides pertinent information regarding the basis of the recommendation as it relates to the candidate's existing rate of pay, recent salary history or competing job offer, higher or unique qualifications or special needs of the VA." *Id.*

The relevant board in the instant case is the Veterans Integrated Service Networks 7 Pharmacy Professional Standards Board ("VISN 7 Board" or "Board"), which has the

---

[3] As a general housekeeping matter, the Court notes that throughout the briefing in this case, the parties direct the Court's attention to what are effectively the same source materials, but which appear at—and are duplicated throughout—numerous points on the docket. For example, in Plaintiff's motion for summary judgment, she cites an affidavit quote at "ROI 103." Pl.'s Mot. Summ. J. at 6. This references a document within a "Record of Investigation" that was filed by the government in the Northern District of Alabama, prior to this case being transferred here. Plaintiff notes that the quote is also located at "Doc. 6 p. 111." *Id.* n.1. The government here, however, cites the same quote in its motion for summary judgment as "Appx201," referring to the more recently filed "Administrative Record" at ECF No. 44 (plus attachments). Gov.'s Mot. Summ. J. at 17. This could create a confusing mess of references, double references, and cross-references. On October 30, 2020, the government filed a four-part appendix to its cross-motion for summary judgment. ECF No. 44, 44-1, 44-2, 44-3. As the Appendix contains most, if not all, of the documents referred to by the parties in their cross-motions, the Court will cite to the government's appendix ("Appx") throughout this opinion when drawing upon the factual record, unless a cited document or record does not appear (or is not as readily identifiable) in the Appx.

3

**Appx3**

responsibility "to advance the professional standards of pharmacy by determining eligibility for employment and grade qualifications for GS-14 level positions or lower grades where a local Board cannot be convened." Appx 35. Moreover, the VISN 7 Board "will, where necessary, make recommendations for appointment, reassignment, retention, promotion and special within-grade advancements consistent with the aforementioned grade levels." *Id*. Pursuant to the VISN 7 Board's policy:

> Any request should be submitted to the designated Human Resources Representative at the local Medical Center. The HR Representative or designee will ensure that all of the appropriate documentation, such as the license, application, and where needed, [Official Personnel Folder], are available. The Representative will then forward the request and file to the Chair of the Local Board or the Chair of the VISN Board, who will determine and convene the necessary members to act on the request. The Board's recommendation, along with the supporting documentation, will be returned to the originating HR Office for final approval by the Medical Center Director.

*Id*. In short, the selecting official sends a recommendation for an individual's appointment, grade, and step to the Board, which then "act[s] on the request" and presents its recommendation "for final approval" to the Medical Center Director.

## B. Plaintiff's Appointment and Step Determination

Plaintiff earned her doctorate in pharmacy in 1999. ECF No. 46 at 6 ("Pl.'s Mot. Summ. J."); *see also* Appx 67. She worked as a staff pharmacist at Pay-Less Pharmacy from 1999 to 2000, Rite Aid Pharmacy from 2000 to 2002, Huntsville Hospital from 2002 to 2005, and Walgreens from 2005 to 2007. *Id*. In 2007, Plaintiff accepted a position as a pharmacy manager at Kroger Pharmacy, a position in which she remained part time until her move to BVAMC.[4] Pl.'s Mot. Summ. J. at 6–7. Finally, Plaintiff worked as a staff pharmacist at the State of Alabama-North Alabama Regional Hospital in Decatur, Alabama, from 2011 until shortly before BVAMC hired her in 2015. Appx 67.

In February 2015, Plaintiff applied for a position as a clinical pharmacist with BVAMC. Gov.'s Mot. Summ. J. at 6 (citing Appx 59–66). In her application, Plaintiff listed her salary at

---

[4] There is some ambiguity in the record over whether and when Plaintiff worked full-time at Kroger Pharmacy. For now, the matter is irrelevant to the question before the Court on summary judgment.

**Appx4**

North Alabama Regional Hospital as "105,000.00 USD Per Year" and her salary at Kroger Pharmacy as "120,000.00 USD Per Year." *Id.* at 6–7 (citing Appx 63).[5]

Prior to her start, Plaintiff exchanged a series of emails with Monica Sfakianos, Associate Chief, Pharmacy Service, concerning a range of topics, including an official start date and salary with BVAMC. Appx 71–73. On June 9, 2015, Plaintiff emailed Sfakianos stating: "I am currently just filling in for Kroger. Our census at the hospital is down to six patients and should be down to two later this week, so I am no longer employed by the State of Alabama." Appx 71. Plaintiff continued:

> Also, Ramona mentioned that I could send copies of my W-2 forms or payroll stubs from Kroger and the State [of Alabama] and she would pass the information along to the review board that I have worked two jobs the last four years. Kroger did not pay me a premium rate for the hours I worked. I have asked around and it is a very conservative rate . . . . I would like to know if this is acceptable with you for her to communicate this salary information to the review board for me.

*Id.* In reply the same day, Sfakianos said:

> Send [me] anything you can that I can justify meeting salary!!
>
> The GS 12 pay scale ranges from step 1 $96,133 to step 10 $124,980. They do not base it on years of experience. It is more based on education, residency, published articles, BCPS, etc… but they do consider salary matching. Although, I don't think they will let us use the combined salaries to match our salary. We will surely try!

*Id.* The next day, Plaintiff responded with:

> Monica, I faxed information confirming my salary and hourly rate from Kroger. Please let me know you received it. Does it matter to the board that my current employer is Kroger instead of the State of Alabama? I really appreciate you

---

[5] It appears that this $120,000 per year salary is actually what Plaintiff would hypothetically have made if one calculates her part time hourly wages as if she was working in this position full time.

**Appx5**

getting this information to them and I look very forward to working with you and the VA!

Appx 72.

On July 7, 2015, Sfakianos sent a memorandum to the Board recommending Plaintiff's appointment to BVAMC, wherein she justified an upward departure from the minimum pay rate for the grade for the pharmacist position. Appx 70. In relevant part, Sfakianos' memo states:

1. The following candidate, [Plaintiff], has been selected as a Clinical Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center. She has met all the requirements to be considered for initial appointment. I recommend her initial appointment as a GS-12, Step 7, which is above the minimum rate of grade (GS-12, Step 1). This board action is recommended for initial appointment and applies to the Licensed Pharmacist Qualifications Standards in accordance with the provisions of VA Handbook 5005/55, Part II, Appendix G15.

2. BVAMC will benefit greatly from the addition of [Plaintiff] to our staff. She brings a wealth of experience through her fifteen years of pharmacy practice. She has extensive experience with direct patient care in both retail and institutional settings. She also has advanced clinical skills with medication monitoring and making medication recommendations based on clinical efficacy while maintain [sic] an annual budget. She most recently has worked directly as a lead pharmacist in a mental health institution. This will be of great benefit in dealing with this growing population of our veterans. She also has experience with and coordinated Joint Commission surveys within pharmacy services.

3. The recommendation of a GS-12, Step 7 is requested to secure [this] highly qualified candidate. GS-12, step 7 is recommended to remain competitive and meet current documented salary. In addition, candidate received a very positive reference from former employers. The enclosed board action is submitted for review and recommendation. . . .

*Id*. Two days later, July 9, 2015, the Board provided its recommendation that Plaintiff be appointed as a clinical pharmacist at GS-12, Step 7. Appx 69. In pertinent part, the Board's recommendation states:

[Plaintiff] brings over fifteen years of pharmacy practice. She has extensive experience with direct patient care in both retail and institutional settings. She

6

**Appx6**

also has advanced clinical skills with medication monitoring and making
medication recommendations based on clinical efficacy while maintain [sic] an
annual budget. She has extensive experience with pharmaceutical needs of
mental health patients which will be a benefit in dealing with this growing
population of our veterans. She also has experience with and coordinated Joint
Commission surveys within pharmacy services. Due to [Plaintiff's]
pharmaceutical skills, education and current salary, the board recommends a
GS12 step 7 to secure this highly qualified candidate.

*Id*. The record suggests that William F. Harper, Acting Medical Center Director, approved the
Board's recommendation on July 10, 2015, Appx 68, and Plaintiff was officially appointed as a
clinical pharmacist on July 12 at GS-12, Step 7 with a basic pay of **$115,364**, Appx 38.

## C. Male Comparator's Appointment and Step Determination

Approximately six months after Plaintiff's hiring, BVAMC hired Male Comparator as a
clinical pharmacist at GS-12, Step 10 with a basic pay of **$126,223**. ECF No. 32. at ¶ 5
("Transfer Compl."). He earned a masters in biological sciences in 2003 from the University of
Alabama in Huntsville, followed by a doctorate in pharmacy in 2006 (seven years after Plaintiff)
from the same institution as Plaintiff. Gov.'s Mot. Summ. J. at 19 (citing Appx 331). He
worked as a pharmacy manager at Rite Aid from 2006 to 2012, Kroger from 2012 to 2015, and
Central North Alabama Health Services, Inc., from 2015 until his hiring at BVAMC in January
2016. Pl.'s Mot. Summ. J. at 7; *see also* Appx 331.

On January 6, 2016, Sfakianos sent a memorandum to the Board recommending Male
Comparator's appointment to BVAMC, wherein—as with Plaintiff—she justified an upward
departure from the minimum pay rate for the position. Appx 334. In relevant part, Sfakianos'
memo states:

1. The following candidate, [Male Comparator], has been selected as a Clinical
Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center. He
has met all the requirements to be considered for initial appointment. I
recommend his initial appointment as a GS-12, Step 10, which is above the
minimum rate of grade (GS-12, Step 1). This board action is recommended for
initial appointment and applies to the Licensed Pharmacist Qualifications
Standards in accordance with the provisions of VA Handbook 5005/55, Part II,
Appendix G15.

2. BVAMC will benefit greatly from the addition of [Male Comparator] to our
staff. He brings a wealth of experience with many years of pharmacy practice.

**Appx7**

He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration.

3.  The recommendation of a GS-12, Step 10 is requested to secure highly qualified candidate.  GS-12, step 10 is recommended to remain competitive and more closely meet current documented salary.  In addition, candidate received a very positive reference from former employers.  The enclosed board action is submitted for review and recommendation. . . .

*Id*.  On January 11, 2016, the Board provided its recommendation that Male Comparator be appointed as a clinical pharmacist at GS-12, Step 10.  Appx 333.  The Board's recommendation states:

1.  BVAMC will benefit greatly from the addition of [Male Comparator] to our staff.  He brings a wealth of experience with many years of pharmacy practice.  He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration.  [Male Comparator's] experience will be valuable in treating veterans in the Huntsville CBOC as a new expanded clinic where a hybrid model will be utilized between dispensing functions and direct patient care.

2.  The recommendation of a GS-12, Step 10 is requested to remain competitive and more closely meet current documented salary of this highly qualified candidate.  In addition, candidate received a very positive reference from former employers.  The enclosed board action is submitted for review and recommendation. . . .

*Id*.  The record suggests that Thomas C. Smith, III, Medical Center Director, approved the Board's recommendation on January 22, 2016.  Appx 332.

## D.  Plaintiff's Discovery of Step Differential

In July 2018, three years after her hiring, Plaintiff learned she was paid at a lower rate than three pharmacists she worked with at BVAMC's Huntsville clinic—one male and two females.[6]  Appx 153, 291.  In a July 24, 2018, email to Angela Craig, the Supervisory Human Resources Staffing Specialist for BVAMC, Plaintiff alleges:

---

[6] The VA's "Investigative Report" for Plaintiff's "EEO Complaint of Discrimination" includes the following computation regarding prior salary:

The past three years I have made $10,000 less per year than all three. I explained to Ms. Sfakianos that my performance the last three years has exceeded the other three pharmacists and Ms. Sfakianos explained that my salary was a difference in the boarding process. She feels that prior salary made a difference for the other pharmacists, but I am concerned that my previous salary was not recommended clearly to [the Board].

Appx 291. Plaintiff's email also states, "I have a higher degree than one pharmacist, more clinical experience and years of experience relative to this career at the VA, and a higher evaluation than the other pharmacists." *Id*. In response to Plaintiff, Craig writes:

The Professional Standards Board (PSB) set the pay for Pharmacists. The service manager send [sic] a recommendation memo to HR. We attach this memorandum with your resume and application and send this to the PSB. It is up to the PSB, which are the subject matter experts, to take into consideration what the manager recommends (grade and step).

Appx 287.

On July 24, 2018, Plaintiff emailed Sfakianos purporting to cite Office of Personnel Management ("OPM") guidance regarding salary and step determinations, which in turn cites as

---

Pay information submitted to the Pharmacy Professional Standards Board by [Plaintiff] and [Male Comparator] shows that the pay stub provided by [Male Comparator] indicates that his previous employer paid him a rate of $62.50 per hour which worked out to yearly calculated rate of $130,000 when multiplied by the number of work hours in a year (2080). The first pay stub provided by [Plaintiff] indicated that she was paid $4,791.80 in a pay period. It also indicated that [Plaintiff] was paid by her previous employer 24 times a year for a yearly calculated rate of $115,003. [Plaintiff] also submitted a paystub that covered May 17, 2015, to May 23, 2015, indicating she had worked 6.75 hours, this page includes a handwritten note that advises this is part-time work, and that HR cannot combine full-time and part-time to equal one full-time VA position. She also submitted a W-2 tax form indicating that she made $15,627.93 in 2014 from the same employer. The W-2 also has a handwritten note indicating it was part-time employment. She also turned in a print out indicating pay from 2011 which also includes a handwritten note stating that it was not used as it was not current.

A document showing special rates for the city of Huntsville, Alabama, where the Huntsville Clinic is situated, shows that for this locality the rate of pay for GS-12 positions are as follows: Step 7 at $115,364, Step 8 at $118,570, Step 9 at $121,775, and Step 10 at $124,980.

Appx 154–155 (internal citations omitted).

"References" 5 U.S.C. § 5333 and 5 C.F.R. § 531.212.[7]  Appx 189–190.  On July 30, 2018, Sfakianos—in responding to each line of Plaintiff's cited "OPM guidance" in turn—explained that Plaintiff's "experience was one of the reasons used for justification for boarding at a step 7" and that Plaintiff's "previous full time salary (stub provided) was used by the Board and HR when the initial step was recommended."  Appx 185.  Moreover, the "same boarding factors were used for all pharmacists hired."  Appx 186.  Plaintiff, disagreeing with Sfakianos' statement regarding her experience, points to the June 9, 2015, email from Sfakianos telling Plaintiff, "[t]hey do not base [salary] on years of experience."  Appx 184 (original at Appx 71).  Sfakianos replied:

> I stated . . . that salary is not based on "years" of experience.  Your mental health experience was noted [in] your boarding request.
>
> We tried to justify as much as we could.  The [clinical pharmacist] position in the Huntsville Annex did not require any mental health experience.  I agree that your 4 years working at the State mental health facility was beneficial, as a large portion of our population has mental health needs.  That is why it was noted in the boarding information.

Appx 183 (emphasis in original).

On August 2, 2018, Plaintiff met with Lorelei Hudson, Assistant Chief Human Resources Officer for BVAMC, as the "next level" in the grievance process.  Appx 97.  The day after, Hudson emailed Sfakianos regarding her own review of the boarding process for Plaintiff, Male Comparator, and Plaintiff's two other clinical pharmacist coworkers (both female)[8] who—like Male Comparator—were hired at Step 10:

> I explained to [Plaintiff] that I determined the board actions were completed in accordance with VA Handbook 5005/55 Part 11, Appendix G15.  I explained that based on this information there was no legal/regulatory basis for me to correct her salary.  I expressed to [Plaintiff] that salary negotiations should occur when job offers are extended and at that time an applicant may decline or accept the job offer.

*Id.*

---

[7] Plaintiff begins her email to Sfakianos stating, "Ms. Craig asked for OPM guidance, so I wanted to send to you also."  Appx 189–190.  It is not clear from where or whom Plaintiff received the "Pay Rate Determination" information, which references 5 U.S.C. § 5333 and 5 C.F.R. § 531.212.  *Id.*

[8] While Hudson's email only provides the names of the four clinical pharmacists, the VA's "Investigative Report" demonstrates that the two other comparator clinical pharmacists at the Huntsville clinic at the time of Plaintiff's grievance were female and boarded at the Step 10 rate.  Appx 121.

10

**Appx10**

### E. Equal Employment Opportunity Investigation

Unsatisfied with the response she received from BVAMC, Plaintiff consulted with an Equal Employment Opportunity ("EEO") counselor in the VA's Office of Resolution Management ("ORM") on August 3, 2018. Appx 102, 105–08. In the counselor's report, Plaintiff's claim is noted as an alleged EPA violation on the bases of race and sex, for which Plaintiff seeks "[p]ay equal to her coworkers at the Step 10 rate." Appx 106. It also notes Plaintiff's allegation that "Sfakianos did not accurately account for her past salary, and denied her request for pay increase when evidence was provided." *Id.* On August 17th, in response to Plaintiff's consultation with ORM, Renee Smith, Chief of Pharmacy Service, explained:

> The pharmacist application process consists of submitting the applicant's package along with a BVAMC memo with salary recommendation. In accordance with the requirements set forth in VA Handbook 5005, Appendix G-15 Licensed Pharmacist Qualification Standard, the Pharmacist Professional Standards Board reviews the qualifications and application package. The memoranda for boarding recommendations for each of the GS-12 pharmacists is submitted as Attachment 1. In accordance with VA Handbook 5005/86, Part 11, Appendix O, the local facility will board appointments for Pharmacist, GS-660-12 and below. The Board determines Grade/Step for initial appointments, then the board action is routed to the Medical Center Director for signature. A firm job offer is extended to the Pharmacist and at that time they may accept or decline the job offer. Pharmacist salary negotiation occurs 'up front' during the application and boarding process which in the case of Ms. Boyer was July 2015.

Appx 121. Smith concluded that "[Plaintiff's] race and sex where [sic] not a determining factor in her Step determination," and "pharmacists of both White and female EEO protected category were hired at the Step-10 rate." *Id.*

Following an unsuccessful mediation, Plaintiff filed a formal EEO complaint on October 23, 2018, alleging wage discrimination "because of my female gender and race." Appx 102. She points specifically to Male Comparator as having "an identical job to mine and was hired in at a higher level than me despite the fact that I have more experience and superior qualifications than him." *Id.* The record then proceeds with EEO affidavits of Plaintiff, Sfakianos, and other VA officials, the transcripts of which Plaintiff and the government reference throughout their briefs.

The EEO affidavits begin with Plaintiff's testimony. When asked to identify the officials responsible for her alleged discrimination, Plaintiff replied, "Monica Sfakianos is responsible for boarding me." Appx 168. Regarding her salary determination, Plaintiff testified that Sfakianos

**Appx11**

"told me that she recommends a certain step and then the rest of the group can either approve that, go along with it, or disapprove it. So, she recommends the step." Appx 171. Later, however, Plaintiff testified, "I think that [Sfakianos] can basically recommend whatever she wants to recommend. And that the board would approve whatever she recommended." Appx 174. Plaintiff continued, "I deserve to be boarded at a step 10 because I perform the same exact duties as the Pharmacists here in Huntsville. Especially [Male Comparator]. I know his work history and . . . [h]e has only retail pharmacy experience and has less experience by seven years." *Id*.

Plaintiff also testified that she had explained to Sfakianos about working two jobs— Kroger and the North Alabama Regional Hospital—for the seven years preceding her VA boarding, but Sfakianos "told me that she could not look at my salary from the combination of my past two jobs . . . ." Appx 175–176. Plaintiff explained that her hospital employment "had a lower salary there because there were a lot of benefits and perks that no one else offers in Pharmacy." Appx 176. For example, Plaintiff "could get off work any time [she] wanted to," "accrued like three days of comp time every month," and "was able to spend – do things with [her] family a lot easier than [she could] at and [sic] other job." *Id*. The hospital closed in May 2015, so Plaintiff "asked Kroger if [she] could work full-time for them. . . . So, [she] worked basically full-time several weeks until [she] could get in with the VA." Appx 176–177. Plaintiff continued:

> And [Sfakianos] said she could not consider neither a combination of my salaries from the State of Alabama and Kroger and she could not consider my hourly rate from Kroger either because that was considered a premium rate. Well, I have a problem with that. That was just another reason I felt it was discrimination. She did not even want to consider my salaries. She thought she could give me a lower rate because I guess I was laid off from my dream job.

Appx 177.

Sfakianos also testified. Asked to describe the normal process for boarding a pharmacist, she explained:

> So when we look at the boarding process to bring [pharmacists] in they may come in between a step one and a step ten. Everybody is assumed to come in at the minimum which a [sic] step one. To bring someone up – to justify above the minimum you have to have specific reasons to justify that. Some examples of those reasons are residency. There's a one and a two-year residency. They could get a step for that. If they have a national certification that could qualify for like two steps. They have to have very specific qualifications to grant anything above

12

**Appx12**

a step one.  Another way to justify bringing someone in above the step one is their current salary – is to match current salary as best you can.  And so more times than not that is the way we bring people in because it helps us get that employee in and not expect them to take a loss in pay to come to work for us.  And when our recommendation goes to Human Resources, they review our justifications and they have to agree with that before they will sign off on it as the technical representative on the board.

Appx 198–99.  Sfakianos testified that she had participated in the boarding of more than twenty pharmacists, including both Plaintiff and Male Comparator, for whom she "prepared the recommendation memo."  Appx 199.  Asked about her recommendation of each, Sfakianos testified:

Each Pharmacist there was boarded based on their current salary.  We requested that they submit current pay stubs so that we could match.  Otherwise, they would have been brought in [at] much lower steps.  And the salary is the easiest way to justify.  So we did have pay stubs for each of those employees.  We looked – or I looked at the current pay scale at that time versus that person's current salary and most closely matched that salary as I could on the step level from one to ten.

Appx 199–200.  Sfakianos added this was done "[e]very time" she recommended a pharmacist for hire.  Appx 200.  As for Plaintiff's pay stubs, "we used her most current full time pay stub as a comparator to rate her steps for her current one full-time job with the VA."  *Id*.  Sfakianos stated that she "boarded everybody exactly the same without regards to anything special other than their current pay stubs."  Appx 201.

The EEO investigation also obtained testimony from members of the Board.   Lisa Ambrose, a pharmacist who served on the Board for Plaintiff and Male Comparator, described the "normal" boarding process at BVAMC as follows:

[W]e basically have an algorithm that we look at that says you know if this person has had this many years of service then they are rated at this step.  If they have certain publications, then they are rated at certain steps.  So basically it's an algorithm.  And then we also historically have taken into account a person's current or most recent pay stubs from the job in which they're coming from into the VA.  And we try to match as closely as we can to what they're currently being paid.

Appx 210.  Ambrose acknowledged that Plaintiff "may have been offered less than a package than others based on where she was coming from."  Appx 212.  She continued:

13

**Appx13**

I do know that we've had Pharmacists with the same exact credentials if you just looked at their education and experience. But then if you look at their pay stubs of where they're coming form [sic] it can make a huge difference. It can make the difference between a step three and a step ten just based on what they're currently being paid. That's the biggest factor that we always took into consideration. We don't want to short change people who are coming and taking pay cuts to come here. But we don't want to overpay people if they're not already making the higher amount.

*Id.*

Kendra Brookshire, Associate Chief of Pharmacy Service, served as the chairman of the Board for Plaintiff and Male Comparator. Similarly asked about the normal boarding process, Brookshire testified:

So Pharmacists salaries are basically kind of dictated and guided you know through Professional Standards Boards. So we have qual [sic] standards that would determine the grade. And then the steps are generally based on qualifying experience or – generally we would go qualifying experience initially. . . . So we look at their education, training, and qualifying experience and kind of go that route. But at the end of the day pay stubs can basically trump what would be determined by the qualifying experience.

Appx 220. Describing the role of the Board, Brookshire explained:

The board actually you know are making a recommendation but still, it's not the final say. So you know the process would be if I'm a supervisor and I'm submitting a board I would you know evaluate you know the information that I have and their background and their experience. And you know I could submit that and then the board is going to review that and consider it. But even after that, it goes you know through HR and through the VISN for a final determination. So it's really kind of more of a recommendation than an absolute decision.[9]

_____

[9] Later, Brookshire reiterated that the Board's recommendation is not necessarily final, stating:

You know neither the supervisor nor really the board has the final say on [recommendations]. You know it is not unusual that a supervisor would make one recommendation and the board go back and evaluate it and is like no we – you know that doesn't really match up. Or the for the board to make a recommendation it [sic] to get to the next level and they say it does not match up. So I think that that's a really important piece. Is that it's a recommendation process.

Appx 221.  Asked again about how salary steps are determined, Brookshire testified:

> So the way that it would normally go is our first scenario is going to kind of be
> you know to look at that relevant experience.  But then if the employee – they can
> choose on the front end to provide you know prior pay stubs.  Or it could be that
> you know they're presented with you know this could be your salary, and they're
> like oh I can't come for that.  You know, and then you know they may be asked to
> provide pay stubs.  But at any rate, if their pay stubs would justify a higher salary
> then really that experience – relevant experience kind of just goes to the wayside.

Appx 222.  Regarding Male Comparator, Brookshire observed that "[h]e also had an MS Degree
in Biological Sciences and a BS Degree.  So those were not required for Pharmacy School, but
that was additional education that he had."  Appx 223.  She also indicated that Huntsville "is a
little more challenging area for recruitment . . . so we would certainly have been inclined to be
willing to match pay to get somebody on board."  Appx 227.

## F.  Subsequent Proceedings and the Instant Case

Aside from the VA's "Investigative Report" of February 2019, Appx 151–61, the record
is devoid of conclusions or recommendations by ORM concerning Plaintiff's formal EEO
complaint.  The government suggests this is "because less than two months later, in April 2019,
[Plaintiff] filed suit in the United States District Court for the Northern District of Alabama,
alleging a violation of the [Equal Pay Act] . . . ."  Gov.'s Mot. Summ. J. at 19 (citing *Boyer v.
Wilkie*, No. 2:19-CV-00552-JEO (N.D. Ala. Feb. 13, 2020)).  After initially ruling in favor of
Plaintiff on summary judgment, the presiding magistrate judge in that matter determined the
district court lacked subject matter jurisdiction and transferred the case to this Court.  *Boyer v.
Wilkie*, No. 2:19-CV-00552-JEO, 2020 WL 733181, at *1 (N.D. Ala. Feb. 13, 2020) ("Plaintiff
agrees with Defendant that the amount in controversy is greater than $10,000. . . .  As such, the
'Little Tucker Act' applies to her Equal Pay Act claims and the court lacks jurisdiction over the
claim.").  In transferring the case, the magistrate vacated his earlier ruling on summary judgment.
*Id*. at *2.  Plaintiff's complaint here, like its predecessor in the district court, alleges the
government "willfully violated the Equal Pay Act by paying Plaintiff lower wages to a similarly
situated male performing a job of equal skill, responsibility and effort under similar working
conditions."  Transfer Compl. ¶ 18.

With the dispute now firmly before this Court, the parties have crossed-moved for
summary judgment—largely grounded in conflicting interpretations of the same materials in the

Appx 226.

record.[10]  Plaintiff asserts she has undisputedly established a prima facie case under the EPA.
Pl.'s Mot. Summ. J. at 5; *see also id.* at 16–17.  Thus, and as explained more below, the burden
shifts to the government to establish an affirmative defense.  On this point, Plaintiff argues that
the record "contains sworn testimony showing that Defendant relied on prior salary alone in
hiring her at a lower rate of pay than her male comparator," *id*. at 5, and that experience was not
a factor in BVAMC's step determination, *id*. at 25–26.  Plaintiff avers that she "undisputedly had
six more years of pharmacy experience," *id*. at 25, yet BVAMC paid Male Comparator more
"without identifying any ways in which his experience exceeded Plaintiff's," *id*. at 26.
Therefore, according to Plaintiff, the case "turns on whether Defendant's sole reliance on prior
salary constitutes reliance on 'any other factor other than sex' to establish an affirmative defense
under the Equal Pay Act." *Id*. at 6.  Plaintiff urges the Court to "follow the numerous courts that
have held that reliance on prior salary, and especially reliance on prior salary <u>alone</u>, is
insufficient to establish an affirmative defense under [the Equal Pay Act]." *Id*. (emphasis in
original).

In cross-moving, the government admits that Plaintiff "demonstrates a *prima facie* case
under the Equal Pay Act . . . because she was paid less than a certain male coworker at
[BVAMC]."  Gov.'s Mot. Summ. J. at 1.  However, according to the government, BVAMC
"possessed legitimate factors other than gender for the plaintiff's starting salary."  *Id*.  Citing the
laws governing pay of VHA employees, the government asserts "[t]he plaintiff cannot
demonstrate that the agency considered her gender in establishing her initial base pay . . . ."  *Id*.
Rather, "[t]here is no violation of the [Equal Pay Act] because any disparity in pay is due to the
proper application of the *bona fide* gender neutral VHA compensation system covering
[Plaintiff] as well as all other [BVAMC] clinical pharmacists." *Id*. at 2; *see also id.* at 24–32.
The government also argues that Plaintiff fails to indicate any pretext for discrimination, having
"presented *no* evidence that the agency's proffered nondiscriminatory reasons are untrue and that
intentional discrimination is the real reason [Plaintiff] allegedly received less compensation than
her male comparator." *Id*. at 32 (citation omitted) (emphasis in original).  Finally, the
government rejects Plaintiff's allegation of a willful violation of the EPA—which, if found,
extends the relevant statute of limitations—arguing Plaintiff's complaint "lacks any supporting
facts or circumstances" to support a claim of willfulness.  *Id*. at 34–35.

Responsive briefing largely restates the arguments set forth in the cross-motions for
summary judgment.  Plaintiff's response challenges the government's reliance on OPM's
regulatory scheme, arguing that "Defendant made no finding that [Male Comparator's]
qualifications were significantly higher compared to Plaintiff's qualifications; accordingly, the
regulatory language does not authorize reliance on prior salary here."  ECF No. 50 at 17 ("Pl.'s
Resp.").  Reiterating segments of Sfakianos' testimony, *see* Appx 201 ("I boarded everybody
exactly the same without regards to anything special other than their current pay stubs"), Plaintiff

---

[10] *See supra* note 3 (regarding the Court's references to "materials in the record").

urges the Court "to follow the majority of Circuits that have considered" the issue of prior pay under the EPA and deny the government's motion, Pl.'s Resp. at 25.  Moreover, "because Defendant has failed to meet its burden of establishing its affirmative defense . . . the Court should not reach the pretext stage of the burden-shifting analysis."  Pl.'s Resp. at 26–27.

The government's response asserts that "statutory and regulatory authority, as well as VHA Handbook 5007, *all* permit an agency to consider existing pay *alone* in setting the initial rate of compensation for employees."  ECF No. 49 at 3 ("Gov.'s Resp.") (emphasis in original).  Even so, "there is actually no dispute of material fact that the board primarily considered prior pay, but also looked to experience and other factors."  *Id*. at 7.  The government also challenges Plaintiff's reliance on EPA case law, given the specific policies and authorities at issue in the instant matter concerning a federal employee.  *Id*. at 12.

The reply briefs offer much the same, with Plaintiff reiterating the government's failure "to come forward with proof that it considered anything other than prior salary alone" and urging the Court to "hold that reliance on prior salary alone is insufficient" as an affirmative defense.  ECF No. 55 at 5 ("Pl.'s Reply") (emphasis in original).  Regarding the regulations at issue, Plaintiff again asserts that "[h]ad [Male Comparator's] experience indeed been greater than the Plaintiff's, and had [BVAMC] made that determination prior to setting his salary, [BVAMC] would not have run afoul of the [Equal Pay Act] . . . ."  *Id*. at 9.  In reply, the government suggests Plaintiff's reading of the regulation incorrectly "conflates the determination of whether a candidate has 'superior qualifications' with the selection of the pay rate," ECF No. 57 at 4 ("Gov.'s Reply"), and it reiterates the "uncontroverted evidence that the agency considered multiple factors—background, experience, and prior pay—and that while prior pay may have been afforded more weight, that was likewise permissible" under the governing law.  *Id*. at 12.

The Court held oral argument on the cross-motions for summary judgment, which are now ripe for consideration.

## DISCUSSION

### A.  Legal Standard

#### 1.  Summary Judgment

Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC") provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the . . . court of the basis for its motion" and must identify the portions of the record

that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former version of Fed. R. Civ. P. 56(c)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. For a dispute over a material fact to be genuine, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." RCFC 56(c)(1)(A)–(B).

The judge's function at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Anderson*, 477 U.S. at 249, bearing in mind that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 (1970)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" thus making summary judgment appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The foregoing also applies in cases, as here, in which the parties have cross-moved for summary judgment. *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009). "[E]ach motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." *Id.* (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). "To the extent there is a genuine issue of material fact, both motions must be denied." *Id.* at 969.

## 2. Equal Pay Act

Enacted in 1963 as an amendment to the Fair Labor Standards Act ("FLSA"), the Equal Pay Act provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of

which requires equal skill, effort, and responsibility, and which are performed
under similar working conditions, except where such payment is made pursuant to
(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings
by quantity or quality of production; or (iv) a differential based on any other
factor other than sex . . . .

29 U.S.C. § 206(d)(1). Through the EPA, Congress sought to correct the "serious and endemic
problem of employment discrimination in private industry—the fact that the wage structure of
'many segments of American industry has been based on an ancient but outmoded belief that a
man, because of his role in society, should be paid more than a woman even though his duties are
the same.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting S. Rep. No.
176, 88th Cong., 1st Sess., 1 (1963)); *see also Yant v. United States*, 588 F.3d 1369, 1371 (Fed.
Cir. 2009) (stating that Congress acted "to prevent gender-based wage discrimination by
enacting the Equal Pay Act"). The Act is "broadly remedial, and it should be construed and
applied so as to fulfill the underlying purposes which Congress sought to achieve." *Corning
Glass Works*, 417 U.S. at 208. In 1974, Congress extended the FLSA's coverage, including the
EPA, to include most federal employees. Fair Labor Standards Amendments of 1974, Pub. L.
No. 93–259, 88 Stat. 55 (1974); *see also* 29 U.S.C. § 203(d)–(e).

Under the EPA, the burden of establishing a prima facie case of wage discrimination rests
on a plaintiff, who "must show that an employer pays different wages to employees of opposite
sexes 'for equal work on jobs the performance of which requires equal skill, effort, and
responsibility, and which are performed under similar working conditions.'" *Corning Glass
Works*, 417 U.S. at 195 (referencing 29 U.S.C. § 206(d)(1)). If a plaintiff is successful in
carrying this burden, "the burden shifts to the employer to show that the differential is justified
under one of the Act's four exceptions." *Corning Glass Works*, 417 U.S. at 196; *see also
Gordon*, 903 F.3d at 1252 ("Once an employee in an EPA case establishes a prima facie case of
salary discrimination, the burden of persuasion shifts to the employer to prove that the wage
disparity was justified by one of four permissible reasons . . . ."). "The burden on an employer to
establish an affirmative defense is 'a heavy one.'" *Cooke v. United States*, 85 Fed. Cl. 325, 342
(2008) (quoting *Mansfield v. United States*, 71 Fed. Cl. 687, 693 (2006)), *dismissed*, 352 F.
App'x 429 (Fed. Cir. 2009). And "[a]n employer must prove that the gender-neutral factor it
identified is indeed *the* factor causing the wage differential in question." *Behm v. United States*,
68 Fed. Cl. 395, 400 (2005); *see also U.S. Equal Emp. Opportunity Comm'n v. Md. Ins. Admin.*,
879 F.3d 114, 121 (4th Cir. 2018) (holding that employers must prove "not simply that the
employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do
in fact* explain the wage disparity").

Centrally relevant in the instant matter is the EPA's fourth affirmative defense, which
permits employers to use "a differential based on any other factor other than sex . . . ." 29 U.S.C.

19

§ 206(d)(1)(iv). The case law varies among the circuits as to the factors other than sex this exception can or cannot sustain, and the Federal Circuit has not yet clearly spoken on the issue.[11] The Second Circuit, for example, requires employers to "bear[] the burden of proving that a bona fide business-related reason exists for using the gender-neutral factor that results in a wage differential in order to establish the factor-other-than-sex defense." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir. 1992). In the Sixth Circuit, "the 'factor other than sex' defense does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *U.S. Equal Emp. Opportunity Comm'n v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988). The Ninth Circuit, prior to a recent decision that goes a step beyond, opined that employers "cannot use a factor which causes a wage differential between male and female employees absent an acceptable business reason." *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir. 1982), *overruled by Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018), *and overruled by Rizo v. Yovino*, 950 F.3d 1217 (9th Cir. 2020) (en banc). Notably, this Court has previously "reject[ed] the gloss placed on the statute by the Second, Sixth, and Ninth Circuits." *Behm*, 68 Fed. Cl. at 400. In other circuits, "[t]he factor need not be 'related to the requirements of the particular position in question,' nor must it even be business-related." *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1462 (7th Cir. 1994); *see also Taylor v. White*, 321 F.3d 710, 719 (8th Cir. 2003) ("[O]ur concern is not related to the wisdom or reasonableness of the asserted defense.").

The disagreement among the circuits is even more apparent regarding a defendant's use of prior or existing salary as the proffered "factor other than sex." In the Tenth and Eleventh Circuits, prior pay alone cannot justify a wage differential. *See Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015) ("[A]n individual's former salary can be considered in determining whether pay disparity is based on a factor other than sex. . . . However, the EPA 'precludes an employer from relying solely upon a prior salary to justify pay disparity.'") (citation omitted); *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) (Prior salary "cannot solely carry the affirmative defense."). More nuanced, in the Eighth Circuit, "[w]hen prior salary is asserted as a defense . . . this court carefully examines the record to ensure that an employer does not rely on the prohibited 'market force theory' to justify lower wages for female employees simply because the market might bear such wages." *Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1073 (8th Cir. 2009) (citations omitted). The Eight Circuit's "concern is related solely to the issue of whether the prior salary is based on a factor other than sex." *Id.*

---

[11] In *Yant v. United States*, the Federal Circuit affirmed summary judgment regarding an EPA claim in favor of the government because the plaintiffs had "failed to raise a genuine issue of material fact that the pay differential . . . is either historically or presently based on sex." 588 F.3d at 1372. The circuit also noted that "the difference in pay [in *Corning Glass Works*] was based *solely* on gender. As such, and consistent with the language of the statute, this was a violation of the [EPA]." *Id.* at 1373 (emphasis added). The case did not examine the scope of the EPA's exceptions but, rather, stands for the proposition that "[a]n [EPA] violation is established when an employee demonstrates past or present discrimination based on sex." *Id.* at 1374.

In the Fourth and Seventh Circuits, prior salary alone is a permissible "factor other than sex." *See, e.g., Wernsing v. Dep't of Hum. Servs., State of Ill.*, 427 F.3d 466, 468 (7th Cir. 2005) ("Wages at one's prior employer are a 'factor other than sex' and so . . . an employer may use them to set pay consistently with the Act."); *Spencer v. Va. State Univ.*, 919 F.3d 199, 206 (4th Cir. 2019) (denying EPA claim in which "the wage difference at issue resulted from the University setting [claimant's and comparator's] pay at 75% of their previous salaries as administrators"). In stark contrast, the Ninth Circuit recently held that employers, in defending against a prima facie EPA claim, "must demonstrate that any wage differential was in fact justified by job-related factors other than sex. Prior pay, alone or in combination with other factors, cannot serve as a defense." *Rizo*, 950 F.3d at 1231.

The Supreme Court asserted decades ago that the "fourth affirmative defense of the Equal Pay Act . . . was designed differently, to *confine* the application of the Act to wage differentials *attributable to* sex discrimination." *Washington Cty. v. Gunther*, 452 U.S. 161, 170 (1981) (citations omitted) (emphasis added). Moreover, "[u]nder the Equal Pay Act, the courts and administrative agencies are not permitted to 'substitute their judgment for the judgment of the employer . . . who [has] established and applied a bona fide job rating system,' so long as it does not discriminate on the basis of sex." *Id*. at 170–71 (quoting 109 Cong. Rec. 9209 (1963) (statement of Rep. Goodell)).

To summarize, the circuits are split between prior salary alone being an acceptable factor other than sex (Fourth and Seventh), prior salary being an acceptable factor when combined with other factors (Eighth, Tenth, and Eleventh), and prior salary never being an acceptable factor to consider (Ninth).

In addition, if a defendant is able to establish that a factor other than sex was used to justify the salary differential, it is generally accepted that the burden of production shifts to the plaintiff to demonstrate that the proffered justification for the wage differential is pretextual. *See Moorehead v. United States*, 88 Fed. Cl. 614, 624 (2009) ("A plaintiff may counter an affirmative defense under the Equal Pay Act by producing evidence that 'the reasons the employer seeks to advance are actually a pretext for sex discrimination.'") (citing *Aldrich*, 963 F.2d at 526); *Behm*, 68 Fed. Cl. at 400 ("[T]he question of pretext places, at the least, a burden of production on plaintiffs to come forward with evidence that could disprove (or, if you will, prevent the employer from proving) the affirmative defense."). While the Federal Circuit has not explicitly opined on the question of pretext, other circuits have included this "third" step in their own Equal Pay Act analyses. *See, e.g., Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752–53 (6th Cir. 2016) ("We have read the EPA to establish a three-step burden-shifting scheme . . . . *Finally*, if an EPA defendant proves an affirmative defense, an EPA plaintiff 'must come forward with evidence demonstrating the existence of a triable issue of fact' regarding pretext.")

**Appx21**

(citations omitted); *Irby*, 44 F.3d at 954 ("When the defendant overcomes the burden, the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential.") (citations omitted); *Covington v. S. Ill. Univ.*, 816 F.2d 317, 322 (7th Cir. 1987) ("Although we realize that a plaintiff need not establish discriminatory intent . . . we do not believe that the Act precludes an employer from carrying out a policy which . . . has in no way been shown to undermine the goals of the EPA."); *but see Rizo*, 950 F.3d at 1223 ("EPA claims have just two steps: (1) the plaintiff bears the burden to establish a prima facie showing of a sex-based wage differential; (2) if the plaintiff is successful, the burden shifts to the employer to show an affirmative defense. No showing of pretext is required.").

### 3. Federal Hiring and Pay Authority

Of particular relevance in the instant matter, Congress has statutorily prescribed the circumstances under which most federal employees' initial salary may be set above the minimum step of the appropriate grade under the GS system. First enacted in 1966, 5 U.S.C. § 5333 provides in relevant part:

> New appointments shall be made at the minimum rate of the appropriate grade. However, under regulations prescribed by the Office of Personnel Management which provide for such considerations as the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government for his services, the head of an agency may appoint, with the approval of the Office in each specific case, an individual to a position at such a rate above the minimum rate of the appropriate grade as the Office may authorize for this purpose.

5 U.S.C.A. § 5333. In other words, new government employees are presumed to start at the minimum salary step (or rate) unless "the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government" justifies an upward departure. These pay rate decisions are further governed by OPM regulations outlining agencies' "Superior qualifications and special needs pay-setting authority," which state:

> (a) Agency authority.
>
> (1) An agency may use the superior qualifications or special needs pay-setting authority in 5 U.S.C. 5333 to set the payable rate of basic pay for an employee above the minimum rate of the highest applicable rate range for the employee's position of record. . . .

22

**Appx22**

(b) Superior qualifications or special needs determination. An agency may set the payable rate of basic pay of a newly appointed employee above the minimum rate of the grade under this section if the candidate meets one of the following criteria:

(1) The candidate has superior qualifications. An agency may determine that a candidate has superior qualifications based on the level, type, or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors that support a superior qualifications determination. The candidate's skills, competencies, experience, education, and/or accomplishments must be relevant to the requirements of the position to be filled. These qualities must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality compared to other candidates . . . .

(c) Pay rate determination. An agency may consider one or more of the following factors, as applicable in the case at hand, to determine the step at which to set an employee's payable rate of basic pay using the superior qualifications and special needs pay-setting authority:

(1) The level, type, or quality of the candidate's skills or competencies;

(2) The candidate's existing salary, recent salary history, or salary documented in a competing job offer (taking into account the location where the salary was or would be earned and comparing the salary to payable rates of basic pay in the same location) . . . .

5 C.F.R. § 531.212.

Case law on this statutory and regulatory authority is sparse at best. The Court has identified only one case in which these provisions have been clearly addressed in conjunction with the EPA. Reviewing a claim brought by an employee of the U.S. Department of Education, another judge of this Court noted "that 'existing pay' is enshrined both in section 5333 and 5 C.F.R. § 531.212(c) as a valid factor in setting the starting pay of federal employees." *North v. United States*, 123 Fed. Cl. 457, 466 (2015).

## B. Analysis

As noted above, despite the Federal Circuit's decision in *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009), the government concedes that Plaintiff has established a prima facie case under the EPA. Gov.'s Resp. at 2 ("As an initial matter, in our answer, we agreed that [Plaintiff]

23

**Appx23**

established a *prima facie* case . . . .").  Accordingly, the crux of this dispute—and the focus of the cross-motions for summary judgment—comes down to whether the government has established an affirmative defense.  Because "each motion is evaluated on its own merits" with reasonable inferences "resolved against the party whose motion is being considered," the Court now addresses the respective motions in turn.  *Marriott Int'l Resorts*, 586 F.3d at 968–69 (citation omitted).

### 1.  Plaintiff's Motion for Summary Judgment

Plaintiff's motion for summary judgment boils down to two interrelated assertions, one legal and one factual.  First, Plaintiff asserts that as a matter of law an EPA defendant may not rely on prior salary *alone* as a "factor other than sex" in justifying a wage differential.  *See, e.g.*, Pl.'s Reply at 7.  Second, as to the facts, Plaintiff argues that there is no genuine dispute of material fact that the government relied on prior salary *alone* in paying Male Comparator more than Plaintiff.  Pl.'s Mot. Summ. J. at 25–26.

On the legal question, for the reasons discussed below regarding genuine issues of material fact, the Court does not need to conclusively decide whether prior salary alone is a factor other than sex in order to rule on Plaintiff's motion.  At this juncture, the Court only needs to determine, which it easily does,[12] that it is not going to follow the Ninth Circuit's decision in *Rizo*.  The legal standard in that case—that prior salary may never be used, even in combination with other factors, as a defense under the EPA—is the only legal standard under which Plaintiff could prevail on summary judgment given the material facts in dispute.  Under the standards followed in EPA cases other than *Rizo* and its progeny, Plaintiff is unable to demonstrate the absence of a genuine issue of material fact and, therefore, is not entitled to summary judgment on her claims.

---

[12] The opening paragraph of Judge McKeown's concurrence in *Rizo*, succinctly describes the problems with the reasoning of the majority *en banc* decision:

> The majority embraces a rule not adopted by any other circuit—prior salary may never be used, even in combination with other factors, as a defense under the Equal Pay Act.  The circuits that have considered this important issue have either outright rejected the majority's approach or declined to adopt it.  I see no reason to deepen the circuit split.  What's more, the majority's position is at odds with the view of the Equal Employment Opportunity Commission ("EEOC"), the agency charged with administering the Act.  And, perhaps most troubling, the majority fails to account for the realities of today's dynamic workforce, choosing instead to view the workplace in a vacuum.  In doing so, it betrays the promise of equal pay for equal work and disadvantages workers regardless of gender identity.

950 F.3d at 1232 (McKeown, J. concurring).

The Court begins with Plaintiff's assertion that "Defendant's *decisionmaker* has provided undisputed testimony that she relied on nothing other than prior salary . . . ." Pl.'s Mot. Summ. J. at 23–24 (emphasis added). The "decisionmaker," in Plaintiff's estimation, is Sfakianos, who, according to Plaintiff, "set the rates of pay for Plaintiff and [Male Comparator]." *Id*. at 24. Plaintiff focuses on Sfakianos' testimony as part of the VA's EEO investigation that "[e]ach Pharmacist there was boarded based on their current salary," Appx 199, and that she "boarded everybody exactly the same without regards to anything special other than their current pay stubs," Appx 201. Plaintiff also cites "the contents of" Sfakianos' recommendation letters to the Board as undisputed evidence "that Plaintiff was the more experienced hire; yet, Sfakianos recommended that [Male Comparator] be hired at Step 10 and Plaintiff at Step 7 . . . ." Pl.'s Mot. Summ. J. at 26. Thus, according to Plaintiff, "no reasonable [factfinder] could find that Defendant based the decision to pay [Male Comparator] more on 'prior pay and more experience'" and "judgment should be granted for the Plaintiff." *Id*. Respectfully, the Court disagrees.

Even if the Court were to adopt Plaintiff's conclusions from Sfakianos' *testimony*, which was taken three-and-a-half years after Plaintiff's boarding, that is not the end of the matter—especially when one views the rest of the record in the light most favorable to the government as the non-moving party. For example, just prior to Plaintiff's official hiring, Sfakianos informed Plaintiff that "[t]hey do not base [salary] on years of experience. It is more based on *education, residency, published articles, BCPS, etc...* but they do *consider* salary matching." Appx 71 (emphasis added). This communication alone, sent by email during the boarding process, suggests a multi-layered salary justification. Moreover, the Board's recommendation cites Plaintiff's "pharmaceutical skills, education *and* current salary" in justifying the step on the salary scale she was given. Appx 69 (emphasis added). Is a reasonable factfinder to ignore this more contemporaneous evidence?

Even if, for the sake of argument, the Court were to grant that the record could arguably support a conclusion that Sfakianos relied on prior salary alone, the record—viewed in the light most favorable to the non-movant—could equally support a conclusion that Sfakianos was *not* the "decisionmaker." Thus, a reasonable factfinder could find Sfakianos' alleged reasoning immaterial. Per the VISN 7 Board's policy, the "Representative will then forward the request and file to the Chair of the [relevant Board], who will . . . convene the necessary members to act on the request." Appx 307. Then, "[t]he *Board's* recommendation . . . will be returned to the originating HR Office *for final approval by the Medical Center Director*." *Id*. (emphasis added). Moreover, Kendra Brookshire, who served as the chairman of the Board for Plaintiff and Male Comparator, even testified that the Board "mak[es] a recommendation but *still, it's not the final say*." Appx 221 (emphasis added). So, whose recommendation and decision controls? And, thus, whose alleged justifications are material? Viewing the record in the light most favorable to the non-movant, it is the Board's recommendations and the Medical Director's decisions with

25

**Appx25**

respect to the salaries of Plaintiff and Male Comparator that are material.  While Plaintiff may be able to disprove this at trial, any conclusion to the contrary would require a weighing of facts, which is inappropriate for summary judgment.

Plaintiff also seemingly wants the Court to take judicial notice of the fact that she "was the more experienced hire . . . ."  Pl.'s Mot. Summ. J. at 26; *see also id*. at 25 ("Plaintiff undisputedly had six more years of pharmacy experience than [Male Comparator].").  Plaintiff's argument thus follows that prior salary must be the *only* factor accounting for the pay differential.  The Court does not dispute that Plaintiff received her doctorate in pharmacy years before Male Comparator.  But what constitutes "experience" is necessarily a factual inquiry.  As the government posits, Plaintiff "did not have [Male Comparator's] level of pharmacy management experience, nor his other advanced degrees . . . ."  Gov.'s Resp. at 6.  During the VA's EEO investigation, Brookshire also recalled that Male Comparator had "additional education . . . ."  Appx 223.  Moreover, the Board's recommendation for Male Comparator specifically cites how his "experience will be valuable in treating veterans in the Huntsville CBOC as a new expanded clinic where a hybrid model will be utilized between dispensing functions and direct patient care."  Appx 333.  Viewing the record in the light most favorable to the government, it cannot be said with certainty that *years* of pharmaceutical experience since graduation was the *only* type of "experience" that could have distinguished Plaintiff and Male Comparator for pay rate purposes.  Rather, this question is, again, one that would be suited for trial.

Plaintiff's motion for summary judgment rests entirely on a record that she did not further develop for purposes of her motion.  Plaintiff conducted no additional discovery (beyond initial interrogatories confirming the roles of individuals referenced in the VA's EEO Investigative Report), secured no depositions, and instead relies only on materials compiled for the Investigative Report as the indisputable proof of the government's reliance on prior salary alone.  Yet, that very record, as discussed above, leaves a reasonable factfinder with inconclusive results and genuine issues of material fact.

To be clear, Plaintiff could very well establish at trial that the government relied on prior salary *alone* in justifying the pay differential.  But that is not the procedural posture of this case.  Viewing the record in the light most favorable to the non-moving party, a reasonable factfinder could conclude that other factors were considered and incorporated into the pay differential.  Accordingly, Plaintiff has not met her burden of showing that there are no material facts in dispute; therefore, summary judgment in favor of Plaintiff is denied.

### 2.  The Government's Motion for Summary Judgment

Turning to the government's motion, the Court begins by reiterating the undeniable presence of a triable fact: whether existing or prior pay alone accounts for the pay differential between Plaintiff and Male Comparator. Above, the Court determined that a reasonable factfinder, examining the record in the light most favorable to the government, could conclude that existing or prior pay *plus* experience (and, perhaps, other factors) were used to set Plaintiff's and Male Comparator's respective salaries and justify the differential. But conversely, as to the government's motion for summary judgment, a reasonable factfinder viewing the facts in the light most favorable to Plaintiff could conclude that existing or prior pay *alone* explains the salary differential. Simply put, the parties draw markedly different, but reasonable, conclusions from the same factual record. *Compare* Pl.'s Mot. Summ. J. at 26 (describing Sfakianos' recommendation letters as undisputedly based on prior salary alone, which "[t]he Board and the approving authority then rubber-stamped") *with* Gov.'s Mot. Summ. J. at 31 (citing Sfakianos' recommendation letter of Plaintiff for the proposition that "experience had been noted in her boarding action").

Moreover, neither party offered additional evidence to support or rebut their conclusions nor conducted further discovery to aid the inquiry. This disagreement between the parties regarding whether pay alone or pay plus other factors resulted in the salary differential between Plaintiff and Male Comparator would necessitate a finding of fact, with the Court weighing the reliability of witness testimony and documentary evidence. However, because a judge "is not himself to weigh the evidence and determine the truth of the matter" at the summary judgment stage, *Anderson*, 477 U.S. at 249, the Court cannot grant summary judgment to either party on this factual question.

This is not the end of the inquiry, though, on the government's motion for summary judgment, as the Court must further determine whether the above factual dispute is one that "might affect the outcome of the suit under the governing law . . . ." *Anderson*, 477 U.S. at 248. As to the government's motion, the statutory and regulatory scheme surrounding the determining of federal government employee pay rates, as well as an undisputed admission by Plaintiff regarding factors that affected her salary at her previous employer, answer this question in the negative. This is because, although the Court cannot conclude on the cross-motions for summary judgment whether the VA determined the pay rates for Plaintiff and Male Comparator based on existing or prior pay alone, Plaintiff has only alleged such rates were determined based on existing or prior pay alone. And, for the reasons discussed below, in the context of setting federal employee pay, this method qualifies as a factor other than sex under the EPA.

As was discussed above, Plaintiff urges this Court to adopt the reasoning of either the Ninth Circuit (that prior salary may never be used, even in combination with other factors, as an affirmative defense under the EPA) or of the Eighth, Tenth, and Eleventh Circuits (that prior salary may only qualify as an affirmative defense to an EPA claim if it was considered in

27

combination with other factors) to determine in this case whether the government's alleged use of existing or prior pay alone qualifies as a factor other than sex.  In the cases Plaintiff advocates that the Court follow, the circuits determined that Congress did not intend prior pay to be a factor other than sex because setting salary based on prior pay may tend to perpetuate the gender-based pay gap that Congress otherwise intended to eliminate in passing the EPA.  Based on this reasoning, those circuits concluded that Congress could not have intended prior pay alone to be a factor other than sex.

However, those circuits were addressing whether Congress intended prior pay to be a factor other than sex in the context of non-federal employees.  They were not examining what may or may not constitute a factor other than sex in the context of statutory and regulatory hiring provisions related to federal employees, which, as explained below, explicitly allow for the use of existing or prior salary alone in determining pay rates.  In addition, the facts of the cases before those circuits do not appear to have any overlap with an undisputed admission made by Plaintiff that explains why her prior salary was lower than would be typical for a pharmacist of her experience.  Taken together or separately, the federal statutory and regulatory scheme and Plaintiff's admission regarding her prior salary demonstrate why, in this case, existing or prior pay *alone* qualifies as an affirmative defense under the EPA.

The Court begins with 5 U.S.C. § 5333, which provides the reasons for which an agency may depart from the minimum rate of pay for the appropriate grade for a federal government employee appointed under the GS system.  Under the statute, "[n]ew appointments shall be made at the minimum rate of the appropriate grade" unless "the *existing pay or* unusually high or unique qualifications of the candidate" justify appointing "an individual to a position at such a rate above the minimum rate of the appropriate grade . . . ."  5 U.S.C. § 5333 (emphasis added).

It is black letter law that statutory construction begins with the language of the statute itself.  *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579 (Fed. Cir. 1990).  "If the language is clear, the plain meaning of the statute will be regarded as conclusive."  *Van Wersch v. Dep't of Health and Hum. Servs.*, 197 F.3d 1144, 1148 (Fed. Cir. 1999) (citation omitted).  Turning to the text of § 5333, the Court takes particular note of the use of "or" in the statutory language.  After all, "the plain meaning of 'or' is disjunctive," because "in the English language, the word 'or' unambiguously signifies alternatives."  *Id*. at 1148, 1151; *see also In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) (noting that "a statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives'") (citation omitted); *United States v. Moore*, 613 F.2d 1029, 1039 (D.C. Cir. 1979) ("Normally, of course, 'or' is to be accepted for its disjunctive connotation, and not as a word interchangeable with 'and.'") (footnote omitted).  Therefore, § 5333, read literally, states that a new employee may be appointed above the minimum rate of the appropriate grade based on either "existing pay" *or*

"unusually high or unique qualifications" (or other factors established by OPM through regulation).

Moreover, "Congress is presumed to have intended a disjunctive meaning by using the disjunctive word 'or' . . . ." *Markovich v. Sec'y of Health and Hum. Servs.*, 477 F.3d 1353, 1357 (Fed. Cir. 2007). And "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise . . . ." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (citation omitted). In other words, "[t]he ordinary rule is that unless a strict grammatical construction frustrates legislative intent, the term 'or' is given a disjunctive interpretation." *Ruben by Ruben v. Sec'y of Dep't of Health & Hum. Servs.*, 22 Cl. Ct. 264, 266 (1991) (citing cases). There is nothing about the grammatical construction of § 5333 that suggests anything other than that the ordinary and usual disjunctive meaning of "or" was intended, nor would use of the disjunctive meaning of "or" result in an unreasonable interpretation of the statute. The provision simply contains a disjunctive list of reasons that permit an agency to depart from the minimum pay rate for a new appointment. Indeed, the list itself is non-exhaustive, with OPM permitted to add additional reasons for a departure. If the items on the list were intended to be joined by a conjunctive, a non-exhaustive list would make little sense. Accordingly, it appears clear that the use of "or" in § 5333 was intended to have its ordinary disjunctive meaning and thus, according to Congress, existing pay *alone*, without regard to high or unique qualifications or other factors, is an appropriate reason to depart from the otherwise minimum rate of pay under the GS system.

Because it is clear that existing or prior pay alone may be used under § 5333 to determine pay rates for new GS employees, the next question becomes: how does § 5333 relate to the EPA? Congress enacted § 5333 in 1966, just three years after its passage of the EPA. *See* Pub. L. 89-554, 80 Stat. 467 (1966). Although Congress did not formally extend the FLSA (and thus the EPA) to cover most federal employees until 1974, one would be hard-pressed to argue that in the immediate wake of its passage of the EPA, Congress, via § 5333, enshrined in the primary federal pay statute a policy that would be facially discriminatory under the EPA if it had applied to federal employees at that time. But more importantly, after Congress's extension of the EPA to cover most federal employees in 1974—including GS employees, who are covered by § 5333—one would have to find that the EPA and the language regarding existing pay in § 5333 are in conflict with one another to hold that the EPA prohibits the use of existing pay alone in determining GS employee wages. The Court, however, does not read the two statutes to be in conflict. Rather, the two statutes are easily harmonized.

As was discussed above, the Court presumes Congress meant what it said in permitting federal GS pay rate determinations based on a candidate's "existing pay *or* unusually high or unique qualifications": under the GS system, existing or prior pay *alone* may be used in determining pay above the minimum rate of the appropriate grade. *See, e.g.*, *Conn. Nat. Bank v.*

*Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citing cases). The cases that Plaintiff suggests the Court follow, however, hold that the EPA prohibits the use of existing or prior pay alone in determining wages. That caselaw relates to the determination of wages by non-federal government employers. The Court here, though, is presented with a question of federal wage setting and a statute that would conflict with the interpretation of the EPA set forth in the caselaw Plaintiff cites. In other words, in order to follow the cases regarding existing or prior pay Plaintiff prefers, the Court would have to find that the EPA and § 5333 conflict with one another and that the EPA prevails. But, as a matter of statutory interpretation, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [a] Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). In this case, giving effect to both provisions is relatively easy and comports with the precedent in at least two circuits. *See Wernsing v. Dep't of Hum. Servs., State of Ill.*, 427 F.3d 466, 468 (7th Cir. 2005); *Spencer v. Va. State Univ.*, 919 F.3d 199, 206 (4th Cir. 2019). Simply put, to harmonize the EPA and § 5333, all the Court must do is find that existing or prior pay alone qualifies as a factor other than sex under the EPA. To find otherwise would not only assume Congress essentially acted contrary to the EPA's intent three years after its passage but would also require the Court to read the two statutes as conflicting with one another.

There is no reasonable way that one can read the EPA to prohibit the use of existing pay alone in determining federal employee pay *and* read § 5333 in a manner that gives effect to its allowance of the use of existing pay alone in determining initial pay for GS employees. In other words, if existing pay alone is not a factor other than sex for GS employees, then the EPA and § 5333 necessarily conflicted with one another once the 1974 FLSA amendments were enacted and have continued to conflict in the over 45 years since. Finding such a conflict is unnecessary, however, as the more natural reading, and the one that harmonizes the two statutes, is to conclude that existing pay alone—at least for purposes of the federal pay system—is a factor other than sex.[13] *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984) ("[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (internal quotations omitted); *Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose.") (citations omitted).

---

[13] To be clear, the Court does not suggest that other courts have incorrectly construed the EPA as precluding defendants' reliance on existing or prior pay alone to justify pay differentials between employees of different sexes. It simply notes that federal employees and the impact of § 5333 were not at issue in those cases.

**Appx30**

Moreover, finding a conflict between the EPA and § 5333, and thus an implicit repeal of the existing pay language in § 5333, is not only unnecessary, but it is not permitted unless the "legislative intent to repeal [is] manifest in the 'positive repugnancy between the provisions' of the two statutes." *California v. United States*, 271 F.3d 1377, 1382 (Fed. Cir. 2001) (quoting *United States v. Batchelder*, 442 U.S. 114, 122 (1979) and *United States v. Borden Co*., 308 U.S. 188, 199 (1939)). This is because "[i]t is, of course, a cardinal principle of statutory construction that repeals by implication are not favored," *Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986) (quotation omitted), and that "'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute," *Epic Sys. Corp.*, 138 S. Ct. at 1624 (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)). Therefore, the Court simply cannot conclude that enactment of the 1974 FLSA amendments repealed the relevant language in § 5333 unless it "is irreconcilable with [the] earlier statute, or [its] enactment so comprehensively covers the subject matter of the earlier statute that it must have been intended as a substitute." *Todd v. Merit Sys. Prot. Bd.*, 55 F.3d 1574, 1577 (Fed. Cir. 1995) (citing *Traynor v. Turnage*, 485 U.S. 535, 547 (1988)). There is nothing in the 1974 FLSA amendments, or in the simplicity with which the two statutes are harmonized, that makes "Congress' intention to repeal the earlier law . . . 'clear and manifest.'" *Id*. (quoting *Radzanower v. Touche Ross & Co*., 426 U.S. 148, 154 (1976) and *Neptune Mut. Ass'n v. United States*, 862 F.2d 1546, 1551 (Fed. Cir. 1988)).

In order to find the EPA and § 5333 in conflict, and thus that the FLSA amendments implicitly repealed the existing pay language in § 5333, the Court would have to find that: (1) when Congress enacted the EPA in 1963 it intended existing pay alone *not* to be a factor other than sex; (2) yet Congress enacted § 5333 three years later to allow the federal government to consider existing pay alone in determining pay rates for GS appointees, which at the time totaled in excess of one million appointees; (3) Congress eight years later repealed this language in § 5333 by implication; and (4) as will be discussed more fully below, Congress 28 years later enacted another statute that allows for a departure from the minimum pay rate for the grade for certain VA employees appointed under title 38 based on existing pay alone. This course of events would seem to be a stretch at best and certainly not the "clear and manifest" intent required to implicitly repeal § 5333 (especially considering that a natural reading of the two statutes allows the existing pay provision in § 5333 to stand as a factor other than sex).[14]

---

[14] It would also mean that *if* existing or prior pay alone is *not* a factor other than sex, every time over the last 45 years that a federal agency hired an employee at a pay rate over the minimum rate for the pay grade for his or her position based on existing or prior salary alone, as permitted by § 5333 and 5 C.F.R. § 531.212, it was a potential EPA violation (if another employee of a different gender was performing equal work on a job the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions and was paid at either the minimum rate or any other comparatively lower pay rate for the position). With millions of GS employees over this timeframe, the potential EPA violations are myriad if the relevant language in § 5333 and 5 C.F.R. § 531.212 conflicts with the EPA.

In addition, Congress has on several occasions amended and even expanded the coverage of § 5333 since the enactment of the 1974 FLSA amendments. For instance, in 1990, Congress eliminated the GS-11 threshold for new employees to be paid above the minimum rate for their grade pursuant to § 5333. Federal Employees Pay Comparability Act of 1990, Pub. L. No. 101-509, title V, § 529 [title I, § 106, title II, § 211(b)(1)], 104 Stat. 1427, 1449, 1461 (1990). Such an expansion belies any congressional intent to implicitly repeal § 5333 through the enactment of the 1974 FLSA amendments.

The regulation promulgated by OPM to carry out § 5333 further confirms that "existing salary" or "recent salary history" *alone* may be used in determining GS employee's initial pay rate. It provides that "[a]n agency may set the payable rate of basic pay of a newly appointed employee above the minimum rate of the grade . . . if the candidate meets one of" two listed criteria. 5 C.F.R. § 531.212(b). Relevant here is the first criterion regarding "superior qualifications," which an agency determines by reviewing "the level, type, or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors that support a superior qualifications determination." 5 C.F.R. § 531.212(b)(1). Additionally, "[t]he candidate's skills, competencies, experience, education, and/or accomplishments must be relevant to the requirements of the position to be filled" and "[t]hese qualities must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality compared to other candidates . . . ." *Id*. If a determination is made that this criterion is met, the "agency may consider *one or more* of" a list of factors, including "[t]he candidate's *existing salary, recent salary history*, or salary documented in a competing job offer," to determine the step of an employee's initial pay rate. 5 C.F.R. § 531.212(c)(1)–(2) (emphasis added).

Plaintiff, in opposing the government's motion, asserts that subsection (b) allows an agency to "set the basic pay of a newly appointed employee above the minimum rate <u>only</u> if it first determines that the candidate has 'superior qualifications' which 'must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality <u>compared to other candidates</u>.'" Pl.'s Resp. at 17 (emphasis in original). The Court agrees. From this, however, Plaintiff concludes that "Defendant made no finding that [Male Comparator's] qualifications were significantly higher *compared to Plaintiff's* qualifications; accordingly, the regulatory language does not authorize reliance on prior salary here." *Id*. (emphasis added). The Court disagrees.

First, under Plaintiff's conflation of the language, an agency would *always* need to assess candidates against each other, even though the disjunctive "or" in the regulation permits a "superior qualifications" determination solely based on a candidate possessing qualities "significantly higher than that needed to be minimally required for the position . . . ." 5 C.F.R. § 531.212(b)(1). Second, engendering even more illogical results, Plaintiff's interpretation

would presumably require the VA—and all federal agencies, for that matter—to compare a *candidate's* qualifications with effectively *all other current* employees doing the same or similar work. According to Plaintiff, unless that candidate's qualifications were "significantly higher" than all such employees, the candidate would not be eligible for a subsection (c) pay rate determination above the minimum step of the grade. The regulation, however, speaks only of "a candidate" and "other candidates," not "other employees." In short, Plaintiff's interpretation is not a fair reading of the regulation. Moreover, Plaintiff herself was found to have superior qualifications and was therefore paid above the minimum pay rate for the grade, just as the regulation envisions.

In addition, the VA Handbook,[15] consistent with both § 5333 and the OPM regulation, expressly permits the use of a "candidate's *existing pay* or *recent salary history*, competing job offer(s), higher or unique qualifications, *or* special needs of VA" in setting initial pay rates. VA Handbook 5007/51, Part II, Chapter 3, Subpart 3(b)(1) (emphasis added). Thus, the disjunctive "or" in the VA Handbook specifically permits use of existing pay or recent salary history *alone* without consideration of other factors in determining a VA employee's pay rate.

Furthermore, another statute applicable to the VA, enacted in 1991, authorizes the use of existing pay alone in determining an employee's salary: "[t]he Secretary, after considering an individual's *existing pay*, higher or unique qualifications, *or* the special needs of the Department, may appoint the individual . . . at a rate of pay above the minimum rate of the appropriate grade." 38 U.S.C. § 7408 (emphasis added). Although this provision does not directly apply to the appointment of VA pharmacists, the principle is nonetheless the same: Congress has statutorily allowed pay to be determined through consideration of existing pay *alone* even after passage of the EPA. And, as with 5 U.S.C. § 5333, the only way to harmonize 38 U.S.C. § 7408 and the EPA, while giving effect to all the language in both statutory provisions, is to interpret existing pay alone to be a factor other than sex.

Although 5 U.S.C. § 5333 and 38 U.S.C. § 7408 are not dispositive of Plaintiff's claim, as she was not appointed under either statute, they are conclusive evidence that, at least for federal employees, Congress considers existing or prior pay alone to be a factor other than sex.

---

[15] The Federal Circuit has recognized that the VA "has not issued a comprehensive set of regulations implementing the VHA personnel provisions in title 38. Instead, DVA has set forth its interpretation of the title 38 personnel provisions in the form of manuals, directives, and handbooks . . . ." *James v. Von Zemensky*, 284 F.3d 1310, 1318-19 (Fed. Cir. 2002). The circuit has explained that such documents are "akin to 'interpretations contained in policy statements, agency manuals, and enforcement guidelines," and, as such, "are not entitled to *Chevron* deference." *Id.* at 1319 (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)). Rather, "they are accorded a lesser degree of deference 'proportional to [their] power to persuade.'" *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001)); *see also Martin v. Occupational Safety and Health Rev. Comm'n*, 499 U.S. 144, 157 (1991) (holding that "some weight" is due to informal interpretations though not "the same deference as norms that derive from the exercise of . . . delegated lawmaking powers").

33

OPM's own regulations confirm this decision.[16]  Thus, absent any indication of pretext,[17] the government's use of existing or prior pay alone in determining an employee's salary as part of the GS or similar system, like that used by the VA for pharmacists and other "hybrid" employees,[18] is an affirmative defense to an EPA claim.  To hold otherwise would read at least two statutes (both applicable to some employees at the VA), an OPM regulation (applicable to some employees at the VA), and the VA Handbook off the books.  Unless and until Congress so instructs, this Court declines to "substitute [its] judgment for the judgment of the employer," when the factor chosen is "gender-neutral on its face and *bona fide* – that is, used in good faith and not in a discriminatory manner – in its application."  *Behm*, 68 Fed. Cl. at 400.  The Court simply cannot read two federal statutes (both enacted after the EPA) to conflict with the EPA when a more natural reading harmonizes them.  Moreover, it simply cannot be the case that the VA would have an affirmative defense to an EPA claim based on use of existing or prior pay alone for employees it appointed under title 5 or 38 U.S.C. § 7408, but not for employees, like Plaintiff, appointed under another provision in title 38.  This would essentially carve VA employees into distinct classes for the purpose of EPA claims.

What is more, even if these two federal statutes, and the OPM and VA regulatory schemes implementing those statutes, did not demonstrate that for federal employees, absent a showing of pretext, use of existing or prior pay alone qualifies as a factor other than sex, the Court would need to ignore an undisputed admission of fact by Plaintiff in order to find that the VA violated the EPA in this case.  This is because the undisputed facts of this case demonstrate why Plaintiff's prior salary was set at the level it was: Plaintiff explained that her North Alabama Regional Hospital employment "had a lower salary . . . because there were a lot of benefits and perks that no one else offers in Pharmacy."  Appx 176.[19]  For example, Plaintiff "could get off work any time [she] wanted to," "accrued like three days of comp time every month," and "was

---

[16] Indeed, a recent Executive Order supports this interpretation, at least under the law when Plaintiff was hired.  That Executive Order announced that OPM "anticipates issuing a proposed rule that will address the use of salary history in the hiring and pay-setting processes for Federal employees . . . ." Exec. Order No. 14,069, 87 Fed. Reg. 15,315 (published Mar. 18, 2022).

[17] Plaintiff fails to offer any evidence whatsoever that the government's justification is pretextual. Rather, she insists the government "has failed to meet its burden of establishing its affirmative defense" and thus "the Court should not reach the pretext stage of the burden-shifting analysis."  Pl.'s Resp. at 26-27.  The Court, of course, has found otherwise.  Plaintiff bears the burden of production to demonstrate pretext, yet Plaintiff offers no evidence to support a finding of pretext here.  Left with nothing but Plaintiff's successive rejections of the government's stated defense, the Court's hands are tied, and the affirmative defense carries the day.

[18] The pay schedule that covers VA pharmacists has the same general structure as OPM's GS pay scale.  Plaintiff and Male Comparator were paid at the GS-12 grade for their respective pay rates on the VA's "Special Rates" scale.

[19] Ordinarily, a concession like this under Federal Circuit precedent would be fatal to Plaintiff's prima facie case under the EPA.  However, in this case, the government conceded that Plaintiff had established a prima facie case of an EPA violation.  *See supra* note 1.

able to spend – do things with [her] family a lot easier than [she could] at and [sic] other job." *Id*.

Thus, while using prior salary in determining a new appointee's starting salary "may serve to perpetuate an employee's wage level that has been depressed because of sex discrimination by a previous employer," *Covington*, 816 F.2d at 322, the Court knows in this case, directly from Plaintiff, that her prior salary was "depressed" at her previous employer "because there were a lot of benefits and perks that no one else offers in Pharmacy," Appx 176. In other words, basing a pay rate on a prior salary *could* perpetuate past discrimination if gender discrimination led to that lower prior salary, but Plaintiff has not made, much less offered any evidence to support, such a claim. And the undisputed fact the Court has before it on this point is an admission by Plaintiff that her prior salary was lower because of "benefits and perks," not gender discrimination.

Facially, the text of the EPA does not suggest any limitations to the broad, "factor other than sex" catch-all affirmative defense. Given this facially broad catch-all exception, Congress's explicit grant of authority to federal agencies to use existing pay alone in determining federal employees' salaries in at least two statutes, and Plaintiff's admission that her lower prior salary was the result of benefits and perks (and not discrimination), the Court simply cannot rule in the instant case that the VA violated the EPA (even assuming that the VA used existing salary alone to set Male Comparator's pay rate higher than Plaintiff's). *See, e.g.*, *Yant*, 588 F.3d at 1374 ("This case, however, is completely devoid of the historical discrimination at issue in *Corning Glass Works*, and the record before us does not suggest that the TVHS is hiring female PAs to avoid liability under the Equal Pay Act. An Equal Pay Act violation is established when an employee demonstrates past or present discrimination based on sex. There has been no such showing here."); *Wernsing*, 427 F.3d at 470 ("Wage patterns in some lines of work could be discriminatory, but this is something to be proved rather than assumed. Wernsing has not offered expert evidence (or even a citation to the literature of labor economics) to support a contention that the establishments from which the Department recruits its employees use wage scales that violate the Equal Pay Act and thus discriminate against women. If sex discrimination led to lower wages in the 'feeder' jobs, then using those wages as the base for pay at the Department would indeed perpetuate discrimination and violate the Equal Pay Act. But as the record is silent about this possibility, and plaintiffs bear the burden of persuasion in civil litigation, the Department is entitled to the summary judgment it received.") (internal citations omitted).

In sum, Plaintiff alleges the VA appointed Male Comparator at a higher pay rate based on his existing pay alone. Although the Court is unable to determine at this stage whether existing pay alone, or in conjunction with other factors, formed the basis for the pay differential between Plaintiff and Male Comparator, the Court can conclude that Congress granted agencies the

authority to depart upwardly from the minimum rate of pay for new federal employees hired under title 5, including some VA employees, and certain other VA employees under title 38, based on existing or prior pay alone.  Subsequent regulations further reinforce this authority.  The Court can also conclude, based on the undisputed facts, that Plaintiff's prior pay was lower because Plaintiff's previous employer, by Plaintiff's own admission, offered "a lot of benefits and perks that no one else offers in Pharmacy."  Accordingly, any factual dispute over whether the agency used existing or prior pay alone *or* existing- or prior-pay-plus is immaterial to the "outcome of the suit," *Anderson*, 477 U.S. at 248, and cannot be the basis for a genuine dispute of fact that warrants trial.  The government, therefore, "is entitled to judgment as a matter of law."  RCFC 56(a).

## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to establish the absence of a genuine issue of fact as to those facts material to her motion for summary judgment.  Accordingly, Plaintiff's motion for summary judgment is **DENIED**.

Furthermore, the Court concludes that Congress permitted the VA to use existing or prior pay alone in determining pay rates for new appointees.  Thus, as to the government's motion for summary judgment, any factual question of whether existing or prior pay alone was used in determining Plaintiff's and Male Comparator's pay rates is immaterial to the outcome of this case, and the government is entitled to judgment as a matter of law.  Therefore, the government's motion for summary judgment is **GRANTED**.  The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**


s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge

**Appx36**