No. 2022-1822

=================================================

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

=================================================

LESLIE BOYER,
Plaintiff-Appellant,
v.

UNITED STATES,
Defendant-Appellee.

---

Appeal from the United States Court of Federal Claims
No. 20-CV-438-ZNS, Hon. Zachary N. Somers

---

## BRIEF OF DEFENDANT-APPELLEE AND ADDENDUM

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

OF COUNSEL:                          KARA M. WESTERCAMP
W. Robert Boulware                   Trial Attorney
Staff Attorney                       Commercial Litigation Branch
U.S. Department of Veterans          U.S. Department of Justice, Civil Division
Affairs                              P.O. Box 480, Ben Franklin Station
Office of Regional Counsel           Washington, D.C. 20044
Southeast District                   Tel: (202) 305-7571
                                     Email: Kara.M.Westercamp@usdoj.gov

December 19, 2022                    *Attorneys for Defendant-Appellee*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS ..............2

I.    Statement Of Facts.........................................................................2

    A.    The VHA Pay System ..........................................................2

    B.    Ms. Boyer's Employment At The VHA ...............................6

        1.    The Pharmacy Professional Standards Board
            Recommended Ms. Boyer's Initial Salary Determination..........6

        2.    Three Years After Ms. Boyer Started Working At
            Birmingham VAMC, She Complained About Her
            Alleged Pay Disparity And The Agency Promptly
            Responded ...................................................................9

    C.    Ms. Boyer Filed An EEOC Complaint Alleging Gender
        Discrimination, As a Basis For Her Alleged Pay Disparity...............12

II.   Course Of Proceedings And Disposition Below ..........................17

    A.    The Trial Court Denied Ms. Boyer's Summary Judgment
        Motion ...............................................................................17

    B.    The Trial Court Granted The Government's Summary
        Judgment Motion, Holding That The VHA Setting Initial
        Pay Based On Prior Pay Alone Is A "Factor Other Than Sex" ..........19

SUMMARY OF THE ARGUMENT ...................................................26

ARGUMENT ....................................................................................27

I.     Standard Of Review......................................................................27

II.    Equal Pay Act Standard ................................................................27

III.   For Federal Agencies Determining Pay Rates For New Employees,
       Consideration Of Prior Or Existing Pay Is A "Factor Other Than Sex".......30

       A.     The Trial Court Correctly Declined To Follow Other Circuits
              In That Prior Pay Alone Cannot Be A "Factor Other Than Sex" .......30

       B.     The EPA And Federal Pay-Setting Authorities Can Be
              Harmonized, Whereas Ms. Boyer's Reading Requires This
              Court To Find That Congress Implicitly Repealed Parts Of
              The Statutes ........................................................................33

       C.     OPM Regulation, 5 C.F.R. § 531.212, And VA Handbook
              5007 Allow Use Of Prior Pay For Setting Initial Pay.......................41

IV.    The Record Is Uncontroverted That The Agency Complied With
       The VA Handbook 5007 In Hiring Ms. Boyer And The Male
       Comparator ..................................................................................49

       A.     The Trial Court Did Not Shift The Respective Burdens....................50

       B.     Ms. Boyer Conflates "Superior Qualifications" And The
              Pay Rate............................................................................51

CONCLUSION ..................................................................................57

# TABLE OF AUTHORITIES

## Cases

*Aerojet-Gen. Corp. v. United States*,
  568 F.2d 729 (Ct. Cl. 1977)................................................................40

*Aldrich v. Randolph Cent. Sch. Dist.*,
  963 F.2d 520 (2d Cir. 1992) ..............................................................29

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
  908 F.3d 792 (Fed. Cir. 2018) ...........................................................38

*Barseback Kraft AB v. United States*,
  121 F.3d 1475 (Fed. Cir. 1997) .........................................................27

*Behm v. United States*,
  68 Fed. Cl. 395 (2005) ................................................................. 28, 29

*Branch v. Smith*,
  538 U.S. 254 (2003) ...........................................................................36

*California v. United States*,
  271 F.3d 1377 (Fed. Cir. 2001) .........................................................36

*Cooke v. United States*,
  85 Fed. Cl. 325 (2008), *dismissed*, 352 F. App'x 429 (Fed. Cir. 2009)...............28

*Corning Glass Works v. Brennan*,
  417 U.S. 188 (1974) ...........................................................................28

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...........................................................................38

*Girdis v. Equal Emp. Opportunity Comm'n*,
  688 F. Supp. 40 (D. Mass. 1987).......................................................49

*Glenn v. Gen. Motors Corp.*,
  841 F.2d 1567 (11th Cir. 1988) .........................................................32

*Irby v. Bittick,*
    44 F.3d 949 (11th Cir. 1995) ...............................................................32

*King v. Burwell,*
    576 U.S.473 2480 (2015) .....................................................................38

*Kouba v. Allstate Ins. Co.,*
    691 F.2d 873 (9th Cir. 1982) ...............................................................29

*Kuntz v. Tangherlini,*
    No. C14-152 MJP, 2015 WL 1565910 (W.D. Wash. Apr. 8, 2015)...................53

*Lear Siegler Servs., Inc. v. Rumsfeld,*
    457 F.3d 1262 (Fed. Cir. 2006) ...........................................................27

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.,*
    550 U.S. 618 (2007) ...........................................................................13

*La. Pub. Serv. Comm'n v. F.C.C.,*
    476 U.S. 355 (1986) ...........................................................................40

*Mansfield v. United States,*
    71 Fed. Cl. 687 (2006)........................................................................28

*Molden v. United States,*
    11 Cl. Ct. 604 (1987).........................................................................27

*Moorehead v. United States,*
    84 Fed. Cl. 745 (2008)........................................................................31

*Moorehead v. United States,*
    88 Fed. Cl. 614 (2009).................................................................. 29, 31

*North v. United States,*
    123 Fed. Cl. 457 (2015)................................................................ passim

*Nutt v. United States,*
    837 F.3d 1292 (Fed. Cir. 2016) ...........................................................27

*Rizo v. Yovino*,
  950 F.3d 1217 (9th Cir. 2020) .................................................. 17, 18, 19

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ........................................................................41

*Sage Prods. Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997) ....................................................36

*Teninty v. Geren*,
  776 F. Supp. 2d 725 (N.D. Ill. 2011).............................................53

*Thomas v. United States*,
  86 Fed. Cl. 633, *aff'd*, 351 F. App'x 433 (Fed. Cir. 2009) ........... 29, 57

*United States v. Cooper Corp.*,
  312 U.S. 600 (1941) ......................................................................40

*United States v. Woods*,
  571 U.S. 31 (2013) ............................................................. 43, 46, 47

*VE Holding Corp. v. Johnson Gas Appliance Co.*,
  917 F.2d 1574 (Fed. Cir. 1990) .....................................................37

*Watt v. Alaska*,
  451 U.S. 259 (1981) ......................................................................41

## **Statutes**

5 U.S.C. § 1131 ..................................................................................39

5 U.S.C. § 1133 ..................................................................................39

5 U.S.C. § 5101 ..................................................................................35

5 U.S.C. § 5333 .......................................................................... passim

29 U.S.C. § 201 ..................................................................................27

29 U.S.C. § 203 ..................................................................................27

29 U.S.C. § 206(d)(1) ......................................................................... 28, 39

38 U.S.C. § 7401 ...................................................................................34

38 U.S.C. § 7408 ........................................................................... passim

38 U.S.C. § 7451(a)(2)(C) ...................................................................2, 3

Fair Labor Standards Amendments of 1974, Pub. L. No. 93–259, 88 Stat. 55 .......39

The Department of Veterans Affairs Nurse Pay Act of 1990, Pub. L. No. 101-336, 104 Stat. 420 .......................................................................................2

Federal Employees Pay Comparability Act of 1990, Pub. L. No. 101-509, title V, § 529, 104 Stat. 1427 ................................................................. 22, 39

Dep't of Veterans Affairs Health-Care Personnel Act of 1991, Pub. L. No. 102-40, Title IV, § 01(b)(2), 105 Stat. 229; *amended* Pub. L. 103-446, Title XII, § 1201(e)(21), Nov. 2, 1994, 108 Stat. 4686. ......................................................40

Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 112-2, 123 Stat. 5 ...................13

## Regulations

5 C.F.R. § 531.212 ........................................................................ passim

## Other Authorities

*Changes in Pay Administration Rules for General Schedule Employees*, 70 Fed. Reg. 31,278 (Off. of Pers. Mgmt. May 31, 2005) ............................ 42, 43

Exec. Order No. 14,035, 86 Fed. Reg. 34,593 (June 25, 2021) .............................. 44

Exec. Order No. 14,069, 87 Fed. Reg. 15,315 (Mar. 18, 2022) ...................... 24, 45

## STATEMENT OF RELATED CASES

No appeal from this civil action was previously before this or any other appellate court.  Counsel is unaware of any case pending before this or any other court or agency that directly will affect or be affected directly by this Court's decision in the pending appeal.

## STATEMENT OF THE ISSUES

1.     Whether the Court of Federal Claims (trial court) correctly granted the United States summary judgment because any disparity in pay between Leslie Boyer's initial base pay and her male comparator's is due to "any other factor other than sex," specifically, the application of the Veteran Health Administration's (VHA or agency) *bona fide* gender-neutral pay system, which permits reliance on prior pay alone, and therefore, is not a violation of the Equal Pay Act.

2.     Whether Ms. Boyer's argument that, because 5 U.S.C. § 5333 and 38 U.S.C. § 7408 do not contain a "notwithstanding" clause, Congress did not express an intent for the Equal Pay Act to not apply to Federal employees has been waived because Ms. Boyer did not raise this specific argument before the trial court.

3.     Whether the trial court correctly determined that 5 U.S.C. § 5333 and 38 U.S.C. § 7408 can be harmonized with the Equal Pay Act.

4.     Whether the trial court correctly determined that the VA followed VA Handbook 5007 in determining to make an upward departure from the minimum

rate of pay for both Ms. Leslie and the male comparator, and then set their initial pay based on prior or existing pay, which is consistent with VA Handbook 5007.

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

### I.    Statement Of Facts

#### A.    The VHA Pay System

In 1990, Congress enacted The Department of Veterans Affairs Nurse Pay Act of 1990, Pub. L. No. 101-336, 104 Stat. 420 (Aug. 15, 1990) (codified at 38 U.S.C. § 7451) (hereinafter, VA Pay Bill). The VA Pay Bill established the manner in which the VHA set and administered rates of pay for nurses and other health care professionals, such as clinical pharmacists. 38 U.S.C. § 7451(a)(2)(C) (referring to 38 U.S.C. § 7401(3) (listing pharmacists and pharmacist technicians as covered positions included in the VA Pay Bill)).

Section 7451(b) provides that the VHA "shall maintain the five grade levels for nurses" and "shall establish grades for other covered positions," like clinical pharmacists. Within the grades, the VHA was mandated to establish a "range of basic pay," *id.* § 7451(c)(1), with the "range of basic pay for each such grade . . . divided into equal increments, known as 'steps.'" *Id.* § 7451(c)(3). The VHA was directed to periodically update the "rates of basic pay for each grade in a covered position" in line with other updates to rates of pay in the General Schedule. *Id.* § 7451(d)(1)(A). Like the General Schedule, VHA has adopted 10 "steps" in each

2

grade. *See* Appx94. In other words, grade 12, or GS-12, consists of "steps" 1 through 10, meaning that an employee hired at grade 12, step 7, would be a "GS-12-7." *See id.*

The VA Handbook 5005 and VA Handbook 5007 then implemented the mandatory procedures on pay administration. VA Handbook 5005/55, Part II, Appendix G15 sets forth the qualification standards for licensed pharmacists, characterized as a "special rate 660 appointment." Appx60; Appx62. The five grade determinations range from GS-11 to GS-15, with, as relevant here, a GS-12 being a "clinical pharmacist." Appx62. A GS-12 candidate must be a graduate of an Accreditation Council for Pharmacy Education (ACPE) accredited College or School of Pharmacy with a baccalaureate degree in pharmacy (B.S. Pharmacy) and/or a Doctor of Pharmacy (Pharm.D.) degree, and handles, among other things, "routine medication-related activities" in accordance with local, VHA, and national policies and regulations. *Id.*

"New appointments shall be made at the minimum rate of the appropriate grade," but agencies like VHA are allowed to deviate from this requirement, "for such considerations as the *existing pay* or unusually high or unique qualifications of the candidate."[1] 5 U.S.C. § 5333 (emphasis added). The United States Office

---

[1] OPM administers the GS classification and pay system, which "covers the majority of civilian white-collar Federal employees (about 1.5 million worldwide) in professional, technical, administrative, and clerical positions." Further, "[e]ach

3

of Personnel Management (OPM) has explained that an agency may consider one or more of the following factors to determine the appropriate step at which to set an employee's initial pay rate: (1) the level, type or quantity of the candidate's skills or competencies; (2) the "candidate's *existing salary, recent salary history*," or salary documented in a competing job offer; or (3) significant disparities between Federal and non-Federal salaries for the skills and competencies in the position to be filled.  5 C.F.R. § 531.212(c) (emphasis added).

Consistent with OPM regulations and the VA Pay Bill, VA Handbook 5007 then establishes the guidance and procedures for pay administration for personnel like clinical pharmacists.  VA Handbook 5007, Part II, Chapter 3, explains the authorization of individual appointments *above* the minimum rate of the grade, in other words, how VHA may justify setting the grade of a prospective candidate above the minimum step, which is 1.  Appx77.  It explains that "[a]uthorized officials may, after considering an individual's existing pay, higher or unique qualifications, or special needs of VA," appoint clinical pharmacists "at rates of pay above the minimum rate of the [highest applicable rate range for the] appropriate grade."  *Id.*  Then, the recommended pay rate "must be based on prior

---

agency classifies its GS positions and appoints and pays its GS employees filling those positions *following statutory and OPM guidelines*."  General Schedule Classification and Pay, OPM.gov, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited Dec. 6, 2022) (emphasis added).

full-time, part-time *or* intermittent service under an appointment or contractual

agreement," with the appointment or contract agreement being a duration of at

least 90 days.  Appx78 (emphasis added).

For clinical pharmacists, the selecting official is required to "forward the

recommendation for appointment above the minimum rate of the grade to the

appropriate professional or similar standards board."  Appx79.  The board is then

required to consider this information when "making a formal recommendation

regarding the candidate's qualifications, and recommended grade and step upon

appointment."  *Id.*

The purpose of referring a candidate to a professional standards board is to

determine eligibility, whether a candidate meets the applicable standards, and to

recommend the appropriate grade and step for appointment.  Appx70.  Boards

range from three to five members, who all must be at a grade and level that is equal

to or higher than that of the candidate being considered, with one person selected

as the chairperson.  Appx71.  In addition, a human resources technical advisor is

also required to attend all meetings.  *Id*.

If a professional standards board intends to recommend an appointment

above the minimum rate of the grade, the following factors must be documented

and forwarded to the authorizing official: (1) recommended grade, step, and salary

rate; (2) reason for requesting an appointment above the minimum rate of the

grade, such as the candidate's existing pay or recent salary history;

(3) methodology used to determine the recommended pay, if not otherwise

discussed in (1) or (2); and information regarding competing job offers or

information regarding tentative benefits package, if applicable.  Appx73-74.  Any

recommended salary is not final until approved by the authorizing official.

Appx75; *see also* Appx94.

### B.     Ms. Boyer's Employment At The VHA

#### 1.     The Pharmacy Professional Standards Board Recommended Ms. Boyer's Initial Salary Determination

Ms. Boyer applied for a position as a clinical pharmacist at the Huntsville

clinic of the Veterans Affairs Medical Center of Birmingham, Alabama

(Birmingham VAMC) in February 2015.  Appx118-125.  In her application, she

attached her resume, which showed that she graduated from Auburn University

with a Doctorate of Pharmacy in 1999.  Appx124.

Since her graduation in 1999, she worked for various retail pharmacy

employers.  Appx122-123.  Ms. Boyer listed two full-time employers.  As of 2007,

Ms. Boyer worked at a Kroger Pharmacy in Hartselle, Alabama.  She listed this

position in her application and accompanying resume as full-time, with an

annualized salary of approximately $120,000 per year.  *Id.*  Since March 2011,

Ms. Boyer *also* listed the State of Alabama, North Alabama Regional Hospital as

her full-time employer, with a salary of $105,000.  Appx122.

Monica Sfakianos, Associate Chief, Pharmacy Service, Birmingham VAMC, wrote the memorandum for Ms. Boyer's qualifications and salary recommendation for the professional standards board for clinical pharmacists. Appx129. Prior to preparing the packet that Ms. Sfakianos sent to the board, she requested pay stubs from Ms. Boyer in order to justify a salary above the minimum grade, which was step 1. Via email on June 9, 2015, Ms. Boyer explained to Ms. Sfakianos that she had been working at both Kroger and the North Alabama hospital and would provide copies of her W-2 pay stubs to support her salary information. Appx131-132. Ms. Boyer explained that she was currently just "filling in" for Kroger and that the hospital was soon closing. Appx131.

Ms. Sfakianos responded, "[s]end me anything you can that I can justify meeting salary!!" *Id.* Ms. Sfakianos further explained that the GS-12 pay scale ranges from "step 1 $96,133 to step 10 $124,980. They do not base it on years of experience . . . but they do consider salary matching." *Id.* Ms. Sfakianos cautioned that she did not "think they will let us use the combined salaries to match [y]our salary." *Id.*

Ms. Boyer subsequently faxed the pay stubs to Ms. Sfakianos, with the North Alabama hospital pay stub dated from more than six months earlier, in November 2014, and reflecting a full-time rate of $115,000 per year. Appx361. Ms. Boyer also included several Kroger pay stubs reflecting part-time work, with

7

her most recent pay stub showing a total of 6.75 hours for the May 2015 pay period. Appx362-363. Handwritten notes on the 6.75-hour Kroger pay stub state: "per HR – cannot combine FT + PT to equal one VA FT." Appx362. The agency did not consider an April 2011 pay stub from Kroger, which reflected an annualized salary of $119,339, because it was "not current." Appx364. Using the North Alabama hospital pay stub, the closest salary for clinical pharmacists was $115,364 for GS-12-7 employees, Appx93, in order to secure a "highly qualified candidate," which was "recommended to remain competitive and meet current documented salary." Appx129.

The professional standards board then considered Ms. Boyer's application and the salary recommendation from Ms. Sfakianos. Appx126-128. After reviewing Ms. Boyer's qualifications, the board recommended that she be appointed as a licensed clinical pharmacist because she "brings over 15 years of experience of pharmacy practice," has "advanced clinical skills with medication monitoring and making medication recommendations based on clinical efficacy," and has "extensive experience with pharmaceutical needs of mental health patients." *Id.* Due to her "pharmaceutical skills, education and current salary, the board recommends a grade 12, step 7 to secure this highly qualified candidate." *Id.* A human resources technical advisor, Angela Davis, certified that the board action was complete and reviewed the board action for adherence to all legal and

technical requirements before she forwarded it to the approving authority.

Appx127.

On July 10, 2015, William F. Harper, Acting Medical Center Director,

approved the recommendation of Ms. Boyer's initial compensation from the board.

*Id.* Three days later, Ms. Boyer accepted the position for a starting salary of

$115,364 per year, at a grade 12, step 7 position. Appx97.

> **2. Three Years After Ms. Boyer Started Working At Birmingham VAMC, She Complained About Her Alleged Pay Disparity And The Agency Promptly Responded**

In mid-July 2018, Ms. Boyer first raised her belief with Birmingham VAMC

that she was being paid less than other coworkers. In a July 24, 2018, email to

Angela Craig, the Supervisory Human Resources Staffing Specialist for

Birmingham VAMC, Ms. Boyer explained that she had been referred to her for a

"salary concern." Appx350. Ms. Boyer explained that she believed she was

making less than the other three pharmacists she worked with, and although

Ms. Sfakanios had explained three years before in her initial boarding process, that

her salary "was a difference in the boarding process," Ms. Boyer felt that her

"previous salary was not recommended clearly to the pharmacy professional

standards board." *Id.* In support, and without referring to specific individuals,

Ms. Boyer referred to her alleged "higher degree than one pharmacist, more

clinical experience and years of experience relative to this career at the VA, and a higher evaluation than the other pharmacists." *Id.*

That same day, Ms. Craig responded, saying that all three referenced pharmacists' pay had been set by the professional standards board, and that the "service manager sen[t] a recommendation memo to [human resources]" in support. Appx346-350. Human resources then sent the memorandum and the application packet (including the applicant's resume) to the board, and it is up to the board, "which are the subject matter experts, to take into consideration what the manager recommends (grade and step)." Appx346. Further, she explained that the agency could not "go back to the board for reconsideration of your initial appointment (07/12/2015)." *Id.*

Also on July 24, Ms. Boyer emailed Ms. Sfakianos, who was Ms. Boyer's second-line supervisor, with various OPM guidance that she believed was relevant to her salary. Appx358. Consulting with Ms. Craig before responding to the email, Ms. Sfakianos said that she "remember[ed] telling her that the board could not use both salaries (full time and part time) for matching." Appx133. Ms. Craig confirmed "[o]k, that is correct especially if she was working the PT job in conjunction with the FT job." *Id.*

Ms. Sfakianos thereafter responded to Ms. Boyer and explained that Ms. Boyer's initial pay followed OPM and VHA guidelines. Appx354.

Ms. Sfakianos explained that, "[n]o uniquely special skills or competencies for the job as a clinical pharmacist [were] required for the position," and Ms. Boyer's "previous full time salary (stub provided) was used by the Board and HR when the initial step was recommended. A combination of full and time and part time jobs *was not allowed* for boarding purposes." *Id.* (emphasis added). Ms. Sfakianos explained that the "same boarding factors were used for all pharmacists hired." *Id.*

Disagreeing with this response, Ms. Boyer stated that she still believed she had more experience than her colleagues, and that her "heart for mental health and accepting a lower paying career at a state owned mental health hospital will affect my salary as compared to my co-workers at the VA for 9 years." Appx243. While Ms. Boyer explained that she could "understand not using a combination of salaries," she questioned how the agency could "pick to use the lower salary," since she believed the "hourly rate from Kroger was enough to board [her] higher like the last two pharmacists hired." *Id.* Or, in other words, she believed that the "practice of using prior salary for step placement has hurt me and others." *Id.*

In replying, Ms. Sfakanios said that she had "stated in July 2015 that salary is not based on 'years' of experience," and that Ms. Boyer's "mental health experience was noted" in the boarding request. Appx242. Indeed, Ms. Sfakanios recognized that while the Huntsville clinic did not require mental health experience, it was "beneficial, as a large portion of our population has mental

11

health needs," thus explaining why "it was noted in the boarding information." *Id.* She elaborated that the Birmingham VAMC was "required to follow all HR regulations and guidelines" and that "[b]oarding guidelines are used for all pharmacists hired." *Id.*

Ms. Boyer then met with Lorelei Hudson, Assistant Chief Human Resources Officer, on August 2.  Ms. Hudson documented the meeting in an email to other Birmingham VAMC human resources personnel.  Appx156.  Ms. Hudson explained that at the time of the meeting, "[i]t is 3 years, 1 month after her boarding and she wants her salary changed based on the fact that 3 other employees that were hired *after her* were boarded at 12, step 10." *Id.* (emphasis added).  Ms. Hudson explained to Ms. Boyer that she "determined the board actions were completed in accordance with VA Handbook 5005/55 Part 11, Appendix G15," and that "based on this information there was no legal/regulatory basis for [her] to correct [Ms. Boyer's] salary." *Id.*

### C.    Ms. Boyer Filed An EEOC Complaint Alleging Gender Discrimination, As a Basis For Her Alleged Pay Disparity

On October 22, 2018, Ms. Boyer filed a formal Equal Employment Opportunity Commission (EEOC) employment discrimination complaint alleging

both race and sex discrimination.[2, 3]  Appx164.  She referred to a male colleague and alleged that she was paid less than him despite her "experience and superior qualifications."  *Id.*  The complaint was investigated via both affidavits and sworn testimony from December 26, 2018, to February 9, 2019.

Ms. Boyer gave a sworn statement in January 2019, and testified that, she "deserve to be boarded at a step 10 because I perform the same exact duties as the Pharmacists here in Huntsville[, e]specially [the male comparator]," who is the same age and "has less experience by seven years" and does not have mental health experience.  Appx233.  Regarding her initial pay, Ms. Boyer testified that "Ms. Sfakianos told me that she recommends a certain step and then the rest of the group can either approve that, go along with it, or disapprove it.  So she recommends the step."  Appx230.  Ms. Boyer testified that she had explained to Ms. Sfakianos in "detailed conversations" about working two jobs for the last seven years, and that Ms. Sfakianos responded that "she just couldn't consider my

---

[2]  We do not address the allegation of racial discrimination because it is not relevant to this appeal.

[3]  The EEOC is a separate avenue of relief for an Equal Pay Act claim.  An individual alleging an Equal Pay Act violation may go directly to court and/or file an EEOC charge.  *See generally Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 640 (2007), *superseded by statute on other grounds*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 112-2, 123 Stat. 5 (Jan. 29, 2009) (noting that "the [Equal Pay Act] does not require the filing of a charge with the EEOC or proof of intentional discrimination").

salaries at both" the Alabama hospital and Kroger.  Appx236.  Ms. Boyer

explained that her salary at the Alabama hospital was lower because "there were a

lot of benefits and perks that no one else offers in Pharmacy," like her ability to

"get off of work any time" she wanted, and accrue three days of "comp time every

month," which allowed her to "do things with my family a lot easier than I can at

any other job." *Id.*

In Ms. Sfakianos's sworn statement regarding the setting of Ms. Boyer's

initial pay, she testified that she oversaw the opening of the Huntsville clinic, and

explained how clinical pharmacists are boarded.  Appx254-260.  She testified that

pharmacists must meet the qualification standards, and "[e]verybody is assumed to

come in at the minimum which [is] a step [1]," and to "justify above the minimum

you have to have specific reasons to justify that." Appx257.  While a residency or

national certification could account for step increases, she testified that, "[a]nother

way to justify bringing someone in above the step [1] is their current salary – is to

match current salary as best you can." *Id.*  The salary recommendation then goes

to human resources, who has to agree with that "before they will sign off on it as

the technical representative on the board." Appx258.  Ms. Sfakianos testified that

*both* the male comparator and Ms. Boyer were "boarded based on their current

salary," because otherwise, "they would have been brought in [at] much lower

steps" and "the salary is the easiest way to justify." Appx258-259.  Ms. Sfakianos

also testified that although Ms. Boyer "had worked part-time [at Kroger] with her full-time job for many years," and "requested that [the agency] combine those pay stubs for one salary," the "HR salary department said you cannot combine multiple jobs to match one full-time salary." Appx259. As a result, the agency used Ms. Boyer's "most current full time pay stub as a comparator to rate her steps for her current one full-time job with the VA." *Id.* In summary, Ms. Sfakianos testified that she "boarded everybody exactly the same without regards to anything special other than their current pay stubs." Appx260.

The EEO investigator also sought sworn affidavits from members of the pharmacy professional standards review boards for both Ms. Boyer and the male comparator. The chairperson of both boards, Kendra Brookshire, testified that the board looks at relevant, qualifying experience, but that "pay stubs can basically trump what would be determined by the qualifying experience." Appx279. Ms. Brookshire testified that the male comparator had degrees that were not required for pharmacy school (bachelors of science and masters of science in biological sciences), and that his recommended salary at a grade 12, step 10 was to "remain competitive and more closely meet the current documented salary of a highly qualified candidate." Appx283. In Ms. Brookshire's testimony, she stressed that "the boarding process is number one a kind of a recommendation process," and it was "not unusual" for a recommendation to be rejected by the

15

board or for the authorizing official to reject it. Appx285. In addition, Ms.

Brookshire testified that Huntsville was a "challenging area for recruitment" and

the agency "would certainly have been inclined to be willing to match pay to get

somebody on board." Appx286.

Another member of both boards testified similarly. Lisa Ambrose testified

that the board considers a "person's current or most recent pay stubs from the job

in which they're coming from into the VA," and the board tries to "make it as

equal as possible to what they were already receiving at their previous place of

employment." Appx269. Regarding prior salary, Ms. Ambrose testified as to its

importance, because it can "make a huge difference," and the agency balances not

"shortchang[ing] people" with not "overpay[ing] people if they're not already

making the higher amount." Appx271. In other words, Ms. Ambrose testified that

it is "very, very clear and spelled out exactly how you're supposed to board

someone," and human resources requires documentation for the recommended

salary. Appx270-271.

The record is not clear as to why the EEOC did not make a final

determination, but less than two months later, in April 2019, Ms. Boyer filed suit

in the United States District Court for the Northern District of Alabama, alleging a

violation of the EPA, *Boyer v. Robert Wilkie, Sect'y of Veterans Affairs*, No. 2:19-

cv-552-JEO (N.D. Ala.), which was ultimately transferred to the Court of Federal
Claims on February 13, 2020.

## II.   Course Of Proceedings And Disposition Below

On March 25, 2022, the Court of Federal Claims denied summary judgment
to Ms. Boyer and granted summary judgment in favor of the United States, holding
that the United States established an affirmative defense.  Appx1-36.

### A.   The Trial Court Denied Ms. Boyer's Summary Judgment Motion

First, the court explained that Ms. Boyer's motion "boils down to two
interrelated assertions, one legal and one factual," with those being:  (1) as a matter
of law, a defendant "may not rely on prior salary *alone* as a 'factor other than sex'
in justifying a wage differential," and (2) there is no genuine dispute of material
facts that the Birmingham VMAC "relied on prior salary *alone* in paying Male
Comparator more than Plaintiff."  Appx24 (emphasis in original).

As to the legal question, the court determined that the only way Ms. Boyer
could prevail is if prior pay alone could not serve as an affirmative defense, which
it declined to find.  *Id.* (rejecting the reasoning of the Ninth Circuit's decision, *Rizo
v. Yovino*, 950 F.3d 1217, 1231 (9th Cir. 2020) ("[p]rior pay, alone or in
combination with other factors, cannot serve as a defense.")).

Turning to whether there were any material facts in dispute, the court
rejected Ms. Boyer's assertion that Ms. Sfakianos was the decisionmaker and that

"she relied on nothing other than prior salary." Appx25. Viewing the record in the light most favorable to the government as the non-moving party, the court held that contemporaneous emails during the boarding process "suggests a multi-layered salary justification" with "pharmaceutical skills, education *and* current salary" used to "justify[ ] the step on the salary scale she was given." *Id.* (emphasis in original).

Further, the court held that the record "could equally support a conclusion that Sfakianos was *not* the 'decisionmaker'" because "it is the Board's recommendations and the Medical Director's decisions with respect to the salaries of Plaintiff and Male Comparator that are material." Appx25-26. Along the same lines, although Ms. Boyer "seemingly wants the Court to take judicial notice of the fact that she 'was the more experienced hire,'" the court pointed to other record evidence such that "it cannot be said with certainty that *years* of pharmaceutical experience since graduation was the *only* type of 'experience' that could have distinguished Plaintiff and Male Comparator for pay purposes." Appx26 (emphasis in original).

At bottom, the court held that Ms. Boyer's motion "rests entirely on a record that she did not further develop for purposes of her motion" and that her reliance on the EEO investigative report "leaves a reasonable factfinder with inconclusive

results and genuine issues of material fact," and therefore denied her motion for summary judgment. *Id.*

**B.     The Trial Court Granted The Government's Summary Judgment Motion, Holding That The VHA Setting Initial Pay Based On Prior Pay Alone Is A "Factor Other Than Sex"**

Turning to the United States' motion, the court held that there was "disagreement between the parties regarding whether pay alone or pay plus other factors resulted in the salary differential between the Plaintiff and Male Comparator," but held that "in the context of setting federal employee pay, this method qualifies as a factor other than sex under the EPA." Appx27. In doing so, the court observed that circuits not allowing prior pay to be a factor other than sex was in the "context of non-federal employees" and "[t]hey were not examining what may or may not constitute a factor other than sex in the context of statutory and regulatory hiring provisions related to federal employees," which "explicitly allow for the use of existing or prior salary alone in determining pay rates." Appx28. The court also considered Ms. Boyer's "undisputed admission" as to "why her prior salary was lower than would be typical for a pharmacist of her experience," and held, regardless of that admission, "existing or prior pay *alone* qualified as an affirmative defense under the EPA." *Id.* (emphasis in original).

The court then examined the Federal pay system and its relevance to Ms. Boyer's claim, starting with 5 U.S.C. § 5333, which provides for when an

19

agency may depart from the minimum rate of pay for the appropriate grade for an employee appointed under the general schedule (GS) system. *Id.* (quoting 5 U.S.C. § 5333, in that "[n]ew appointments shall be made at the minimum rate of the appropriate grade" unless "the *existing pay or* unusually high or unique qualifications of the candidate" justify appointing "an individual to a position at such a rate above the minimum rate of the appropriate grade . . . .") (emphasis added). The court observed that the statute is disjunctive and "it appears clear that the use of 'or' in § 5333 was intended to have its ordinary disjunctive meaning and thus, according to Congress, existing pay *alone*, without regard to high or unique qualifications or other factors, is an appropriate reason to depart from the otherwise minimum rate of pay under the GS system." Appx29 (citations omitted and emphasis in original).

As to how § 5333 relates to the EPA, the court explained that "Congress enacted § 5333 in 1966, just three years after its passage of the EPA," and although the EPA was not extended to cover most Federal employees until 1974, the court noted that "one would be hard-pressed to argue that in the immediate wake of its passage of the EPA, Congress, via § 5333, enshrined in the primary federal pay statute a policy that would be facially discriminatory under the EPA if it had applied at that time." *Id.* Rather than determine that the statutes conflict, the court explained how they are "easily harmonized." *Id.* "Simply put, to harmonize the

EPA and § 5333, all the Court must do is find that existing or prior pay alone qualified as a factor other than sex under the EPA," and to "find otherwise[,] would not only assume Congress essentially acted contrary to the EPA's intent three years after its passage but would also require the Court to read the two statutes as conflicting with one another," which it declined to do.  Appx30; *id.* ("In other words, if existing pay alone is not a factor other than sex for GS employees, then the EPA and § 5333 have necessarily conflicted with one another since the 1974 [Fair Labor Standards Act (FLSA)] amendments were enacted and have continued to conflict in the over 45 years since."); Appx31 (holding that there is no legislative intent to implicitly repeal "the existing pay language in § 5333").

And then considering that "Congress 28 years later enacted another statute that allows for a departure from the minimum pay rate for the grade for certain VA employees appointed under title 38 based on existing pay alone," the court held that "[t]his course of events would seem to be a stretch at best and certainly not the 'clear and manifest' intent' required to implicitly repeal § 5333 (especially considering that a natural reading of the two statutes allows the existing pay provision in § 5333 to stand as a factor other than sex)."  Appx31.  In addition, the court noted that Congress had also "expanded the coverage of § 5333 since the enactment of the 1974 FLSA amendments" and that "[s]uch an expansion belies any congressional intent to implicitly repeal § 5333 through the enactment of the

1974 FLSA amendments."  Appx32 (citing Federal Employees Pay Comparability Act of 1990, Pub. L. No. 101-509, 104 Stat. 1427, 1449, 1461 (1990)).

The court continued that the regulation OPM promulgated "to carry out § 5333 further confirms that 'existing salary' or 'recent salary history' *alone* may be used in determining GS employee's initial pay rate." *Id.* (emphasis in original). 5 C.F.R. § 531.212(b)(1) requires that an agency "may determine that a candidate has superior qualifications based on the level, type, or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors that support a superior qualifications determination." *Id.* Once an agency has determined that an employee is eligible for above the minimum rate of pay, then the "'agency may consider *one or more* of' a list of factors, including '[t]he candidate's *existing salary, recent salary history*, or salary documented in a competing job offer,' to determine the step of an employee's initial pay rate." *Id.* (quoting 5 C.F.R. § 531.212(c)(1)-(2)) (emphasis in original). The court also referenced the VA Handbook as well as "another statute applicable to the VA, enacted in 1991," which "specifically permits use of existing pay or recent salary history *alone* without consideration of other factors in determining a VA employee's pay rate."  Appx33 (quoting VA Handbook 5007/51, Part II, Chapter 3, Subpart 3(b)(1)) (emphasis in original); *id.* (citing 38 U.S.C. § 7408).

Next, the court rejected Ms. Boyer's "conflation" of that regulation, 5 C.F.R.
§ 531.212, wherein she argued that a new employee's pay may be set above the
minimum rate only if a candidate has "superior qualifications" *compared* to other
candidates, and that the Birmingham VAMC made no finding that the Male
Comparator's qualifications were significantly higher than her own. *Id.* The court
explained that Ms. Boyer's interpretation would mean that "an agency would
*always* need to assess candidates against each other," which is not required in the
disjunctive "or" in the regulation. *Id.* (emphasis in original). And "engendering
even more illogical results," such an interpretation would "presumably require the
VA—and all federal agencies, for that matter—to compare a *candidate's*
qualifications with effectively *all other current* employees doing the same or
similar work." Appx32-33 (emphasis in original). As the court observed, Ms.
Boyer "herself was found to have superior qualifications and was therefore paid
above the minimum pay rate for the grade, such as the regulation envisions."
Appx33.

Further, the court acknowledged that 5 U.S.C. § 5333 and 38 U.S.C. § 7408,
as well as OPM's regulations, "are not dispositive" because Ms. Boyer was "not
appointed under either statute," but held "they are conclusive evidence that, at least
for federal employees, Congress considers existing or prior pay alone to be a factor
other than sex." Appx33-34. "To hold otherwise would read at least two statutes

(both applicable to some employees at the VA), an OPM regulation (applicable to some employees at the VA), and the VA Handbook off the books . . . when a more natural reading harmonizes them." Appx34. Indeed, the court explained that "it simply cannot be the case that the VA would have an affirmative defense to an EPA claim based on use of existing or prior pay alone" for some employees but not for others, like Ms. Boyer, because that "would essentially carve VA employees into distinct classes for the purpose of EPA claims." *Id.* The court also cited a recent Executive Order supporting its interpretation at the time of Ms. Boyer's hiring, which announced that OPM "'anticipates issuing a proposed rule that will address the use of salary history in the hiring and pay-setting processes for Federal employees . . . .'" *Id.* (quoting Exec. Order No. 14,069, 87 Fed. Reg. 15,315 (Mar. 18, 2022)).

Additionally, the court briefly addressed Ms. Boyer's "undisputed admission" that her "prior salary was 'depressed' at her previous employer" due to other benefits and perks. Appx34-35. The court held that "basing a pay rate on a prior salary *could* perpetuate past discrimination if gender discrimination led to that lower prior salary, but Plaintiff has not made, much less offered any evidence to support, such a claim," as the undisputed fact "is an admission by Plaintiff that

her prior salary was lower because of 'benefits and perks,' not gender discrimination."[4]  Appx35 (emphasis in original).

Finally, the court held that, "[f]acially, the text of the EPA does not suggest any limitations to the broad, 'factor other than sex' catch-all affirmative defense." Appx35.  The court continued that it "simply cannot rule in the instant case that the VA violated the EPA (even assuming that the VA used existing salary alone to set Male Comparator's pay rate higher than Plaintiff's)" due to "Congress's explicit grant of authority to federal agencies to use existing pay alone in determining federal employees' salaries in at least two statutes, and Plaintiff's admission that her lower prior salary was the result of benefits and perks (and not discrimination)."  *Id.*  Thus, because the court "conclude[d] that Congress permitted the VA to use existing or prior pay alone in determining pay rates for new appointees," the court held that the United States was entitled to judgment as a matter of law.  Appx35-36; *see also* Appx28 ("Taken *together or separately*, the federal statutory and regulatory scheme and Plaintiff's admission regarding her prior salary demonstrate why, in this case, existing or prior pay *alone* qualifies as

---

[4]  In a footnote, the court explained that Ms. Boyer had failed to "offer any evidence whatsoever that the government's justification is pretextual," and "[l]eft with nothing but Plaintiff's successive rejections of the government's stated defense, the Court's hands are tied, and the affirmative defense carries the day." Appx34 n.17.

an affirmative defense under the EPA.") (first emphasis added and second emphasis in original).

## SUMMARY OF THE ARGUMENT

In applying the same summary judgment standard as the Court of Federal Claims, this Court should find that the United States did not violate the Equal Pay Act and affirm the judgment. An employer may defeat a *prima facie* Equal Pay Act claim by showing that any pay differential is "based on any other factor other than sex." Here, Congress authorized the VA to use existing or prior pay *alone* in determining pay rates for new pharmacist appointees.

Even if that were not sufficient to defeat Ms. Boyer's claim, consistent with 5 C.F.R. § 531.212(b)(1) and the VHA Handbook, the trial court also correctly held that the agency determined that Ms. Boyer and the male comparator possessed "superior qualifications," in order to depart upwardly from the minimum rate of pay for new Federal employees. And once it made that determination, pursuant to 5 C.F.R. § 531.212(c)(1)-(2), the agency then considered the candidate's prior or existing salary to determine the step of the initial pay rate.

Finally, although Ms. Boyer and *amici* invite this Court to adopt a standard that would preclude consideration of prior pay as a "factor other than sex" affirmative defense to an EPA violation, that standard is foreclosed with respect to

Federal employees, given Congress's clear intent that prior pay may be a relevant factor in setting initial salaries.

## **ARGUMENT**

### I.    **Standard Of Review**

This Court "review[s] the Court of Federal Claims' grant of summary judgment de novo, applying the same standard applied by the court below." *Nutt v. United States*, 837 F.3d 1292, 1295 (Fed. Cir. 2016) (citing *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997)). It reviews the Court of Federal Claims' denial of summary judgment for abuse of discretion. *Lear Siegler Servs., Inc. v. Rumsfeld*, 457 F.3d 1262, 1266 (Fed. Cir. 2006).

### II.    **Equal Pay Act Standard**

The EPA was enacted in 1963 and extended from private industry to the Federal Government in 1974. 29 U.S.C. §§ 201, 203(e)(2); *Molden v. United States*, 11 Cl. Ct. 604, 609 (1987). The EPA provides:

> No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or *(iv) a differential based on any other factor other than sex* . . . .

29 U.S.C. § 206(d)(1) (emphasis added).

To establish a *prima facie* EPA case, a plaintiff "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). If the plaintiff successfully carries this burden, then "the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions." *Id.* at 196; *see also* 29 U.S.C. § 206(d)(1). "The burden on an employer to establish an affirmative defense is 'a heavy one.'" *Cooke v. United States*, 85 Fed. Cl. 325, 342 (2008) (quoting *Mansfield v. United States*, 71 Fed. Cl. 687, 693 (2006)), *dismissed*, 352 F. App'x 429 (Fed. Cir. 2009). Moreover, "[a]n employer must prove that the gender-neutral factor identified is indeed *the* factor causing the wage differential in question." *Behm v. United States*, 68 Fed. Cl. 395, 400 (2005) (emphasis in original).

Relevant here, when an employer raises the "any other factor other than sex" defense, the factor must be "gender-neutral on its face and *bona fide* — that is, used in good faith and not in a discriminatory manner — in its application." *Id.* The court's scrutiny of a "factor other than sex" defense "should not entail questioning the wisdom of a particular policy, or whether it actually furthers an

identified and acceptable business purpose . . . ." *Id.* Rather, the court applies deferential, "rational basis" scrutiny, meaning that "courts are to exercise restraint and uphold a government policy unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Id.* at 401 (internal quotations, bracketing and citations omitted). If the challenged "economic or social policy passes this test[, then] any state of facts reasonably may be conceived to justify it." *Id.* (citations omitted and alteration added).

Finally, a plaintiff may counter an affirmative defense under the EPA "by producing evidence that 'the reasons the employer seeks to advance are actually a pretext for sex discrimination.'" *Moorehead v. United States*, 88 Fed. Cl. 614, 624 (2009) (quoting *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir. 1992)). If the employer's reason for "'a pay difference is shown to be pretextual, the affirmative defense fails.'" *Id.* (quoting *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876-77 (9th Cir. 1982)); *see Thomas v. United States*, 86 Fed. Cl. 633, 641, *aff'd*, 351 F. App'x 433 (Fed. Cir. 2009) ("There are no specific allegations of fact before the court which undermine the affirmative defense established by the government.").

### III.  For Federal Agencies Determining Pay Rates For New Employees, Consideration Of Prior Or Existing Pay Is A "Factor Other Than Sex"

The trial court correctly determined that, "[a]t least for Federal employees, Congress considers existing or prior pay alone to be a factor other than sex" affirmative defense.  Appx33.  The court explained that Federal pay-setting statutes and regulations enacted *after* the EPA, such as 5 U.S.C. § 5333 and 38 U.S.C. § 7408(b), expressly permit Federal agencies to depart upwardly from the minimum rate of pay for new Federal employees hired on the basis of existing or prior pay alone.  Appx29-31.  Thus, the court correctly determined that to harmonize the EPA and the various Federal pay-setting authorities, Congress expressly "permitted the VA to use existing or prior pay alone in determining pay rates for new appointees."  Appx36.  This Court should adopt the sound reasoning of the trial court in affirming the judgment.  Ms. Boyer's and *amici curiae*'s arguments, as explained below, are without merit.

### A.  The Trial Court Correctly Declined To Follow Other Circuits In That Prior Pay Alone Cannot Be A "Factor Other Than Sex"

Ms. Boyer argues that the "court should have followed the majority of Circuits that have held that reliance on a comparator's prior pay alone is insufficient" as a factor other than sex affirmative defense.  Applnt. Br. at 17-22. *Amici* add that reliance on salary history or "market forces" perpetuates the gender

30

wage gap and that allowing the Federal government to rely solely on prior pay would create a "shockingly large carve-out from the EPA." Amici Br. at 6-21.

However, the trial court considered this "disagreement among the circuits" as to whether prior salary can ever serve as a "factor other than sex" affirmative defense, Appx20-21, and held that those circuits "were not examining what may or may not constitute a factor other than sex in the context of statutory and regulatory hiring provisions related to *federal* employees." Appx28 (emphasis added). Neither Ms. Boyer nor *amici* acknowledge the important distinction between Federal and private employment in the context of the EPA, with Ms. Boyer arguing only that "this Court could adopt the more moderate reasoning of the Tenth and Eleventh Circuits and hold that reliance on prior pay *alone* is insufficient to carry a defendant's burden of establishing the affirmative defense." Applnt. Br. at 22 (emphasis in original); *id.* (arguing that "[t]he reasoning of the Tenth and Eleventh Circuits mandates reversal in this matter").

Relatedly, while *amici* argue that a reliance on prior pay perpetuates the gender gap, the so-called "market forces" argument, and offer various academic publications in support,[5] Amici Br. at 6-12, Ms. Boyer does not argue that market

---

[5] *Amici* cite *Moorehead v. United States*, 84 Fed. Cl. 745, 749 (2008), for the court's so-called recognition of the "problematic nature of using salary history alone to set pay," Amici Br. at 17, but fail to add that prior salary was not one of the factors that the agency, the Transportation Safety Agency (TSA) considered in setting initial pay. *See Moorehead*, 88 Fed. Cl. at 624 (holding after a trial, that the

forces depress pay for female pharmacists applying to the Federal government, let alone female pharmacists applying to the VHA. Rather, Ms. Boyer merely cites Eleventh Circuit precedent, where her action was originally filed, for the proposition that it is "one of the jurisdictions that has consistently rejected 'market force' justifications for gender wage differentials," Applnt. Br. at 21-22 (citing *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995); *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1570-71 (11th Cir. 1988)), without explaining how pay for female pharmacists has been depressed, such that prior pay could not serve as a "factor other than sex" affirmative defense.

In any event, the market forces argument is not persuasive, for reasons the Court of Federal Claims previously articulated in *North v. United States*. There, the plaintiff argued "that market forces tend to result in lower federal starting pay for women, and higher pay for men." 123 Fed. Cl. 457, 466 (2015). While the court noted that "[t]here is a certain appeal to this 'market force' argument, at least from a historical standpoint," the court was ultimately "not persuaded, however, that the Equal Pay Act claim before the court can proceed based upon such an abstract and generalized violation, if it is indeed a violation, of egalitarian principles." *Id.* In addition to noting that "'existing pay' is enshrined both in

---

criteria related to experience in a Salary Guidance manual "are on their face gender neutral, and were applied in a gender-neutral manner to all applicants. The even-handed use of those factors caused any disparity in initial salary offers").

section 5333 and 5 C.F.R. § 531.212(c) as a valid factor in setting the starting pay of federal employees," the court further explained that "Congress could have acted to rectify any 'market force' gender discrimination caused by a reliance on 'existing pay' which disfavors women," but "Congress has not chosen to do so." *Id.* Relevant here, the court also held that "the undisputed facts show that it was not market forces but Ms. North's individual career circumstances which caused her starting pay to be set at GS–14, Step 1" and "[a] male candidate with a similar career path and reduced earnings would also, no doubt, have been denied higher than minimum pay" at the agency. *Id.* at 468.

Regardless, the Court need not reach this question, because as we explain below, Congress has authorized Federal agencies to rely on prior pay alone when determining pay rates for new appointees.

### B.  The EPA And Federal Pay-Setting Authorities Can Be Harmonized, Whereas Ms. Boyer's Reading Requires This Court To Find That Congress Implicitly Repealed Parts Of The Statutes

Rather than find an implicit partial repeal of at least two Federal statutes and an OPM promulgating regulation (affecting *millions* of Federal employees over decades), the trial court correctly held that, when "presented with a question of federal wage setting" and Ms. Boyer's interpretation of the EPA that Federal agencies cannot rely on prior pay for setting initial salaries, "the more natural reading, and the one that harmonizes the two statutes, is to conclude that existing

33

pay alone—at least for purposes of the federal pay system—is a factor other than sex." Appx30. The arguments to the contrary by Ms. Boyer and *amici* are unpersuasive, as we explain below.

As an initial matter, Ms. Boyer argues that she was appointed pursuant to 38 U.S.C. § 7401(3), so there was no need for the trial court to analyze 5 U.S.C. § 5333 or 38 U.S.C. § 7408. Applnt. Br. at 23-24. *Amici* add that the appointment statute "contains no authorization for the Agency to evaluate prior salary of candidates." Amici Br. at 24. But this places undue weight on 38 U.S.C. § 7401(3), which does not operate within a vacuum. If an appointment statute gives no guidance on how VHA may determine initial pay for new pharmacists, then it follows that there must be some other authority that informs VHA how to determine initial pay, including the pay framework established in the VA Handbook.[6] Indeed, the trial court correctly recognized that § 5333 and § 7408 "are not dispositive" of her claim; rather, they "are conclusive evidence that, at least for federal employees, Congress considers existing or prior pay alone to be a factor other than sex." Appx33.

Second, Ms. Boyer argues that it was error for the trial court to find "an inherent conflict between the two statutes it did consider and the EPA's prohibition

---

[6] As another example, the general VHA appointment statute, 38 U.S.C. § 7401, provides for the appointment of a wide range of personnel, but similarly provides no guidance for determination of initial pay.

on establishing an affirmative defense to a pay disparity by reference to prior pay alone." Applnt. Br. at 24-27 (referencing § 5333 and § 7408). Ms. Boyer primarily argues that neither statute "*requires* an Agency to set the salary of a new hire at a level that would create a pay disparity between similarly situate male and female employees that would be justifiable solely by reference to the male comparator's prior pay." *Id.* at 24-25 (emphasis in original). Relatedly, *amici* argue that the trial court should have interpreted 5 U.S.C. § 5333 in light of the Classification Act of 1949, 5 U.S.C. § 5101, which allegedly provides "vital context regarding Congress's clear intent to eliminate and avoid pay inequity within the federal government." Amici Br. at 28.

But these arguments fail to undermine the trial court's sound reasoning that, "[t]here is no reasonable way that one can read the EPA to prohibit the use of existing pay alone in determining federal employee pay *and* read § 5333 in a manner that gives effect to its allowance of the use of existing pay alone in determining initial pay for GS employees . . . ." Appx30-31 (emphasis in original); *see also* Appx34 (referring to § 7408). Ms. Boyer's suggestion that the statutes do not "require" reliance on prior pay alone cannot be reconciled with the express authorizations to do so in both statutes.

In other words, she has offered no authority for finding that the pay-setting portions of § 5333 and § 7408 are implicitly repealed for purposes of the EPA,

merely because an agency or the VHA could use a different factor, *i.e.*, "superior qualifications," for making an appointment above the minimum grade rather than consider existing pay.  Indeed, it is antithetical to statutory construction to find that a statute is impliedly repealed in *some* circumstances, but not in others, because "legislative intent to repeal [must be] manifest in the 'positive repugnancy between the provisions' of the two statutes."  *California v. United States*, 271 F.3d 1377, 1382 (Fed. Cir. 2001) (citations omitted and alteration added); *see also Branch v. Smith*, 538 U.S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute") (quotations omitted).

Similarly, Ms. Boyer argues that neither § 5333 nor § 7408 contain a "'notwithstanding' clause or other similar language expressing an intent by Congress to hold the federal government to a different standard than private employers in the majority of the country." Applnt. Br. at 26.  Ms. Boyer waived this argument by not raising it before the trial court.  *See Sage Prods. Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) (an argument is waived if not raised before the trial court).

Nonetheless, citing no legislative history in support, Ms. Boyer urges the Court to find that "Congress's decision that no such clause was needed *likely*

reflects congressional understanding that it is possible for an agency to rely on all the factors set forth in § 5333 and the regulations while simultaneously avoiding the creation of pay disparities justifiable solely by reference to prior pay." Applnt. Br. at 26-27 (emphasis added). But as we explain further below, prior pay is one of the two factors Congress intended for agencies to consider in departing upward from the minimum pay grade. *See* 5 U.S.C. § 5333. It would be curious indeed if Congress expressly intended agencies to rely on prior pay but not if prior pay somehow created pay disparities in any particular circumstance (of which there could be myriad on an annual basis), which is what Ms. Boyer appears to argue.

Rather, it is "black letter law that statutory construction begins with the language of the statute itself." *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579 (Fed. Cir. 1990). Here, the text in both § 5333 and § 7408 are disjunctive in that an agency may consider existing pay *or* another factor in order to depart from the minimum rate of pay for new Federal employees:

- 38 U.S.C. § 7408(b): "after considering an individual's *existing pay*, higher or unique qualifications") (emphasis added);

- 5 U.S.C. § 5333 ("the *existing pay* or unusually high or unique qualifications of the candidate") (emphasis added).

As the trial court correctly explained, "[t]here is nothing about the grammatical construction of § 5333 that suggests anything other than that the

37

ordinary and usual disjunctive meaning of 'or' was intended, nor would use of the disjunctive meaning of 'or' result in an unreasonable interpretation of the statute." Appx29. Thus, "according to Congress, existing pay *alone*, without regard to high or unique qualifications or other factors, is an appropriate reason to depart from the otherwise minimum rate of pay under the GS system." *Id.* (emphasis in original). "Where 'the statutory language is plain, . . . it must be enforce[d ] according to its terms.'" *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 803 (Fed. Cir. 2018) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

Further, § 5333 was passed three years *after* the EPA (with a further extension of the EPA to Federal employment in 1974). As the trial court noted, "one would have to find that the EPA and the language regarding existing pay in § 5333 are in conflict with one another to hold that the EPA prohibits the use of existing pay alone in determining GS employee wages." Appx29. There is no reason to find a conflict. While the "meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand," *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), § 5333 was passed *after* the EPA and applies to only Federal employees. In other words, Congress passed the general Federal pay-setting statute allowing agencies to use prior or existing pay in setting pay rates for new appointees, *after* the passage of the EPA, which already provided

for an affirmative defense of a "factor other than sex." *See* 29 U.S.C. § 206(d)(1).

While *amici* argue that the court should have considered the "context" of equal pay enshrined in the Classification Act of 1949, Amici Br. at 28, they conveniently ignore that 5 U.S.C. § 5333 is derived from two earlier statutes, 5 U.S.C. §§ 1131 and 1133, which were also passed in 1949 (Oct. 28, 1949, ch. 782, § 801, 63 Stat. 969), well before the passing of the Equal Pay Act of 1963.

In addition, while Congress may have extended the EPA's coverage to most Federal employees in 1974, Fair Labor Standards Amendments of 1974, Pub. L. No. 93–259, 88 Stat. 55, the most recent amendment to § 5333 was in 1990, when the GS-11 threshold for new employees to be paid above the minimum rate for their grade was eliminated.  Federal Employees Pay Comparability Act of 1990, Pub. L. No. 101-509, title V, § 529 [title I, § 106, title II, § 211(b)(1)], 104 Stat. 1427, 1449, 1461.

Notably, even after Congress extended the EPA to Federal employees, Congress made *no* changes to the pay language in 5 U.S.C. § 5333 statute.  If Congress intended for a new Federal employee's pay to not be above the minimum rate of the appropriate grade based on prior or existing pay, then it would have done so.  Instead, in 1991, Congress passed a VA-specific statute, 38 U.S.C. § 7408, which authorizes the use of existing pay alone in determining an employee's salary, when making an appointment above the minimum rate of the

appropriate grade.  *See* Department of Veterans Affairs Health-Care Personnel Act

of 1991, Pub. L. No. 102-40, Title IV, § 01(b)(2), 105 Stat. 229; *amended* Pub. L.

103-446, Title XII, § 1201(e)(21), Nov. 2, 1994, 108 Stat. 4686.

 Thus, the trial court correctly found that § 5333 could be read in harmony

with the EPA, because all that was required was to "find that existing or prior pay

alone qualifies as a factor other than sex under the EPA."  Appx29; *see also La.*

*Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("we are guided by the

familiar rule of construction that, where possible, provisions of a statute should be

read so as not to create a conflict").  Otherwise, it would mean that, in passing

§ 5333, "Congress essentially acted contrary to the EPA's intent three years after

its passage but would also require the Court to read the two statutes as conflicting

with one another."  Appx30; *see Aerojet-Gen. Corp. v. United States*, 568 F.2d

729, 758 (Ct. Cl. 1977) ("However great the temptation, it must be remembered

that it is not the function of a court to engraft on a statute additions which it thinks

the legislature might or should have made.") (citing *United States v. Cooper Corp.*,

312 U.S. 600, 605 (1941)).

That conclusion was not necessary because "the more natural reading, and

the one that harmonizes the two statutes, is to conclude that existing pay alone—at

least for purposes of the federal pay system—is a factor other than sex."  Appx30

(citing *Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1018 (1984) ("[W]here two

statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (internal quotations omitted); *Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose.") (citations omitted)).

Thus, this Court should also find that "Congress has statutorily allowed pay to be determined through consideration of existing pay *alone* even after passage of the EPA." Appx33 (emphasis in original). And in order to give effect to all the pay language in 5 U.S.C. § 5333 and 38 U.S.C. § 7408, all the Court need do "is to interpret existing pay alone to be a factor other than sex." *Id.*

### C.    OPM Regulation, 5 C.F.R. § 531.212, And VA Handbook 5007 Allow Use Of Prior Pay For Setting Initial Pay

The trial court also correctly determined that 5 C.F.R. § 531.212 and the VA Handbook 5007, explicitly allow use of prior pay, alone, or in conjunction with other factors, in setting initial salaries for Federal (and VHA) employees. Appx32-33. The Court should reject Ms. Boyer's and *amici's* unpersuasive arguments, as we explain below.

First, and similar to her argument with respect to 5 U.S.C. § 5333, Ms. Boyer argues that 5 C.F.R. § 531.212 does not "require" an agency to set the salary of a new hire at a level that "would create a pay disparity between similarly situated male and female employees justifiable solely by reference to prior pay."

41

Applnt. Br. at 27; *see also* Amici Br. at 27 (arguing that 5 C.F.R. § 531.212 "is only applicable in a set of facts that does not exist in this case."). However, that argument does not comport with the express language of the regulation.

In 2005, OPM promulgated 5 C.F.R. § 531.212. *Changes in Pay Administration Rules for General Schedule Employees*, 70 Fed. Reg. 31,278, 31,294-295 (Off. of Pers. Mgmt. May 31, 2005). Referring to 5 C.F.R. § 531.212(b), OPM explained, the "interim regulations define what is meant by superior qualifications and special needs so that agencies better understand how this pay flexibility may be used." *Id.* at 31,283. Section (b), the "Superior qualifications or special needs determination," provides that, "[a]n agency may set the payable rate of basic pay of a newly appointed employee above the minimum rate of the grade under this section if the candidate meets one of the following criteria: (1) The candidate has superior qualifications" or "(2) The candidate fills a special agency need." When determining if a candidate has "superior qualifications," an agency must consider if the qualities are "significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality compared to other *candidates*." 5 C.F.R. § 531.212(b)(1) (emphasis added).

OPM further explained that "[t]he interim regulations also expand the elements that can be considered in justifying the higher rate, *allowing the use of*

*factors other than existing pay*, consistent with 5 U.S.C. § 5333." *Changes in Pay Administration Rules for General Schedule Employees*, 70 Fed. Reg. at 31,283 (emphasis added). Entitled "pay rate determination," it established a disjunctive list of 10 factors, and "[a]n agency may consider *one or more*" of the factors "to determine the step at which to set an employee's payable rate of basic pay using the superior qualifications and special needs pay-setting authority." 5 C.F.R. § 531.212(c) (emphasis added). OPM included within the non-exhaustive list of disjunctive factors: "(2) The candidate's *existing* salary, *recent* salary history, or salary documented in a competing job offer" and "(10) Other relevant factors." *Id.* § 531.212(c)(2), (10) (emphasis added).

A traditional canon of statutory construction is that terms joined by the disjunctive "or" have different meanings unless the context dictates otherwise. *See, e.g.*, *United States v. Woods*, 571 U.S. 31, 45 (2013). There is also a preference to prevent words from being superfluous to each other. *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 176 (2012) ("Because legal drafters should not include words that have no effect, courts should avoid a reading that renders some word altogether redundant."). Thus, it follows that an agency need only consider *one* of the 10 factors, which includes prior pay.

With this background, the trial court determined that the OPM regulation

"further confirms that 'existing pay' or 'recent salary history' *alone* may be used in determining GS employee's initial pay rate." Appx32 (emphasis in original). Likewise, "consistent with both § 5333 and the OPM regulation", VA Handbook 5007 "expressly permits the use of a 'candidate's *existing pay or recent salary history*, competing job offer(s), higher or unique qualifications, *or* special needs of VA' in setting initial pay rates." Appx33 (citing VA Handbook 5007/51, Part II, Chapter 3, Subpart 3(b)(1)) (emphasis in original); *see also* Appx2-3 (discussing pay-setting requirements in VA Handbook 5007). The court noted that even the OPM's regulations "confirm this decision," and cited "a recent Executive Order[7] [that] supports this interpretation[.]"[8] Appx34 & n.16 (citing Exec. Order No.

---

[7] An earlier executive order from President Biden lends further support that current Federal law and regulations permit agencies to rely on prior pay alone when determining initial salaries. Exec. Order No. 14,035, 86 Fed. Reg. 34,593, 34,601-602 (June 25, 2021), directs the OPM Director to "review Government-wide regulations and guidance and, as appropriate and consistent with applicable law, in order to address any pay inequities and advance equal pay, consider whether to . . . prohibit agencies from seeking or relying on an applicant's *salary history during* the hiring process to set pay or when setting pay for a current employee, unless salary history is raised without prompting by the applicant or employee." (emphasis added).

[8] The day following the announcement of this executive order, *amici* National Women's Law Center (NWLC) issued a press release "applaud[ing]" the order and stating that it will require the Federal government to "*take steps to limit or ban* the use of salary history with respect to federal employees." *NWLC Applauds President Biden's Executive Order Curbing the Use of Salary History in Pay Setting*, National Women's Law Center (Mar. 16, 2022), https://nwlc.org/press-release/nwlc-applauds-president-bidens-executive-order-

14,069, 87 Fed. Reg. 15,315 (Mar. 18, 2022), which announced that OPM

"anticipates issuing a proposed rule that will address the use of salary history in the

hiring and pay-setting processes for Federal employees . . . .")).

While Ms. Boyer acknowledges that 5 C.F.R. § 531.212(c) sets forth a list of

factors an agency may consider in setting pay, including prior pay, she argues that

"the inclusion of the catch-all [factor] makes clear that an agency seeking to rely

on a candidate's prior pay may consider the pay and qualifications of similarly

situated employees."  Applnt. Br. at 30 (alteration added).  She adds that the VA

"would remain free to rely on *all* the factors set forth in § 5333 and its

implementing regulations."  *Id.* (emphasis added).

But her interpretation does not comport with the language of the regulation,

nor does it make sense.  Instead, her argument would render a "candidate's *existing*

salary, *recent* salary history, or salary documented in a competing job offer"

superfluous language because under her theory, an agency could only consider

prior pay in conjunction *with* a different factor.  In other words, under Ms. Boyer's

interpretation, "all the factors" could still be used but not if prior pay would result

in "paying a male new hire more than a similarly situated female employee,"

which she argues is an outcome that agencies should avoid by looking to other

---

curbing-the-use-of-salary-history-in-pay-setting/ (last visited Dec. 16, 2022)
(emphasis added).

factors than prior pay. *Id.* at 30. The logical result of her argument is that prior pay cannot be used *alone*, which is contrary to the express language of the regulation, which is an argument the Court should reject.

Turning to the pay-setting language in the VA Handbook 5007, Ms. Boyer's and *amici*'s arguments are similarly without merit. Ms. Boyer argues that the VA Handbook 5007 is a directive which requires "managers, in setting the pay of new hires, [to] consider whether such decisions may give rise to pay inequities with current employees." Applnt Br. at 32; *see also id.* at 33. She continues that "nothing in the VA Handbook *requires* the Agency to rely on prior pay alone." Appx33 (emphasis in original); *see* Amici Br. at 25 (arguing that "the VA Handbook does not authorize officials to only consider prior salary").

While Ms. Boyer and *amici* argue that it is incumbent upon VA to consider, among other things, "the number of on-duty personnel in the category under consideration and their pay rates, the number of vacancies and the availability of well-qualified candidates; possible employee and/or community relations problems which may result, Applnt Br. at 32; *see also* Amici Br. at 25, they misinterpret how this section of the VA Handbook 5007 applies. The cited section cautions the VA to consider different factors before it even *recommends* appointing a candidate above the minimum grade of the position. *See* Appx79. It has nothing to do with how to set the pay rate.

46

Rather, the VA Handbook states that reasons for requesting an appointment above the minimum rate of the grade "may include information on the candidate's existing pay or recent salary history, competing job offer(s), higher or unique qualifications, *or* special needs of VA[.]" Appx78 (emphasis added). This is, once again, a disjunctive provision, meaning that the VA may consider a candidate's "existing pay or recent salary history," alone, without considering any other factor. *See id.*; Appx33; *Woods*, 571 U.S. at 45.

Indeed, the Court of Federal Claims has previously found no EPA violations when Federal agencies follow the guidance of handbooks, such as the VA Handbook 5007, in determining compensation, even *if* pay disparity results from considering prior or existing salaries. In *North v. United States*, the court determined that the Department of Education's pay policy of awarding higher starting pay for existing pay was gender neutral. 123 Fed. Cl. at 461. To wit, the court considered whether a Personnel Manual Instruction 338-1 (PMI 338-1) was rational and non-discriminatory because it allowed a "candidate's superior and/or unique qualifications," along with "forfeiture of existing pay" to be considered when awarding greater than minimum starting pay. *Id.* The Department of Education paid employees under the General Schedule (GS) system, and also allowed the recruitment of candidates by adjusting their step level in order to set pay at above the minimum. *Id.* In *North*, the plaintiff's request for higher starting

pay was denied, whereas a male coworker's was not.  *Id.* at 462-63.  The plaintiff

could not prove that she would be forced to take a pay cut in order to accept the

position, in contrast to the male coworker, who provided supporting records.  *Id.*

The Department of Education had argued that, "it was clearly not Ms.

North's gender at issue in the pay disparity with [the male comparator], it was her

decreased existing income at the time she was offered the position."  *Id.* at 466.

The Court considered that "'existing pay' is enshrined both in [5 U.S.C. §] 5333

and 5 C.F.R. § 531.212(c) as a valid factor in setting the starting pay of federal

employee."  *Id.* at 466.  And after reviewing cases interpreting this statutory and

regulatory scheme, the Court found that "[i]t is clear from these decisions that the

EEOC has approved of the consideration of higher private sector 'existing pay' in

federal pay-setting policies, and has found that such policies provide a legitimate

affirmative defense to Equal Pay Act claims."  *Id.* at 467.  Moreover, the plaintiff

conceded that, when she accepted her position, she "'could not demonstrate that

her 'current salary' or 'existing pay' exceeded that of the minimum salary" for her

desired grade and step.  *Id.* at 468.  In contrast, the male comparator "was able to

prove to the agency that his existing pay at the time of his candidacy exceeded the

minimum salary of GS 14, Step 1, and he therefore received a higher starting

salary."  *Id.*  While *North* does not bind this Court, it provides persuasive authority

that the VA Handbook 5007, which states that prior pay can be used to set an

initial salary, is "clearly gender-neutral and is a legitimate 'factor other than sex.'"
*Id.*

In conclusion, "Congress granted agencies the authority to depart upwardly from the minimum rate of pay for new federal employees hired under title 5, including some VA employees, and certain other VA employees under title 38, based on existing or prior pay alone." Appx35-36. The court correctly held that "Congress permitted the VA to use existing or prior pay alone in determining new rates for new appointees." Appx36; *see Girdis v. Equal Emp. Opportunity Comm'n*, 688 F. Supp. 40, 46 (D. Mass. 1987) (holding that a Federal personnel policy was a legitimate 'factor other than sex' because a male employee would have experienced the same pay disparity as the female complainants if his work background had been the same as theirs."). This Court should affirm this aspect of the judgment.

## IV.    The Record Is Uncontroverted That The Agency Complied With The VA Handbook 5007 In Hiring Ms. Boyer And The Male Comparator

In addition to determining that the VA could use prior pay alone in determining the salaries of new employees, the trial court correctly held that the agency complied with VA Handbook 5007 in setting the pay of Ms. Boyer and the male comparator. *See* Appx30-36. As we demonstrate below, Ms. Boyer and *amici*'s contrary arguments conflate the pay-setting authority to deviate upward from the minimum rate of pay, with the actual rate of pay. *See* Applnt. Br. at 39-

53; Amici Br. at 24-27.

### A.    The Trial Court Did Not Shift The Respective Burdens

First, Ms. Boyer argues that the trial court erred by relying on a purported "admission" as to why she made less money in her former pharmacist position, which allowed the agency "to bypass" its burden of proof.  Applnt. Br. at 35-39.  This is incorrect.

Once this case was transferred to the Court of Federal Claims, the agency conceded in its answer that Ms. Boyer had established a *prima facie* case of an EPA violation, which the trial court noted.[9]  Appx34 n.19.  In her deposition testimony before the EEOC, Ms. Boyer testified that her prior salary was depressed because her former position offered other "benefits and perks that no one else offers in Pharmacy."  Appx235.  Thus, considering that testimony, the trial court opined that "basing a pay rate on a prior salary *could* perpetuate past discrimination if gender discrimination led to that lower prior salary, but Plaintiff has not made, much less offered any evidence to support, such a claim."  Appx35 (emphasis in original).

Notably, the trial court did *not* suggest that this purported admission eroded

---

[9] As the trial court correctly noted, VA conceded that Ms. Boyer had established a *prima facie* case.  "Accordingly, the crux of this dispute—and the focus of the cross-motions for summary judgment—comes down to whether the government has established an affirmative defense."  Appx23-24.

or undercut her *prima facie* case, because it did not. *See* Appx35-36. Rather, the trial court concluded only that her prior salary was lower due to the benefits and perks associated with that job. Appx36. Regardless of *why* Ms. Boyer's prior salary may have been lower, the court nonetheless held that it "can conclude that Congress granted agencies the authority to depart upwardly from the minimum rate of pay for new federal employees" on the basis of "existing or prior pay alone." Appx35-36. And, moreover, that any "factual question of whether existing or prior pay alone was used in determining Plaintiff's and Male Comparator's pay rates is immaterial to the outcome of this case," Appx36, as is Ms. Boyer's purported admission for making less at her former job.

### B.    <u>Ms. Boyer Conflates "Superior Qualifications" And The Pay Rate</u>

First, Ms. Boyer argues that the trial court erred in holding that existing or prior pay alone is "insufficient" as an affirmative defense, and that the "evidence makes clear" that the pay stubs from Ms. Boyer and the male comparator "were the only factor that differentiated" them. Applnt. Br. at 39, 42. The *amici* argue that the agency should have considered alternatives before resorting to prior salary. *See* Amici Br. at 26-27. This is an incorrect understanding of VA's pay-setting policies.

As we explained above, the agency applies the equivalent of § 531.212(b) to make the *initial* determination that an employee is *eligible* to have a pay rate above

the minimum rate of the grade.  Then the agency considers various factors to determine the rate of pay.  In other words, the purpose of section (b) is for the agency to determine whether a candidate has "superior qualifications" and is effectively a screening mechanism, which must be determined *before* an agency can select a rate of pay above the minimum.

Ms. Boyer suggests that the agency should not have determined the male comparator deserved higher pay because she was the "more experienced hire." Applnt. Br. at 41.  But Ms. Boyer's "superior qualifications" analysis conflates the determination of whether a candidate has "superior qualifications" with the selection of the pay rate.  There is no evidence whatsoever demonstrating that the agency's consideration of this threshold determination under section (b), was on the basis of gender.  In fact, the uncontroverted record supports the trial court's finding that the agency had determined that Ms. Boyer "herself was found to have superior qualifications and was therefore paid above the minimum pay rate for the grade, just as the regulation envisions."  Appx33.  Unrebutted record evidence demonstrates that, because the agency found Ms. Boyer to have superior qualifications, she was paid above the minimum pay rate for the grade, that is, she was paid at a step 7, rather than a step 1.  Appx129.

As to the type of experience, the trial court explained that "it cannot be said with certainty that *years* of pharmaceutical experience since graduation was the

*only* type of 'experience' that could have distinguished Plaintiff and Male

Comparator for pay rate purposes." Appx26. Regardless, the agency treated Ms.

Boyer and the male comparator the *very same* when it determined that both

candidates had "superior qualifications" to merit initial pay above the minimum

grade. *See* Appx125-129, Appx191-193; *see also Teninty v. Geren*, 776 F. Supp.

2d 725, 735 (N.D. Ill. 2011) ("Plaintiff has not offered any evidence that the Army

was using its authority under the 'superior qualifications' regulations [that is, 5

C.F.R. § 531.212(b)] to appoint *only* males at higher steps."); *Kuntz v. Tangherlini*,

No. C14-152 MJP, 2015 WL 1565910, at *4 (W.D. Wash. Apr. 8, 2015) (granting

summary judgment in the General Service Administration's favor because the

court held that a female candidate did not have "superior qualifications" in

comparison to two male comparators).

Second, Ms. Boyer argues that the trial court was incorrect in finding that

the agency had considered other factors other than pay. Applnt. Br. at 44-48; *id.* at

44 ("The Court erred by failing to recognize that the Agency produced no evidence

that it in fact relied on any factor other than the comparator's higher prior salary to

differentiate Plaintiff's pay from her comparator's."). Relatedly, she argues that

the trial court erred in holding that Ms. Sfakianos was not the only decision-maker,

because evidence suggests that the pharmacy board only "rubber stamped" her

salary recommendations. *See id.* at 48-52. But with respect to the decision-maker

—

issue, Ms. Boyer fails to explain how that is a genuine dispute of material fact if Birmingham VAMC *could* consider prior pay alone, or prior pay with other factors, in setting initial pay.  *See* Appx36.

Also, as we explained above, Birmingham VAMC was legally authorized to use prior salary alone in setting the pay of both Ms. Boyer and the male comparator.  *See* 5 U.S.C. § 5333; 5 C.F.R. § 531.212(c)(2).  If Birmingham VAMC indeed only looked to prior pay in setting the initial salaries for Ms. Boyer and the male comparator, as Ms. Boyer alleges, Applnt. Br. at 44-48, there is no genuine dispute of fact that Birmingham VAMC followed its regulations and employee handbook guidance in doing so, and has shown a gender neutral "factor other than sex" for setting Ms. Boyer's pay.  *See* Appx77-78; 5 C.F.R. § 531.212(c) (requiring a Federal agency to consider at least one listed factor in determining the initial rate of pay, including prior pay).  The Court's analysis can stop there because Birmingham VAMC was permitted to use prior salary alone in setting pay.

In any event, should the Court deem it necessary to consider whether Birmingham VAMC looked at factors other than prior pay, which it need not do, then there is uncontroverted evidence demonstrating that Birmingham VAMC considered prior pay, as well as experience and education, in setting the pay of Ms. Boyer and the male comparator.  To begin with, they both had "application

packages," which included all relevant information, including their background, relevant experience, and a pay recommendation memo. *See* Appx126-129, Appx191-193. While the pay recommendation memo may have been largely based on prior pay, as Ms. Sfakianos testified, both employees were "boarded based on their current salary," because otherwise, "they would have been brought in [at] much lower steps" and "the salary is the easiest way to justify." Appx258-259. Lisa Ambrose, a pharmacist who served on the boards recommending pay for both Ms. Boyer and the male comparator, testified that the board "basically get a list of their credentials and a list of any kind of paperwork that may influence decisions regarding their pay such as like pay stubs from current or past employers." Appx269. Moreover, that the boards "basically have an algorithm" that factors in "years of service then they are rated at this step," and that the boards "*also* historically have taken into account a person's current or most recent pay stubs from the job in which they're coming from into the VA." *Id.* (emphasis added).

Kendra Brookshire, the chair of the boards, testified that the board looks at a candidate's "education, training, and qualifying experience," but that "at the end of the day pay stubs can basically trump what would be determined by the qualifying experience." Appx279. She also testified that the board's review is a "standardized process," considering "background, training, [and] relevant

55

experience," but that "the one trumping factor" was prior pay.  Appx286.  And she further testified that the reason why "qualifying pay stubs" may "trump" other factors, in the case of Huntsville, was due to it being a challenging area for recruitment."  *Id.*; *see* 5 C.F.R. 531.212(c)(2) (permitting an agency to consider a candidate's "existing salary").

Notably, Ms. Boyer sidesteps the fact that the male comparator had a prior, documented, salary that supported a GS 12, step 10 position, with his salary being slightly *less* at Birmingham VAMC than what he had made previously.  Appx360.  In contrast, Ms. Boyer submitted various pay stubs from her full-time job and some from her part-time position at Kroger, but the agency properly only considered her last full-time job at the Alabama hospital for setting her initial pay of $115,364, which was slightly *more* than her prior salary at that hospital.  *See* Appx361-364.  And while both Ms. Boyer and *amici* argue that Birmingham VAMC should have considered pay equity in setting the male comparator's pay, Applnt. Br. at 48, Amici Br. at 25, the male comparator was hired *after* Ms. Boyer, and he was able to support his prior pay with a current pay stub.  For there to be pay "equity," as Ms. Boyer argues, the logical result is that the agency would have needed to reduce the male comparator's initial salary to that of Ms. Boyer's, because she offers no authority that the agency could *increase* her salary merely because a later-hired person has a higher initial salary.  *See* Appx156 (stating the time to negotiate

56

salaries is with the initial offer).  Both Ms. Boyer and *amici* fail to address how their pay equity arguments gain traction when the male comparator was hired *after* Ms. Boyer.

Consequently, Birmingham VAMC carefully followed VA rules.  While those rules contemplate that prior salary may be a primary consideration, there is no dispute of material fact that the board also considered other factors, including experience.  Prior salary was not considered in a vacuum; rather, both Ms. Boyer and the male comparator were first found to be qualified, and then the board examined their application packages, which included their resumés and the pay recommendation memos from Ms. Sfakianos, which recommended pay based on her review of their pay stubs.  Under either scenario, prior pay or prior pay with other factors, the Court should find that the agency's affirmative defense has been established and the trial court correctly granted summary judgment in our favor. *See, e.g.*, *Thomas v. United States*, 86 Fed. Cl. 633, 641, *aff'd*, 351 F. App'x 433 (Fed. Cir. 2009) (granting summary judgment for Government).

## **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the trial court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
by Tara K. Hogan
CLAUDIA BURKE
Assistant Director

OF COUNSEL:
W. Robert Boulware
Staff Attorney
U.S. Department of Veterans Affairs
Office of Regional Counsel
Southeast District

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7571

December 19, 2022                    *Attorneys for Defendant*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of
Appellate Procedure 8(b)(1).  The brief contains 13,920 words, excluding the
parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B) and
Federal Circuit Rule 32(a).

2.      This brief complies with the typeface requirements of Federal Rule of
Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of
Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally
spaced typeface using Microsoft Word in Times New Roman 14.

<u>s/Kara M. Westercamp</u>

Kara M. Westercamp

December 19, 2022

## <u>Addendum to Defendant-Appellee's Response Brief</u>

5 U.S.C. § 5333 Minimum Rate For New Appointments .........................................1

38 U.S.C. § 7401 Appointments In Veterans Health Administration ......................2

38 U.S.C. § 7408 Appointment Of Additional Employees ......................................4

5 C.F.R. § 531.212 Superior Qualifications And Special Needs
    Pay-Setting Authority ..............................................................................................5

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part III. Employees (Refs & Annos)
      Subpart D. Pay and Allowances
        Chapter 53. Pay Rates and Systems (Refs & Annos)
          Subchapter III. General Schedule Pay Rates (Refs & Annos)

5 U.S.C.A. § 5333

§ 5333. Minimum rate for new appointments

Currentness

New appointments shall be made at the minimum rate of the appropriate grade. However, under regulations prescribed by the Office of Personnel Management which provide for such considerations as the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government for his services, the head of an agency may appoint, with the approval of the Office in each specific case, an individual to a position at such a rate above the minimum rate of the appropriate grade as the Office may authorize for this purpose. The approval of the Office in each specific case is not required with respect to an appointment made by the Librarian of Congress.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 467; Pub.L. 90-83, § 1(19), Sept. 11, 1967, 81 Stat. 199; Pub.L. 95-454, Title IX, § 906(a)(2), (3), Oct. 13, 1978, 92 Stat. 1224; Pub.L. 96-54, § 2(a)(26)(A), Aug. 14, 1979, 93 Stat. 382; Pub.L. 101-509, Title V, § 529 [Title I, § 106, Title II, § 211(b)(1)], Nov. 5, 1990, 104 Stat. 1427, 1449, 1461.)

5 U.S.C.A. § 5333, 5 USCA § 5333
Current through P.L. 117-228. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Addend. 1

United States Code Annotated
  Title 38. Veterans' Benefits (Refs & Annos)
    Part V. Boards, Administrations, and Services (Refs & Annos)
      Chapter 74. Veterans Health Administration--Personnel (Refs & Annos)
        Subchapter I. Appointments

38 U.S.C.A. § 7401

§ 7401. Appointments in Veterans Health Administration

Effective: June 23, 2017
Currentness

There may be appointed by the Secretary such personnel as the Secretary may find necessary for the health care of veterans (in addition to those in the Office of the Under Secretary for Health appointed under section 7306 of this title), as follows:

**(1)** Physicians, dentists, podiatrists, chiropractors, optometrists, registered nurses, physician assistants, and expanded-function dental auxiliaries.

**(2)** Scientific and professional personnel, such as microbiologists, chemists, and biostatisticians.

**(3)** Audiologists, licensed hearing aid specialists, speech pathologists, and audiologist-speech pathologists, biomedical engineers, certified or registered respiratory therapists, dietitians, licensed physical therapists, licensed practical or vocational nurses, nurse assistants, medical instrument technicians, medical records administrators or specialists, medical records technicians, medical technologists, dental hygienists, dental assistants, nuclear medicine technologists, occupational therapists, occupational therapy assistants, kinesiotherapists, orthotist-prosthetists, pharmacists, pharmacy technicians, physical therapy assistants, prosthetic representatives, psychologists, diagnostic radiologic technologists, therapeutic radiologic technologists, social workers, marriage and family therapists, licensed professional mental health counselors, blind rehabilitation specialists, blind rehabilitation outpatient specialists, and such other classes of health care occupations as the Secretary considers necessary for the recruitment and retention needs of the Department subject to the following requirements:

**(A)** Such other classes of health care occupations--

**(i)** are not occupations relating to administrative, clerical, or physical plant maintenance and protective services;

**(ii)** would otherwise receive basic pay in accordance with the General Schedule under section 5332 of title 5;

**(iii)** provide, as determined by the Secretary, direct patient care services or services incident to direct patient services; and

**(iv)** would not otherwise be available to provide medical care or treatment for veterans.

**(B)** Not later than 45 days before the Secretary appoints any personnel for a class of health care occupations that is not specifically listed in this paragraph, the Secretary shall submit to the Committee on Veterans' Affairs of the Senate, the Committee on Veterans' Affairs of the House of Representatives, and the Office of Management and Budget notice of such appointment.

**(C)** Before submitting notice under subparagraph (B), the Secretary shall solicit comments from any labor organization representing employees in such class and include such comments in such notice.

**(4)** Directors of medical centers and directors of Veterans Integrated Service Networks with demonstrated ability in the medical profession, in health care administration, or in health care fiscal management.

## CREDIT(S)

(Added Pub.L. 102-40, Title IV, § 401(b)(2), May 7, 1991, 105 Stat. 222; amended Pub.L. 102-405, Title III, § 302(c)(1), Oct. 9, 1992, 106 Stat. 1984; Pub.L. 108-170, Title III, §§ 301(a)(1), 302(a), Dec. 6, 2003, 117 Stat. 2054, 2057; Pub.L. 108-422, Title V, § 502, Nov. 30, 2004, 118 Stat. 2396; Pub.L. 109-461, Title II, § 201(a), Dec. 22, 2006, 120 Stat. 3409; Pub.L. 111-163, Title VI, § 601(a), May 5, 2010, 124 Stat. 1167; Pub.L. 114-58, Title VI, § 601(23), Sept. 30, 2015, 129 Stat. 539; Pub.L. 114-256, § 4(a)(1), Dec. 14, 2016, 130 Stat. 1347; Pub.L. 115-41, Title II, § 207(a), June 23, 2017, 131 Stat. 877.)

38 U.S.C.A. § 7401, 38 USCA § 7401
Current through P.L. 117-228. Some statute sections may be more current, see credits for details.

   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 38. Veterans' Benefits (Refs & Annos)
      Part V. Boards, Administrations, and Services (Refs & Annos)
         Chapter 74. Veterans Health Administration--Personnel (Refs & Annos)
            Subchapter I. Appointments

38 U.S.C.A. § 7408

§ 7408. Appointment of additional employees

Currentness

**(a)** There shall be appointed by the Secretary under civil service laws, rules, and regulations, such additional employees, other than those provided in section 7306 and paragraphs (1) and (3) of section 7401 of this title and those specified in sections 7405 and 7406 of this title, as may be necessary to carry out the provisions of this chapter.

**(b)** The Secretary, after considering an individual's existing pay, higher or unique qualifications, or the special needs of the Department, may appoint the individual to a position in the Administration providing direct patient-care services or services incident to direct patient-services at a rate of pay above the minimum rate of the appropriate grade.

## CREDIT(S)

  (Added Pub.L. 102-40, Title IV, § 401(b)(2), May 7, 1991, 105 Stat. 229; amended Pub.L. 103-446, Title XII, § 1201(e)(21), Nov. 2, 1994, 108 Stat. 4686.)

38 U.S.C.A. § 7408, 38 USCA § 7408
Current through P.L. 117-228. Some statute sections may be more current, see credits for details.

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.   

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter I. Office of Personnel Management
      Subchapter B. Civil Service Regulations
        Part 531. Pay Under the General Schedule (Refs & Annos)
          Subpart B. Determining Rate of Basic Pay (Refs & Annos)
            Setting Pay when Appointment or Position Changes

5 C.F.R. § 531.212

§ 531.212 Superior qualifications and special needs pay-setting authority.

Effective: September 13, 2013
Currentness

(a) Agency authority.

(1) An agency may use the superior qualifications or special needs pay-setting authority in 5 U.S.C. 5333 to set the payable rate of basic pay for an employee above the minimum rate of the highest applicable rate range for the employee's position of record. The superior qualifications or special needs pay-setting authority may be used for—

(i) A first appointment (regardless of tenure) as a civilian employee of the Federal Government; or

(ii) A reappointment that is considered a new appointment under 5 U.S.C. 5333 because it meets the conditions prescribed in paragraph (a)(2) and (3) of this section.

(2) An agency may use the superior qualifications and special needs pay-setting authority for a reappointment only when the employee has had a break in service of at least 90 days from the last period of civilian employment with the Federal Government, except as provided in paragraph (a)(3) of this section.

(3) Except as provided in paragraph (a)(5) of this section, an agency may use the superior qualifications and special needs pay-setting authority for a reappointment without requiring a 90–day break in service if the candidate's civilian employment with the Federal Government during the 90–day period immediately preceding the appointment was limited to one or more of the following:

(i) A time-limited appointment in the competitive or excepted service;

(ii) A non-permanent appointment in the competitive or excepted service;

(iii) Employment with the government of the District of Columbia (DC) when the candidate was first appointed by the DC government on or after October 1, 1987;

(iv) An appointment as an expert or consultant under 5 U.S.C. 3109 and 5 CFR part 304;

(v) Employment under a provisional appointment designated under 5 CFR 316.403;

(vi) Employment under an Internship Program appointment under § 213.3402(a) of this chapter ; or

(vii) Employment as a Senior Executive Service limited term appointee or limited emergency appointee (as defined in 5 U.S.C. 3132(a)(5) and (a)(6), respectively).

(4) Service as an employee of a nonappropriated fund instrumentality (NAFI) of the Department of Defense or Coast Guard is not considered employment by the Federal Government under this section except for employees covered by § 531.216 upon appointment or reappointment (i.e., employees who move from NAFI position to GS position with a break in service of 3 days or less and without a change in agency). Employees covered by § 531.216 upon appointment or reappointment to a GS position are not eligible to have pay set under the superior qualifications or special needs authority, since their NAFI employment is considered employment by the Federal Government. Otherwise, NAFI employment does not block application of this section.

(5) An agency may not apply an exception in paragraph (a)(3) of this section if the candidate's civilian employment with the Federal Government during the 90–day period immediately preceding the appointment was in one or more of the following types of positions:

(i) A position to which an individual is appointed by the President, by and with the advice and consent of the Senate;

(ii) A position in the Senior Executive Service as a noncareer appointee (as defined in 5 U.S.C. 3132(a)(7));

(iii) A position excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character;

(iv) A position to which an individual is appointed by the President without the advice and consent of the Senate;

(v) A position designated as the head of an agency, including an agency headed by a collegial body composed of two or more individual members;

(vi) A position in which the employee is expected to receive an appointment as the head of an agency; or

(vii) A position to which an individual is appointed as a Senior Executive Service limited term appointee or limited emergency appointee (as defined in 5 U.S.C. 3132(a)(5) and (a)(6), respectively) when the appointment must be cleared through the White House Office of Presidential Personnel.

(b) Superior qualifications or special needs determination. An agency may set the payable rate of basic pay of a newly appointed employee above the minimum rate of the grade under this section if the candidate meets one of the following criteria:

(1) The candidate has superior qualifications. An agency may determine that a candidate has superior qualifications based on the level, type, or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors that support a superior qualifications determination. The candidate's skills, competencies, experience, education, and/or accomplishments must be relevant to the requirements of the position to be filled. These qualities must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality compared to other candidates; or

(2) The candidate fills a special agency need. An agency may determine that a candidate fills a special agency need if the type, level, or quality of skills and competencies or other qualities and experiences possessed by the candidate are relevant to the requirements of the position and are essential to accomplishing an important agency mission, goal, or program activity. A candidate also may meet the special needs criteria by meeting agency workforce needs, as documented in the agency's strategic human capital plan.

(c) Pay rate determination. An agency may consider one or more of the following factors, as applicable in the case at hand, to determine the step at which to set an employee's payable rate of basic pay using the superior qualifications and special needs pay-setting authority:

(1) The level, type, or quality of the candidate's skills or competencies;

(2) The candidate's existing salary, recent salary history, or salary documented in a competing job offer (taking into account the location where the salary was or would be earned and comparing the salary to payable rates of basic pay in the same location);

(3) Significant disparities between Federal and non–Federal salaries for the skills and competencies required in the position to be filled;

(4) Existing labor market conditions and employment trends, including the availability and quality of candidates for the same or similar positions;

(5) The success of recent efforts to recruit candidates for the same or similar positions;

(6) Recent turnover in the same or similar positions;

(7) The importance/criticality of the position to be filled and the effect on the agency if it is not filled or if there is a delay in filling it;

(8) The desirability of the geographic location, duties, and/or work environment associated with the position;

(9) Agency workforce needs, as documented in the agency's strategic human capital plan; or

(10) Other relevant factors.

(d) Consideration of recruitment incentive. In determining whether to use the superior qualifications and special needs pay-setting authority and the level at which the employee's payable rate of basic pay should be set, an agency must consider the possibility of authorizing a recruitment incentive under 5 CFR part 575, subpart A.

(e) Approval and documentation requirements.

(1) An agency must approve each determination to use the superior qualifications and special needs pay-setting authority prior to the candidate entering on duty. Each determination must be made in writing and reviewed and approved by an official of the agency who is at least one level higher than the employee's supervisor, unless there is no official at a higher level in the agency.

(2) An agency must document all of the following for each determination to use the superior qualifications and special needs pay-setting authority sufficient to allow reconstruction of the action taken in each case:

(i) The superior qualifications of the candidate under paragraph (b)(1) of this section or the special agency need for the candidate's services under paragraph (b)(2) of this section which justifies a higher than minimum rate;

(ii) An explanation of the factor(s) and supporting documentation under paragraph (c) of this section which were used to justify the rate at which the employee's pay is set. The written documentation must explain how the factors directly relate to the rate approved; and

(iii) The reasons for authorizing a higher than minimum rate instead of or in addition to a recruitment incentive under 5 CFR part 575, subpart A.

(f) Ensuring compliance. An agency must establish appropriate internal guidelines and evaluation procedures to ensure compliance with the law, this section of OPM regulations, and agency policies.

**Credits**
[73 FR 66152, Nov. 7, 2008; 77 FR 28222, May 11, 2012; 78 FR 49362, Aug. 14, 2013]

SOURCE: 33 FR 12448, Sept. 4, 1968; 50 FR 35488, 35498, Aug. 30, 1985; 50 FR 40179, Oct. 1, 1985; 51 FR 8419, March 11, 1986; 53 FR 34274, Sept. 6, 1988; 55 FR 14829, April 19, 1990; 56 FR 772, Jan. 9, 1991; 56 FR 6204, Feb. 14, 1991; 56 FR 12836, March 28, 1991; 56 FR 20337, May 3, 1991; 56 FR 54530, Oct. 22, 1991; 57 FR 2432, Jan. 22, 1992; 57 FR 12404, April 10, 1992; 57 FR 32152, July 21, 1992; 58 FR 3200, Jan. 8, 1993; 58 FR 33498, June 18, 1993; 58 FR 65535, Dec. 15, 1993; 58 FR 69172, Dec. 30, 1993; 59 FR 24029, May 10, 1994; 59 FR 65703, Dec. 21, 1994; 59 FR 66632, Dec. 28, 1994; 59 FR 67604, Dec. 30, 1994; 60 FR 33098, June 27, 1995; 60 FR 33325, June 28, 1995; 60 FR 67287, Dec. 29, 1995; 61 FR

3540, Feb. 1, 1996; 66 FR 67070, Dec. 28, 2001; 70 FR 31291, May 31, 2005; 73 FR 66151, Nov. 7, 2008; 74 FR 23938, May 22, 2009; 76 FR 68634, Nov. 7, 2011, unless otherwise noted.

AUTHORITY: 5 U.S.C. 5115, 5307, and 5338; sec. 4 of Public Law 103–89, 107 Stat. 981; and E.O. 12748, 56 FR 4521, 3 CFR, 1991 Comp., p. 316; Subpart B also issued under 5 U.S.C. 5303(g), 5305, 5333, 5334(a) and (b), and 7701(b)(2); Subpart D also issued under 5 U.S.C. 5335 and 7701(b)(2); Subpart E also issued under 5 U.S.C. 5336; Subpart F also issued under 5 U.S.C. 5304, 5305, and 5941(a); E.O. 12883, 58 FR 63281, 3 CFR, 1993 Comp., p. 682; and E.O. 13106, 63 FR 68151, 3 CFR, 1998 Comp., p. 224.

Current through Dec. 15, 2022, 87 FR 76917. Some sections may be more current. See credits for details.

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 19th day of December, 2022, a copy of the foregoing was filed electronically. The filing was served electronically to all parties by operation of the Court's electronic filing system.

/s/ Kara M. Westercamp

Kara M. Westercamp