WIGGINS CHILDS
PANTAZIS FISHER
GOLDFARB
Advocates & Litigators

THE KRESS BUILDING · 301–19TH STREET NORTH · BIRMINGHAM, ALABAMA 35203
205–314–0500 MAIN · 205–254–1500 FAX · www.wigginschilds.com

ROBERT L. WIGGINS, JR.
DENNIS G. PANTAZIS
ANN K.WIGGINS
SAMUEL FISHER
DEBORAH A. MATTISON
JON C. GOLDFARB
GREGORY O. WIGGINS
ROCCO CALAMUSA, JR
BRIAN CLARK
RUSSELL W. ADAMS
CRAIG L. LOWELL
CANDIS A. McGOWAN
TEMPLE D. TRUEBLOOD
H. WALLACE BLIZZARD
KEVIN W. JENT
JENNIFER WIGGINS SMITH
ROBERT J. CAMP
RACHEL LEE McGINLEY
JOSHUA R. GALE*
L. WILLIAM SMITH
D.G. PANTAZIS JR.
SIDNEY JACKSON
PATRICK L. PANTAZIS
LACEY DANLEY
CHRISTINA MALMAT
LIESELOTTE CARMEN-BURKS
ERIC C. SHEFFER
NICKI L. LAWSEN

TIMOTHY B. FLEMING*
TERRILL W. SANDERS
OF COUNSEL
*Not Licensed in Alabama

ROBERT F. CHILDS, JR.
(1947-2018)

October 30, 2023

**VIA CM/ECF**
Jarrett B. Perlow
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

Re: Leslie Boyer v. United States, No. 2022-1822
**Federal Rule of Appellate Procedure 28(j) Letter of Supplemental Authority**

Dear Mr. Perlow:

Pursuant to Federal Rule of Appellate Procedure 28(j), Appellant Leslie Boyer ("Appellant") respectfully submits to the Court the following pertinent and additional authorities:

First, on April 28, 2023, the Federal Circuit, sitting *en banc*, issued its decision in *Moore v. United States*, 66 F.4th 991 (Fed. Cir. 2023). *Moore* overruled *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009), a case twice cited by the trial court here for the proposition that "[a]n EPA violation is established when an employee demonstrates past or present discrimination based on sex." (Appx. 20 fn11, Appx. 35). In *Moore*, the Federal Circuit reasoned that *Yant's* requirement of showing that a pay differential "is either historically or presently based on sex" is inconsistent with the text of the Equal Pay Act, as interpreted by the Supreme Court and other courts of appeal, and that requiring Plaintiffs to show discrimination "based on sex" inappropriately "misallocates the EPA's burdens" because it "violates the principle that the EPA does not require … proof of intentional discrimination." *Moore*, 66 F. 4th at 996 (quoting *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 619, 640 (2007).

Next, on May 11, 2023, the Personnel Management Office published proposed rule OPM-2023-0005, Advancing Pay Equity in Governmentwide Pay Systems. 88 Fed. Reg. 30251 (May 11, 2023). Among other changes, the proposed rule revises 5 C.F.R. §531.212(c), the pay-setting regulation analyzed by the trial court. (Again, Plaintiff was hired pursuant to 38 U.S.C. §7401(3) and the VA Handbook, not 5 U.S.C. §5333 and 5 C.F.R. §531.212(c)). (Doc. 10 pp. 22-34, 29). As revised, §531.212(c) would "prohibit an agency from considering a job candidate's salary history (defined as existing salary or prior salary) in setting pay when using the GS superior qualifications" and would also "require an agency to consider how pay has been set for other employees who had similar qualifications … who have been newly appointed to positions that are similar to

the candidate's position." 88 Fed. Reg. 30251, 30255, 30260 (May 11, 2023) (to be codified at 5 C.F.R. §531.212(c)).

Plaintiffs' counsel anticipates addressing these authorities at oral argument.

Respectfully submitted,

Wiggins Childs Pantazis Fisher & Goldfarb, LLC.

By: /s/ L. William Smith
Jon C. Goldfarb
L. William Smith
Attorneys for Appellant

Enclosure

cc: All Counsel of Record (via ECF)

# EXHIBIT A

# United States Court of Appeals for the Federal Circuit

---

**TIMOTHY MOORE,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-1475

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-01931-CFL, Senior Judge Charles F. Lettow.

---

Decided: April 28, 2023

---

PETER BROIDA, Arlington, VA, argued for plaintiff-appellant.

RAFIQUE OMAR ANDERSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by REGINALD THOMAS BLADES, JR., BRIAN M. BOYNTON, PATRICIA M. MCCARTHY.

---

Before PROST, REYNA, and STARK, *Circuit Judges*.

MOORE, *Chief Judge*, NEWMAN, LOURIE, DYK, PROST, REYNA, TARANTO, CHEN, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*, have joined Part II.B of this opinion.

PROST, *Circuit Judge*.

Timothy Moore appeals the U.S. Court of Federal Claims' dismissal of his complaint alleging that his employer, the government, violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d). We vacate the dismissal and remand for further proceedings consistent with this opinion.

# I

## A

The complaint alleges the following facts. Mr. Moore, a man, is an Examination Manager at the Washington, D.C. headquarters of the Securities and Exchange Commission ("SEC"). The SEC also employs two women Examination Managers ("comparators") in that same office. Mr. Moore and the comparators perform the same work and have the same jobs, which require equal skill, effort, and responsibility and are performed under similar working conditions.

In 2014, the SEC initiated a Pay Transition Program ("Program") to recalibrate its employees' pay so that they could receive credit for years of relevant work experience regardless of their SEC hire date. The Program was open to all SEC employees. To be considered for the Program, employees had to apply, which required stating interest and supplying a résumé that included work history, job titles and duties, those jobs' start and end dates, and whether they were full- or part-time. The open period for Program applications was approximately September 14, 2014, to October 14, 2014. The comparators applied for the Program during this open period. Mr. Moore, however, did not, due to family-related issues then occupying his

attention. The SEC permitted about ten other SEC employees impacted by extenuating circumstances to apply for the Program in November and December 2014, after the Program's open period had closed.

Pay adjustments under the Program began to take effect around June 2015. At that time, the comparators' salaries were increased via the Program. In August and September 2016, Mr. Moore tried to apply for the Program, but the SEC's personnel director declined to consider him. Since June 2015, the comparators have been paid more annually than Mr. Moore.

According to the complaint, the SEC lacks justification under the EPA for any Program-related pay differential between him and the comparators because: (1) the Program's application process was unnecessary, given that the SEC has always had in its records the information it needed to evaluate the proper level of his pay; and (2) the SEC had no valid basis for creating, or not extending, a deadline for any employee to apply for and obtain the Program's benefits. Mr. Moore seeks damages under the EPA greater than $10,000 to account for the past and present pay differential between him and the comparators.

B

The government moved to dismiss Mr. Moore's complaint under Court of Federal Claims Rule 12(b)(6), relying heavily on our decision in *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009).

In *Yant*, a group of nurse practitioners at the Department of Veterans Affairs ("VA") sued the government, alleging that it violated the EPA by paying nurse practitioners (around 80% of whom were women) less than physician assistants (around 60% of whom were men) despite the jobs' equivalence. The Court of Federal Claims granted summary judgment for the government, concluding that "the EPA does not contemplate" mixed-gender

groups with such a substantial portion of the "putatively preferred" gender in the lower-paid category and the "putatively disadvantaged" gender in the higher-paid category. *Yant v. United States*, 85 Fed. Cl. 264, 272 (2009).

On appeal in *Yant*, we affirmed—but for a different reason. We first articulated the usual standard for an EPA claimant's prima facie case: showing "that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Yant*, 588 F.3d at 1372 (cleaned up) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). But we then added an extra element to the claimant's prima facie case—namely, a showing that the pay differential "is either historically or presently based on sex." *Id.* And we affirmed the summary judgment because the claimants had failed to raise a triable issue of fact on this element. *Id.* at 1374 ("Because the Yant plaintiffs fail to raise a genuine issue of material fact that the pay differential . . . is based on sex, they have failed to make a prim[a] facie case."); *see also id.* (reasoning that, because the claimants failed to make such a showing, "the ratios of males to females are irrelevant").

The government's motion in this case argued that *Yant* compelled dismissing Mr. Moore's complaint. It noted the complaint's acknowledgement that the Program was open to all employees and that it created a pay differential between Mr. Moore and the comparators given Mr. Moore's failure to timely apply for the Program. The government also noted the complaint's lack of allegations that any differential was based on sex. The government therefore argued that Mr. Moore had not met *Yant*'s prima facie element of showing that any differential was based on sex. *See* Def.'s Mot. to Dismiss Pl.'s Compl. at 7–10, *Moore v. United States*, No. 1:21-cv-01931 (Fed. Cl. Nov. 29, 2021) (quoting and citing *Yant* throughout), ECF No. 5. Reiterating *Yant* in its reply, the government insisted that the

Court of Federal Claims was "required to follow *Yant*, as it is binding precedent"; that "post *Yant*, the [c]ourt no longer has the authority to infer that sex discrimination occurred simply because there is a difference in pay between men and women in jobs requiring similar skills, effort, and responsibility"; and that "*Yant* applies to all EPA cases in the [c]ircuit." Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss at 4, 5, 7, *Moore v. United States*, No. 1:21-cv-01931 (Fed. Cl. Jan. 14, 2022), ECF No. 10.

The Court of Federal Claims relied on *Yant* to dismiss the complaint for failing to state an EPA claim. *Moore v. United States*, 157 Fed. Cl. 747 (2022). The court observed that Mr. Moore had the burden to "show[] that discrimination based on sex exists or at one time existed," *id.* at 750 (alteration in original) (quoting *Yant*, 588 F.3d at 1373), and that it could "not ignore binding authority from the Federal Circuit," *id.* at 750 n.3 (referencing *Yant*). And, after noting both (1) the complaint's acknowledgements that the Program was open to all employees but, unlike the comparators, Mr. Moore didn't timely apply for it, and (2) that the complaint "does not claim that the difference in pay for equal work is the result of past or present discrimination based on sex," the court concluded that Mr. Moore did "not state a *prima facie* violation of [the EPA], 29 U.S.C. § 206(d)(1)." *Id.* at 750 (cleaned up).

Mr. Moore timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

II

We review de novo the Court of Federal Claims' Rule 12(b)(6) dismissal of a complaint for failure to state a claim. *E.g.*, *Creative Mgmt. Servs., LLC v. United States*, 989 F.3d 955, 961 (Fed. Cir. 2021).

Our discussion has three parts. First, we consider whether, assuming *Yant* is good law, its prima facie standard is applicable in this case (it is). Second, we consider en

banc whether *Yant*'s prima facie standard is good law (it is not). Third, we consider whether affirming the dismissal on grounds independent of *Yant* is appropriate (it is not).

A

Initially, both parties argue on appeal that *Yant*'s prima facie standard doesn't apply here because this case doesn't involve the same mixed-gender-group fact pattern as did *Yant*. *See, e.g.*, Appellant's Br. 38 ("*Yant* does not dictate application to comparator-to-comparator[] cases of the analysis for a mixed-gender quasi-class action . . . ."); Appellee's Br. 11–12 (arguing that *Yant* "was highly dependent on its unusual facts" and that, given the factual differences between *Yant* and this case, *Yant* "is of limited relevance").[1]

We are unpersuaded. The court in *Yant* spoke broadly of the prima facie standard governing EPA cases, never suggesting that its standard applied only in cases presenting the same fact pattern. If anything, the *Yant* court *disclaimed* reliance on that case's particular facts. *See Yant*, 588 F.3d at 1374 (reasoning that, because the plaintiffs failed to "demonstrate[] past or present discrimination based on sex," "the ratios of males to females are *irrelevant*" (emphasis added)).

And indeed, we have applied *Yant*'s prima facie standard in a case involving factual allegations much more similar to this case than to *Yant*. In *Gordon v. United States*,

---

[1] This differs markedly from what the government told the Court of Federal Claims. There, the government maintained not only that *Yant* was highly relevant, but also that *Yant*'s prima facie standard "*applies to all EPA cases in the [c]ircuit*." Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss at 7–8, *Moore v. United States*, No. 1:21-cv-01931 (Fed. Cl. Jan. 14, 2022) (emphasis added), ECF No. 10; *see also supra* pp. 4–5.

903 F.3d 1248 (Fed. Cir. 2018), *vacated on other grounds*, 754 F. App'x 1007 (Fed. Cir. 2019), two women physicians with the VA sued the government, alleging that it violated the EPA by paying certain men physicians more for equal work. Relying on *Yant*, we affirmed the Court of Federal Claims' summary judgment for the government because the women physicians had "point[ed] to no evidence that the pay differential complained of was based on sex, either historically or presently." *Id.* at 1254 (citing *Yant*, 588 F.3d at 1372); *see also id.* at 1252 ("This court's decision in *Yant* . . . further requires that, as part of the prima facie case, an EPA plaintiff bears the burden of showing that discrimination based on sex exists or at one time existed." (cleaned up)).[2]

Accordingly, assuming *Yant*'s prima facie standard is good law, that standard applies in this case and would compel affirmance.

B[3]

We now consider en banc whether *Yant*'s prima facie standard is good law. We conclude it is not.

The EPA states in relevant part:

---

[2] Although we vacated our opinion in *Gordon* due to the parties' subsequent settlement and stipulated dismissal, *see* 754 F. App'x 1007, we are aware of nothing that would call into question the cited reasoning in that opinion. *See Hadley v. United States*, 229 Ct. Cl. 591, 594–95 (1981) (observing that, despite an opinion's vacatur, its reasoning may still "remain[] valid").

[3] Part II.B of this opinion has been considered by an en banc court formed of MOORE, *Chief Judge*, NEWMAN, LOURIE, DYK, PROST, REYNA, TARANTO, CHEN, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*.

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1).

Nearly fifty years ago, the Supreme Court described the EPA's basic operation as "straightforward." *Corning Glass*, 417 U.S. at 195. To make out a prima facie EPA case, a claimant bears the burden to "show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id.* (quoting 29 U.S.C. § 206(d)(1)).

Every other circuit articulates an EPA claimant's prima facie case the same (or materially the same) way as the Supreme Court. *E.g.*, *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 298 (1st Cir. 1998); *Belfi v. Prendergast*, 191 F.3d 129, 135–36 (2d Cir. 1999), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000); *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120–21 (4th Cir. 2018); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1136–37 (5th Cir. 1983); *Buntin v. Breathitt Cnty. Bd. of Educ.*,

134 F.3d 796, 799–800 (6th Cir. 1998); *Fallon v. Illinois*, 882 F.2d 1206, 1208, 1211 (7th Cir. 1989); *Taylor v. White*, 321 F.3d 710, 715–16 (8th Cir. 2003); *Rizo v. Yovino*, 950 F.3d 1217, 1222 (9th Cir. 2020) (en banc); *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 & n.5 (10th Cir. 2006); *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995); *Goodrich v. Int'l Brotherhood of Elec. Workers, AFL-CIO*, 815 F.2d 1519, 1522–24 (D.C. Cir. 1987).

In *Yant*, this circuit added an extra element to an EPA claimant's prima facie case—namely, a showing that the pay differential "is either historically or presently based on sex."[4] *Yant*, 588 F.3d at 1372. This extra element is problematic for a few reasons—all related. First, it's simply extraneous in view of the Supreme Court's articulation of an EPA claimant's prima facie case. Second, it violates the principle that "the EPA does not require . . . proof of intentional discrimination." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 640 (2007), *superseded on other grounds by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5. Having to prove—*on top* of a pay differential across sexes for equal work—that the differential is "based on" sex is tantamount to having to prove that it's *because* of sex, which is tantamount to having to prove intentional discrimination. Third, it misallocates the EPA's burdens. Once an EPA claimant carries the burden on the (properly understood) prima facie case, it becomes

---

[4] This move was noted at the time. *See Yant*, 588 F.3d at 1375 (Prost, J., concurring in the result) (noting that "the majority imports a novel requirement into the plaintiff's prima facie case"). It has been noted since. *See Gordon*, 903 F.3d at 1256–57 (Reyna, J., additional views) (noting that "*Yant* decidedly changed th[e] standard by requiring, as part of the prima facie case, evidence that the pertinent pay differential is based on sex," and that "[n]o other circuit imposes such a requirement on the plaintiff").

the *employer's* burden to prove—as an affirmative defense—that the pay differential has a permissible *non-sex-based* justification. *See Corning Glass*, 417 U.S. at 195–96, *see also* 29 U.S.C. § 206(d)(1) (providing four permissible non-sex-based justifications for paying different sexes differently for equal work—i.e., "where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential *based on any other factor other than sex*" (emphasis added)).

Given these problems with *Yant*'s extra prima facie element, it's perhaps unsurprising that the government—by far the most frequent (and perhaps the only) employer that comes before this circuit facing an EPA claim—declines to defend this aspect of *Yant* on appeal. Oral Arg. at 42:40–43:07 ("We don't necessarily agree with *Yant* all the way . . . . [S]ome of it has to deal with what the plaintiffs are required to do at the opening part of their case. In terms of saying that there has to be a showing of past or present discrimination, we don't necessarily agree with that part.");[5] *see* Appellee's Br. 11–12 (declining to embrace *Yant*, instead arguing that the Court of Federal Claims "did not need to apply *Yant*" to dismiss the complaint).

We therefore take this opportunity to bring this circuit in line with our sister circuits and the Supreme Court. To make out a prima facie EPA case, a claimant bears the burden to "show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass*, 417 U.S. at 195 (quoting

---

[5] No. 22-1475, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-1475_02062023.mp3.

29 U.S.C. § 206(d)(1)). *Yant* is overruled to the extent it is inconsistent with the foregoing.

C

We lastly consider whether to affirm the complaint's dismissal on grounds having nothing to do with *Yant*. We decline to do so. Although the government argues that *Yant*-independent grounds warrant dismissal, *see, e.g.*, Oral Arg. at 17:30–32 ("We don't have to touch *Yant* at all . . . ."); Appellee's Br. 11–12 (arguing that the Court of Federal Claims "did not need to apply *Yant*" to dismiss the complaint), the government's arguments in this regard have not been adequately developed in this appeal (nor, seemingly, in the Court of Federal Claims). Because the Court of Federal Claims relied on *Yant* to dismiss the complaint, and because *Yant*'s prima facie standard is no longer good law, we believe the appropriate course is to vacate the dismissal and remand for further proceedings consistent with this opinion. If, on remand, the government again pursues a Rule 12 motion, it will be able to develop its *Yant*-independent arguments, and the Court of Federal Claims will be able to review the complaint free of *Yant*'s prima facie standard. Additionally, the Court of Federal Claims may wish to provide Mr. Moore an opportunity to amend his complaint, now that he knows he no longer needs to meet *Yant*'s requirements.

Before remanding, however, we address a misconception that has become evident on appeal—one that may be relevant to the government's suggestion that Mr. Moore "plead[ed] [his] way out of court." *See* Oral Arg. at 25:00–18. Both the government and the Court of Federal Claims seem to believe that the complaint affirmatively states that the pay differential was *not* based on sex. *See, e.g.*, Appellee's Br. 12 ("[T]he complaint plainly states that the reason for the wage difference was because of the [Program]; *and not because of sex/gender*." (emphasis added)); *id.* at 15 ("[Mr. Moore] alleges that the complained of wage

differential was *not* based on sex . . . .” (emphasis in original)); *Moore*, 157 Fed. Cl. at 750 (stating that “the complaint affirmatively acknowledges that no sex-based discrimination caused the difference in pay”). The complaint does not do so. To be sure, it alleges that the reason for the pay differential is one that’s seemingly unrelated to sex—i.e., Mr. Moore didn’t timely apply for the Program. But identifying the reason for the pay differential as one that doesn’t *seem* based on sex is not the same as conceding that the differential was *not* based on sex. Nowhere does the complaint do the latter. Appellee’s App’x 1–7; *accord* Reply Br. 17 (“[Mr.] Moore does not concede or agree that the salary differentials were not because of, on account of, or the result of sex under the EPA.”).[6] To be clear, we express no view on the merits of any “pleaded yourself out of court” argument that might be developed on remand

[6] We further note that the complaint alleges that the SEC lacked an acceptable business reason for (1) requiring Program applications at all, and (2) creating, or not extending, a deadline for any employee to apply for and obtain the Program’s benefits. Appellee’s App’x 6 ¶ 17. These allegations may be relevant to the EPA’s fourth statutory affirmative defense—a pay differential “based on any other factor other than sex.” 29 U.S.C. § 206(d)(1). Some circuits have held that the statutory “any other factor other than sex” must be job-related or related to a legitimate business reason. *See, e.g.*, *Belfi*, 191 F.3d at 136; *EEOC v. J.C. Penny Co.*, 843 F.2d 249, 253 (6th Cir. 1988); *Rizo*, 950 F.3d at 1227. Other circuits have been less willing to restrict what qualifies as “any other factor other than sex.” *See, e.g.*, *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1462 (7th Cir. 1994); *Taylor*, 321 F.3d at 717–20. Our circuit has not waded into this debate, and we are in no position to do so today. We simply note the issue in the event it becomes relevant.

(whether as to this complaint or any amended one). We simply observe that, as currently written, the complaint itself does not affirmatively state or concede that the pay differential was not based on sex.

III

We have considered the parties' remaining arguments and find them unpersuasive. Because the Court of Federal Claims' dismissal relied on *Yant*, which is now overruled, and because we decline to affirm on any *Yant*-independent grounds, we vacate the dismissal and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED**

COSTS

Costs to appellant.

# EXHIBIT B

# Proposed Rules

Federal Register

Vol. 88, No. 91

Thursday, May 11, 2023

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## OFFICE OF PERSONNEL MANAGEMENT

### 5 CFR Parts 531, 532, 534, and 930

**RIN 3206–AO39**

### Advancing Pay Equity in Governmentwide Pay Systems

**AGENCY:** Office of Personnel Management.

**ACTION:** Proposed rule with request for comments.

**SUMMARY:** The Office of Personnel Management is proposing revisions to the criteria for making salary determinations based on salary history to advance pay equity in the General Schedule pay system, Prevailing Rate Systems, Administrative Appeals Judge pay system, and Administrative Law Judge pay system.

**DATES:** Comments must be received on or before June 12, 2023.

**ADDRESSES:** You may submit comments, identified by RIN number ''3206–AO39,'' and title using the following method:

*Federal Rulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** Carey Jones by telephone at (202) 606–2858 or by email at *pay-leave-policy@opm.gov.*

**SUPPLEMENTARY INFORMATION:** The Office of Personnel Management (OPM) is proposing revisions to the criteria for making salary determinations based on salary history to advance pay equity in the General Schedule (GS) pay system, Prevailing Rate Systems, Administrative Appeals Judge (AAJ) pay system, and Administrative Law Judge (ALJ) pay system.

For the purpose of this proposed notice, ''salary history'' refers to the salary a job candidate is currently receiving (*i.e.,* their existing salary) or the salary the candidate has been paid in a previous job (*i.e.,* prior salary). In the hiring practices of some employers, when an individual applies to a job and is being considered for employment, the employer may ask questions about the individual's salary history (if not otherwise prohibited from doing so). These questions may be raised when the candidate's salary is being negotiated. For example, the employer may make a tentative job offer to the individual that includes the salary for the position and the individual rejects the initial job offer stating that the salary is too low and shares information on their salary history to negotiate higher compensation. Or the employer could ask the job candidate questions to determine what salary to include in the initial job offer. Another scenario is that a job candidate may voluntarily provide their salary history without being asked before a job or salary offer is made by the employer, which the employer may then use to determine the initial job or salary offer. Such salary negotiation practices using a job candidate's salary history are currently allowed under the Federal Government's GS pay system, Prevailing Rate Systems, AAJ pay system, and ALJ pay system.

However, setting pay based on an individual's salary history may maintain or exacerbate pay inequity a job candidate experienced in their current or previous employment. Nationally, women earn less than men, on average, and this pay gap varies by race and ethnicity. Data is available on the Department of Labor Women's Bureau website.[1] As will be discussed later in this Supplementary Information, gender and race/ethnicity pay gaps also exist in the Federal Government's civil service, though such gaps are typically smaller than in the private sector.

The Federal Government's civilian personnel management systems are required to adhere to a set of merit system principles established in law at 5 U.S.C. 2301. Included in the merit system principles that apply to the Federal Government's civil service systems are the following:

[1] Department of Labor Women's Bureau. ''Earnings and Ratios.'' *https://www.dol.gov/agencies/wb/data/earnings.*

- 5 U.S.C. 2301(b)(2)—''All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights.''
- 5 U.S.C. 2301(b)(3)—''Equal pay should be provided for work of equal value, with appropriate consideration of both national and local rates paid by employers in the private sector, and appropriate incentives and recognition should be provided for excellence in performance.''

The Federal Government strives to be a model employer, one that values diversity, equity, inclusion, and accessibility (DEIA). OPM is proposing these regulations to advance pay equity in pay setting for Federal employees. For individuals receiving their first appointment as a civilian employee of the Federal Government, agencies would not be able to set pay based on salary history, which could vary between equally qualified candidates. Agencies would be able to consider a competing job offer, but only within limitations specified in the regulations. Agencies would also be required to have policies regarding setting pay based on a previous Federal salary for employees who have previous civilian service in the Federal Government.

## Background

*Advancing Diversity, Equity, Inclusion, and Accessibility in the Federal Government*

On June 25, 2021, President Biden signed Executive Order (E.O.) 14035 (86 FR 34593), titled ''Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce.'' To address any pay inequities and advance equal pay, section 12 of E.O. 14035 required the Director of OPM to review Governmentwide regulations and, as appropriate and consistent with applicable law, consider prohibiting the use of an applicant's salary history to set pay or when setting pay for a Federal employee. On March 15, 2022, the President issued E.O. 14069 (87 FR 15315), titled ''Advancing Economy, Efficiency, and Effectiveness in Federal Contracting by Promoting Pay Equity and Transparency.'' Section 1 of that

E.O. (describing the policy objectives of the E.O.) notes that OPM anticipates issuing a proposed rule that would address the use of salary history in the hiring and pay-setting processes for Federal employees, consistent with E.O. 14035. OPM has reviewed the pay-setting regulations governing the GS pay system, Prevailing Rate Systems, AAJ pay system, and ALJ pay system, and is issuing this proposed rule in response to E.O. 14035 and pursuant to its regulatory authority in 5 U.S.C. 5333, 5338, 5343(c), 5372(c), and 5372b(b), consistent with the merit system principles discussed above.

These proposed regulations are one of many actions OPM, agencies, and the Administration are taking to advance DEIA in the Federal workforce. In November 2021, the White House issued a Governmentwide DEIA strategic plan.[2] It includes an equity roadmap, which states that the Federal Government must provide all employees, including employees who may experience multiple forms of discrimination, with equal opportunities to advance in their careers and grow as leaders by mitigating any potential biases or barriers to professional development and promotion. It also states that as an employer, the Government has the responsibility to take steps to advance fair outcomes and access to services. The roadmap has examples, which include establishing policies that do not rely solely on salary history to set pay and regularly conducting pay equity audits to assess whether similarly situated individuals are equitably compensated for similar work.

OPM's strategic goals for FY 2022–2026 state the agency's aspirations to meet its mission and address national problems, needs, challenges, and opportunities on behalf of the American people.[3] These regulations if finalized as currently proposed would support OPM's first strategic goal to position the Federal Government as a model employer and advance DEIA by supporting efforts to (1) achieve a Federal workforce that is drawn from the diversity of America, exhibited at all levels of Government; and (2) embrace the future of work with model policies and initiatives in hiring, talent development, competitive pay, benefits, and workplace flexibilities.

*2014 Governmentwide Strategy To Advance Pay Equality in the Federal Government*

OPM is building on previous work focused on the issue of gender pay equality, which emphasizes equal pay between women and men with the same jobs and is similar to gender pay equity, which analyzes systemic reasons for wage disparities. In 2014, OPM issued a Governmentwide Strategy to Advance Pay Equality in the Federal Government in response to a 2013 Presidential memorandum.[4] OPM analyzed workforce data reported by agencies to OPM central data systems and produced three overall types of statistical reports: workforce snapshot data, regression-decomposition data analysis, and dynamic data on certain personnel actions such as use of pay-setting flexibilities for new hires and promotion and quality step increase actions (an additional discretionary increase in pay based on outstanding performance). OPM calculated the gender pay gap, which is the percentage difference between the average salaries of men and women, for 1992, 2002, and 2012. OPM also collected information agencies provided in response to an OPM data call memorandum.

OPM employed multivariate regression-decomposition analysis to determine which factors most influenced the gender pay gap. Application of decomposition methods allowed OPM to decompose the pay gap into an explained portion (*i.e.,* portion attributable to the factors included in the analysis) and an unexplained portion. The occupation factor had by far the largest impact on the explained portion of the pay gap. In 2012, 76 percent of the explained portion of the gender pay gap for the white-collar population was explained by occupation. (The term ''white collar'' refers to employees who agencies code using the ''professional'', ''administrative'', ''technical'', ''clerical'', or ''other white collar'' occupational category data element in data reported to OPM.) No other factor accounted for more than 10 percent of the explained portion of the gap. OPM identified possible theoretical explanations for the unexplained portion of the pay gap including discrimination, prior work experience outside the Federal Government, and caregiving responsibilities (*e.g.,* elder care or age of children being cared for). (Some of these possible explanations were also identified in a 2009 Government Accountability Office report.)[5]

The 2013 Presidential memorandum required each agency to provide OPM information on and an analysis of all agency-specific policies and practices for setting starting salaries for new employees. Some agencies reported that their policies on the superior qualifications and special needs pay-setting authority required the use of a job candidate's existing salary, or that existing salary must be considered when setting pay of a new GS employee. In response, OPM revised its fact sheet on the superior qualifications and special needs pay-setting authority to remind agencies that existing salary is only one factor an agency may use when setting pay under this authority and to clarify the regulatory criteria. (This authority is explained in the ''GS Basic Pay Setting'' section below.)

OPM worked with agencies to implement a number of other recommendations in the Governmentwide strategy, which are summarized in a 2015 memorandum.[6] OPM implemented all of the recommendations between 2014 and 2016. OPM's actions are also summarized in Appendix VI to GAO's 2020 report ''Gender Pay Differences: The Pay Gap for Federal Workers Has Continued to Narrow, but Better Data on Promotions Are Needed.''[7]

*Federal Government Pay Gaps*

OPM has been periodically updating its pay gap data analysis since issuing the 2014 Governmentwide strategy. Based on September 2021 Enterprise Human Resources Integration (EHRI)[8] data covering nonseasonal, full-time,

[2] The White House. ''Governmentwide Strategic Plan to Advance Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce,'' November 2021. *https://www.whitehouse.gov/wp-content/uploads/2021/11/Strategic-Plan-to-Advance-Diversity-Equity-Inclusion-and-Accessibility-in-the-Federal-Workforce-11.23.21.pdf.*

[3] Office of Personnel Management. ''Strategic Plan Fiscal Years 2022–2026.'' March 2022. *https://www.opm.gov/about-us/strategic-plan/03454-fy2022-2026-strategicplan-lookbook-508pdf.pdf.*

[4] Office of Personnel Management. ''Governmentwide Strategy on Advancing Pay Equality in the Federal Government,'' April 2014. *https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/reports/Governmentwide-Strategy-on-Advancing-Pay-Equality-in-the-Federal-Government.pdf.*

[5] Government Accountability Office. ''Women's Pay: Gender Pay Gap in the Federal Workforce Narrows as Differences in Occupation, Education, and Experience Diminish.'' April 2009. *https://www.gao.gov/products/gao-09-279.*

[6] Office of Personnel Management. ''Additional Guidance on Advancing Pay Equality in the Federal Government,'' July 2015. *https://www.chcoc.gov/content/additional-guidance-advancing-pay-equality-federal-government.*

[7] Government Accountability Office. ''Gender Pay Differences: The Pay Gap for Federal Workers Has Continued to Narrow, but Better Data on Promotions Are Needed,'' December 2020. *https://www.gao.gov/products/gao-21-67* (GAO notes on its website that the one recommendation from the report for the Equal Employment Opportunity Commission was implemented and has been closed. There were no recommendations for OPM.)

[8] Office of Personnel Management. ''About Our Data (EHRI–SDM).'' *https://www.fedscope.opm.gov/datadefn/aehri_sdm.asp.*

permanent Executive branch employees, on average for all race/ethnicity groups combined, women are paid 94 cents for every dollar paid to a man—a gender pay gap of six percent. This raw, unadjusted gender pay gap of 6 percent is before considering any factors that might explain the gap, such as occupation. For comparison purposes, OPM looked at data from the Current Population Survey Annual Social and Economic Supplements conducted by the Census Bureau. That data showed a national 16 percent gender pay gap in 2021, based on the median earnings of men and women who worked full-time, year-round.[9] We note this comparison is not perfect because the Federal pay gap is computed using average salaries instead of median salaries.

OPM also conducted some analysis regarding pay gaps for groups of employees identified by both gender and race/ethnicity. OPM calculated pay gaps comparing (1) women to men in the same racial/ethnic group to understand disparities by gender and (2) men and women in each racial/ethnic group compared to White men to understand overlapping disparities by gender and race/ethnicity. This analysis revealed that pay gaps varied significantly depending on the specific population. For example, there is a raw, unadjusted gender pay gap of −0.4 percent between men and women in the Black/African American racial ethnic group (that is, the average salaries for Black/African American women are 0.4 percent above the average salaries for Black/African American men), but there is a raw, unadjusted pay gap of 15.6 percent between Black/African American men and White men, and a raw, unadjusted pay gap of 15.2 percent between Black/African American women and White men. As another example, there is a raw, unadjusted gender pay gap of 11.2 percent between men and women in the American Indian/Alaskan Native racial/ethnic group, but a raw, unadjusted pay gap of 18 percent between American Indian/Alaskan Native men and White men, and a raw, unadjusted pay gap of 27.2 percent between American Indian/Alaskan Native women and White men. OPM will be releasing more information on its pay gap data analysis results separately.

Many factors may contribute to the overall gender and race/ethnicity pay gaps in the Federal Government. In conducting its data analysis, OPM observed evidence of some of these factors at play. For example, more women than men occupy positions classified at lower GS grades with lower pay, while more men than women occupy positions classified at higher GS grades with higher pay and in higher-paying Senior Executive Service positions. Data indicated that, for each GS grade, women and men had close to the same average position in range (average step position). Factors such as length in service, quality step increases, and—most significantly for this regulation—how pay is set upon personnel actions such as appointment or promotion affect an employee's step position.

OPM found that the size of the gender pay gap varied by occupation. For Executive branch employees in occupational series with more than 100 employees, the average salary percentage for women was 95–99.9 percent of the average salary for men in 42 percent of the occupational series analyzed (199 out of 473 occupational series). The average salary percentage for women was less than 95 percent of the average salary for men in 28 percent of the occupational series analyzed (131 out of 473 occupational series). The average salary for women exceeded the male average salary in 30 percent of the occupational series analyzed (143 out of 473 occupational series). OPM also calculated population-weighted averages. To make this calculation, OPM first computed the raw, unadjusted pay gap for each occupation. Then OPM computed a weighted average of those individual occupation pay gaps, weighting the average based on the size of each occupation subpopulation as a percentage of the total population. This weighted average can shed light on the effect of the varying distribution of men and women across subpopulation categories. The population-weighted average should be compared to the overall raw average. The population-weighted average gender pay gap based on pay gaps in individual occupations was two percent. This indicates the distribution of men and women across occupational categories is a major factor contributing to the gender pay gap. In other words, there are more men than women in higher-paying occupations (*i.e.,* occupational segregation).

OPM's findings are consistent with research on the national workforce. A November 2020 research paper[10] also found that the gender pay gap varied significantly by occupation. There was no gender pay gap in some occupations, but gender pay gaps as large as 45 percent in others. The researchers found larger gender pay gaps in occupations that were more competitive and hazardous, occupations that reward longer hours of work, and those that have a larger proportion of women workers.

*Pay Transparency*

A literature review suggests that pay transparency can help reduce gender pay gaps. For example, Mercer, a human resources consulting firm, states in its 2020 report, ''The Case for Pay Transparency,'' a combination of pay transparency and data analysis can result in ''fairer pay equity outcomes.''[11] When an online recruitment platform for full-time engineering jobs in the United States began providing job candidates the median salary that firms offer for similar candidates, it eliminated the extent to which women ask for lower salaries than comparable men.[12]

Researchers found that employers posted wages more often following salary history bans, such as those mentioned in the ''State Laws'' section of this Supplementary Information. The rate of posting salaries in online help wanted ads increased ''sharply'' the quarter after a salary history ban went into effect. ''The national share of online help wanted ads listing salary information increased by around a quarter of all ads following the introduction of salary history bans in a dozen states.''[13]

OPM already posts the GS and other Governmentwide pay tables that OPM administers on its public website.[14] The Defense Civilian Personnel Advisory Service in the Department of Defense maintains a website with all Federal Wage System (FWS) wage schedules.[15] (Most but not all prevailing rate system employees are consolidated under the FWS.) In 2014, OPM worked with agencies to promote posting of GS

[9] U.S. Census Bureau. ''Figure 6. Female-to-Male Earnings Ratio and Median Earnings of Full-Time, Year-Round Workers 15 Years and Older by Sex: 1960 to 2021.'' *https://www.census.gov/content/dam/Census/library/visualizations/2022/demo/p60-276/figure6.pdf.*

[10] Foster, T., Murray-Close, M., Landivar, L., & de Wolf, M. ''An Evaluation of the Gender Wage Gap Using Linked Survey and Administrative Data,'' November 2020. *https://www.census.gov/library/working-papers/2020/adrm/CES-WP-20-34.html.*

[11] Mercer, LLC. ''The Case for Pay Transparency,'' 2020. *https://www.mercer.us/content/dam/mercer/attachments/north-america/us/us-2020-the-case-for-pay-transparency.pdf.*

[12] Roussille, N. ''The Central Role of the Ask Gap in Gender Pay Inequality,'' July 2022. *https://ninaroussille.github.io/files/Roussille_askgap.pdf.*

[13] Bessen, J., Meng, C., and Denk, E. ''Perpetuating Inequality: What Salary History Bans Reveal About Wages.'' February 2021. *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3628729.*

[14] Office of Personnel Management. ''Salaries & Wages.'' *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/.*

[15] Defense Civilian Personnel Advisory Service. ''Wage and Salary.'' *https://wageandsalary.dcpas.osd.mil/BWN/WageIndex/.*

equivalent-level salary tables or rate ranges on public websites and to make them available to job candidates.

Agencies are required by law and regulation to post starting pay on competitive service job announcements, which also helps with transparency. Under 5 U.S.C. 3330, OPM must establish and keep current a comprehensive list of all announcements of vacant positions in the competitive service within each agency that are to be filled by appointment for more than one year and for which applications are being (or will soon be) accepted from outside the agency's workforce. The law states that the ''rate of pay'' must be included for any position listed. OPM's regulations implementing this law for competitive service positions are in 5 CFR 330.104. Regarding salary, the regulations state that the vacancy must contain the starting pay. OPM maintains USAJOBS [16] as a web-based job board to meet its legal obligation. Any position listed must include, among other things, a brief description of the position, including its title, tenure, location, and rate of pay. USAJOBS displays the starting salary in the search results and the full salary range in the job announcement. USAJOBS requires that agencies include a minimum and maximum salary.[17] For example, the agency would post the step 1 rate (the minimum rate) and the step 10 rate (maximum rate) for a GS grade, including any additional locality payment or special rate supplement for the position. After issuing the 2014 Governmentwide strategy, OPM added a frequently asked question about how pay is set for employees new to the Federal Government in the Help section of the USAJOBS website.[18]

These proposed regulations cover positions that are in the competitive and excepted service. However, most excepted service positions are not required to be posted on USAJOBS. Agencies filling excepted service positions are responsible for determining how to advertise positions. Typically, job announcements for excepted service positions can be found on individual agency websites.

State Laws

As of the date this **Federal Register** notice was drafted, 21 states have laws or executive orders that address whether and to what extent hiring employers may seek, use, or discuss an applicant's salary history.[19] In a July 2020 paper regarding salary history bans, such as those in state laws, the authors indicated: ''The stated motivation of these pay history inquiry bans is to reduce pay path dependence for historically disadvantaged groups that systematically earned lower pay in the past. Specifically, policymakers contend that banning pay history inquiries will prevent employers from unintentionally perpetuating pay disparities by basing salary offers on past pay.'' [20] The salary history prohibitions in Michigan, North Carolina, and Pennsylvania only apply to state agencies. The prohibitions in other states generally apply to both public and private employers, with some limitations and exclusions.

The provisions in the state laws and executive orders, however, vary widely. Some states—including Colorado (Senate Bill 19–085), Illinois (820 ILCS 112/10), Nevada (SB 293), and North Carolina (Executive Order No. 93)—prohibit employers from both seeking a job applicant's salary history and from relying on that salary in setting pay. Most states, however, allow some exceptions to their salary history bans, including allowing an employer to set pay based on prior salary history if the applicant voluntarily discloses it. But these laws often impose additional restrictions, including, for example, only allowing an employer to rely on an applicant's voluntarily-disclosed salary history if doing so does not create an unlawful pay differential. (For example, see § 3–304.2 in Maryland's Equal Pay for Equal Work law in Labor and Employment Article Title 3, Subtitle 3.)

**OPM Review of Governmentwide Regulations**

As required by section 12(a) of E.O. 14035, and as described above, OPM reviewed the regulations on Governmentwide pay systems to identify whether any changes could address pay equity in the Federal workforce—consistent with the merit system principles set forth in statute at 5 U.S.C. 2301. Through this proposed regulation, OPM is taking action to address the treatment of a candidate's salary history when setting pay upon an employee's first appointment in the Federal Government. Currently, OPM's regulations do not require a Federal job applicant to share their salary history for an agency to make a hiring or pay-setting decision. (For the purpose of this rule, an applicant is a person who has asked to be considered for a job with an agency and is not currently employed by any agency. A candidate is a person who an agency is considering for a job with the agency and the person is not currently employed by any agency.) Current OPM regulations, however, specifically allow agencies to request an applicant's salary history and apply it as a factor in setting initial pay in certain situations after determining that the candidate has superior qualifications or the agency has a special need for the candidate's services. These proposed regulations change that policy—under these regulations, agencies may not consider an applicant's salary history when setting pay for newly appointed Federal employees in certain pay systems. OPM is thus proposing revisions to the criteria for making salary determinations based on salary history in certain pay-setting regulations for the GS pay system, Prevailing Rate Systems, AAJ pay system, and ALJ pay system. (The proposed regulatory changes for each of these pay systems is explained below.)

OPM is not proposing to revise the regulations on setting pay for Senior Executive Service (SES) positions. Those regulations do not include consideration of salary history in setting pay. The regulations in 5 CFR 534.404(a) state, in part, ''In setting a new senior executive's rate of basic pay, an agency must consider the nature and quality of the individual's experience, qualifications, and accomplishments as they relate to the requirements of the SES position, as well as the individual's current responsibilities.'' Further, we note that, as of September 2021, the gender pay gap for SES positions on average for all race/ethnicity groups combined was less than 1 percent.

Similarly, OPM does not propose revising the regulations on setting pay for Senior-Level (SL) and Scientific or Professional (ST) positions. The regulations in 5 CFR 534.506(a) state, in part, ''In setting a new senior professional's rate of basic pay, an agency must consider the nature and quality of the individual's experience, accomplishments, and any unique skills, qualifications, or competencies

[16] Office of Personnel Management. ''USAJOBS.'' *www.usajobs.gov.*

[17] Office of Personnel Management. ''Job Announcement Playbook.'' *https://usajobs.github.io/ATP-Support/job-announcement-playbook/details/overview/#salary.*

[18] Office of Personnel Management. ''How is Pay Set for Employees New to the Government?'' *https://www.usajobs.gov/Help/faq/pay/setting/.*

[19] National Women's Law Center. ''Progress in the States for Equal Pay,'' January 2023. *https://nwlc.org/wp-content/uploads/2023/01/Equal-Pay-Progress-in-the-States-1.12.23.pdf* and University of California, Irvine. ''The Pay Equity Project—Fifty-State Pay Equity Law Summary'', November 2021. *https://www.law.uci.edu/centers/pay-equity-project/images/50-state-law-chart.pdf.*

[20] Sran, G., Vetter, F. & Walsh, M. ''Employer Responses to Pay History Inquiry Bans,'' July 2020. *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3587736.*

the individual possesses as they relate to requirements of the senior professional position and its impact on the agency's performance.'' The regulations do not mention consideration of salary history. Further, we note that, as of September 2021, the gender pay gap for SL/ST positions on average for all race/ethnicity groups combined was less than 1 percent.

**GS Basic Pay Setting**

The GS classification and pay system under 5 U.S.C. chapter 53, subchapter III, covers most civilian Federal employees in professional, technical, administrative, and clerical occupations. The GS system is designed with standardized classification criteria for determining the grade levels of positions, and each GS grade has a range of pay consisting of 10 step rates. OPM may prescribe regulations necessary for the administration of GS pay rates under 5 U.S.C. 5338. The GS system has standardized rules for setting pay within a grade's rate range for employees entering Federal service for the first time, returning to Federal employment, and receiving promotions or other position changes within the Federal Government. These standardized rules help to promote equitable treatment among employees. Where there is pay-setting flexibility, agencies must apply such flexibilities in neutral ways so as not to disadvantage any individual based on protected characteristics, consistent with 5 U.S.C. 2301(b)(2).

New GS employees are usually hired at the step 1 rate of the applicable GS grade for their position. An agency may use a discretionary authority in 5 CFR 531.212 to set a newly appointed GS employee's rate of basic pay above the minimum of the rate range based on the candidate's superior qualifications or a special agency need. After an agency has determined that a candidate has superior qualifications or that the agency has a special need for the candidate's services under the criteria in 5 CFR 531.212(b), the agency must determine the step rate at which to set the employee's pay in the rate range for the grade of the employee's position. An agency may set pay at any rate within the rate range, up to the maximum rate (step 10). The current regulations at 5 CFR 531.212(c) state that an agency may consider one or more of nine specified factors or other relevant factors in making this step rate determination. One of these factors is the candidate's existing salary, recent salary history, or salary documented in a competing job offer. Other factors include significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled and the success of recent efforts to recruit candidates for the same or similar positions. An agency must document the justification for each use of this pay flexibility in writing, and an official at least one level higher than the employee's supervisor must approve the decision before the candidate enters on duty. OPM provides guidance to agencies on this authority in a fact sheet.[21] Agencies may have more specific policies to supplement OPM's regulations and guidance.

OPM proposes revising 5 CFR 531.212(c) to prohibit an agency from considering a job candidate's salary history (defined as existing salary or prior salary) in setting pay when using the GS superior qualifications and special needs pay-setting authority. The proposed regulations would require an agency to consider how pay has been set for other employees who had similar qualifications (based on the level, type, or quality of the candidate's skills or competencies or other qualities and experiences) who have been newly appointed to positions that are similar to the candidate's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable. The regulations would continue to allow an agency to consider the salary in a competing job offer. The competing job offer could be based on salaries for the skills and competencies required in the position to be filled. However, the regulations would require an agency to consider at least one other factor specified in 5 CFR 531.212(c)(2) (in addition to how pay has been set for other employees) if the agency is considering a competing job offer when setting pay under this authority. A determination based on more than one factor provides a stronger justification and mitigates any potential pay inequity from considering a competing job offer that may have been based on the candidate's salary history.

Another pay flexibility agencies may use when setting GS pay is the maximum payable rate (MPR) rule. This rule allows an agency to set an employee's pay at a rate above the rate that would be established using normal rules, based on the employee's ''highest previous rate'' earned in a previous Federal civilian job. The rule may be used in various personnel actions including upon reemployment, promotion, or demotion. OPM also provides guidance on this authority in a fact sheet.[22]

OPM proposes adding in 5 CFR 531.221 that an agency must establish a policy regarding use of the GS maximum payable rate rule that includes elements specified in the regulations, such as considering how pay has been set for employees performing similar work in the organization (based on the position's occupational series, grade level, types of duties, or other job-relevant factors). Requiring agencies to have a policy regarding their use of this discretionary pay authority will provide transparency and support consistent use among employees. The policy would be used to clarify if the agency uses the rule, in what situations, and how the agency will set pay in those situations. For example, the policy could specify whether the agency will always set pay at the maximum payable rate upon demotion and, if not, how much pay will be set below the maximum payable rate (*e.g.,* two steps below the maximum payable rate), as long as the employee's rate is not lower than the rate to which the employee is otherwise entitled (*i.e.,* pay cannot be set below the step 1 rate upon voluntary demotion to a lower grade).

**Prevailing Rate Systems Pay Administration**

The prevailing rate system under 5 U.S.C. chapter 53, subchapter IV, is a uniform pay-setting system that covers FWS appropriated fund and nonappropriated fund employees who are paid by the hour. Under 5 U.S.C. 5343(c)(5), OPM must prescribe regulations governing the administration of pay on appointment, transfer, promotion, demotion, and other similar changes in employment status. Generally, a new appointment to a prevailing rate position must be made at the minimum (step 1) rate of the grade of the employee's position. Under 5 CFR 532.403, an agency may make an appointment at a rate above the minimum rate of the appropriate grade of a prevailing rate schedule in recognition of an appointee's special qualifications. Subchapter S8 of the FWS Appropriated Fund Operating Manual and Subchapter S8 of the FWS Nonappropriated Fund Operating Manual[23] provide the example of when

[21] Office of Personnel Management. ''Superior Qualifications and Special Needs Pay-Setting Authority.'' *https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/superior-qualifications-and-special-needs-pay-setting-authority/.*

[22] Office of Personnel Management. ''Maximum Payable Rate Rule.'' *https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/maximum-payable-rate-rule/.*

[23] Office of Personnel Management. (2022). *Subchapter S8 Pay Administration. https://*

Continued

an applicant has skills and experience of an exceptional or highly specialized nature in the employee's trade or craft. However, the regulations and operating manuals currently do not address how an agency determines the appropriate rate at which to set pay for an appointee who has special qualifications.

OPM proposes to revise 5 CFR 532.403 so that an agency would not be able to consider the appointee's pay history (defined as existing pay or prior pay) in determining the rate at which to set pay. (In the FWS regulations, the term ''pay history'' is proposed, but has the same general meaning as ''salary history.'') An agency would be required to consider how pay has been set for employees who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences) and have been newly appointed to positions that are similar to the appointee's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable. An agency could consider other relevant factors such as the level, type, or quality of the appointee's skills and competencies or the pay documented in a competing job offer, except that an agency must consider an additional relevant factor if considering a competing job offer.

Under 5 CFR 532.405, when an employee in a prevailing rate system is reemployed, reassigned, transferred, promoted, or changed to a lower grade, the agency may fix the employee's pay at any rate of the new grade which does not exceed the employee's highest previous rate. OPM proposes adding that an agency must establish a policy governing use of this authority that includes elements specified in the regulations, such as considering how pay has been set for employees performing similar work in the organization (based on the position's occupational series, grade level, types of duties, or other job-relevant factors). This revision is consistent with how OPM proposes revising the GS maximum payable rate rule as described above.

### Administrative Appeals Judge Pay Administration

The duties of AAJs involve reviewing decisions of ALJs appointed under 5 U.S.C. 3105 and rendering final administrative decisions. Pursuant to 5 U.S.C. 5108, such positions are not classifiable above GS–15. OPM may prescribe regulations for how pay is set for AAJs under 5 U.S.C. 5372b(b). The AAJ pay system has six rates of basic pay—AA–1, 2, 3, 4, 5 and 6. Upon initial appointment, an agency must set the rate of basic pay of an AAJ at the minimum rate AA–1 of the AAJ pay system, unless the AAJ is appointed without a break in service from a GS position, or the employee is eligible for a higher rate because of prior service or superior qualifications. (See 5 U.S.C. 5372b and 5 CFR part 534, subpart F.) OPM provides guidance on the AAJ pay system in a fact sheet.[24]

An agency may offer an AAJ applicant with prior Federal service a rate up to the lowest rate of basic pay of the AAJ pay system that equals or exceeds the employee's highest previous rate of basic pay in a Federal civil service position, not to exceed the rate of basic pay for AA–6. OPM proposes adding in 5 CFR 534.604 that an agency must establish a policy regarding use of this provision that includes elements specified in the regulations, including that the policy must require consideration of how pay has been set for other AAJs if the agency decides to use this authority. This is consistent with the proposed revisions to the GS and prevailing rate pay system rules described above.

An agency may offer an AAJ applicant with superior qualifications who is not a current Federal employee a higher than minimum rate when such a rate is clearly necessary to meet the needs of the Government. An agency may pay a higher than minimum rate of pay that is next above the applicant's existing pay or earnings, up to the maximum rate AA–6. OPM proposes several revisions to this authority in § 534.604. Agencies would be able to set pay at any rate within the AAJ pay system. OPM proposes adding language that would require an agency to document the superior qualifications of the applicant, the need of the Government for the applicant's services, consideration of how pay has been set for administrative appeals judges who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences) and have been newly appointed to positions that are similar to the applicant's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable, and an explanation of the factors that were used to justify the rate at which the employee's pay is set. Factors an agency could consider include the success of recent efforts to recruit for the same or similar AAJ positions or significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled. This documentation would allow an agency to evaluate for equity purposes how pay has been set and reconstruct the action if necessary. An agency would not be able to consider an applicant's or former AAJ's salary history (defined as existing salary or prior salary).

### Administrative Law Judge Pay System

ALJs are individuals appointed under 5 U.S.C. 3105 for administrative proceedings conducted in accordance with 5 U.S.C. 556 and 557. The ALJ pay system has three levels of basic pay: AL–1, AL–2, and AL–3. Pay level AL–3 has six rates of basic pay. (See 5 U.S.C. 5372(c) for OPM's authority to issue regulations governing ALJ pay and the implementing regulations in 5 CFR part 930, subpart B.) OPM provides guidance on the ALJ pay system in a fact sheet.[25]

Upon appointment to a position at level AL–3, an ALJ is paid at the minimum rate unless the agency chooses to set pay at a higher rate based on prior service or superior qualifications. OPM proposes revising 5 CFR 930.205 to add that, before an agency sets pay based on the ALJ's highest previous Federal rate of basic pay, the agency must establish a policy that includes certain elements specified in the regulations, including that the policy must require consideration of how pay has been set for other ALJs if the agency decides to use this authority. OPM also proposes revisions to the regulations on setting pay based on the ALJ applicant's superior qualifications in § 930.205. Agencies would be able to submit a request to OPM to set pay at any rate within the AL–3 level. Agencies' requests to OPM would be required to include: (1) the applicant's or former ALJ's superior qualifications; (2) how pay has been set for administrative law judges who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities

*www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/appropriated-fund-operating-manual/subchapter8.pdf* and *Subchapter S8 Pay Administration. https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/nonappropriated-fund-operating-manual/subchapter8.pdf.*

[24] Office of Personnel Management. ''Administrative Appeals Judge Pay System.'' *https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/administrative-appeals-judge-pay-system/.*

[25] Office of Personnel Management. ''Administrative Law Judge Pay System.'' *https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/administrative-law-judge-pay-system/.*

and experiences) and have been newly appointed to positions that are similar to the ALJ's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable; and (3) the proposed rate of basic pay and justification for that rate. Agencies would not be able to consider an applicant's or former ALJ's salary history (defined as existing salary or prior salary). Other factors an agency could consider include the success of recent efforts to recruit for the same or similar ALJ positions or significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled. OPM is also proposing minor revisions to reflect changes resulting from Executive Order 13843 ''Excepting Administrative Law Judges from the Competitive Service'' (83 FR 32755), signed July 10, 2018.

**Expected Impact of This Proposed Rule**

*A. Statement of Need*

OPM is issuing this proposed rule pursuant to its authority to issue regulations governing the GS, FWS, AAJ, and ALJ pay systems in 5 U.S.C. 5333, 5338, 5343, 5372, and 5372b. The purpose of these regulations is to advance pay equity and DEIA in the Federal Government and position the Federal Government as a model employer. As stated previously, based on September 2021 data covering nonseasonal, full-time, permanent Executive branch employees, gender and racial pay gaps persist. Because setting pay based on a candidate's salary history could potentially perpetuate a pay rate that was inequitable, the Federal Government is taking steps to address the treatment of salary history and establish policies that support equitable pay determinations. Currently, certain regulations allow agencies to request an applicant's salary history and apply it as a factor in setting initial pay in certain situations, including when an applicant volunteers their salary history without prompting. Agencies also are not required by OPM's current regulations to consider how pay has been set for employees performing similar work or candidates who had similar qualifications, if applicable, when using pay-setting flexibilities. In addition, agencies are not required to have policies regarding use of an employee's highest previous Federal rate to set pay.

*B. Impact*

This proposed rule would prohibit agencies from setting pay based on an applicant's salary history. Agencies would need to consider other factors, such as how pay has been set for employees who had similar qualifications (based on the level, type, or quality of the candidate's skills or competencies or other qualities and experiences) and have been newly appointed to positions that are similar to the candidate's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable. When setting pay based on prior Federal salary for current employees, agencies would be required to have a policy that supports consistency in setting pay for employees.

This rule applies to Federal civilian employees in the GS, prevailing rate, AAJ, and ALJ pay systems. Based on data regarding nonseasonal, full-time, permanent Executive branch employees reported to OPM's EHRI database as of September 2021, there were over 1.3 million GS employees, approximately 160,000 FWS appropriated fund prevailing rate employees, about 1,700 ALJs, and 63 AAJs in the Federal Government. This included approximately 97,000 new hires in the GS pay system, 13,000 new FWS appropriated fund hires, 17 new hires in the ALJ pay system, and 3 new hires in the AAJ pay system. (Nonappropriated fund FWS prevailing rate employees are not reported to EHRI.)

In fiscal year 2021, 9.5 percent of new GS employees (9,216 individual pay actions/authorizations) had their pay set using the superior qualifications and special needs pay-setting authority in 5 CFR 531.212. Of all the authorizations, 21.5 percent were authorized for employees in the 06XX Medical, Hospital, Dental, and Public Health occupational family, 17.4 percent were authorized for employees in the 08XX Engineering and Architecture occupational family, 12.1 percent were authorized for employees in the 03XX General Administrative, Clerical, and Office Services occupational family, and 10.6 percent were authorized for employees in the 22XX Information Technology occupational family. The authority was used more frequently (on a percentage basis) for men than for women: 11.2 percent of non-seasonal full-time permanent (NSFTP) GS new hires who were men had their pay set using the superior qualifications and special needs pay-setting authority, but only 7.9 percent of NSFTP GS hires who were women had their pay set using the superior qualifications and special needs pay-setting authority. Of the four occupational families having the majority of the superior qualifications and special needs pay-setting authorizations, the occupations that are overwhelmingly male dominated are also the occupational families that have the greatest percentage of new hires with pay set under the superior qualifications and special needs pay-setting authority. In the 08XX occupational family (Engineering and Architecture), 21 percent of new hires are women, and 79 percent of new hires are men. About 29 percent of new hires in the 08XX occupational family have their pay set using the superior qualifications and special needs pay-setting authority. In the 22XX occupational family (Information Technology), 24 percent of new hires are women, and 76 percent of new hires are men. About 22 percent of new hires in the 22XX occupational family have their pay set using the superior qualifications and special needs pay-setting authority. In the 06XX occupational family (Medical, Hospital, Dental, and Public Health), 79 percent of new hires are women, and 21 percent of new hires are men, but only about 9 percent of new hires have their pay set using the superior qualifications and special needs pay-setting authority. Lastly, in the 03XX occupational family (General Administrative, Clerical, and Office Services), 54 percent of new hires are women, and 46 percent of new hires are men, but only about 8 percent of new hires have their pay set under the superior qualifications and special needs pay-setting authority.

Agencies used the authority in 5 CFR 532.403(b) to set pay above the minimum rate of the appropriate grade for around 210 appointees in the prevailing rate system with superior qualifications in fiscal year 2021. During the same period, one agency set pay above the minimum rate for an ALJ applicant based on their superior qualifications under 5 CFR 930.205(f)(2) with OPM approval. (Agencies must seek OPM pre-approval to use this pay-setting flexibility for ALJs.) No agencies reported setting pay under 5 CFR 534.604 based on an AAJ's superior qualifications.

After an agency has determined that a candidate for a GS position has superior qualifications or that the agency has a special need for the candidate's services under the criteria in 5 CFR 531.212(b) for the discretionary superior qualifications and special needs pay-setting authority, the agency must determine the step rate at which to set the employee's pay in the rate range for the grade of the employee's position. The current regulations at 5 CFR 531.212(c) state that an agency may

consider one or more of nine specified factors or other relevant factors in making this step rate determination, which may include the candidate's existing pay or recent salary history. Because this pay authority is delegated to agencies and agency written justifications for its use are not reported to EHRI, OPM does not have information regarding which factor or factors were used to justify the rate at which each new employee's pay is set under the superior qualifications and special needs pay-setting authority.

Because we lack this data, we are not able to predict with specificity how proposed changes to the regulations could affect the rate at which pay is set for candidates based on their superior qualifications. The pay flexibilities the regulations cover are discretionary, and agencies may set pay at any rate within the specified rate range based on certain parameters.

OPM does not have data on agency use of the other pay flexibilities that this proposed regulation would revise (that is, the GS maximum payable rate rule in 5 CFR 531.221–223, the authority in 5 CFR 930.205(f)(1) to set pay based on an ALJ applicant's highest previous Federal rate of basic pay, the authority in 5 CFR 532.405 to set pay for a prevailing rate employee based on their highest previous rate, or the authority in 5 CFR 534.604 to set pay based on an AAJ applicant's highest Federal previous rate of basic pay). OPM does not anticipate that the proposed changes would result in a change in how frequently the pay flexibilities are used.

*C. Costs*

This proposed rule would affect the operations of more than 80 Federal agencies—ranging from cabinet-level departments to small independent agencies—that have employees under the GS, prevailing rate, ALJ, and AAJ pay systems. We estimate that this rule would require individuals employed by these agencies to spend time updating agency policies and procedures for the pay flexibilities the proposed regulations would revise. For this cost analysis, the assumed average salary rate of Federal employees performing this work will be the rate in 2023 for GS–14, step 5, from the Washington, DC, locality pay table ($150,016 annual locality rate and $71.88 hourly locality rate). We assume the total dollar value of labor, which includes wages, benefits, and overhead, is equal to 200 percent of the wage rate, resulting in an assumed labor cost of $143.76 per hour.

To comply with the regulatory changes in the proposed rule, affected agencies would need to review the rule and update their policies and procedures. We estimate that, in the first year following publication of a final rule, this would require an average of 160 hours of work by employees with an average hourly cost of $143.76 per hour. This would result in estimated costs in that first year of implementation of about $23,000 per agency, and about $1.8 million Governmentwide. There are costs associated with administering the pay flexibilities in this proposed rule, but not necessarily an increase in administrative costs for agencies that are already using these pay flexibilities.

*D. Benefits*

Numerous studies employing different approaches suggest salary history bans have helped reduce the gender pay gap, largely by improving wages for women. For example, an April 2020 paper found evidence that women's earnings have increased relative to men's earnings in states with salary history bans.[26] The researchers used Census Bureau Basic Monthly Current Population Survey data from 2006 to the end of 2019 in states and cities that enacted salary history bans through January 2019. The estimated increase in earnings was larger for women who had switched jobs recently. There was also evidence that salary history bans are associated with increases in the gender earnings ratio, or the ratio of women's earnings to men's earnings.

Salary history bans can also help close racial/ethnic pay gaps. A February 2021 paper found that employers increased pay for job changers, particularly for women and people of color, following enactment of salary history bans.[27] The researchers used Census Bureau Basic Monthly Current Population Survey data from January 2013 to February 2020. The authors wrote that ''although salary history bans may have been intended primarily to benefit women, they appear to play a substantial and positive role for other disadvantaged groups.''

Salary history bans have also been shown to improve wages and job mobility for workers who began their careers during a recession, with women and people of color experiencing the greatest benefits. When an inexperienced job market entrant seeks employment during a recession, increased competition forces them to accept lower wages than they would tolerate during an economic boom. The ensuing wage disparity between recession job entrants and non-recession job entrants is called scarring. A 2021 paper found that salary history bans increase job mobility, hourly wages, and weekly earnings for workers who entered the labor market during a recession, helping to mitigate the scarring effect.[28]

Further, ending the practice of employers asking job applicants for salary history may help to attract and retain diverse and qualified talent and enhance employers' talent pools.[29] A 2021 field experiment found that when employers were not allowed to access the compensation history of job applicants, employers collected more information to evaluate applicants and hired qualified workers with lower past average wages (that may include women or people of color).[30] In addition, to the extent that it will enhance the equal treatment and compensation of similarly-situated workers—curbing inequitable pay decisions—a salary history ban can promote the values of equity, human dignity, and fairness within the Federal workforce described in E.O. 13563. Salary history bans can also promote more equitable and fairer pay-setting practices that are based on workers' skills, experience, or meeting a special agency need—and eliminate reliance on the pay decisions of previous employers for which there is no context and that may have been arbitrary or potentially discriminatory.

*E. Regulatory Alternatives*

Agencies are required to set pay at the minimum of the rate range for new GS, prevailing rate, AAJ, and ALJ employees unless the agency chooses to set pay above the minimum based on one of the pay flexibilities that are available in regulations. To advance pay equity for new hires, one regulatory alternative could be eliminating pay flexibilities to set pay above the minimum rate of the applicable rate range. This option, however, would be detrimental to agencies and job candidates. Agencies use pay flexibilities to set pay above the

[26] Hansen, B. & McNichols, D. ''Information and the Persistence of the Gender Wage Gap: Early Evidence from California's Salary History Ban.'' National Bureau of Economic Research, April 2020. *https://www.nber.org/system/files/working_papers/w27054/w27054.pdf.*

[27] Ibid, page 11, footnote 13.

[28] Mask, J. ''Salary History Bans and Healing Scars from Past Recessions.'' Jul 15, 2021. *https://mask2.people.uic.edu/Research/Mask2020.pdf.*

[29] National Women's Law Center. ''Asking for Salary History Perpetuates Pay Discrimination from Job to Job.'' March 2022. *https://nwlc.org/wp-content/uploads/2020/12/Asking-for-Salary-History-2022.pdf.*

[30] Moshe A. Barach & John J. Horton, 2021. ''How Do Employers Use Compensation History? Evidence from a Field Experiment,'' Journal of Labor Economics, vol 39(1), pages 193–218. *https://www.journals.uchicago.edu/doi/epdf/10.1086/709277.*

minimum rate to recruit candidates with superior qualifications or when agencies have a special need for the candidate's services. Candidates may reject employment if the offered salary is below their expectations.

Another option would be to allow agencies to set pay based on a candidate's salary history if it is provided voluntarily and without prompting. Section 12 of E.O. 14035 required the Director of OPM to consider whether to prohibit agencies from using an applicant's salary history to set pay unless salary history is raised without prompting by the applicant or employee. As explained in the ''State Laws'' section, there are states that allow this type of exception to a salary history ban. OPM considered this option. However, preliminary research indicates there may be negative effects from allowing employers to set pay based on voluntarily provided salary history. One recent study found that men are more likely to disclose their salaries than women and that women reported higher psychological costs of disclosing.[31] It also found that workers with higher salaries are more likely to disclose than lower-paid workers. If men with higher salaries are more likely to disclose their salaries than women with lower salaries, this could have the effect of exacerbating the gender pay gap. Further, and importantly, prohibiting agencies from considering prior salary history even when volunteered can be more effectively administered. Allowing agencies to consider prior salary history when volunteered could lead to questions and disputes about what it means for such information to be volunteered. There are also concerns about notifying applicants regarding this type of policy, especially when these regulations apply to both the competitive and the excepted service, which, as previously discussed, have different job posting requirements. Further, prohibiting agencies from considering a candidate's salary history will not necessarily hamper the Federal Government's ability to compete for talent because agencies would still be able to consider relevant factors when setting pay, such as significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled, as well as any competing salary offers that a candidate may have.

[31] Agan, A., Cowgill, B. & Gee, L. ''Do Workers Comply with Salary History Bans? A Survey on Voluntary Disclosure, Adverse Selection, and Unraveling.'' AEA Papers and Proceedings, May 2020, 110: 215–219. *https://www.aeaweb.org/articles?id=10.1257/pandp.20201123.*

Lastly, OPM could maintain the status quo and not propose regulations to change salary determinations based on salary history. As previously explained in the ''Benefits'' section, preliminary evidence suggests that state laws restricting use of salary history are providing employees with greater pay equity. Because the Federal Government should serve as a model employer to the public and private sectors in establishing policies that advance pay equity, regulatory change is needed to help advance pay equity for Federal employees.

*F. Request for Comments*

OPM requests comments on the implementation and impacts of this proposed rule. Such information will be useful for better understanding the effect of these regulations on pay-setting by Federal agencies. The type of information in which OPM is interested includes, but is not limited to, the following:

- What data should the Federal Government consider when measuring the effects of greater pay equity achieved through a salary history ban, including effects on Federal worker turnover?
- As OPM continues to work with agencies to analyze and refine data in this issue area, what factors should OPM consider for positions of high occupational segregation (wherein women and men often tend to work in different occupations, and the occupations that are predominantly held by women pay less and are valued less, compared to those predominantly held by men at the same level of skill or education)?
- Is there any research we should consider regarding what impact structured pay systems have on pay equity, and what impact pay policies that allow organizations to set pay above the minimum rate of the rate range for new employees based on specified criteria have on pay equity?
- As explained in the Regulatory Alternatives section, OPM determined that it should prohibit Federal agencies from relying on prior salary history even if the candidate voluntarily provides it. What are the advantages and disadvantages to this position, and what are possible justifications for allowing an exception to the prior salary history prohibition? What information, if any, exists on whether such an exception would be consistent with the goals of this regulation?
- What information should agencies provide to applicants or candidates on the pay-setting flexibilities that they use to set starting salaries above the minimum rate of the rate range? At what stage in the hiring process should agencies provide this information?
- Is there any research or evidence on the best way to inform applicants or candidates regarding the pay-setting flexibilities employers use to set starting salaries? For example, should this information be included in a job opportunity announcement? Should employers post their policies on their websites?
- Is there any additional social science research or other evidence OPM should consider that suggests that limiting reliance on salary history (1) advances equity and/or has other workplace benefits or (2) has resulted in specific workforce or workplace costs?
- Are there additional ways that the Federal Government can be a model employer with respect to pay equity?

**Regulatory Flexibility Act**

I certify that these regulations will not have a significant economic impact on a substantial number of small entities because they will apply only to Federal agencies and employees.

**Regulatory Review**

OPM has examined the impact of this rule as required by Executive Order 12866 and Executive Order 13563, which directs agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public, health, and safety effects, distributive impacts, and equity). A regulatory impact analysis must be prepared for major rules with economically significant effects of $100 million or more in any one year. While this rule does not reach the economic effect of $100 million or more under Executive Order 12866, this rule is still designated as a ''significant regulatory action,'' under Executive Order 12866.

**E.O. 13132, Federalism**

This regulation will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant preparation of a Federalism Assessment.

### E.O. 12988, Civil Justice Reform

This regulation meets the applicable standards set forth in section 3(a) and (b)(2) of Executive Order 12988.

### Unfunded Mandates Reform Act of 1995

This proposed rule will not result in the expenditure by State, local or tribal governments of more than $100 million annually. Thus, no written assessment of unfunded mandates is required.

### Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35)

This regulatory action will not impose any additional reporting or recordkeeping requirements under the Paperwork Reduction Act.

### List of Subjects in Title 5 CFR Parts 531, 532, 534, and 930

Administrative practice and procedure, Computer technology, Freedom of information, Government employees, Hospitals, Law enforcement officers, Motor vehicles, Reporting and recordkeeping requirements, Students, Wages.

U.S. Office Of Personnel Management.

**Steve Hickman,**

*Federal Register Liaison.*

Accordingly, OPM is proposing to amend 5 CFR parts 531, 532, 534, and 930 as follows:

## PART 531—PAY UNDER THE GENERAL SCHEDULE

■ 1. The authority citation for part 531 continues to read as follows:

**Authority:** 5 U.S.C. 5115, 5307, and 5338; sec. 4 of Public Law 103–89, 107 Stat. 981; and E.O. 12748, 56 FR 4521, 3 CFR, 1991 Comp., p. 316; Subpart B also issued under 5 U.S.C. 5303(g), 5305, 5333, 5334(a) and (b), and 7701(b)(2); Subpart D also issued under 5 U.S.C. 5335 and 7701(b)(2); Subpart E also issued under 5 U.S.C. 5336; Subpart F also issued under 5 U.S.C. 5304, 5305, and 5941(a); E.O. 12883, 58 FR 63281, 3 CFR, 1993 Comp., p. 682; and E.O. 13106, 63 FR 68151, 3 CFR, 1998 Comp., p. 224.

### Subpart B—Determining Rate of Basic Pay

■ 2. In § 531.212—
■ a. Revise paragraph (c) introductory text;
■ b. Redesignate paragraphs (c)(1) through (c)(10) as (c)(2)(i) through (c)(2)(x);
■ c. Add a new paragraph (c)(1) and (c)(2) introductory text;
■ d. Revise newly redesignated paragraphs (c)(2)(ii) and (c)(2)(x); and
■ e. Revise paragraph (e)(2)(ii).

The revisions and additions read as follows:

#### § 531.212 Superior qualifications and special needs pay-setting authority.

* * * * *

(c) *Pay rate determination.* To determine the step at which to set an employee's payable rate of basic pay using the superior qualifications and special needs pay-setting authority, an agency must consider:

(1) How pay has been set for employees who had similar qualifications (based on the level, type, or quality of the candidate's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the candidate's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable; and

(2) One or more of the following factors, as applicable in the case at hand:

* * * * *

(ii) The salary documented in a competing job offer (taking into account the location where the salary would be earned and comparing the salary to payable rates of basic pay in the same location), except that then an agency must consider at least one additional factor under this paragraph (c)(2);

* * * * *

(x) Other relevant factors, except that an agency may not consider the candidate's salary history (*i.e.,* existing salary or prior salary).

* * * * *

(e) * * *

(2) * * *

(ii) An explanation of the factors and supporting documentation under paragraph (c) of this section which were used to justify the rate at which the employee's pay is set. The written documentation must explain how the factors directly relate to the rate approved; and

* * * * *

■ 3. In § 531.221, add paragraph (a)(6) to read as follows:

#### § 531.221 Maximum payable rate rule.

(a) * * *

(6) Before setting pay under this section, an agency must establish a policy on its use of the maximum payable rate rule that includes—

(i) Designation of officials with the authority to approve and set pay under this section;

(ii) Any situations in which the agency must use the authority;

(iii) Any situations in which the agency may exercise its discretion in using the authority;

(iv) The factors the designated officials may or must consider in determining the step at which to set the employee's pay between the employee's entitlement under any other applicable pay-setting rule and the employee's maximum payable rate, which must include how pay has been set for other employees performing similar work in the organization (based on the position's occupational series, grade level, types of duties, or other job-relevant factors); and

(v) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

* * * * *

## PART 532—PREVAILING RATE SYSTEMS

■ 4. The authority citation for part 532 continues to read as follows:

**Authority:** 5 U.S.C. 5343, 5346; § 532.707 also issued under 5 U.S.C. 552.

### Subpart D—Pay Administration

■ 5. In § 532.403, revise paragraph (b) to read as follows:

#### § 532.403 New appointments.

* * * * *

(b) An agency may make a new appointment at a rate above the minimum rate of the appropriate grade in recognition of an appointees' special qualifications. In determining the rate at which to set the appointee's pay:

(1) An agency must consider how pay has been set for employees who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the appointee's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable;

(2) An agency may not consider the appointee's pay history (*i.e.,* existing pay or prior pay); and

(3) An agency must consider other relevant factors (*e.g.,* the level, type, or quality of the appointee's skills or competencies; significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled; or the pay documented in a competing job offer (taking into account the location where the pay would be earned and comparing it to payable rates of basic pay in the same location), except that an agency must consider an additional relevant factor if considering the pay documented in a competing job offer).

* * * * *

■ 6. In 532.405, add paragraph (e) to read as follows:

**§ 532.405 Use of highest previous rate.**

* * * * *

(e) Before setting pay under this section, an agency must establish a policy regarding use of employees' highest previous rates. The policy must include the following elements:

(1) Designation of officials with the authority to approve and set pay under this section;

(2) Any situations in which the agency must use an employee's highest previous rate;

(3) Any situations in which the agency may exercise its discretion in using an employee's highest previous rate;

(4) The factors the designated officials may or must consider in determining the step at which to set the employee's pay between the employee's entitlement under any other applicable pay-setting rule and the employee's highest previous rate, which must include how pay has been set for other employees performing similar work in the organization (based on the position's occupational series, grade level, types of duties, or other job-relevant factors); and

(5) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

## PART 534—PAY UNDER OTHER SYSTEMS

■ 7. The authority citation for part 534 continues to read as follows:

**Authority:** 5 U.S.C. 1104, 3161(d), 5307, 5351, 5352, 5353, 5376, 5382, 5383, 5384, 5385, 5541, 5550a, sec. 1125 of the National Defense Authorization Act for FY 2004, Pub. L. 108–136, 117 Stat. 1638 (5 U.S.C. 5304, 5382, 5383, 7302; 18 U.S.C. 207); and sec. 2 of Pub. L. 110–372, 122 Stat. 4043 (5 U.S.C. 5304, 5307, 5376).

### Subpart F—Pay for Administrative Appeals Judge Positions

■ 8. In § 534.604—

■ a. Revise paragraph (b);

■ b. Redesignate paragraphs (c) and (d) as paragraphs (f) and (g), respectively; and

■ c. Add new paragraphs (c), (d), and (e).

The revision and additions read as follows:

**§ 534.604 Pay administration.**

* * * * *

(b) Upon initial appointment, an agency must set the rate of basic pay of an administrative appeals judge at the minimum rate AA–1 of the administrative appeals judge pay system, except as provided in paragraphs (c), (d), and (e) of this section.

(c) An agency must set the pay of an employee under the General Schedule pay system who is appointed to an administrative appeals judge position without a break in service at the lowest rate of basic pay of the administrative appeals judge pay system that equals or exceeds the rate of basic pay the employee received immediately prior to such appointment, not to exceed the rate of basic pay for AA–6. If the resulting basic pay increase is less than one-half of the dollar value of the employee's next within-grade increase, the agency must set the employee's rate of basic pay at the next higher rate of basic pay in the basic rate range of the administrative appeals judge pay system, not to exceed the rate of basic pay for AA–6.

(d) An agency may offer an administrative appeals judge applicant with prior Federal service a rate up to the lowest rate of basic pay of the administrative appeals judge pay system that equals or exceeds the employee's highest previous rate of basic pay in a Federal civil service position, not to exceed the rate of basic pay for AA–6. Before setting pay under this paragraph, an agency must establish a policy that includes the following elements:

(1) Designation of officials with the authority to approve and set pay under this paragraph;

(2) Whether use of this authority is discretionary or mandatory;

(3) The other factors the designated officials may or must consider in determining the rate at which to set the applicant's pay, which must include how pay has been set for other administrative appeals judges; and

(4) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

(e) An agency may offer an administrative appeals judge applicant with superior qualifications who is not a current Federal employee a higher than minimum rate up to the maximum rate AA–6 when such a rate is clearly necessary to meet the needs of the Government. Superior qualifications for applicants include, but are not limited to, having legal practice before the hiring agency, having practice in another forum with legal issues of concern to the hiring agency, or having an outstanding reputation among others in the field. An agency must document all of the following:

(1) The superior qualifications of the applicant;

(2) The need of the Government for the applicant's services;

(3) Consideration of how pay has been set for administrative appeals judges who had similar qualifications (based on the level, type, or quality of the applicant's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the applicant's position (based on the position's occupational series, organization, geographic location, or other job-relevant factors), if applicable; and

(4) An explanation of the factors which were used to justify the rate at which the employee's pay is set, except an agency may not consider an applicant's or former administrative appeals judge's salary history (*i.e.,* existing salary or prior salary).

* * * * *

## PART 930—PROGRAMS FOR SPECIFIC POSITIONS AND EXAMINATIONS (MISCELLANEOUS)

### Subpart B—Administrative Law Judge Program

■ 9. The authority citation for subpart B continues to read as follows:

**Authority:** 5 U.S.C. 1104(a), 1302(a), 1305, 3105, 3301, 3304, 3323(b), 3344, 4301(2)(D), 5372, 7521, and E.O. 10577, 3 CFR, 1954–1958 Comp., p. 219.

■ 10. In § 930.201, revise paragraph (e)(5) to read as follows:

**§ 930.201 Coverage.**

* * * * *

(e) * * *

(5) Approve personnel actions related to pay for administrative law judges under § 930.205(c), (g), (h), and (k);

* * * * *

■ 11. In § 930.205—

■ a. In paragraph (e), remove the words ''paragraph (f)'' and add ''paragraphs (f) and (g)'' in their place;

■ b. Revise paragraph (f);

■ c. Redesignate paragraphs (g) through (j) as paragraphs (h) through (k), respectively; and

■ d. Add a new paragraph (g).

The revisions and addition read as follows:

**§ 930.205 Administrative law judge pay system.**

* * * * *

(f) When an applicant to an administrative law judge position at AL–3 has prior Federal service, the agency may set pay at a higher than minimum rate up to the lowest rate of basic pay that equals or exceeds the applicant's highest previous Federal rate of basic pay, not to exceed the maximum rate F. Before setting pay under this paragraph, an agency must establish a policy regarding use of this pay setting authority that includes the following elements:

(1) Designation of officials with the authority to approve and set pay under this paragraph;

(2) Whether use of this authority is discretionary or mandatory;

(3) The factors the designated officials may or must consider in determining the rate at which to set the applicant's pay, which must include how pay has been set for other administrative law judges; and

(4) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

(g) With prior OPM approval, an agency may offer a higher than minimum rate, up to the maximum rate F, to an administrative law judge applicant or a former administrative law judge with superior qualifications who is eligible for appointment to a position at AL–3. An agency request to OPM must include:

(1) A description of the superior qualifications (as defined in § 930.202) of the applicant or former administrative law judge;

(2) How pay has been set for administrative law judges who had similar qualifications (based on the level, type, or quality of the applicant's or former administrative law judge's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the administrative law judge's position (based on the position's occupational series, organization, geographic location, or other job-relevant factors), if applicable; and

(3) The proposed rate of basic pay and a justification for that rate, except an agency may not consider an applicant's or former administrative law judge's salary history (*i.e.,* existing salary or prior salary).

* * * * *

[FR Doc. 2023–09564 Filed 5–10–23; 11:15 am]

**BILLING CODE 6325–39–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 25

**[Docket No. FAA–2022–1740; Notice No. 25–23–01–SC]**

## Special Conditions: The Boeing Company Model 777 Series Airplanes; Passenger Seats With Pretensioner Restraint Systems

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice of proposed special conditions.

**SUMMARY:** This action proposes special conditions for Boeing Company (Boeing) Model 777 series airplanes. These airplanes will have a novel or unusual design feature when compared to the state of technology envisioned in the airworthiness standards for transport category airplanes. This design feature is pretensioner restraint systems installed on passenger seats. The applicable airworthiness regulations do not contain adequate or appropriate safety standards for this design feature. These proposed special conditions contain the additional safety standards that the Administrator considers necessary to establish a level of safety equivalent to that established by the existing airworthiness standards.

**DATES:** Send comments on or before June 26, 2023.

**ADDRESSES:** Send comments identified by Docket No. FAA–2022–1740 using any of the following methods:

- *Federal eRegulations Portal:* Go to *https://www.regulations.gov/* and follow the online instructions for sending your comments electronically.
- *Mail:* Send comments to Docket Operations, M–30, U.S. Department of Transportation (DOT), 1200 New Jersey Avenue SE, Room W12–140, West Building Ground Floor, Washington, DC 20590–0001.
- *Hand Delivery or Courier:* Take comments to Docket Operations in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.
- *Fax:* Fax comments to Docket Operations at 202–493–2251.
- *Docket:* Background documents or comments received may be read at *https://www.regulations.gov/* at any time. Follow the online instructions for accessing the docket or go to Docket Operations in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Shannon Lennon, Cabin Safety, AIR–624, Technical Policy Branch, Policy and Standards Division, Aircraft Certification Service, Federal Aviation Administration, 2200 South 216th Street, Des Moines, Washington 98198; telephone and fax 206–231–3209; email *shannon.lennon@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Comments Invited

The FAA invites interested people to take part in this rulemaking by sending written comments, data, or views. The most helpful comments reference a specific portion of the proposed special conditions, explain the reason for any recommended change, and include supporting data.

The FAA will consider all comments received by the closing date for comments, and will consider comments filed late if it is possible to do so without incurring delay. The FAA may change these special conditions based on the comments received.

### Privacy

Except for Confidential Business Information (CBI) as described in the following paragraph, and other information as described in title 14, Code of Federal Regulations (14 CFR) 11.35, the FAA will post all comments received without change to *https://www.regulations.gov/,* including any personal information you provide. The FAA will also post a report summarizing each substantive verbal contact received about these special conditions.

### Confidential Business Information

Confidential Business Information (CBI) is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (FOIA) (5 U.S.C. 552), CBI is exempt from public disclosure. If your comments responsive to these special conditions contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to these special conditions, it is important that you clearly designate the submitted comments as CBI. Please mark each page of your submission containing CBI as ''PROPIN.'' The FAA will treat such marked submissions as confidential under the FOIA, and the indicated comments will not be placed in the public docket of these special conditions. Send submissions containing CBI to the individual listed in the **FOR FURTHER INFORMATION CONTACT** section below. Comments the FAA receives, which are not specifically designated as CBI, will be placed in the public docket for these special conditions.

### Background

On September 30, 2021, Boeing applied for an amendment to Type Certificate No. T00001SE for Boeing Model 777 series airplanes. These airplanes, currently approved under Type Certificate No. T00001SE, are twin-engine, transport-category airplanes with maximum seating for 495