WIGGINS CHILDS
PANTAZIS FISHER
GOLDFARB
Advocates & Litigators

THE KRESS BUILDING · 301–19TH STREET NORTH · BIRMINGHAM, ALABAMA 35203
205–314–0500 MAIN · 205–254–1500 FAX · www.wigginschilds.com

ROBERT L. WIGGINS, JR.
DENNIS G. PANTAZIS
ANN K.WIGGINS
SAMUEL FISHER
DEBORAH A. MATTISON
JON C. GOLDFARB
GREGORY O. WIGGINS
ROCCO CALAMUSA, JR
BRIAN CLARK
RUSSELL W. ADAMS
CRAIG L. LOWELL
CANDIS A. McGOWAN
TEMPLE D. TRUEBLOOD
H. WALLACE BLIZZARD
KEVIN W. JENT
JENNIFER WIGGINS SMITH
ROBERT J. CAMP
RACHEL LEE McGINLEY
JOSHUA R. GALE*
L. WILLIAM SMITH
D.G. PANTAZIS JR.
SIDNEY JACKSON
PATRICK L. PANTAZIS
LACEY DANLEY
CHRISTINA MALMAT
LIESELOTTE CARMEN-BURKS
ERIC C. SHEFFER
NICKI L. LAWSEN

TIMOTHY B. FLEMING*
TERRILL W. SANDERS
OF COUNSEL
*Not Licensed in Alabama

ROBERT F. CHILDS, JR.
(1947–2018)

February 23, 2024

**VIA CM/ECF**
Jarrett B. Perlow
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

Re: Leslie Boyer v. United States, No. 2022-1822
**Federal Rule of Appellate Procedure 28(j) Second Letter of Supplemental Authority**

Dear Mr. Perlow:

Pursuant to Federal Rule of Appellate Procedure 28(j), Appellant Leslie Boyer ("Appellant") respectfully submits to the Court the following pertinent and additional authorities:

On January 30, 2024, the Personnel Management Office published Final Rule 3206-AO39, Advancing Pay Equity in Governmentwide Pay Systems. 89 Fed. Reg. 5737. Among other changes, the final rule revises 5 C.F.R. §531.212(c), the inapplicable pay-setting regulation analyzed by the trial court. (Again, Plaintiff was hired pursuant to 38 U.S.C. §7401(3) and the VA Handbook, not 5 U.S.C. §5333 and 5 C.F.R. §531.212(c)). (Doc. 10 pp. 22-34, 29). As revised, §531.212(c) "prohibits agencies from considering a candidate's salary history as a factor in setting pay for new Federal civilian employees." 89 Fed. Reg. 5738.

In determining the step at which to set an employee's basic rate of pay using the superior qualifications and special needs authority of 5 C.F.R. §531.212, an agency "must" consider "[t]he step at which pay has been set for employees who had similar qualifications […] who have been newly appointed to positions that are similar to the candidate's position […]" 9 Fed. Reg. 5754. The final rule provides that the agency "may not consider the candidate's salary history (i.e. existing salary or prior salary) or a salary from a competing job offer." 89 Fed. Reg. 5755.

The final rule's effective date is April 1, 2024. 89 Fed. Reg. 5737. Agencies must be in full compliance with this final rule not later than October 1, 2024. Id.

Respectfully submitted,

Wiggins Childs Pantazis Fisher & Goldfarb, LLC.

By: /s/ L. William Smith
Jon C. Goldfarb
L. William Smith
Attorneys for Appellant

Enclosure

cc: All Counsel of Record (via ECF)

Rules and Regulations

Federal Register

Vol. 89, No. 20

Tuesday, January 30, 2024

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## OFFICE OF PERSONNEL MANAGEMENT

### 5 CFR Parts 531, 532, 534, and 930

**RIN 3206–AO39**

## Advancing Pay Equity in Governmentwide Pay Systems

**AGENCY:** Office of Personnel Management.

**ACTION:** Final rule.

**SUMMARY:** The Office of Personnel Management is issuing final regulations governing the criteria for making salary determinations based on salary history to advance pay equity in the General Schedule, prevailing rate, Administrative Appeals Judge, Administrative Law Judge, Senior Executive Service, and senior-level and scientific or professional pay systems. For individuals receiving their first appointment as a civilian employee of the Federal Government (or a reappointment after a break in service) in one of these pay systems, agencies will not be able to set pay based on a job candidate's non-Federal salary or pay history, which could vary between equally qualified candidates, or based on a competing job offer. Agencies will also be required to have policies regarding setting pay based on a previous Federal salary for employees who have previous civilian service in the Federal Government.

**DATES:** This final rule is effective April 1, 2024. Agencies must be in full compliance with this final rule not later than October 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Carey Jones by telephone at (202) 606–2858 or by email at *paypolicy@opm.gov.*

**SUPPLEMENTARY INFORMATION:**

### Overview

The Federal Government strives to be a model employer that values diversity, equity, inclusion, and accessibility (DEIA). After consideration of public comments on the proposed rule, OPM is issuing a final rule that amends the criteria for making salary determinations for the General Schedule (GS), prevailing rate, Administrative Appeals Judge (AAJ), Administrative Law Judge (ALJ), Senior Executive Service (SES), and senior-level and scientific or professional (SL/ST) pay systems to advance pay equity in pay setting for Federal employees. OPM is issuing this rule pursuant to its authority to issue regulations governing these pay systems in 5 U.S.C. 5333, 5338, 5343, 5372, 5372b, 5376, and 5382.

Generally, when an individual applies for a job and is being considered for employment, the employer may inquire about the individual's salary or pay history [1] and consider it as part of the pay-setting process, if not otherwise prohibited from doing so. The employer may ask the candidate [2] direct questions about salary history or the candidate may offer the information without prompting. The information can be solicited or shared at various points before an offer is accepted or rejected. These and other considerations of a job candidate's salary history are permissible under current statutes and regulations governing the GS, prevailing rate, AAJ, ALJ, SES, and SL/ST pay systems. Consideration of salary history is explicitly allowed under the Federal Government's GS pay system and is not prohibited by the prevailing rate, AAJ, ALJ, SES, and SL/ST pay systems.

As described in the proposed rule and in this final rule, however, salary history is not necessarily a good indicator of worker value, experience, and expertise, and it also may contain or exacerbate biases. Pay setting based on salary history may be inequitable, can perpetuate biases from job to job, and may contribute to a pay gap between the earnings of men and women. Nationally, on average women earn less than men, and this pay gap is even greater for most women of color.[3] Gender and race/ethnicity pay gaps also exist in the Federal Government's civil service. Although such gaps are typically smaller than those in the private sector, they may represent an inequity as acknowledged by the President in Executive Orders (E.O.) 14035 (86 FR 34593) and 14069 (87 FR 15315). As discussed further below, by eliminating a factor that may contain or exacerbate biases inconsistent with merit system principles, this final rule seeks to promote pay equity consistent with the President's Executive Orders.

For individuals receiving their first appointment as a civilian employee of the Federal Government (or a reappointment after a break in Federal service), agencies will no longer be able to set pay based on non-Federal salary history, which could vary between equally qualified candidates. Agencies also will not be permitted to consider a candidate's competing job offer when setting pay. Finally, agencies will be required to have policies regarding setting pay based on a previous Federal salary for employees who have previous civilian service in the Federal Government.

### Background

On June 25, 2021, President Biden signed E.O. 14035, titled ''Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce.'' [4] To address any pay inequities and advance equal pay, section 12 of E.O. 14035 requires the Director of OPM to review Governmentwide regulations and, as appropriate and consistent with applicable law, consider prohibiting the use of an applicant's salary history when setting pay for a Federal employee.

On March 15, 2022, the President issued E.O. 14069, titled ''Advancing Economy, Efficiency, and Effectiveness in Federal Contracting by Promoting Pay Equity and Transparency.'' [5] Section 1 of that E.O., describing the policy objectives of the E.O., notes that OPM ''anticipates issuing a proposed rule that would address the use of salary history in the hiring and pay-setting processes

[1] For this rulemaking, ''salary history'' or ''pay history'' refer to the salary or pay a job candidate is currently receiving (*i.e.,* their existing salary or pay) or the salary or pay the candidate has been paid in a previous job (*i.e.,* prior salary or pay). The terms are used interchangeably.

[2] In this final rule, the terms ''applicant'' and ''candidate'' are used interchangeably to refer to an individual under consideration for appointment to a Federal civil service position.

[3] Data on the national pay gap is available on the Department of Labor Women's Bureau website at *https://www.dol.gov/agencies/wb/data/earnings.*

[4] *See* 86 FR 34593 (June 25, 2021).

[5] *See* 87 FR 15315 (Mar. 15, 2022).

for Federal employees,'' consistent with E.O. 14035.

OPM reviewed the pay-setting regulations governing the GS, prevailing rate, AAJ, and ALJ, SES, and SL/ST pay systems. On May 11, 2023, OPM issued a proposed rule at 88 FR 30251 in response to E.O. 14035 and pursuant to its regulatory authorities in 5 U.S.C. 5333, 5338, 5343(c), 5372(c), and 5372b(b).[6] As explained in the proposed rule, the Federal Government's civilian personnel management systems are required to adhere to merit system principles established in law at 5 U.S.C. 2301, including:

- All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights. 5 U.S.C. 2301(b)(2).
- Equal pay should be provided for work of equal value, with appropriate consideration of both national and local rates paid by employers in the private sector, and appropriate incentives and recognition should be provided for excellence in performance. 5 U.S.C. 2301(b)(3).

For the GS, prevailing rate, AAJ, and ALJ structured pay systems, generally, an agency must set pay at the minimum rate for a new entrant to the civil service. The GS system is designed with standardized classification criteria for determining the grade levels of positions, and each GS grade has a range of pay consisting of ten step rates. The prevailing rate system under 5 U.S.C. chapter 53, subchapter IV, is a uniform pay-setting system that covers Federal Wage System (FWS) appropriated fund and nonappropriated fund employees. Generally, a new appointment to a GS or a prevailing rate position must be made at the minimum (step 1) rate of the grade of the employee's position. The AAJ pay system has six rates of basic pay—AA–1, 2, 3, 4, 5 and 6. Upon initial appointment, an agency generally must set the rate of basic pay of an AAJ who is new to the Federal Government at the minimum rate AA–1 of the AAJ pay system. The ALJ pay system has three levels of basic pay: AL–1, AL–2, and AL–3. Pay level AL–3 has six rates of basic pay. Upon appointment to a position at level AL–3, an ALJ is generally paid at the minimum rate.

Under each of these systems, the default is to set pay at the minimum rate, but agencies have the authority to set pay above the minimum rate for newly appointed employees if specific factors are shown. Under the GS pay system, the largest of the pay systems at issue in this final rule, an agency has the authority to set pay above the minimum rate if it determines that the candidate has superior qualifications or that the agency has a special need for the candidate's services under the criteria in 5 CFR 531.212(b). The current regulations at 5 CFR 531.212(c) state that an agency may consider one or more of nine specified factors or other relevant factors in making this step rate determination. One factor an agency can consider is the candidate's existing pay, recent salary history, or a salary documented in a competing job offer. 5 CFR 531.212(c)(2). Similarly, the AAJ, and ALJ pay systems allow consideration of current pay when setting pay for an applicant with superior qualifications who is not a current Federal employee. Under those circumstances, an agency sets the AAJ or ALJ pay at the rate that is next above the applicant's existing pay or earnings. 5 CFR 534.604 (for AAJ pay system), 930.205 (for ALJ pay system). The prevailing rate pay systems also allow setting pay above the minimum rate based on special qualifications. The prevailing rate pay systems do not specifically list salary or pay history as an allowable factor in setting pay. *See* 5 CFR 532.403.

There are also standard rules when setting pay for current and former employees upon various personnel actions such as reemployment, reassignment, promotion, transfer, or demotion, and the flexibility to set pay above the rate to which the employee would otherwise be entitled based on the employee's Federal salary history. For the GS pay system, an agency may use the ''maximum payable rate'' rule, which bases pay on the employee's highest previous rate of pay in a Federal civilian position. 5 CFR 531.221. The prevailing rate pay system also allows an agency to set an employee's pay at any rate (of the relevant grade) that does not exceed the employee's highest previous rate. 5 CFR 532.405. For the AAJ and ALJ pay systems, an agency can set pay above the minimum rate for an appointee with prior Federal service either based on superior qualifications as used for new entrants or based on the highest previous Federal rate of basic pay. 5 CFR 534.604 (for AAJ pay system), 930.205 (for ALJ pay system).

The SES and SL/ST pay systems do not require an agency to set pay at the minimum rate and, instead, require an agency to consider specific factors when setting pay. *See* 5 CFR 534.404(a), (g); 534.506. The SES and SL/ST pay systems are discussed in more detail in the SES & SL/ST Pay Systems section of this final rule.

This final rule prohibits agencies from considering a candidate's salary history as a factor in setting pay for new Federal civilian employees. If an agency seeks to set pay above the minimum rate of the applicable rate range under the GS, prevailing rate, AAJ, or ALJ pay systems, that adjustment must be based on factors other than a candidate's non-Federal pay history, such as how pay has been set for employees who had similar qualifications (based on the level, type, or quality of the candidate's skills or competencies or other qualities and experiences) and have been newly appointed to positions that are similar to the candidate's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable. Similarly, when setting pay under the SES or SL/ST pay systems, the agency must base the pay on enumerated factors and cannot consider a candidate's non-Federal pay history. When setting pay based on prior Federal salary for reappointed or current employees, agencies must have a policy that supports consistency in setting pay for employees.

In addition to the data summarized in the proposed rule, OPM considered comments received in response to the proposal. OPM received 63 submissions representing 512 commenters during the 30-day public comment period from a variety of individuals (including Federal employees), organizations (including labor organizations), and Federal agencies regarding the substance of the proposed rule.[7 8] Comments ranged from strong support of the proposed rule to categorical rejection. OPM reviewed and carefully considered all comments. They are summarized below, together with a discussion of the suggestions for revisions and OPM's rationale for either adopting or declining those suggestions.

In the first section below, we discuss comments that address topics related to

[6] *See* 88 FR 30251 (May 11, 2023).

[7] OPM determined one comment was beyond the scope of the proposed changes; that comment is not addressed below.

[8] One commenter recommended that OPM extend the rulemaking process and do more outreach to Federal employees about the proposal. Comment 23, available at *https://www.regulations.gov/comment/OPM-2023-0005-0023.* In addition to publishing the proposed rule in the **Federal Register**, at the beginning of the comment period, OPM shared the proposed rule with numerous stakeholders, including Federal employee unions, and publicized the proposed rule in a press release. Multiple media sources such as Forbes, CNN, Axios, Gov Exec, Federal News Network, and Federal Times, covered the publication of the proposed regulatory changes.

the background and context of this rule, including responses to questions posed by OPM in the proposed rule. In the sections that follow, we address comments related to specific aspects of this final rule.

**Comments Regarding Background and Context**

*Federal Government Pay Gaps and Occupational Segregation*

OPM has been periodically updating its pay gap data analysis since issuing its 2014 Governmentwide strategy.[9] Based on September 2021 EHRI[10] data covering nonseasonal, full-time, permanent Executive branch employees, on average for all race/ethnicity groups combined, women are paid 94 cents for every dollar paid to a man—a gender pay gap of six percent. This raw, unadjusted gender pay gap is before considering any factors that might explain the gap, such as occupation.

As discussed in the proposed rule, OPM also conducted an analysis regarding pay gaps for groups of employees identified by both gender and race/ethnicity. This analysis revealed that pay gaps varied significantly depending on the specific population. OPM found that many factors may contribute to the overall gender and race/ethnicity pay gaps in the Federal Government. In conducting its data analysis, OPM observed evidence of the impact of other factors, including occupational segregation. A November 2020 study[11] focused on national pay gaps found that the gender pay gap varied significantly by occupation. OPM's findings regarding Federal pay gaps are consistent with research on pay gaps in the national workforce. Comments on OPM's pay gap analysis are discussed in more detail in the Regulatory Alternatives section.

In instances where pay disparities are found, one organization recommended that OPM ''require agencies to immediately scale up to raise lower gender and racial/ethnic median wage to match the higher median pay at the beginning of the fiscal year.'' Comment 64.[12] Two organizations, several commenters, and an agency also suggested that OPM encourage agencies to conduct pay audits and raise the wages of individuals subject to inequitable pay disparities. *See* Comments 24, 27, 29, 46, 62, 64.

Putting aside the questions of whether, as a policy and legal matter, it would be appropriate and workable to have automatic pay adjustments to achieve a zero pay gap in median pay, OPM has no general statutory authority to require agencies to increase pay of current employees when gender and racial/ethnic pay gaps are found. We note, however, that there are several authorities (*e.g.,* the Equal Pay Act, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act) under which an agency is authorized to increase the salary of a Federal employee found to be subject to an inequitable pay disparity. We also note that there may be legitimate, non-discriminatory factors that could contribute to pay disparities for selected categories of employees, such as employee seniority, performance, or other factors not controlled for in the analysis. In 2015, OPM encouraged agencies to conduct pay gap analyses by gender, race/ethnicity, or other characteristics for their own workforces to identify where potential pay disparities exist within an agency in order to develop targeted strategies to reduce disparities and has issued guidance to help agencies complete this exercise.[13]

OPM invited comments on what factors OPM should consider for positions of high occupational segregation (wherein women and men often tend to work in different occupations, and the occupations that are predominantly held by women pay less, compared to those predominantly held by men at the same level of skill or education). Four organizations responded to this request for comment. One recommended that OPM consider race and ethnicity alongside gender when looking into the issue of positions of high occupational segregation. Comment 33. Another stated that ''[g]iven that the goal is equal pay for equal work, the focus of these initial steps to fight pay discrimination needs to be on ensuring fairness in pay setting for like positions. Ultimately, changes in pay between different positions will require modification of the classification standards used to adjust the scoring results, as those classification standards are the main measure OPM has in place for instilling uniformity in pay-setting across different agencies.'' Comment 49. The two other organizations recommended that OPM consider job evaluations. Comments 60, 61. One of these organizations stated that conducting job evaluations is a strategy ''to identify and remedy pay inequities so that women and people of color receive equitable compensation for their labor. Job evaluation schemes assess jobs across occupations on a range of factors to establish fair and equitable pay and promotion. These schemes make it more likely that pay and promotion are based on performance rather than bias.'' Comment 61.

Occupational segregation in both the public and private sectors is a systemic and persistent issue identified in pay equity studies. Addressing occupational segregation, however, is outside the scope of the Federal pay and classification system. OPM will assist agencies, in exercising their delegated classification authority, in collecting metrics and other relevant agency data to examine classification practices based on a variety of factors, including gender analysis by occupation. OPM will also assist agencies to expand the use of skills-based hiring practices to address occupational segregation.

*Pay Equity in Structured Pay Systems*

OPM invited comments on whether there is any research we should consider regarding the impact that structured pay systems have on pay equity, and the impact that pay policies that allow organizations to set pay above the minimum rate of the rate range for new employees based on specified criteria have on pay equity. OPM received two comments that addressed this question. First, an agency suggested that OPM look at agencies that have converted to pay banded systems, such as demonstration projects under 5 U.S.C. chapter 47, to determine the benefits of such systems. Comment 34. The GS, prevailing rate, ALJ, and AAJ pay systems are all structured with grades or work levels and defined steps or pay rates within each grade or work level. It would be difficult to draw direct comparisons between pay-setting policies for pay banded systems (that combine multiple grades into a single

[9] Office of Personnel Management. ''Governmentwide Strategy for Advancing Pay Equality in the Federal Government.'' *https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/reports/Governmentwide-Strategy-on-Advancing-Pay-Equality-in-the-Federal-Government.pdf.*

[10] Office of Personnel Management. ''About Our Data (EHRI–SDM).'' *https://www.fedscope.opm.gov/datadefn/aehri_sdm.asp.*

[11] Foster, T., Murray-Close, M., Landivar, L., & de Wolf, M. ''An Evaluation of the Gender Wage Gap Using Linked Survey and Administrative Data,'' November 2020. *https://www.census.gov/library/working-papers/2020/adrm/CES-WP-20-34.html.*

[12] A reference at the end of a comment quotation or paraphrase provides the location of the item in the public record. (*i.e.,* the two-digit number associated with the location in the docket). Comments filed in response to the proposed rule are available at *https://www.regulations.gov/comment/OPM-2023-0005-00nn,* where nn is the comment number.

[13] Office of Personnel Management. ''Guidance for Agencies Conducting Gender Pay Data Analysis.'' *https://chcoc.gov/sites/default/files/Attachment-Agency%20Gender%20Data%20Analysis%20Guidance-rev_0.pdf.*

work level and/or have open salary ranges instead of step rates within a range) and the effect on pay equity. We do not have information on agency pay banding policies and practices nor has OPM conducted any pay equity analysis on agency pay banding systems or their policies and practices.

We also note that section 12(b) of E.O. 14035 requires agencies to review regulations and guidance and, as appropriate and consistent with applicable law, revise compensation practices for pay systems authorized outside of title 5 of the United States Code to address any pay inequities and advance equal pay. OPM will ask agencies to report any revisions to compensation practices made to implement the President's direction. Such reports may include information on beneficial compensation practices under alternative pay systems, such as pay banding systems.

Second, an organization shared two sources and stated that structured pay systems can help address pay gaps and are essential to attracting and retaining a talented and diverse workforce. Comment 61. One article summarized how implementing transparency and accountability procedures reduced the extent to which women and people of color received lower monetary performance-based rewards.[14] As OPM's regulatory changes affect certain structured pay systems with specified salaries rather than performance award determinations, this article is not directly applicable. As discussed in the proposed rule, however, we agree that pay transparency—as exists in Federal pay systems—can help reduce gender pay gaps and that written policies support agencies' consistent use of pay flexibilities.

The other article stated that, in developing a pay structure, ''grades enable flexibility and internal equity in an organization by providing a framework in which equivalent jobs are treated equally for pay purposes.'' [15] As explained in the proposed rule, the GS classification and pay system is designed with standardized classification criteria for determining the grade levels of positions, and each GS grade has a range of pay consisting of 10 step rates. The GS system has standardized pay-setting rules that help promote the equitable treatment among employees. The FWS has three main pay plans (Wage Grade (WG), Wage Leader (WL), and Wage Supervisor (WS)); the WG and WL pay plans have 15 grades and WS has 19. Each grade has five steps. The AAJ pay system has six rates of basic pay. An ALJ in level AL–3 also has six rates of basic pay. OPM agrees that these structured pay systems provide a framework that provides equal pay for work of an equal value, consistent with the merit system principle in 5 U.S.C. 2301(b)(3). Because structured pay systems minimize discriminatory influence on pay setting, OPM is not banning consideration of prior Federal pay when setting pay but is requiring agencies to establish policies that further promote equity in pay setting. OPM expects that, over time, any residual pay gaps in the Federal systems will shrink.

*Classification*

OPM received a few comments regarding how employees qualify for positions, how positions are classified, and how these decisions impact pay. One commenter requested that OPM require that agencies be more transparent about the pay for which new Federal employees qualify and specifically how the grade assessments are made or calculated. Comment 04. Another commenter similarly stated that ''clearly the source of inequity is in grade-setting, not step-setting as this rule targets.'' Comment 09. A third commenter stated, ''[t]his proposed rule appears to consider pay setting within a grade level, but it ignores another primary method of pay-setting in the government—grade level.'' Comment 20.

Although pay is often associated with position classification, position classification is based solely on work performed or the core duties and responsibilities of a position. The classification of positions recognizes levels of difficulty and responsibility in terms of the grade levels established in law at 5 U.S.C. 5104. While these grade-level definitions are used to determine grades that are linked to ranges of basic pay rates, those definitions are not based on pay factors or pay relationships. All OPM GS position classification standards are based on the difficulty and responsibility of the work at each level and the qualifications required to do that work. Under 5 U.S.C. 5107, Federal agencies are responsible for classifying their GS positions consistent with position classification standards issued by OPM. Similarly, under 5 U.S.C. 5346, agencies are responsible for grading their prevailing rate jobs consistent with the job grading standards issued by OPM. Therefore, similar or like positions and jobs across Federal agencies should be classified or graded in a consistent manner since they are evaluated against the same standards rather than position-to-position comparisons.

An agency also stated that ''a proposal to cease or significantly limit how Federal agencies can take into account past salary history must be paired with a wholesale reexamination of the GS pay scale and how hiring managers determine which qualifications meet which GS levels.'' Comment 21. The GS pay structure of 15 grades and 10 steps within each grade is defined in statute at 5 U.S.C. 5332(a)(2) and rates are adjusted in accordance with 5 U.S.C. 5303. The agency also recommended that OPM issue revised guidance on the minimum qualifications associated with each grade level. In May 2022, OPM issued updated guidance and qualifications policy including the General Schedule Qualifications Operating Manual.[16] Qualification requirements are aligned with classification policy for an occupational series. Similarly, OPM's Federal Wage System Qualifications provide guidance regarding the knowledge, skills, and abilities (KSAs) or job elements needed for jobs and provides a reference for assessing the qualifications of applicants for a particular grade.[17] Candidates for Federal employment and/or Federal employees may qualify for Federal jobs based on training, experience, education, and/or other requirements aligned with the position. Both the Manual and the FWS Qualifications provide detailed information to assist with aligning the qualifications of a candidate with the appropriate KSAs needed for jobs by grade, providing consistency between candidates, within an agency, and between agencies.

A commenter also expressed concern that ''to the extent that agencies are limited in their ability to set pay within GS levels, they are more likely to adjust the GS levels such that step 1 of the offered GS level is closer to the market rate.'' Comment 20. OPM cautions that the intentional misclassification of positions to manipulate recruitment,

[14] Castilla, E. ''Accounting for the Gap: A Firm Study Manipulating Organizational Accountability and Transparency in Pay Decisions,'' Organization Science, vol 26(2), March–April 2015, pages 311–333.

[15] Strategic Human Resource Management. ''Building a Market-Based Pay Structure from Scratch.'' *https://www.shrm.org/resourcesandtools/tools-and-samples/toolkits/pages/buildingamarket-basedpaystructurefromscratch.aspx.*

[16] Office of Personnel Management. ''Guidance Release—E.O. 13932; Modernizing and Reforming the Assessment and Hiring of Federal Job Candidates.'' *https://www.chcoc.gov/content/guidance-release-eo-13932-modernizing-and-reforming-assessment-and-hiring-federal-job.*

[17] Office of Personnel Management. ''Federal Wage System Qualifications.'' *https://www.opm.gov/policy-data-oversight/classification-qualifications/federal-wage-system-qualifications/#url=Overview.*

qualifications, and/or pay may be a prohibited personnel practice subject to review by the Office of Special Counsel.

**Consideration of Salary History**

Executive Order 14035 directed OPM to consider, as appropriate and consistent with applicable law, prohibiting the use of an applicant's salary history to set pay or when setting pay for a Federal employee. OPM has authority to issue regulations governing the GS, prevailing rate, AAJ, ALJ, SES, and SL/ST pay systems in 5 U.S.C. 5333, 5338, 5343, 5372, 5372b, 5376, 5382, and consistent with merit system principles established in law at 5 U.S.C. 2301. Relevant to this final rule is the requirement that all employees and candidates for employment receive fair and equitable treatment in all aspects of personnel management (5 U.S.C. 2301(b)(2)) and that equal pay should be provided for work of equal value, with ''appropriate consideration'' for both national and local rates paid by employers in the private sector (5 U.S.C. 2301(b)(3)).

Throughout the proposed rule and this final rule, OPM adheres to these authorities and merit system principles. We have identified the reasons—based on OPM data, Department of Labor data, examples of state salary history bans and their impacts on salary equity, research regarding the benefits of such bans, and other information—why salary history should not be a consideration in the pay-setting process for new Government employees.

OPM administers pay systems that have taken a variety of approaches to setting initial pay. The GS pay system specifically allows salary history as a factor to be considered when setting pay for an initial appointment in Federal service (or reappointment after a break in service). The prevailing rate pay systems allow agencies to set pay above a minimum rate based on ''special'' qualifications but provide no direction on what factors to consider when determining the step at which to set pay within the grade. The AAJ pay system allows agencies to offer an AAJ applicant with superior qualifications a higher than minimum rate of pay that is next above the applicant's existing pay or earnings, up to the maximum rate. The ALJ pay system allows agencies, with prior OPM approval, to pay an ALJ applicant with superior qualifications the rate of pay that is next above the applicant's existing pay or earnings up to the maximum rate. The SES and SL/ST pay systems provide a specific list of factors—which does not include salary history—that an agency must consider when setting initial pay.

OPM has determined that salary history should no longer be considered in setting pay for new Federal employees entering into the GS, prevailing rate, AAJ, ALJ, SES, and SL/ST pay systems. Accordingly, OPM is modifying the regulatory language for the GS pay system by removing salary history as a factor to consider in setting pay for newly appointed employees. Similarly, OPM is adding language to the prevailing rate systems, AAJ, ALJ, SES, and SL/ST pay system regulations to detail the factors that should be considered in setting pay and/or to make clear that salary history is no longer a permitted factor.

National unions, a local union, as well as multiple other organizations, Federal employees, and members of the public expressed strong support for many of the regulatory amendments in the proposed rule. One commenter reported an academic research study in which a description of the proposed salary history ban was shared with 1,605 Americans and found that about two-thirds of those surveyed favored the policy somewhat or strongly. *See* Comment 58. Commenters provided sources of information and data arguing against using salary history in the pay setting process. These commenters and the cited sources demonstrate multiple rationales supporting OPM's decision not to permit continued consideration of salary history in setting initial pay. The main rationales presented by commenters are discussed in the following sections along with consideration of countervailing comments.

*Salary history does not demonstrate an individual's qualifications or fitness for a position.* Commenters argued that past salary in a non-Federal job is not indicative of ability to perform in the Federal position. One organization wrote that ''prior salary is not an accurate measure of a job candidate's qualifications, skill, or ability to perform a job,'' referencing an Issue Brief from the Women's Bureau of the U.S. Department of Labor (DOL). Comment 56. A union commented that including salary history as an allowable consideration is at odds with the principles reflected in the current regulations. *See* Comment 44. The commenter explained that salary history ''does not directly reflect either the employee's superior qualifications or the agency's special needs,'' noting that those are the types of interests for which OPM regulations allow consideration. Id.

Another commenter also expressed concern that consideration of past salary information ''perpetuates the flawed assumption'' that a lower paid candidate is of lower quality. Comment 60. That commenter cited a study, which found that ''salary history is not an effective tool for assessing a candidate's value . . . because organizations do not accurately match pay to an employee's productivity'' and ''there [is] too much variation on the relationship between pay and performance.'' [18] Id. For example, candidates who have had a break in their career to serve as full-time caregivers to children or other family members may have a salary history that is lower than market value, but the candidate is well-qualified to perform the duties of the position. Id. Several other commenters also cited the example of lower pay for caregivers not being indicative of lower quality employees. *See, e.g.,* Comments 20, 33, 56.

Commenters raised the issue that variability in current pay may reflect the aspects of the current employer rather than any factors relevant to Federal employment. For example, an organization commented that ''those who take lower-paying jobs, such as those at non-profits or state and local government . . . should not be penalized [compared to those working for private sector employers].'' Comment 46.

Several commenters disagreed, contending that past pay can be indicative of superior skills and/or high performance. An agency recommended that OPM expand the criteria for determining an employee's salary based on qualifications to allow agencies to consider the ''whole of the individual and their experience'' rather than banning agencies from considering a candidate's salary history. Comment 34.

An individual commented that the rule was arbitrary and capricious because it is inconsistent with merit system principles at 5 U.S.C. 2301(b)(1) and 2301(b)(3), calling for equal pay for work of equal value. Comment 28. The commenter argues that the determination of ''relative ability, knowledge, and skills'' in ''fair and open competition'' means comparing individuals with others in a market, or competitive, economy, and that this requires a review of salary history because it is ''the price of a worker's labor per unit time.''

OPM disagrees with this analysis. As an initial matter, ''fair and open competition'' in 5 U.S.C. 2301(b)(1) does

[18] Adler, L. ''What's a Job Candidate Worth? Explaining Variation in Pay-Setting Practices, SOCARXIV (2020). *https://osf.io/preprints/socarxiv/ctu8m.*

not mean the Government should compare salaries vis-à-vis others in a market economy. It refers to the recruitment, selection, and advancement of qualified individuals based on merit (as opposed to, for example, political favor). More significantly, OPM disagrees that salary history is a consistently accurate proxy for worker value. Non-Federal employers can have widely varying compensation structures, policies, and funding. Lower paying jobs, such as non-profit organizations or entry-level professional positions, could have compensation packages that include non-salary benefits (*e.g.,* more generous leave or childcare flexibilities) that would be difficult to capture by only looking at past salary. Also, many higher paying jobs have an expectation or requirement of longer hours (as many are exempt from the overtime pay provisions of the Fair Labor Standards Act), such that the salary per hours worked would more closely resemble that of a lower paying job with a lower hours expectation or requirement. *See* Comments 20, 33, 44, 62, 68. But that nuance would not be captured by looking only at a monetary figure. In addition, OPM's regulations already allow—and will continue to allow—agencies to consider several factors including the level, type, or quality of the candidate's skills or competencies.

Agencies do not typically have access to the information that a previous non-Federal employer used to determine a job candidate's salary, whether the previous employer conducted any salary survey or labor market analysis when making pay-setting determinations, or how a candidate's employment history may have affected the previous employer's salary decisions. Under this final rule, agencies will set pay above the minimum of the rate range based on factor(s) such as the level, type, or quality of the candidate's skills or competencies, which will be more equitable and relevant than salary history.

*Salary history bans break the cycle of pay discrepancies arising from discrimination and inequity and have positive impacts on pay gaps.* Commenters noted that setting starting pay based on salary history can contribute to inequitable pay gaps. Citing a DOL Issue Brief, an organization noted that salary history may ''reflect past pay discrimination or other factors with gender-based implications.'' Comment 56. Therefore, setting starting pay based on past pay can compound the ''effects of discrimination and inequity,'' in part because starting salary can affect subsequent salary increases. Id. That commenter, citing a Harvard Business Review study, noted that ''nearly two-thirds'' of businesses found that pay disparities ''stemmed from reliance on salary history.'' Id. Another commenter also noted that prior salary history may reflect ''prior economic downturns in which women and minority workers are often harder hit.'' Comment 44.

Several commenters referenced a 2020 paper showing that implementing a salary history ban results in greater increases in salary for job changers for populations that have historically experienced discrimination. *See, e.g.,* Comments 51, 56, 61.[19] A Federal employee union expressed the view that the proposed approach would likely lead to an increase in pay for women and people of color. Comment 59. Another commenter argued that implementing a salary history ban would ''increase the diversity of our workforce and leadership.'' Comment 22. That commenter also argued that the proposed ban would ''provide greater footing to women and minority groups.'' Id. A Federal employee-run organization commented that ''in eliminating the use of salary history when setting pay the Government will emphasize its commitment to gender and racial equality while also reducing costly legal challenges to pay disparities.'' Comment 62. Similarly, an organization commented that the proposal would help to ''ensure that the Federal Government is in compliance with the Equal Pay Act.'' Comment 56.

In contrast, an agency expressed concern that prohibiting the consideration of salary history was not in line with the November 2021 Governmentwide DEIA Strategic Plan,[20] which discouraged ''solely'' relying on salary history to set pay. OPM believes the rule is consistent with the DEIA strategic plan. The DEIA strategic plan listed this suggestion among many policy examples the Government could adopt to ensure fair outcomes. Further, the President, through E.O. 14035 and E.O. 14069, directs OPM to consider prohibiting setting pay based on salary history, which OPM has concluded is appropriate.

Many of the comments arguing that salary history bans can reduce pay gaps cited the experiences of states and localities, noting that 21 states and 22 localities have enacted laws prohibiting the use of salary history in setting pay. *See, e.g.,* Comments 33, 56, 59, 60, 61. One organization cited to data from Colorado, Nevada, and Rhode Island in support of implementing a prohibition on considering a candidate's salary history. Comment 33. Several organizations further noted, citing multiple studies, that these salary bans have helped narrow pay gaps. *See, e.g.,* Comments 33, 60, 61. One of those organizations asserted that OPM's proposed changes would help bring the Federal Government in line with these states, localities, and private firms that have already taken steps to limit or ban employers from using an applicant's prior or current salary in determining pay. Comment 33.

In contrast, an agency commented that, OPM should not ''ban any pay flexibility across the board'' based on pay gaps specific to an agency, to certain occupations within an agency, or a limited number of agencies. Comment 34. It stated that agencies with such issues should ''seek to remedy those gaps or impose their own limits based on OPM authorities.'' Id. Further, some commenters questioned the existence of pay gaps (Comment 16) or the effectiveness of a salary history ban (Comments 18, 23), and argued that a salary history ban could harm women who earn a competitive wage (Comment 23). OPM does not believe that these comments warrant consideration of prior salary. The governing merit system principles are not unique to one agency, and OPM believes that eliminating consideration of prior salary is most consistent with those principles regardless of whether any agency or occupation currently has an inequitable pay gap. Additionally, even if a particular agency or occupation does not currently have a pay gap, that does not eliminate the possibility that a pay gap could develop if new hires have differing starting salary ranges for reasons unrelated to any merit system principles (including but not limited to prior discrimination); eliminating consideration of prior salary can help prevent inequities from developing in the future. No commenters provided data showing that a salary history ban is not an effective tool for eliminating inequitable pay gaps or preventing such gaps from occurring. OPM concludes that, based on the evidence, prohibiting consideration of salary history has been demonstrated to reduce pay gaps and, thus, is a valid tool for the Federal

[19] *See* Bessen, James E., Chen Meng, and Erich Denk. 2020. ''Perpetuating Inequality: What Salary History Bans Reveal About Wages.'' *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3628729.*

[20] The White House. ''Governmentwide Strategic Plan to Advance Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce,'' November 2021. *https://www.whitehouse.gov/wp-content/uploads/2021/11/Strategic-Plan-to-Advance-Diversity-Equity-Inclusion-and-Accessibility-in-the-Federal-Workforce-11.23.21.pdf.*

Government to implement for these pay systems.

*Additional Considerations Regarding Setting Pay*

Commenters raised several other considerations regarding the pay-setting processes at issue in this rule.

OPM proposed that, when setting pay above the minimum rate for an employee newly appointed to a GS, prevailing rate system, AAJ, and ALJ position, an agency would be required to consider how pay has been set for employees who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the appointee's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable. A commenter noted that ''this may have the effect of locking in low pay and creating disparities across teams or across agencies.'' Comment 20. The commenter suggested OPM ''provide a type of pay-setting authority that would allow an agency to remedy this by raising the pay for current employees to achieve equity with incoming employees.'' Id. There is no statutory authority for this suggested change. For example, 5 U.S.C. 5334 provides OPM with the authority to prescribe regulations regarding setting a GS employee's pay when an employee transfers from a non-GS position or another GS position, or upon demotion, reinstatement, reappointment, change in type of appointment, change in employment status, or change in grade. The law does not allow OPM to prescribe regulations regarding adjusting pay for existing employees to achieve equity.

An organization recommended that ''OPM provide additional guidance, including examples, to agencies about what constitutes 'similar work,' and how agencies should make determinations for employees doing 'similar work' who have different levels of experience.'' Comment 56. This final rule specifies that determinations regarding whether work is similar would be based on the position's occupational series, grade level, types of duties, or other job-relevant factors. While agencies will be responsible for making these determinations within these parameters, OPM will consider the need to provide further agency assistance on this issue in future implementing guidance.

Commenters noted that OPM proposed only banning the *consideration* of salary history in setting pay. Several organizations recommended that OPM explicitly ban agencies from asking for and discussing salary history with job candidates. *See, e.g.,* Comments 33, 56, 60, 61. The organizations also recommended that OPM guidance should clarify that agencies should not instead ask about an individual's salary expectation and that agencies should appropriately train relevant staff to ensure effective implementation of OPM's proposal. Id.

The regulations that OPM is amending relate to the factors agencies use in setting pay, not to agencies' conduct in the hiring process, but OPM agrees that agencies should not solicit salary history from job candidates. As an initial matter, agencies are prohibited from using this information, so there is simply no reason why agencies should request it, as there is no use for this information, if acquired. Moreover, doing so could suggest to a candidate that the agency intended to consider the information in violation of the regulation, which further militates against an agency from asking. Therefore, agencies should not request a candidate's salary history, and OPM will issue guidance saying the same. OPM will consider the scope and content of implementation guidance, trainings, and other means of sharing best practices following the publication of this rule.

We note, of course, that an agency has no control over what information a candidate may volunteer to provide and that a candidate could disclose their prior salary during the interview process. In the event of voluntary salary disclosure, agencies will continue to be prohibited from considering that information to set pay, regardless of how they learn that information.

With respect to candidates providing salary expectations, OPM notes that nothing in this rule limits candidates' ability to offer this information. Under this final rule, agencies can still set pay above the minimum rate (using factors other than salary history or a competing job offer). Information regarding candidates' salary expectations may help agencies effectively recruit and onboard these candidates by increasing minimum pay based on factors other than salary history or a competing job offer.

An agency was concerned that not allowing Federal agencies to consider salary when setting initial pay ''could lead to a biased pay-setting process and have unintended consequences.'' Comment 48. The commenter suggests that salary is a factor that helps to remove subjective bias. OPM disagrees that the changes could lead to a biased pay-setting process. Under the current regulations, agencies may consider one or more of the factors listed in the regulations when setting pay for a GS appointee with superior qualifications or for which the agency has a special need. Under the revised regulations for the GS pay system, agencies must consider the step at which pay has been set for employees who had similar qualifications and who have been newly appointed to positions that are similar to the candidate's position and at least one other factor listed in the regulations. Similarly, under the current prevailing rate regulations, an agency applying the special qualifications authority currently has no limitations. Under the revised regulations, OPM provides specific factors for an agency to consider, which will make pay setting less subjective and less prone to bias. Under the AAJ and ALJ pay systems, adjustments from the minimum rate for superior qualifications are currently based primarily on current pay. With the revisions in this final rule, AAJs and ALJs that are new to Federal employment or reappointed after a break in service may have pay set based on qualifications with consideration given to the pay received by AAJs or ALJs, respectively, with similar qualifications and in similar positions. This means that we expect a lower risk of bias because salary history, a factor known to perpetuate gender and racial/ethnic biases, is being removed from consideration.

*Pay Systems Outside of Title 5*

An agency noted that the proposed revisions would not apply to pay systems under authorities outside of title 5 of the United States Code and implied that implementing these changes for the title 5 pay systems but not for other pay systems would result in some sort of inequity. Comment 52. Another agency asked whether OPM's proposed regulatory changes would apply to employees under the Department of Defense Civilian Acquisition Workforce Personnel Demonstration Project (AcqDemo) or Science and Technology Reinvention Laboratories (STRL). Comment 57. OPM proposed revising the GS, prevailing rate system, AAJ, and ALJ regulations because OPM has authority to regulate pay setting for these systems under 5 U.S.C. 5333, 5338, 5343(c), 5372(c), and 5372b(b). The regulatory changes do not apply to AcqDemo, which is authorized under 10 U.S.C. 1762, or to STRL, which is authorized under 10 U.S.C. 4121, as the Department of Defense waived provisions of title 5 pertaining

to setting pay for GS employees under these demonstration projects' authorizing legislation and 5 U.S.C. chapter 47. *See* 82 FR 52104 and 87 FR 72462.

We note, however that under section 12(b) of E.O. 14035, the head of each agency that administers a pay system other than one established under title 5 of the United States Code must review the agency's regulations and guidance and, as appropriate and consistent with applicable law, revise compensation practices to address any pay inequities and advance equal pay. OPM will be requesting agency reports on any revisions to compensation practices made to implement the direction in E.O. 14035.

*Impact on Recruitment*

The commenters who categorically disagreed with the proposed rule and those commenters who only cited opposition to portions were largely concerned that prohibiting agencies from using a candidate's salary history to set pay would hurt the Federal Government's ability to recruit employees, especially for occupations for which non-Federal salaries exceed Federal salaries. *See, e.g.,* Comments 6, 8, 9, 18, 21, 23, 26, 35, 52, 57, 61.

Conversely, several commenters argued that prohibiting consideration of salary would improve recruitment because it forces consideration of more equitable factors in setting pay. *See, e.g.,* Comments 17, 33, 44, 51, 56. For example, one union noted that eliminating salary history refocuses ''consideration on . . . factors such as the nature and necessity of the job to the agency, disparities between Federal and non-Federal salaries for similar positions'' and comparability to pay received by similarly qualified candidates for similar positions. Comment 44. An organization, citing a working paper summarizing a field experiment, noted that ''[r]esearch shows that when employers are not able to rely on salary history to set pay, employers collect more information from candidates and ask more substantive and probing questions to evaluate an applicant for the job.'' Comment 56. Many commenters cited as a benefit the stronger emphasis on a candidate's knowledge and skills. *See, e.g.,* Comments 10, 57.

An organization commented that changing Federal Government hiring practices to be more equitable ''will likely result in economy-wide gains as the federal government will be better able to attract and hire a wider pool of workers.'' Comment 33. The organization also noted that the revised practices could improve retention, noting that ''removing salary history from the application and interview process can contribute to a sense of a fair and equitable organization culture that can lead to increased retention and talent attraction'' since ''workers who report a sense [of] unfairness in the workplace are more likely to voluntarily leave their job.'' Id.

An agency suggested that the salary history ban would improve its ability to recruit and retain ''highly skilled employees with specific technical expertise'' due to the perception of the Federal Government as an ideal employer. Comment 51. It argued that the ''halo effect'' of a salary history ban was an important tool for competing in tight labor markets. Id.

OPM agrees that this rule will have a positive impact on recruitment and believes that any recruitment challenges resulting from this rule will be minimal. Agencies will still be able to set pay above the minimum of the rate range to recruit new employees based on other applicable factors. For example, one of the factors agencies will be able to consider when setting pay under 5 CFR 531.212(c) is whether there are significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled.

Several commenters, including an agency, expressed concern that the changes would slow down the pay-setting process or that agencies will be discouraged from using pay flexibilities because of the additional work required if use of salary history is prohibited in setting pay. *See* Comments 26, 41, 52. OPM disagrees that agencies will be discouraged from using the pay flexibilities that are being revised. Instead of being allowed to consider a candidate's salary history, an agency can, where a candidate's superior qualifications or an agency's special need merits setting pay above the minimum rate, consider one or more factors directly related to the position to be filled and how pay has been set for employees who had similar qualifications and who have been newly appointed to positions that are similar to the candidate's position, if applicable. This information should be readily available to agencies and will give agencies the ability to increase a candidate's starting pay as appropriate.

*Competing Job Offers*

OPM's proposal to allow agencies to consider a competing job offer when setting pay within limitations specified in the proposed rule received a significant number of comments.

One commenter said that it was ''arbitrary and capricious to propose that agencies may consider a competing offer but to ignore an applicant's current salary or salary history'' because ''their current compensation represents a competing offer to the Government's offer.'' Comment 20. That commenter argued that there are racial disparities with respect to who ''may be able to wait out longer for a competing [job] offer than others due to higher wealth.'' Id. Another commenter stated that allowing consideration of private sector job offers would be ''more available to beneficiaries of private sector discrimination than to those that have been treated unfairly, and those offers would precisely reflect the private sector salary history that the proposed rule disallows directly.'' Comment 32. A commenter expressed that relying on competing job offers in negotiation of pay ''only serve[s] to perpetuate pay disparities and should be eliminated.'' Comment 40. An organization commented that a competing job offer could be ''another reflection of past pay discrimination, bias, negotiation bias, or other factors with gender-based implications that are irrelevant to a candidate's skills, qualifications, or experience.'' Comment 56. Another organization stated that ''women and people of color likely have lower competing offers or may have none. Therefore, using this information to determine compensation could perpetuate inequality.'' Comment 61.

An organization recommended revising the regulations ''to require that the competing job offer be contemporaneous to the Federal offer at issue, and to require that the competing job offer be bona fide (as certified in writing by the applicant) and not, for example, be an offer that is made at the request of the applicant with no real intention of resulting in actual hiring for the purpose of affecting pay-setting in the hiring agency's job offer.'' Comment 49.

In contrast, one agency supported allowing agencies to consider competing job offers as necessary for the agency to compete with the private sector. Comment 57.

OPM is persuaded that the same principles that apply to consideration of salary history apply to consideration of a competing job offer. A competing job offer could, itself, be based on salary history. And, as noted by multiple commenters, an individual's current pay is effectively a competing offer. Setting pay based on the factors enumerated in this final rule is better suited to establishing equitable pay than comparison to a competing offer.

Because of the rationales for removing consideration of salary history and based on the comments received, OPM is revising this element of its proposed rule and, in this final rule, is removing a salary documented in a competing job offer from the list of factors that an agency may consider when setting pay above the minimum rate. OPM reiterates that agencies will be able to consider other applicable factors when setting pay above the minimum rate, such as significant disparities between Federal and non-Federal salaries for the required skills and competencies.

**Comments Regarding Specific Pay Systems**

*SES & SL/ST Pay Systems*

OPM's proposed rule explained that, although the SES and SL/ST pay systems are among the pay systems administered by OPM, OPM believed that it was not necessary to prohibit consideration of salary history in the SES and SL/ST pay systems because the regulations governing those pay systems provide a specific list of factors to consider when setting pay that does not include salary history. Further, the gender pay gap for these positions, based on September 2021 data, is less than one percent. OPM requested comments, however, on a wide range of topics to inform how OPM could best promote pay equity in its pay systems.

OPM received several comments objecting to OPM's proposal not to revise SES and SL/ST pay systems and advocating that these positions be treated the same as those in the GS, prevailing rate, AAJ, and ALJ pay systems. *See* Comments 07, 32, 47, 56, 62. After further consideration, OPM agrees and is amending the regulations for the SES and SL/ST pay systems to make explicit that salary history and competing job offers cannot be considered when setting pay for new entrants to Federal civilian positions.

The commenters that disagreed with excluding SES and SL/ST pay systems from these new rules argued that this exclusion created arbitrary inconsistency. Id. One commenter stated that ''exempting these [SES and SL/ST] positions from the strict prohibition on considering an applicant's salary history appears arbitrary and would create unnecessary inconsistencies in the regulations.'' Comment 56. Another commenter voiced support for the use of salary history, generally, describing it as ''a factor that is helpful for setting the starting pay'' but supported either a total inclusion or total exclusion of the use of salary history across pay systems, stating that the exclusion of SES and SL/ST ''shows prejudice in applications of this policy.'' Comment 07.

Commenters also objected to the exclusion of SES and SL/ST from this rule on the basis that any gender/racial pay gap, even below one percent, should be addressed. Comments 56, 62. A Federal employee-run organization stated that ''[t]he salary history ban is a critical step towards shrinking unjust and inequitable salary gaps, which is why we encourage OPM to include all positions (including Senior Executive Service jobs) unless OPM can provide compelling reasons for their exclusion.'' Comment 62. Similarly, when commenting on the existing pay gap for SES and SL/ST positions, an organization stated that ''[a]bsent evidence that prohibiting consideration of salary history for SES, SL, and ST positions would increase the pay gap for those positions, the fact that the pay gap is small does not provide an adequate justification for failing to apply rules designed to promote equity to these positions.'' Comment 56. OPM did not receive any comments in support of this aspect of the proposed rule.

OPM agrees with the commenters that the SES and SL/ST pay regulations should be revised consistent with changes being made to the pay-setting rules for other pay systems. Although the SES and SL/ST systems currently do not include salary history as a factor when setting pay for individuals receiving their first appointment as a civilian employee of the Federal Government, they also do not specify that the list of factors is exhaustive. That is, the SES and SL/ST pay regulations mandate what must be considered when setting an initial rate of pay—to include merit-based factors such as the nature and quality of the individual's experience, qualifications, accomplishments, and current responsibilities, which could be read to allow for the consideration of additional factors such as salary history. 5 CFR 534.404; 5 CFR 534.506. Similarly, agencies currently have broad discretion in setting pay for an individual being reappointed to the SES following a break in SES service and for reappointment to an SL or ST position. 5 CFR 534.404(i); 5 CFR 534.506(c).

OPM agrees with commenters that consideration of salary history for SES and SL/ST positions presents the same concerns as for the GS, prevailing rate, AAJ, and ALJ pay systems. Further, even though the SES and SL/ST pay systems do not have a significant pay gap, eliminating consideration of salary history information, as discussed above, is most consistent with merit system principles and can help prevent inequitable pay discrepancies from arising. Salary history also is unlikely to reflect an individual's qualifications or fitness for a position relative to the qualifications of other new appointees. Therefore, we are adding language to the SES and SL/ST pay regulations explicitly prohibiting the use of salary information for appointees who are entering the Federal Government for the first time and prohibiting the use of non-Federal salary information upon reappointment to an SES, SL, or ST position.

Unlike the GS, prevailing rate, AAJ, and ALJ pay systems for which OPM is adding a requirement for agencies to implement policies for setting pay for current and former Federal employees, OPM is not adding a similar provision for the SES and SL/ST pay systems. The regulations for SES pay already require agencies to have a plan for setting and adjusting rates for SES members. 5 CFR 534.404(g). With respect to setting initial pay, plans must provide for transparency in pay setting, may consider the executive's scope of authority and level of responsibility in the agency, and must consider the distribution of pay rates within the SES rate range. Id. Similarly, the SL/ST pay system regulations require an agency to have written procedures for setting pay. 5 CFR 534.505. The procedures must provide for transparency in pay setting. Id. These written SES and SL/ST plans already address the pay-setting issues this final rule requires agencies to develop for the GS, prevailing rate, AAJ and ALJ pay systems.

*General Schedule Pay Setting*

OPM received a number of comments related specifically to the General Schedule pay system and the General Schedule regulations. While some of these comments implicate issues that affect each of the pay systems at issue in this final rule, we address the General Schedule-specific comments here.

An agency suggested modifying or eliminating 5 CFR 531.211(a), which requires that pay be set at the minimum rate. Comment 30. OPM cannot eliminate this regulation because it implements the law in 5 U.S.C. 5333. The statute states, ''New appointments shall be made at the minimum rate of the appropriate grade'' and provides OPM with authority to prescribe regulations to allow setting pay above the minimum rate of the grade based on considerations such as existing pay, the candidate's unusually high or unique qualifications, or a special need of the Government for the candidate's services. While the statute authorizes regulations

that provide pay-setting flexibility, the default is to have pay set at the minimum of the grade. Also, while the statute refers to consideration of ''existing pay,'' it is listed as an example of what OPM regulations may consider. As discussed in this final rule and the proposed rule, OPM has determined to prohibit consideration of existing pay or salary history when setting pay above the minimum rate of a GS grade.

An agency questioned the applicability of 5 CFR 531.212 to nonappropriated fund instrumentality (NAFI) employees who move to GS positions. Comment 52. As stated in 5 CFR 531.212(a)(4), employees who move from a NAFI position to a GS position with a break in service of 3 days or less and without a change in agency are not eligible to have pay set under 5 CFR 531.212 because their NAFI employment is considered employment by the Federal Government. Such NAFI employees are covered by the regulations in 5 CFR 531.216, which allow consideration of a NAFI employee's highest previous rate when setting pay. NAFI employees who are not covered by 5 CFR 531.216 (*i.e.,* those who have a break in service of more than 3 days or a change in agency upon movement to a GS position) may be eligible to have their pay set under the GS superior qualifications and special needs pay-setting authority at 5 CFR 531.212, as revised by this final rule.[21]

An agency was concerned that OPM does not ''have the agency data to accurately state whether salary history was the basis for justifying [setting pay above step 1 in the GS system] or whether it was one of the other eight factors considered.'' Comment 45. The agency recommended ''[mandating] . . . that setting pay above step 1 cannot be based solely on salary history,'' that agencies ''communicate to applicant/candidate/selectee that they are not required to provide any salary history,'' and that ''OPM request the data/information they are lacking to make a more informed decision regarding the proposed removal of this factor.'' Comment 52. Another commenter also suggested that OPM collect more data. OPM does not believe that it is practical to ask agencies to submit the written documentation of their justifications to use the superior qualifications and special needs pay-setting authority that is required by 5 CFR 531.212(e) when it was used for over 9,000 GS employees in fiscal year 2021. In 2013, some agencies reported that their policy on this authority required the use of a job candidate's existing salary, or that existing salary must be considered when setting pay of a new GS employee. While OPM revised its fact sheet on the authority in 2015 to remind agencies that existing salary is only one factor an agency may use when setting pay under this authority, the regulations have not changed since that time so agency policies may not have changed either. OPM will update its guidance on setting pay to reflect the changes made by this final rule.

A Federal employee-run organization ''agree[d] that it is prudent for agencies to consider the wages of existing comparable peers when setting a new employee's pay'' but encouraged ''OPM to clarify that agencies should not look at the actual salary a comparable peer made when starting, but rather the *grade* and *step* the peer was originally given.'' Comment 62 (emphasis added). The organization suggested revising 5 CFR 531.212(c)(1) to replace ''How pay has been set for'' with ''Which grade and step had been given to'' and replacing ''have'' with ''had'' in the paragraph reading ''How pay has been set for employees who had similar qualifications (based on the level, type, or quality of the candidate's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the candidate's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable.'' Id. Another organization similarly supported ''requiring the hiring agency to search comparative pay of current employees at the hiring agency when setting pay for new hires, with measures taken to account for differences in locality pay and post-hire merit-based pay increases, such as within-grade increases and quality step increases.'' Comment 49. The proposed rule accounts for the grade level and geographic location (which would account for differences in locality pay and other location-based payments applicable to GS employees) of the position. However, OPM has clarified in this final rule that agencies must consider the step at which pay has been set for employees who had similar qualifications and who have been newly appointed to positions that are similar to the candidate's position.

Another organization commented that consideration of labor market factors to set a higher than minimum rate can maintain pay inequities. The regulations in 5 CFR 531.212 allow an agency to consider ''existing labor market conditions and employment trends, including the availability and quality of candidates for the same or similar positions.'' Comment 61. The organization writes that ''workers who enter during a competitive labor market could earn a higher wage than workers who perform the same job but entered during a less competitive labor market'' and that ''this is fundamentally at odds with the notion of equal pay,'' and ''when the affected workers are women or people of color, this approach can exacerbate gender and racial pay inequities.'' Id. We are not revising the regulations in response to this comment. This factor—which an agency has discretion to consider—recognizes that it may be difficult to recruit employees during a competitive labor market, especially when the agency has a special need for the candidate's services and may need to set pay at a higher rate in the rate range. Agencies will be required to consider how pay has been set for employees who had similar qualifications (based on the level, type, or quality of the candidate's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the candidate's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable. This required factor will better advance pay equity.

A commenter asked, with respect to 5 CFR 531.212(e) for the GS pay system, whether it would be permissible for agencies to create a uniform policy by which a certain step is always assigned, such as step 4, for candidates with similar qualifications for similar positions. Comment 14. The commenter suggested that this would ensure that all candidates that benefit from the regulation always have their pay set the same to reduce variability in outcomes. Id. OPM notes that agencies may create such policies if the agency also approves and documents each determination to use the authority consistent with 5 CFR 531.212(e).

OPM proposed adding in 5 CFR 531.221 that an agency must establish a policy regarding use of the GS maximum payable rate (MPR) rule that included elements specified in the proposed rule, such as considering how pay has been set for employees performing similar work in the organization (based on the position's occupational series, grade level, types of duties, or other job-relevant factors). One agency suggested requiring agencies in most circumstances to provide a salary offer no lower than the highest rate of pay the employee

[21] OPM has a fact sheet on NAFI employees moving to GS positions, which is based on the law in 5 U.S.C. 5334(f).

previously received in another Federal job (the employee's highest previous rate or HPR). OPM is not making this change. An agency's decision to use the MPR rule or how to set pay under the MPR rule may be influenced by different factors, such as budget, and under this final rule must reflect consideration of how pay has been set for employees performing similar work in support of pay equity. Under the regulations, agencies will list these factors in their policies. Agencies may establish policies under which they will always set pay at the employee's MPR.

A commenter recommended additional revisions, including that OPM require that agencies post and maintain their MPR policies on their websites and that agency decisions regarding any exceptions to these policies be made on a centralized basis. OPM declines to add these requirements to the rule. OPM will be issuing implementation guidance separately, which will include best practices.

The same commenter also recommended that OPM permit agencies to set an employee's salary up to 15 percent higher than an employee's highest previous rate in recognition that some Federal agencies have the independent statutory authority to provide benefits that are greater than those provided under title 5 of the United States Code to most Federal employees. This recommendation is beyond the scope of this rulemaking. This rule is not intended to address pay discrepancies resulting from independent agency authority to provide alternative compensation and benefits.

**Prevailing Rate Pay Setting**

OPM did not receive any comments specific to the prevailing rate pay systems regulations. Accordingly, OPM is adopting its proposals with two changes, as described above. First, as discussed in the Competing Job Offers section, in this final rule, an agency will not be able to consider a competing job offer when setting pay for a new prevailing rate pay system employee. Second, we are also clarifying that agencies must consider the ''step'' at which pay has been set (instead of ''pay'') for employees who had similar qualifications and who have been newly appointed to positions that are similar to the candidate's position.

**Administrative Appeals Judge Pay Setting**

Under 5 CFR 534.604, an agency may offer an AAJ applicant with prior Federal service a rate up to the lowest rate of basic pay of the AAJ pay system that equals or exceeds the employee's highest previous rate of basic pay in a Federal civil service position, not to exceed the rate of basic pay for AA–6. OPM proposed adding that an agency must establish a policy regarding use of this provision that includes elements specified in the regulations, including that the policy must require consideration of how pay has been set for other AAJs if the agency decides to use this authority.

Also under the AAJ pay-setting regulations, an agency may offer an AAJ applicant with superior qualifications who is not a current Federal employee a higher than minimum rate when such a rate is clearly necessary to meet the needs of the Government. An agency may pay a higher than minimum rate of pay that is next above the applicant's existing pay or earnings, up to the maximum rate AA–6. OPM proposed several revisions to this authority, including allowing agencies to set pay at any rate within the AAJ pay system. OPM proposed adding language requiring an agency to document the superior qualifications of the applicant, the need of the Government for the applicant's services, consideration of how pay has been set for AAJs who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences) and have been newly appointed to positions that are similar to the applicant's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable, and an explanation of the factors that were used to justify the rate at which the employee's pay is set. Factors an agency could consider include the success of recent efforts to recruit for the same or similar AAJ positions or significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled. This documentation would allow an agency to evaluate for equity purposes how pay has been set and reconstruct the action if necessary.

An organization supported OPM's proposal to require agencies to document the superior qualifications of AAJs when setting pay above the minimum rate. Comment 61.

As discussed in prior sections, in this final rule, an agency will not be permitted to consider an applicant's or former AAJ's salary history or a salary documented in a competing job offer. OPM is modifying its proposed regulatory text to make clear that, when setting pay for a former AAJ, an agency may set pay using either the highest previous Federal rate of pay (which necessarily considers salary history) or the superior qualifications authority; however, if an agency uses the superior qualifications authority, then the agency may not consider salary history. OPM is adopting the remainder of its proposal without change.

**Administrative Law Judge Pay Setting**

Under 5 CFR 930.205, upon appointment to a position at level AL–3, an ALJ is paid at the minimum rate unless the agency chooses to set pay at a higher rate based on prior service or superior qualifications. OPM proposed revising § 930.205 to add that, before an agency sets pay based on the ALJ's highest previous Federal rate of basic pay, the agency must establish a policy that includes certain elements specified in the regulations, including that the policy must require consideration of how pay has been set for other ALJs if the agency decides to use this authority.

OPM also proposed revisions to the regulations on setting pay based on the ALJ applicant's superior qualifications in § 930.205. Agencies would be able to submit a request to OPM to set pay at any rate within the AL–3 level. Agencies' requests to OPM would be required to include: (1) the applicant's or former ALJ's superior qualifications; (2) how pay has been set for ALJs who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences) and have been newly appointed to positions that are similar to the ALJ's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable; and (3) the proposed rate of basic pay and justification for that rate. Agencies would not be able to consider an applicant's or former ALJ's salary history or the salary in a competing job offer. Other factors an agency could consider include the success of recent efforts to recruit for the same or similar ALJ positions or significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled. OPM also proposed minor revisions to reflect changes resulting from Executive Order 13843 ''Excepting Administrative Law Judges from the Competitive Service,'' signed July 10, 2018.[22] For example, OPM proposed to modify the language of § 930.202 to remove the reference to a ''certificate of eligibles'' to reflect that ALJ positions are now excepted service.

[22] 83 FR 32755 (July 10, 2018).

An organization noted that ''the past practice of relying upon salary history has, in certain instances, limited the starting salary potential of newly hired ALJs without fairly considering the experience and expertise these newly hired individuals would bring to the position.'' Comment 36. The organization stated it supports the goal of ''[increasing] pay equity by removing reliance on salary history as a central factor for setting pay, while retaining the use of past Federal salary as the minimum starting salary for a newly hired ALJ with a history of Federal employment.'' Id. The organization also requested that OPM consider ''taking steps to adjust. . . the maximum salary of a Federal ALJ [to be] equivalent to the salary paid to a Federal magistrate or bankruptcy judge.'' Id. OPM is not adopting this recommendation. The President determines the appropriate adjustment for each level in the ALJ pay system by executive order. *See* 5 U.S.C. 5372(b)(4).

Another organization supported OPM's proposal to require agencies to document the superior qualifications of ALJs when setting pay above the minimum rate. Comment 61.

As discussed in prior sections, in this final rule, an agency will not be able to consider an applicant's or former ALJ's salary history (defined as existing salary or prior salary) or a salary documented in a competing job offer when setting pay based on an applicant's superior qualifications. OPM is adopting the remaining aspects of its proposal without change.

**Expected Impact of This Final Rule**

*A. Statement of Need*

OPM is issuing this rule pursuant to its authority to issue regulations governing the GS, prevailing rate, AAJ, ALJ, SES, and SL/ST pay systems in 5 U.S.C. 5333, 5338, 5343, 5372, 5372b, 5376, and 5382. The purpose of this final rule is to advance pay equity consistent with merit system principles and position the Federal Government as a model employer while reaping the benefits that this policy will have for the economy and efficiency of the Government workforce. This rule is also consistent with diversity, equity, inclusion, and accessibility principles. Based on September 2021 EHRI data covering nonseasonal, full-time, permanent Executive branch employees, gender and racial pay gaps persist. On average for all race/ethnicity groups combined, women are paid 94 cents for every dollar paid to a man—a gender pay gap of 6 percent. This raw, unadjusted gender pay gap is before considering any factors that might explain the gap, such as occupation.

Because salary history is not always a good proxy for worker value, experience, and expertise and setting pay based on a candidate's salary history could perpetuate a pay rate that was inequitable, the Federal Government is taking steps to address the treatment of salary history and establish policies that support equitable pay determinations anticipating that these policies in turn will also support certain economies and efficiencies for the Federal Government. Currently, certain regulations allow agencies to consider a candidate's salary history or use a competing salary offer as a factor in setting initial pay. Agencies are not required by OPM's current regulations to consider the assigned grades and steps for employees performing similar work or candidates who had similar qualifications, if applicable, when using pay-setting flexibilities. Nor are agencies required to have policies regarding use of an employee's highest previous Federal rate to set pay.

OPM invited comments on whether there are additional ways that the Federal Government can be a model employer with respect to pay equity and received several responses. A union recommended that OPM ''emphasize pay equity and ensure employee qualifications and the needs of agencies struggling to hire and retain qualified employees are both adequately considered in pay-setting decisions.'' Comment 44. The union's recommendations are generally consistent with this final rule. An organization recommended that OPM ''add language formally stating that the Federal Government intends to serve as a model employer with respect to pay equity. . . maintain oversight and track how these pay-setting authorities are employed. . . [and] continue to use the General Schedule or other similar regimented pay schedules.'' Comment 49. We note that OPM's strategic plan for fiscal years 2022–2026 already states that ''OPM strives for the Federal Government to be a model employer where every Federal job provides fair pay and benefits that reflect the diverse needs of the workforce.'' [23] This final rule does not modify OPM's current oversight responsibilities regarding the use of pay-setting flexibilities and does not eliminate any Governmentwide pay system, such as the GS system, which would require a statutory change.

Several commenters offered other suggestions for ways the Federal Government could improve pay equity. These included examining veterans' preference, ''performing a market analysis and paying civil servants fair wages,'' and shortening the required waiting period that is required to advance to the next higher step or rate or reducing the number of steps in the GS pay system or, more generally, reforming how agencies set pay upon promotion. Comments 58, 02, 08, 48, respectively.

These suggestions would require a statutory change—

- Veterans' preference is provided by 5 U.S.C. 2108 and 2108a.
- GS, FWS, AAJ, and ALJ pay schedules are typically adjusted annually as provided by the statutes that govern those pay systems, which include consideration of changes in the cost of labor or, in the case of the FWS, prevailing rates (5 U.S.C. 5303, 5304, 5304a, 5343, 5372b, and 5372).
- The waiting periods that are required to advance to the next higher step or rate and the number of steps in the GS pay system are specified in 5 U.S.C. 5335.
- Pay setting upon promotion for GS employees is governed by 5 U.S.C. 5334.

Commenters also suggested regulating pay-banding systems more strictly, fully implementing the Federal Employees Pay Comparability Act (FEPCA) of 1990, allowing agencies to establish developmental programs that allow for ''retained pay'' when changing career fields, and providing current Federal employees with more information on promotions including specific benchmarks that employees must achieve to move between pay levels. Comments 09, 18, 34, 56, respectively.

OPM does not administer any pay banding systems—they are administered by the agency that has the pay banding system under its independent statutory pay authority or under a demonstration project authority, following provisions under 5 U.S.C. chapter 47. OPM has prescribed criteria under 5 U.S.C. 9509 for the U.S. Department of the Treasury to follow in exercising its authority to establish one or more pay banding systems covering all or any portion of the Internal Revenue Service workforce.[24] Any such system is administered by the U.S. Department of the Treasury and is outside the scope of this final rule.

[23] Office of Personnel Management. ''Goal 1: Position the federal government as a model employer.'' *https://www.opm.gov/about-us/strategic-plan/goal-1-position-the-federal-government-as-a-model-employer./*

[24] 65 FR 79433 (Dec. 19, 2000).

Several other of the above recommendations are also outside the scope of this final rule—

- With regard to the FEPCA recommendation, on August 31, 2023, the President determined that it was appropriate to exercise his authority to set alternative pay adjustments for 2024 pursuant to 5 U.S.C. 5303(b) and 5 U.S.C. 5304a. These alternative pay adjustments mean FEPCA will continue to not be implemented fully.[25]
- OPM regulations at 5 CFR 536.301(a)(5) provide for retained pay when an agency places an employee in a formal employee development program that is generally utilized Governmentwide, such as the Recent Graduates Program. Agencies have discretion to determine whether to use formal employee development programs generally utilized Governmentwide to fill their positions.
- Information on classification and qualifications for GS and FWS positions is available on OPM's website.[26]

Commenters also suggested prohibiting applicants from placing pay on their resumes, prohibiting agencies from asking about gaps in employment, and considering how many hours a candidate works in a non-Federal position when setting pay. *See, e.g.,* Comments 09, 23, 60, 20.

This final rule does not address what topics may be discussed during salary negotiations, including what information a job candidate may share with an agency on an employment application or resume, as an agency cannot completely control what information a job candidate may provide. See the 'Additional Considerations Regarding Setting Pay' section for further discussion. Instead, this final rule focuses on the agency's action by removing from consideration any salary history information it may receive. Because OPM is requiring agencies not to consider salary history, the number of hours a candidate works in a non-Federal position becomes irrelevant, since there is no reason to standardize salary information (for example, annualizing a non-Federal hourly rate to compare with annual salaries).

Another suggestion was to take strong disciplinary action against managers who discriminate when setting pay to deter deliberate pay discrimination from occurring. Comment 49. An employee's violation of an agency's regulations or policies may cause the employee's agency to take disciplinary or corrective action using well-established tools available to agencies for addressing performance issues and misconduct. If an individual fails to follow pay-setting policy, it could be a performance or misconduct issue addressable under 5 U.S.C. chapters 43 or 75.

*B. Impact*

The rule will impact pay setting for new Federal hires in the affected pay systems when agencies exercise discretionary authority to set pay within the rate range. The rule may also impact pay setting for current Federal employees for certain personnel actions as agencies review or develop policies addressing use of an employee's highest previous rate of pay received in a previous Federal civilian position.

Based on data regarding non-seasonal, full-time permanent Executive branch employees reported to OPM's EHRI database as of September 2021, there were more than 1.3 million GS employees, approximately 160,000 FWS (the largest pay system under the prevailing rate systems) appropriated fund employees,[27] 8,000 SES, 900 SL positions, 400 ST positions, 1,700 ALJs, and 63 AAJs in the Federal Government. This included approximately 97,000 new hires in the GS pay system, 13,000 new FWS appropriated fund hires, 700 new hires in the SES pay system, 24 new SL hires, 10 new ST hires, 17 new hires in the ALJ pay system, and 3 new hires in the AAJ pay system.

In fiscal year 2021, 9.5 percent of new GS employees (9,216 individual pay actions/authorizations) had their pay set using the superior qualifications and special needs pay-setting authority in 5 CFR 531.212. With respect to the prevailing rate pay system, agencies used the authority in 5 CFR 532.403(b) to set pay above the minimum rate of the appropriate grade for around 210 appointees with special qualifications. During the same period, one agency set pay above the minimum rate for an ALJ applicant based on their superior qualifications under 5 CFR 930.205(f)(2) with OPM approval.[28] No agencies reported setting pay under 5 CFR 534.604 based on an AAJ's superior qualifications.

Because this pay authority is delegated to agencies and agencies' written justifications for its use are not reported to EHRI, OPM does not have information regarding which factor or factors were used to justify the rate at which each new employee's pay is set under the GS superior qualifications and special needs pay-setting authority or similar prevailing rate, ALJ, and AAJ pay-setting authorities. As a result, we are not able to predict with specificity how the regulations will affect the rate at which pay is set for candidates based on their special or superior qualifications or a special agency need.

Although OPM does not have data on the specific factors agencies used to justify use of these pay-setting authorities, OPM reviewed hiring and pay data from fiscal year 2021, which demonstrated the extent to which agencies set pay under the GS superior qualifications and special needs pay-setting authority, the occupations for which these pay authorities are used, and how use of these authorities varied by gender. Looking more specifically at the 9.5 percent of new GS employees (9,216 individual pay actions/authorizations) who had their pay set using the superior qualifications and special needs pay-setting authority in 5 CFR 531.212, 21.5 percent of those were authorized for employees in the 06XX Medical, Hospital, Dental, and Public Health occupational family, 17.4 percent were authorized for employees in the 08XX Engineering and Architecture occupational family, 12.1 percent were authorized for employees in the 03XX General Administrative, Clerical, and Office Services occupational family, and 10.6 percent were authorized for employees in the 22XX Information Technology occupational family. The authority was used more frequently (on a percentage basis) for men than for women: 11.2 percent of non-seasonal full-time permanent GS new hires who were men had their pay set using the superior qualifications and special needs pay-setting authority, but only 7.9 percent of non-seasonal full-time permanent GS hires who were women had their pay set using the superior qualifications and special needs pay-setting authority.

Of the four occupational families that had the majority of the superior qualifications and special needs pay-setting authorizations, the two occupational families that were overwhelmingly male dominated (08XX Engineering and Architecture and 22XX Information Technology) are also the occupational families that had the

[25] The White House. ''Letter to the Speaker of the House and President of the Senate on the Alternative Plan for Pay Adjustments for Civilian Federal Employees.'' *https://www.whitehouse.gov/briefing-room/presidential-actions/2023/08/31/letter-to-the-speaker-of-the-house-and-the-president-of-the-senate-on-the-alternative-plan-for-pay-adjustments-for-civilian-federal-employees-2/.*

[26] Office of Personnel Management. ''Classification and Qualifications.'' *https://www.opm.gov/policy-data-oversight/classification-qualifications/.*

[27] Nonappropriated fund FWS prevailing rate employees are not reported to EHRI.

[28] Agencies must seek OPM pre-approval to use this pay-setting flexibility for ALJs. 5 CFR 930.205.

greatest percentage of new hires with pay set under the superior qualifications and special needs pay-setting authority. In the 08XX occupational family (Engineering and Architecture), 21 percent of new hires were women, and 79 percent of new hires were men. About 29 percent of new hires in the 08XX occupational family had their pay set using the superior qualifications and special needs pay-setting authority. In the 22XX occupational family (Information Technology), 24 percent of new hires were women, and 76 percent of new hires were men. About 22 percent of new hires in the 22XX occupational family had their pay set using the superior qualifications and special needs pay-setting authority. Conversely, in the 06XX occupational family (Medical, Hospital, Dental, and Public Health), 79 percent of new hires were women, and 21 percent of new hires were men, but only about 9 percent of new hires had their pay set using the superior qualifications and special needs pay-setting authority. Similarly, in the 03XX occupational family (General Administrative, Clerical, and Office Services), 54 percent of new hires were women, and 46 percent of new hires were men, but only about 8 percent of new hires had their pay set under the superior qualifications and special needs pay-setting authority.

OPM does not collect data on agency use of the other pay flexibilities that this regulation will revise (that is, the GS maximum payable rate rule in 5 CFR 531.221–223, the authority in 5 CFR 532.405 to set pay for a prevailing rate employee based on their highest previous rate, the authority in 5 CFR 534.604 to set pay based on an AAJ applicant's Federal highest previous rate of basic pay, or the authority in 5 CFR 930.205(f)(1) to set pay based on an ALJ applicant's highest previous Federal rate of basic pay). Because OPM is not prohibiting the use of an employee's highest previous Federal rate of pay to set pay, OPM does not anticipate that the regulatory changes in this final rule will result in a change in how frequently these pay flexibilities are used.

OPM invited comments on what data the Federal Government should consider when measuring the effects of greater pay equity achieved through a salary history ban, including effects on Federal worker turnover.

A professional organization stated that OPM should consider possible data sources such as exit interviews and Equal Employment Opportunity Commission (EEOC) data on pay discrimination cases. Comment 49. OPM does not collect exit interview data or data on EEO complaints, which are collected and maintained at agencies. An overview of the Federal Sector EEOC complaint process is available on EEOC's website.[29] Employees can appeal agency decisions to EEOC, but such data would not be complete and may not be readily available. EEOC provides annual reports on the Federal Workforce,[30] but it is summary-level data that is not specific enough to inform OPM's analyses of these regulatory changes. The organization also suggested that OPM should consider latitudinal studies across a sample of agencies to determine if there are differences between different hiring agencies and between different facilities on how frequently these authorities are invoked, and if there are any demographic disparities for subject employees in when and how these authorities are invoked. Id. As explained in the proposed rule, OPM analyzes the use of pay flexibilities by occupation and gender. OPM could also examine the use of pay flexibilities by racial/ethnic group. Pay flexibilities are discretionary so there may be differences between agencies' use of these authorities.

Also in response to OPM's request for comment, an agency suggested that the Federal Government should consider labor costs. Comment 57. The agency stated that ''agencies may be paying more without salary history'' and that ''the Federal Government should focus on career progression or upward mobility and associated pay increases after a person enters civil service rather than starting salary.'' Id. When completing Management Directive 715 for the EEOC, agencies already explore all levels of the workforce to determine if EEO groups have the same opportunities for career advancement.[31] An organization recommended comparing the salaries of newly hired Federal employees after OPM's proposal is enacted, with a control group of employees that would have been subject to the rule had it been in effect at time of hire, to isolate the effects of a salary history ban on wages, pay equity, and worker turnover. Comment 33. As these are discretionary pay authorities, it would be unworkable to identify a control group of employees that could be appropriately compared to employees in which the discretionary pay authorities had been used.

*C. Costs*

This rule will affect the operations of more than 80 Federal agencies—ranging from cabinet-level departments to small independent agencies—that have employees under the GS, prevailing rate, ALJ, AAJ, SES, and SL/ST pay systems. We estimate that this rule will require individuals employed by these agencies to spend time reviewing the rule and updating agency policies and procedures for the pay flexibilities. For this cost analysis, the assumed average salary rate of Federal employees performing this work will be the rate in 2023 for GS–14, step 5, from the Washington, DC, locality pay table ($150,016 annual locality rate and $71.88 hourly locality rate). We assume the total dollar value of labor, which includes wages, benefits, and overhead, is equal to 200 percent of the wage rate, resulting in an assumed labor cost of $143.76 per hour.

We estimate that, in the first year following publication of this final rule, compliance with this rule would require an average of 160 hours of work by employees with an average hourly cost of $143.76 per hour. This would result in estimated costs in that first year of implementation of about $23,000 per agency, and about $1.8 million Governmentwide. There are costs associated with administering the pay flexibilities in this rule, such as surveying and comparing similar positions, but not necessarily an increase in administrative costs for agencies that are already using these pay flexibilities.

A labor organization expressed concern that agency HR professionals may not have the necessary training to set pay based on the factors enumerated in the regulations. Comment 41. The organization recommended that OPM provide mandatory training and generate detailed worksheets to help generate justifications for pay setting. Id. OPM appreciates this suggestion and will consider the scope and content of implementation guidance, trainings, and other means of sharing best practices following the publication of this rule.

Another individual commented that OPM did not account for the cost of the increased wages that the commenter expects will be paid out because of the proposal. Comment 28. The commenter suggested that the cost impact of the proposed rule could be in excess of $570 million if the rule is successful in

[29] Equal Employment Opportunity Commission. ''Overview of Federal Sector EEO Complaint Process.'' *https://www.eeoc.gov/federal-sector/overview-federal-sector-eeo-complaint-process.*

[30] Equal Employment Opportunity Commission. ''Federal Sector Reports''. *https://www.eeoc.gov/federal-sector/reports.*

[31] Equal Employment Opportunity Commission. ''Instructions to Federal Agencies for EEO MD–715.'' *https://www.eeoc.gov/federal-sector/management-directive/instructions-federal-agencies-eeo-md-715-1.*

eliminating pay gaps. The commenter seems to assume that the rule would directly result in increases in pay for existing employees to close pay gaps. As noted in the prior section, the purpose of this rule is consistent with Executive Orders and OPM statutes and regulations, to remove from the pay-setting process consideration of a variable the agency has found to be inequitable. OPM, however, does not have authority to raise the pay for current employees to achieve equity with incoming employees. This rule does not purport to systematically increase existing pay and therefore cannot be the proximate cause of commenter's claimed increased costs to the Government.

*D. Benefits*

This final regulation provides the opportunity for the Federal Government to experience the benefits that certain states have found after enacting salary history bans, which includes benefits in economy and efficiency such as promoting equitable pay, improving wages and job mobility for workers who began their careers during a recession, and creating hiring efficiencies such as improved recruitment and retention. The Federal Government may also experience benefits related to increased equity and fairness within the Federal workforce.

Salary history bans can help close inequitable pay gaps that disadvantage women, workers of color, and workers who began their career during a recession. By enhancing equal treatment and compensation of similarly situated workers, salary history bans could lead to increased job satisfaction, commitment, and motivation among workers. This may help attract and retain a diverse and qualified workforce, and result in improved job performance and enhanced productivity for the employer. In addition to these economic gains, the Federal Government may see cost savings through reduced turnover, saving time and money from avoiding new hiring searches and new employee trainings. Salary history bans can also increase efficiencies by enhancing employers' talent pools.[32] In addition, by curbing inequitable pay decisions, a salary history ban can promote the values of equity, human dignity, and fairness within the Federal workforce described in E.O. 13563. Salary history bans can also promote more equitable and fairer pay-setting practices that are based on workers' skills, experience, or meeting a special agency need and eliminate reliance on the pay decisions of previous employers for which there is no context and that may have been arbitrary or potentially discriminatory.

OPM invited comments on whether there is any social science research or other evidence OPM should consider that suggests that limiting reliance on salary history advances equity and/or has other workplace benefits including for the employer.

Many commenters referenced a variety of social science research papers and data that show positive effects of salary history bans. *See, e.g.,* Comments 31, 33, 56, 61, 68. One commenter shared three articles regarding gender differences in negotiations. The first article reported on an experiment that found significant gender differences when men and women asked for more money as compensation for playing a game in the absence of overt prescriptions to negotiate.[33] Framing the situations as opportunities for negotiation was particularly intimidating to women. By contrast, framing situations as opportunities for asking was much less intimidating to women, as this language is viewed as more polite and role-consistent. The next article reported on an experiment that found that men benefitted more than women from having a strong alternative when negotiating a compensation package, which supported the author's hypothesis that women suffer a backlash from male and female negotiation partners when women negotiate assertively.[34] The authors suggest that ''managers looking to reduce gender gaps in the workplace may want to install guidelines and processes to minimize the possibility that such backlash occurs.'' Id. The third article reported on experiments in which ''evaluators penalized female candidates more than male candidates for initiating negotiations [for higher compensation].'' [35] These articles suggest that removing consideration of salary history may advance gender pay equity because it will help promote a level playing field between men and women in salary negotiations.

An organization and an individual suggested that OPM review pay discrimination litigation relating to Federal employees and data regarding private sector pay discrimination to determine the potential benefit of this rule in helping to avoid a category of pay lawsuits. Comments 27, 62. The EEOC has a fact sheet on notable EEOC litigation involving pay discrimination.[36] The commenters did not identify specific precedents, but OPM identified several cases that resulted in restrictions on considering prior salary in various contexts. In *Rizo* v. *Yovino,* the Ninth Circuit found that relying on prior wages when setting pay would perpetuate a wage disparity between men and women. 950 F.3d 1217 (9th Cir. 2020) (en banc). In a consent decree settling a pay discrimination suit, a bank agreed not to inquire about applicants' prior earnings history during the hiring process. *EEOC* v. *First Metropolitan Financial Services, Inc.,* 1:18–cv–177 (N.D. Miss. March 18, 2021). Similarly, in *EEOC* v. *Cummins, Inc., d/b/a Cummins Business Services,* the company agreed not to rely solely on prior salary in determining compensation. 3:17–cv–01306 (M.D. Tenn. Mar. 29, 2019). *EEOC* v. *Covenant Medical Center, Inc.,* resulted in a consent decree to equalize pay where a woman had been paid less than two male peers based on one man's prior salary history and the other man's negotiation of pay (where the woman had not been permitted to negotiate pay). *EEOC* v. *Covenant Medical Center, Inc.,* 2:20–cv–10662 (E.D. Mich. Sept. 2, 2020).

Similarly, the organization referenced an academic report, which noted that asking candidates to disclose their salary history can ''embed any previously encountered pay inequities into an employee's starting pay with a new employer.'' [37] These cases and report provide further information indicating that limiting reliance on salary history to set pay has positive benefits.

*E. Regulatory Alternatives*

Executive Orders 12866, 13563, and 14094 direct agencies to assess available

[32] National Women's Law Center. ''Asking for Salary History Perpetuates Pay Discrimination from Job to Job.'' March 2022. *https://nwlc.org/wp-content/uploads/2020/12/Asking-for-Salary-History-2022.pdf.*

[33] Small, D., Gelfand, M., Babcock, L., and Gettman, H. ''Who Goes to the Bargaining Table? The Influence of Gender and Framing on the Initiation of Negotiation.'' Journal of Personality and Social Psychology, 2007, Vol. 3, No. 4, 600–613.

[34] Dallanls, J., Zlatev, J., Halevy, N., and Neale, M. ''The Dynamics of Gender and Alternatives in Negotiation.'' Journal of Applied Psychology, 2021, Vol. 106, No. 11, 1655–1672.

[35] Bowles, H., Babcock, L., and Lai, L. ''Social Incentives for Gender Differences in the Propensity to Initiate Negotiations: Sometimes it Does Hurt to Ask.'' Organizational Behavior and Human Decision Processes, 2007, Vol. 103, 84–103.

[36] Equal Employment Opportunity Commission. ''Fact Sheet: Notable EEOC Litigation Involving Pay Discrimination.'' *https://www.eeoc.gov/fact-sheet-notable-eeoc-litigation-involving-pay-discrimination.*

[37] National Academies of Sciences, Engineering, and Medicine. ''Evaluation of Compensation Data Collected Through the EEO–1 Form.'' *https://nap.nationalacademies.org/catalog/26581/evaluation-of-compensation-data-collected-through-the-eeo-1-form.*

regulatory alternatives and to select regulatory approaches that maximize net benefits.

As discussed, agencies are required to set pay at the minimum of the rate range for new GS, prevailing rate, AAJ, and ALJ employees unless the agency chooses to set pay above the minimum based on one of the pay flexibilities that are available in regulations. To advance pay equity for new hires, one regulatory alternative OPM considered was eliminating pay flexibilities to set pay above the minimum rate of the applicable rate range. This option, however, would have been detrimental to agencies and job candidates. Agencies use pay flexibilities to set pay above the minimum rate to recruit candidates with superior qualifications or when agencies have a special need for the candidate's services. Agencies risk candidates rejecting employment if the offered salary does not meet their expectations.

Another option was to allow agencies to set pay based on a candidate's salary history if provided voluntarily and without prompting. OPM invited comments on what the advantages and disadvantages would be of prohibiting Federal agencies from relying on prior salary history, if the candidate voluntarily provided it, and possible justifications for allowing an exception to the prior salary history prohibition. OPM asked whether such an exception would be consistent with the goals of this regulation. OPM received many comments in response.

Most commenters were in favor of prohibiting Federal agencies from relying on prior salary history even if the candidate voluntarily provides it. One commenter stated that allowing an exception would be ''counterproductive [to] the goal of reducing or eliminating the gender pay gap . . . [because] many academic studies have shown that males will engage in salary negotiation about four times as often as females.'' Comment 18. Organizations similarly commented that men are more likely to disclose their salaries than women.

A commenter said that ''allowing private sector compensation to be considered when a candidate voluntarily supplies that information replicates private sector discrimination because candidates treated unfairly in the private sector will have no helpful salary history information to volunteer.'' Comment 32. A union and an organization stated that allowing voluntary disclosure of salary history would ''perpetuate current inequalities in the Federal workforce.'' Comment 44. An organization stated that allowing an exception would make the rule ''pointless'' and would provide ''no added independent benefit.'' Comment 46.

Two organizations agreed with OPM that ''a strict prohibition on considering salary history allows for more effective administration of the regulations and avoids confusion.'' Comment 56. An organization stated that ''allowing reliance on voluntary disclosure would tend to benefit those who have sufficient awareness of Federal hiring processes to know that this flexibility is potentially available and is likely to harm those who have less extensive experience or networks, a group that likely disproportionately includes women, people of color, and other traditionally marginalized candidates.'' Comment 56. The organization also shared results from a study that found that women are disproportionately penalized for declining to disclose their salaries whereas men are disproportionately rewarded.[38] Id. Another organization stated that reliance on prior salary is unnecessary because ''the Federal Government's pay-setting practices allow for consideration of a broad range of factors in determining appropriate pay setting.'' Comment 60.

One agency suggested that possible justifications for allowing an exception to the prior salary prohibition are that 5 U.S.C. 2301(b)(3) allows for ''appropriate consideration of both national and local rates paid by employers in the private sector'' and ''allows for competitiveness in hiring.'' Comment 09. The agency suggested limiting agencies to setting pay at the lowest step that equals or exceeds the candidate's salary history. Id. Another agency also stated that ''salary history, if available, should be factored when setting initial pay for an external candidate'' because otherwise ''individual hiring managers [may] randomly select a step or salary rate'' and setting a candidate's salary above their salary history would result in an ''increase in costs to taxpayers.'' Comment 57.

We find the reasons for prohibiting Federal agencies from considering prior salary history even if the candidate voluntarily provides it more compelling than the reasons for allowing an exception to the prior salary history prohibition. Agencies would still be able to set pay above step 1 to be competitive based on factors specified in the regulations, including significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled. OPM is retaining its proposed approach of prohibiting agencies from considering prior salary history even if the candidate voluntarily provides it.

Lastly, OPM could maintain the status quo and not propose regulations to change salary determinations based on salary history. As explained throughout the proposed rule and this final rule, banning salary history as a consideration when setting pay promotes greater pay equity consistent with merit system principles. Because the Federal Government should serve as a model employer in establishing policies that advance pay equity, regulatory change is needed to help advance pay equity for Federal employees.

In evaluating the regulatory alternatives, OPM considered the information it had available regarding the pay gaps in Federal employment. Many factors, including disparities in salary history, may contribute to the overall gender and race/ethnicity pay gaps in the Federal Government. For example, more women than men occupy positions classified at lower GS grades with lower pay, while more men than women occupy positions classified at higher GS grades with higher pay and in higher-paying Senior Executive Service positions. Data indicated that, for each GS grade, women and men had close to the same average position in range (average step position). Factors such as length in service, quality step increases, and—most significantly for this regulation—how pay is set upon personnel actions such as appointment or promotion affect an employee's step position. OPM also found that the size of the gender pay gap varied by occupation.[39]

OPM's findings regarding Federal pay gaps are consistent with research on pay gaps in the national workforce. A November 2020 study[40] focused on national pay gaps and found that the gender pay gap varied significantly by occupation. There was no gender pay gap in some occupations, but gender pay gaps as large as 45 percent in others. The researchers found larger gender pay gaps in occupations that were more competitive and hazardous, occupations that reward longer hours of work, and those that have a larger proportion of women workers.

OPM's discussion in the proposed rule regarding the calculation and

[38] Payscale. ''Is Asking for Salary History . . . History?'' *https://www.payscale.com/research-and-insights/salary-history/*.

[39] 88 FR 30251, 30253 (May 11, 2023).

[40] Foster, T., Murray-Close, M., Landivar, L., & de Wolf, M. ''An Evaluation of the Gender Wage Gap Using Linked Survey and Administrative Data,'' November 2020. *https://www.census.gov/library/working-papers/2020/adrm/CES-WP-20-34.html*.

presentation of Federal Government pay gaps received multiple comments. One commenter requested more detailed data, such as data by occupational series. Comment 15. The commenter expressed that the public should have access to more detailed data behind our calculations in the proposed rule. A national union that supported the proposed rule asked OPM to examine ''potential clusters of inequity, whether it is within certain position series or grades, or individual agencies'' as part of its pay equity analyses. Comment 59. An agency commented that the Federal Government already has a diverse workforce and that women earn salaries that are the same as or higher than salaries earned by men when comparing both genders in the same position.

An organization cited international pay equity regulations, such as those in the European Union, as an example of a ''comprehensive approach,'' which requires reporting pay gap data in an open and transparent manner. Comment 31. OPM reviewed the European Union pay transparency regulations but concluded that requiring agencies to conduct and report on pay gap analyses is not within the scope of this rulemaking.

Another organization had several recommendations including that OPM: (1) update its multivariate regression-decomposition analysis using 2022 or 2023 data; (2) take an intersectional approach when updating its analysis; (3) break out Asian and Native Hawaiian/Pacific Islander employees into separate groups rather than combining them; (4) use medians instead of means; and (5) examine worker characteristics including supervisory status, education level, geography, tenure, age, and disability status. Comment 33. An international professional and technical union asked OPM to ''undertake an annual review of gender-based and racial/ethnic-based bias in median pay, matched for positions and seniority.'' Comment 64.

These data analysis recommendations raise several issues that are beyond the scope of this rule. Certain data from EHRI is available to the public on FedScope.[41] However, complete raw data is not available due to concerns about identifying employees at the individual level.[42] OPM has been reviewing 2022 data and plans to release a report in the coming months that will summarize pay gap information by gender and race/ethnicity and will present pay gap data for key worker characteristics such as pay system, grade (where applicable), occupation, agency, and age. OPM also plans to release detailed 2022 pay gap data with that report. OPM combines Asian and Native Hawaiian/Pacific Islander ethnic groups due to small sample sizes. OPM uses average, instead of median, salaries, in part, because means are readily available in OPM's EHRI[43] data system. Average salaries are an appropriate metric because a mean reflects the salary of all employees rather than focusing on a typical employee. OPM notes that the risks normally associated with using an average salary as a metric are minimal because Federal salaries have statutory pay limitations, which decrease the occurrence of outliers that would influence average salaries. Although OPM will continue to monitor and evaluate data regarding pay gaps based on gender or race/ethnicity, this final rule is not being promulgated simply to address potential pay gaps; this final rule is based on OPM's broader determination that eliminating consideration of prior salary history is the best way to implement the governing merit system principles.

*F. Implementation*

OPM invited comments on what information agencies should provide on the pay-setting flexibilities and at what stage in the hiring process agencies should provide this information. A union stated that ''information on how pay-setting flexibilities influence the final salary a candidate may be offered in job announcements and on agency websites helps candidates make better informed decisions when deciding whether to apply for such opportunities and what information to disclose during the application process.'' Comment 44. Similarly, several commenters recommended that OPM require agencies to provide this information in job announcements. Comments 44, 56. An agency stated that ''agencies should not solicit candidates to negotiate pay when hiring.'' Comment 57. An organization suggested that ''hiring agencies should be required to give applicants notice and the opportunity to submit to [the] agency pay-setting authorities documentation of any job offers or data on comparative pay for non-Federal positions that the applicant may have'' at the initial offer stage. Comment 49. Then ''only after receipt and review of any response from the applicant (or the passing of the deadline with no response) should the hiring agency finalize the starting pay offer grade and step for the position being offered.'' Id. OPM appreciates the responses received but declines to impose specific requirements for job announcements. OPM will consider these comments and suggestions in developing recommended best practices. In addition, as discussed in the Competing Job Offers section, OPM is revising the regulations in this final rule such that an agency will no longer be able to set pay based on a competing job offer.

Commenters recommended that OPM address other implementation issues. An agency, an organization, and a union recommended that hiring managers and human resources staff be trained on these regulatory changes. Comments 33, 41, 43. The union also recommended that OPM ''develop a standard form that would guide HR practitioners and/or hiring managers in developing a well-supported justification for pay-setting.'' Comment 41. The union suggested that agencies should provide service credit for the non-Federal work experience towards determining the step or rate at which to set the candidate's pay. Id. An organization suggested that OPM provide guidance ''on standards for what constitutes an effective comparative pay information search.'' Comment 49. The organization recommended that OPM ''modify the USAJOBS website and its standard forms for Federal job applications to eliminate rote requests for . . . prior salaries for non-Federal positions as part of detailing their employment histories.'' Id. OPM will review the USAJOBS website as OPM supports implementation of this final rule.

This final rule covers approximately 1.5 million Federal employees in the GS, prevailing rate, AAJ, ALJ, SES, and SL/ST pay systems combined who are employed in more than 80 Federal agencies. OPM's pay-setting regulations for the pay systems covered by this final rule prescribe broad criteria and limitations that agencies must apply in developing and implementing their own agency-specific pay-setting policies and procedures. OPM's regulations do not address the form or content of offers of employment that agencies make to candidates, nor do they address the process by which agencies engage with candidates. For these reasons, agency pay setting, job offer, and candidate communication policies, procedures, and practices may vary widely.

This final rule has a 60-day effective date. OPM recognizes, however, that agencies may need implementing

[41] *https://www.fedscope.opm.gov/.*

[42] *See* the FedScope Data Release Policy at *https://www.fedscope.opm.gov/download_Data%20Release%20Policy.pdf.*

[43] Office of Personnel Management, ''About Our Data (EHRI–SDM).'' *https://www.fedscope.opm.gov/datadefn/aehri_sdm.asp.*

guidance and additional time to modify their own policies and procedures and provide new instructions to their human resources professionals and hiring managers regarding setting pay and making pay offers in compliance with this final rule. To accommodate the scope of coverage and range of agency policies and practices this final rule will affect and to minimize disruptions to ongoing agency hiring processes where offers of pay have already been made to candidates, OPM is allowing additional time for agencies to implement this final rule. During this time, agencies should take steps to revise their policies and procedures. As soon as practicable, any new offers for employment including salary information for GS, FWS, ALJ, AAJ, SES, SL, ST positions and new pay-setting decisions for such positions based on an employee's previous Federal salary should reflect the requirements in this final rule. Agencies must be in full compliance with the final rule by October 1, 2024. OPM considers ''full compliance'' to refer to the pay setting decision as documented in the required justifications for use of these pay flexibilities—not necessarily the final processing of the personnel action. Therefore, these justifications that are approved on or after October 1, 2024, must be in full compliance. In accordance with 5 U.S.C. 7116(a)(7), this final rule cannot override any collective bargaining agreement in effect prior to the effective date of this regulation. Such collective bargaining agreement would need to come into compliance with this government wide regulation when the agreement is due to be renegotiated or expires.

*G. Severability*

If any of the provisions of this final rule is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, it shall be severable from its respective section(s) and shall not affect the remainder thereof or the application of the provision to other persons not similarly situated or to other dissimilar circumstances. For example, if a court were to invalidate any portion of this proposed rule as finalized imposing procedural requirements on agencies with respect to one pay system, the other portions of the rule—including the portions applying to each of the other affected pay systems—would independently remain workable and valuable. In enforcing the pay equity provisions of this rule, OPM will comply with all applicable legal requirements.

**Regulatory Flexibility Act**

The Director of OPM certifies that these regulations will not have a significant economic impact on a substantial number of small entities because they will apply only to Federal agencies and employees.

**Regulatory Review**

OPM has examined the impact of this rule as required by Executive Orders 12866, 13563, and 14094, which direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public, health, and safety effects, distributive impacts, and equity). This rule is considered a ''significant regulatory action'' under section 3(f) of Executive Order (12866).

**E.O. 13132, Federalism**

This regulation will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this final rule does not have sufficient federalism implications to warrant preparation of a Federalism Assessment.

**E.O. 12988, Civil Justice Reform**

This regulation meets the applicable standards set forth in section 3(a) and (b)(2) of Executive Order 12988.

**Unfunded Mandates Reform Act of 1995**

This final rule will not result in the expenditure by State, local or tribal governments of more than $100 million annually. Thus, no written assessment of unfunded mandates is required.

**Congressional Review Act**

OMB's Office of Information and Regulatory Affairs has determined this is not a major rule as defined by the Congressional Review Act (5 U.S.C. 804(2)).

**Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35)**

This regulatory action will not impose any reporting or recordkeeping requirements under the Paperwork Reduction Act.

**List of Subjects in Title 5 CFR Parts 531, 532, 534, and 930**

Administrative practice and procedure, Computer technology, Freedom of information, Government employees, Hospitals, Law enforcement officers, Motor vehicles, Reporting and recordkeeping requirements, Students, Wages.

Office of Personnel Management.

**Stephen Hickman,**

*Federal Register Liaison.*

Accordingly, OPM is amending 5 CFR parts 531, 532, 534, and 930 as follows:

## PART 531—PAY UNDER THE GENERAL SCHEDULE

■ 1. The authority citation for part 531 continues to read as follows:

**Authority:** 5 U.S.C. 5115, 5307, and 5338; sec. 4 of Public Law 103–89, 107 Stat. 981; and E.O. 12748, 56 FR 4521, 3 CFR, 1991 Comp., p. 316; Subpart B also issued under 5 U.S.C. 5303(g), 5305, 5333, 5334(a) and (b), and 7701(b)(2); Subpart D also issued under 5 U.S.C. 5335 and 7701(b)(2); Subpart E also issued under 5 U.S.C. 5336; Subpart F also issued under 5 U.S.C. 5304, 5305, and 5941(a); E.O. 12883, 58 FR 63281, 3 CFR, 1993 Comp., p. 682; and E.O. 13106, 63 FR 68151, 3 CFR, 1998 Comp., p. 224.

### Subpart B—Determining Rate of Basic Pay

■ 2. In § 531.212—

■ a. Revise paragraph (c) introductory text;

■ b. Remove paragraph (c)(2);

■ c. Redesignate paragraph (c)(1) as (c)(2)(i) and paragraphs (c)(3) through (c)(10) as (c)(2)(ii) through (c)(2)(ix);

■ d. Add a new paragraph (c)(1) and new paragraph (c)(2) introductory text;

■ e. Revise newly redesignated paragraph (c)(2)(ix); and

■ f. Revise paragraph (e)(2)(ii).

The revisions and additions read as follows:

#### § 531.212 Superior qualifications and special needs pay-setting authority.

* * * * *

(c) *Pay rate determination.* To determine the step at which to set an employee's payable rate of basic pay using the superior qualifications and special needs pay-setting authority, an agency must consider:

(1) The step at which pay has been set for employees who had similar qualifications (based on the level, type, or quality of the candidate's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the candidate's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable; and

(2) One or more of the following factors, as applicable in the case at hand:

* * * * *

(ix) Other relevant factors, except that an agency may not consider the candidate's salary history (*i.e.,* existing salary or prior salary) or a salary from a competing job offer.

* * * * *

(e) * * *

(2) * * *

(ii) An explanation of the factors and supporting documentation under paragraph (c) of this section which were used to justify the rate at which the employee's pay is set. The written documentation must explain how the factors directly relate to the rate approved; and

* * * * *

■ 3. In § 531.221, add paragraph (a)(6) to read as follows:

**§ 531.221 Maximum payable rate rule.**

(a) * * *

(6) Before setting pay under this section, an agency must establish a policy on its use of the maximum payable rate rule that includes—

(i) Designation of officials with the authority to approve and set pay under this section;

(ii) Any situations in which the agency must use the authority;

(iii) Any situations in which the agency may exercise its discretion in using the authority;

(iv) Consideration of the step at which pay has been set for other employees performing similar work in the organization (based on the position's occupational series, grade level, types of duties, or other job-relevant factors) and any other factors the designated official(s) may or must consider in determining the step at which to set the employee's pay between the employee's entitlement under any other applicable pay-setting rule and the employee's maximum payable rate; and

(v) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

* * * * *

## PART 532—PREVAILING RATE SYSTEMS

■ 4. The authority citation for part 532 continues to read as follows:

**Authority:** 5 U.S.C. 5343, 5346; § 532.707 also issued under 5 U.S.C. 552.

### Subpart D—Pay Administration

■ 5. In § 532.403, revise paragraph (b) to read as follows:

**§ 532.403 New appointments.**

* * * * *

(b) An agency may make a new appointment at a rate above the minimum rate of the appropriate grade in recognition of an appointees' special qualifications. In determining the rate at which to set the appointee's pay:

(1) An agency must consider how the step has been set for employees who had similar qualifications (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the appointee's position (based on the position's occupational series, grade level, organization, geographic location, or other job-relevant factors), if applicable;

(2) An agency may not consider the appointee's pay history (*i.e.,* existing pay or prior pay) or a pay rate from a competing job offer; and

(3) An agency must consider other relevant factors (*e.g.,* the level, type, or quality of the appointee's skills or competencies; or significant disparities between Federal and non-Federal salaries for the skills and competencies required in the position to be filled).

* * * * *

■ 6. In 532.405, add paragraph e to read as follows:

**§ 532.405 Use of highest previous rate.**

* * * * *

(e) Before setting pay under this section, an agency must establish a policy regarding use of employees' highest previous rates. The policy must include the following elements:

(1) Designation of officials with the authority to approve and set pay under this section;

(2) Any situations in which the agency must use an employee's highest previous rate;

(3) Any situations in which the agency may exercise its discretion in using an employee's highest previous rate;

(4) Consideration of the step at which pay has been set for other employees performing similar work in the organization (based on the position's occupational series, grade level, types of duties, or other job-relevant factors) and any other factors the designated official(s) may or must consider in determining the step at which to set the employee's pay between the employee's entitlement under any other applicable pay-setting rule and the employee's highest previous rate; and

(5) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

## PART 534—PAY UNDER OTHER SYSTEMS

■ 7. The authority citation for part 534 continues to read as follows:

**Authority:** 5 U.S.C. 1104, 3161(d), 5307, 5351, 5352, 5353, 5376, 5382, 5383, 5384, 5385, 5541, 5550a, sec. 1125 of the National Defense Authorization Act for FY 2004, Pub. L. 108–136, 117 Stat. 1638 (5 U.S.C. 5304, 5382, 5383, 7302; 18 U.S.C. 207); and sec. 2 of Pub. L. 110–372, 122 Stat. 4043 (5 U.S.C. 5304, 5307, 5376).

### Subpart D—Pay and Performance Awards Under the Senior Executive Service

■ 8. In § 534.404—

■ a. Amend paragraph (a) by adding a sentence to the end of the paragraph; and

■ b. Amend paragraph (i)(1) by adding a sentence to the end of the paragraph.

The revisions read as follows:

**§ 534.404 Setting and adjusting pay for senior executives.**

(a) * * * When making a first appointment (regardless of tenure) as a civilian employee of the Federal Government, an agency may not consider the individual's salary history (*i.e.,* existing salary or prior salary) or a salary from a competing job offer.

* * * * *

(i) * * *

(1) * * * When setting pay upon reappointment to the SES, an agency may not consider the individual's non-Federal salary history (*i.e.,* existing salary or prior salary) or a salary from a competing job offer.

* * * * *

### Subpart E—Pay for Senior-Level and Scientific or Professional Positions

■ 9. In § 534.506, revise paragraphs (a) and (c)(1) to read as follows:

**§ 534.506 Setting a rate of basic pay upon appointment.**

(a) An authorized agency official may set the rate of basic pay of an individual who is not currently an SL or ST appointee of the agency at any rate within the applicable rate range under § 534.504(a) upon appointment to an SL or ST position in the agency, subject to the requirements of this section. In setting a new senior professional's rate of basic pay, an agency must consider the nature and quality of the individual's experience, accomplishments, and any unique skills, qualifications, or competencies the individual possesses as they relate to requirements of the senior professional position and its impact on

the agency's performance. When making a first appointment (regardless of tenure) as a civilian employee of the Federal Government, an agency may not consider the individual's salary history (*i.e.,* existing salary or prior salary) or a salary from a competing job offer. Rates of basic pay above the rate for level III of the Executive Schedule, but less than or equal to the rate for level II of the Executive Schedule, generally are reserved for those newly appointed senior professionals who possess superior leadership, scientific, professional or other competencies necessary to address key program and mission requirements, as determined by the agency through its strategic human capital planning process.

* * * * *

(c)(1) Consistent with the agency's written procedures and paragraph (a) of this section, except as provided in paragraph (c)(2) of this section, an authorized agency official may set pay upon reappointment of a former SL or ST employee at any rate of basic pay within the pay range that applies to the SL or ST position under § 534.504(a). When setting pay, the agency may not consider the individual's non-Federal salary history (*i.e.,* existing salary or prior salary) or a salary from a competing job offer.

* * * * *

## Subpart F—Pay for Administrative Appeals Judge Positions

■ 10. In § 534.604—

■ a. Revise paragraph (b);

■ b. Redesignate paragraphs (c) and (d) as paragraphs (f) and (g), respectively; and

■ c. Add new paragraphs (c) and (d) and paragraph (e).

The revision and additions read as follows:

### § 534.604 Pay administration.

* * * * *

(b) Upon initial appointment, an agency must set the rate of basic pay of an administrative appeals judge at the minimum rate AA–1 of the administrative appeals judge pay system, except as provided in paragraphs (c), (d), and (e) of this section.

(c) An agency must set the pay of an employee under the General Schedule pay system who is appointed to an administrative appeals judge position without a break in service at the lowest rate of basic pay of the administrative appeals judge pay system that equals or exceeds the rate of basic pay the employee received immediately prior to such appointment, not to exceed the rate of basic pay for AA–6. If the resulting basic pay increase is less than one-half of the dollar value of the employee's next within-grade increase, the agency must set the employee's rate of basic pay at the next higher rate of basic pay in the basic rate range of the administrative appeals judge pay system, not to exceed the rate of basic pay for AA–6.

(d) An agency may offer an administrative appeals judge applicant with prior Federal service a rate up to the lowest rate of basic pay of the administrative appeals judge pay system that equals or exceeds the employee's highest previous rate of basic pay in a Federal civil service position, not to exceed the rate of basic pay for AA–6. Before setting pay under this paragraph, an agency must establish a policy that includes the following elements:

(1) Designation of officials with the authority to approve and set pay under this paragraph (d);

(2) Whether use of this authority is discretionary or mandatory;

(3) The factors the designated officials may or must consider in determining the rate at which to set the applicant's pay and which must include consideration of the rate of basic pay set for other administrative appeals judges (based on the level, type, or quality of the appointee's skills or competencies or other qualities and experiences); and

(4) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

(e) An agency may offer an administrative appeals judge applicant (including a former administrative appeals judge) with superior qualifications who is not a current Federal employee a higher than minimum rate up to the maximum rate AA–6 when such a rate is clearly necessary to meet the needs of the Government. Superior qualifications for applicants include, but are not limited to, having legal practice before the hiring agency, having practice in another forum with legal issues of concern to the hiring agency, or having an outstanding reputation among others in the field. An agency must document all of the following:

(1) The superior qualifications of the applicant;

(2) The need of the Government for the applicant's services;

(3) Consideration of how pay has been set for administrative appeals judges who had similar qualifications (based on the level, type, or quality of the applicant's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the applicant's position (based on the position's occupational series, organization, geographic location, or other job-relevant factors), if applicable; and

(4) An explanation of the factors which were used to justify the rate at which the employee's pay is set, except an agency may not consider the applicant's salary history (*i.e.,* existing salary or prior salary) or a salary from a competing job offer.

* * * * *

# PART 930—PROGRAMS FOR SPECIFIC POSITIONS AND EXAMINATIONS (MISCELLANEOUS)

## Subpart B—Administrative Law Judge Program

■ 11. The authority citation for subpart B continues to read as follows:

**Authority:** 5 U.S.C. 1104(a), 1302(a), 1305, 3105, 3301, 3304, 3323(b), 3344, 4301(2)(D), 5372, 7521, and E.O. 10577, 3 CFR, 1954–1958 Comp., p. 219.

■ 12. In § 930.201, revise paragraph (e)(5) to read as follows:

### § 930.201 Coverage.

* * * * *

(e) * * *

(5) Approve personnel actions related to pay for administrative law judges under § 930.205(c), (g), (h), and (k);

* * * * *

■ 13. In § 930.205—

■ a. In paragraph (e), remove the words "paragraph (f)" and add "paragraphs (f) and (g)" in their place;

■ b. Revise paragraph (f);

■ c. Redesignate paragraphs (g) through (j) as paragraphs (h) through (k), respectively; and

■ d. Add a new paragraph (g).

The revision and addition read as follows:

### § 930.205 Administrative law judge pay system.

* * * * *

(f) When an applicant to an administrative law judge position at AL–3 has prior Federal service, the agency may set pay at a higher than minimum rate up to the lowest rate of basic pay that equals or exceeds the applicant's highest previous Federal rate of basic pay, not to exceed the maximum rate F. Before setting pay under this paragraph, an agency must establish a policy regarding use of this pay-setting authority that includes the following elements:

(1) Designation of officials with the authority to approve and set pay under this paragraph;

(2) Whether use of this authority is discretionary or mandatory;

(3) The factors the designated officials may or must consider in determining the rate at which to set the applicant's pay, which must include how the rate of basic pay has been set for other administrative law judges; and

(4) Documentation and recordkeeping requirements sufficient to allow reconstruction of the action.

(g) With prior OPM approval, an agency may offer a higher than minimum rate, up to the maximum rate F, to an administrative law judge applicant or a former administrative law judge with superior qualifications who is eligible for appointment to a position at AL–3. An agency request to OPM must include:

(1) A description of the superior qualifications (as defined in § 930.202) of the applicant or former administrative law judge;

(2) How pay has been set for administrative law judges who had similar qualifications (based on the level, type, or quality of the applicant's or former administrative law judge's skills or competencies or other qualities and experiences) and who have been newly appointed to positions that are similar to the administrative law judge's position (based on the position's occupational series, organization, geographic location, or other job-relevant factors), if applicable; and

(3) The proposed rate of basic pay and a justification for that rate, except an agency may not consider an applicant's or former administrative law judge's salary history (*i.e.,* existing salary or prior salary) or a salary from a competing job offer.

* * * * *

[FR Doc. 2024–01337 Filed 1–29–24; 8:45 am]

**BILLING CODE 6325–39–P**

---

## DEPARTMENT OF AGRICULTURE

### Agricultural Marketing Service

### 7 CFR Part 984

**[Doc. No. AMS–SC–23–0030]**

### Walnuts Grown in California; Decreased Assessment Rate

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** This rule implements a recommendation from the California Walnut Board (Board) to decrease the assessment rate established for the 2023–2024 and subsequent marketing years. The assessment rate will remain in effect indefinitely unless modified, suspended, or terminated.

**DATES:** Effective February 29, 2024.

**FOR FURTHER INFORMATION CONTACT:** Joshua R. Wilde, Marketing Specialist, or Barry Broadbent, Acting Chief, West Region Branch, Market Development Division, Specialty Crops Program, AMS, USDA; Telephone: (503) 326–2724, or Email: *Joshua.R.Wilde@usda.gov* or *Barry.Broadbent@usda.gov.*

Small businesses may request information on complying with this regulation by contacting Richard Lower, Market Development Division, Specialty Crops Program, AMS, USDA, 1400 Independence Avenue SW, STOP 0237, Washington, DC 20250–0237; Telephone: (202) 720–8085, or Email: *Richard.Lower@usda.gov.*

**SUPPLEMENTARY INFORMATION:** This action, pursuant to 5 U.S.C. 553, amends regulations issued to carry out a marketing order as defined in 7 CFR 900.2(j). This rule is issued under Marketing Agreement and Order No. 984, both as amended (7 CFR part 984), regulating the handling of walnuts grown in California. Part 984 (referred to as the ''Order'') is effective under the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), hereinafter referred to as the ''Act.'' The Board locally administers the Order and is comprised of growers and handlers of California walnuts operating within the area of production, and a public member.

The Agricultural Marketing Service (AMS) is issuing this rule in conformance with Executive Orders 12866, 13563, and 14094. Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 14094 reaffirms, supplements, and updates Executive Order 12866 and further directs agencies to solicit and consider input from a wide range of affected and interested parties through a variety of means. This proposed action falls within a category of regulatory actions that the Office of Management and Budget (OMB) exempted from Executive Order 12866 review.

This rule has been reviewed under Executive Order 13175—Consultation and Coordination with Indian Tribal Governments, which requires Federal agencies to consider whether their rulemaking actions would have Tribal implications. AMS has determined that this rule is unlikely to have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

This rule has been reviewed under Executive Order 12988, Civil Justice Reform. Under the Order now in effect, California walnut handlers are subject to assessments. Funds to administer the Order are derived from such assessments. It is intended that the assessment rate will be applicable to all assessable California walnuts for the 2023–2024 marketing year, and continue until amended, suspended, or terminated.

The Act provides that administrative proceedings must be exhausted before parties may file suit in court. Under section 608c(15)(A) of the Act, any handler subject to an order may file with the U.S. Department of Agriculture (USDA) a petition stating that the order, any provision of the order, or any obligation imposed in connection with the order is not in accordance with law and request a modification of the order or to be exempted therefrom. Such handler is afforded the opportunity for a hearing on the petition. After the hearing, USDA would rule on the petition. The Act provides that the district court of the United States in any district in which the handler is an inhabitant, or has his or her principal place of business, has jurisdiction to review USDA's ruling on the petition, provided an action is filed not later than 20 days after the date of the entry of the ruling.

This rule decreases the assessment rate for California walnuts handled under the Order from $0.0125 per inshell pound, the rate that was initially established for the 2023–2024 and subsequent marketing years, to $0.011 per inshell pound.

Section 984.68 authorizes the Board, with the approval of AMS, to formulate an annual budget of expenses and collect assessments from handlers to administer the program. The members of the Board are familiar with the Board's needs and with the costs of goods and services in their local area and are able to formulate an appropriate budget and assessment rate. The assessment rate is formulated and discussed in a public meeting, and all directly affected persons have an opportunity to participate and provide input.

On September 21, 2021, at the request of the Board, AMS issued a temporary